*Courtesy Copy*

BLANK ROME, LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5149

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROLV BERG DRIVE AS,

           Plaintiff,

    - against -

NORTH OFFSHORE AS and TROMS
OFFSHORE AS,

           Defendants.

07 Civ. 11502 (OA)

**VERIFIED COMPLAINT**

---

       Plaintiff ROLV BERG DRIVE AS ("RBD"), by its attorneys Blank Rome, LLP,

complaining of the above-named Defendants NORTH OFFSHORE AS ("NOA") and

TROMS OFFSHORE AS ("TOAS"), alleges upon information and belief as follows:

       1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more

fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction.

       2.    At all material times, RBD was and now is a foreign company organized

and existing under the laws of Norway.

## IDENTITY OF DEFENDANTS

3.    Defendant NOA is the 100% owner of the shares of three subsidiaries: (1) North Brokers and Agency AS, (2) Troms Offshore MPSV AS and (3) TOAS.

4.    At all material times, defendant NOA was and now is a corporation organized and existing under the laws of Norway.

5.    TOAS is also a Norwegian company and 100% owned by NOA.

## THE BASIC FACTS

### (2)    THE PRIOR ACTION

6.    NOA filed a Rule B action in the Court against RBD, as defendant (07 CIV 3095 (SHS)), by complaint dated April 17, 2007 (the "Related Rule B Action").

7.    NOA defended against RBD's claim for Supplemental Rule E counter-security in that action on the basis that RBD's claims under a side letter agreement dated March 5, 2005 (the "Side Letter") which is the basis for this action, arose from a "separate transaction or occurrence" to the claim asserted under the charter for the Vessel on which NOA sued.

8.    RBD's Rule E counter-security request was denied by Order dated November 5, 2007, as discussed in the accompanying memorandum of law.

## THE NORWEGIAN PROCEEDINGS

9.    Pursuant to the Side Letter, RBD agreed to the charter of an ocean-going vessel "AHTS ALDOMA" (the "Vessel" or "ALDOMA").

10. The claims arising under a Side Letter agreement are maritime and, pursuant to a "writ" dated November 7, 2007, have been filed in the Nord-Troms County Court in Norway.

11. A true copy of the Norwegian Pleadings is Exhibit 2 to the accompanying declaration of Olav Vikoren. (Exhibit E to the Harwood Declaration) A "free" and accurate translation of the Norwegian portion of the Norwegian Pleadings into English is Exhibit 3 thereto.

## THE CHARTER OF THE VESSEL

12. Arktikmorneftegazrazvedka of Murmansk, Russia ("AMNGR") is the registered owner of the Vessel.

13. In an email attached as Exhibit 1 to the affirmation of AMNGR's director general, Oleg S. Mnatsakanyan, dated October 1, 2007, filed in the Related Rule B Action (07 Civ. 3095), AMNGR's lawyers confirmed that a charter between AMNGR, as owner of the Vessel, and NOA, as charterer, does not expire until 2009. Vikoren Dec. Ex. 7 (Id., ¶ 7):

> Artik [AMNGR] has concluded a C/P with NO [North Offshore] for a period up to 5th May 2009, including two options on [sic] one year each.

Id., Ex. 3.

14. TOAS's website pages records that TOAS is presently "operating" the Vessel, under charter form her Russian owners. Id., Ex. 8.

15. To the extent that hire payments are being remitted to AMNGR by any of North Offshore's subsidiaries, including but not limited to its subsidiary listed as

"operator" of the Vessel, then such payments are in respect of hire obligations by and between North Offshore and AMNGR in respect of the new charter and represent monies belonging to North Offshore being siphoned through the subsidiaries.

16.    Upon information and belief, Defendant TOAS is a shell corporation through which NOA conducts the charter business of the Vessel.

17.    Upon information and belief, Defendant TOAS acts as paying agent or receiving agent for hire and sub-hire payments for the Vessel or arranges for non-parties to satisfy the debts and obligations of Defendant NOA and/or receive payments being made to defendant NOA.

18.    Upon information and belief, Defendant NOA uses Defendant TOAS as a "pass through" entity in order to insulate itself from charters relating to its commercial obligations.

19.    AMNGR's lawyers have confirmed that NOA is the present charterer of the Vessel and the Hoel Declaration dated October 1, 2007 in the Related Rule B Action identifies hire payments it is making to AMNGR for the Vessel as "bareboat" charter hire. Harwood Dec. Ex. E, Vikoren Dec. Ex. 6, ¶ 23.

20.    Hire payments being collected by TOAS and paid to AMNGR as operator belong to NOA.

## COUNT I

### RULE B RELIEF

21.    Plaintiff repeats paragraphs 1 through 20 as if fully set forth herein.

22.     Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims in the Norwegian Proceeding including its Norwegian attorneys' fees and costs which are routinely awarded in Norwegian proceedings and no security for Plaintiff's claim has been posted by NOA or TOAS or anyone acting on their behalf to date.

23.     At best as can now be estimated, Plaintiff expects to recover the following amounts in the Norwegian Proceeding:

| | | |
|---|---|---|
| A. | On the principal claim | $12,592,500 |
| B. | On the performance bond | $    442,150 |
| C. | Estimated  Recoverable  Lawyers  and  Arbitrators' Fees & "Costs" | $     60,000 |
| | **TOTAL:** | <u>$13,094,650</u> |

24.     Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That since Defendants cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime

Attachment and Garnishment pursuant to Rule B attaching all of Defendants' tangible or intangible property or any other funds held by any garnishee properly served with the process of maritime attachment and garnishment in this district, which are due and owing to Defendants up to the amount of $13,094,650 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.     That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

D.     That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
       December 21, 2007

Respectfully submitted,
BLANK ROME, LLP
Attorneys for Plaintiff

By _____
   Jeremy J.O. Harwood (JH 9012)
   405 Lexington Avenue
   New York, NY 10174
   Tel.: (212) 885-5000

## **VERIFICATION**

STATE OF NEW YORK          )
                                              : ss.:
COUNTY OF NEW YORK     )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.     I am a member of the bar of this Honorable Court and of the firm of Blank Rome, LLP, attorneys for Plaintiff.

2.     I have read the foregoing Complaint and I believe the contents thereof are true.

3.     The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.     The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

Jeremy Harwood<br>
Jeremy J.O. Harwood

Sworn to before me this
21st day of December 2007

_____
    Notary Public

**LEROY LAMBERT**
Notary Public, State of New York
No. 31-4970459
Qualified in New York County
Commission Expires November 27, 20 _10_

128127.00601/6595711v.3                    7

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROLV BERG DRIVE AS,

                Plaintiff,

        - against -

NORTH OFFSHORE AS and TROMS
OFFSHORE AS,

                Defendants.

07 Civ.

**AFFIDAVIT UNDER**
**SUPPLEMENTAL RULE B**

STATE OF NEW YORK    )
                      : ss.:
COUNTY OF NEW YORK  )

      JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

      1.    I am a member of the Bar of this Honorable Court and a member of the

firm of Blank Rome, LLP, attorneys for the Plaintiff herein. I am familiar with the

circumstances of the complaint and submit this affidavit in support of Plaintiff's request

for the issuance of process of maritime attachment and garnishment of the property of

defendants North Offshore AS and Troms Offshore AS, companies organized and

128127.00601/6595716v.1

existing under the laws of Norway, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.     The defendants are not incorporated or registered to do business in this State.

3.     Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2006 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.     In our search, we did not find any listing or reference to defendants in this district or state.

5.     In the circumstances, I believe the defendants cannot be "found" within this district.

6.     I attach as Exhibit A hereto a true copy of the memorandum of law dated October 1, 2007 filed by North Offshore AS ("NOA") in a related action (07 CIV. 3095) (the "Related Rule B Action").

7.     I attach as Exhibit B hereto a true copy of the hearing transcript on October 3, 2007 in the Related Rule B Action.

8.     I attach as Exhibit C hereto a true copy of the memorandum opinion in the Related Rule B Action dated November 29, 2007.

9.     I attach as Exhibit D hereto a true copy of the order dated November 5, 2007 in the Related Rule B Action.

10.    I attach as Exhibit E hereto a true copy of the declaration of Olav Vikøren dated December 21, 2007 with exhibits.  The original executed document will be filed upon receipt.

Jeremy J.O. Harwood

Sworn to before me this
21st day of December, 2007

Notary Public

**LEROY LAMBERT**
Notary Public, State of New York
No. 31-4970459
Qualified in New York County
Commission Expires November 27, 20*10*

128127.00601/6595716v.1

3

**EXHIBIT A**
**TO THE AFFIDAVIT OF JEREMY J.O. HARWOOD**
**DATED DECEMBER 21, 2007**

Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
NORTH OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTH OFFSHORE AS, | |
| Plaintiff, | 07 Civ. 3095 (SHS) |
| -against- | |
| ROLV BERG DRIVE AS, | |
| Defendant. | |

## MEMORANDUM OF LAW OF NORTH OFFSHORE AS
## IN OPPOSITION TO THE MOTION OF ROLV BERG DRIVE AS
## FOR COUNTERSECURITY PURSUANT TO SUPPLEMENTAL RULE E(7)(a)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF FACTS .................................................................................................2

    A. The Charter Parties.................................................................................................2

    B. RBD's Attempts to Re-Hire the ALDOMA ................................................................3

    C. The Disputes Between North Offshore and RBD ......................................................7

    D. North Offshore's Financial Capabilities...................................................................8

ARGUMENT.......................................................................................................................9

I.   Countersecurity is not Warranted Because RBD's Counterclaim Does Not Arise
    Out of the Same Transaction or Occurrence as the Claims of North Offshore,
    and, Thus, is Not a Compulsory Counterclaim..............................................................12

II.  Countersecurity is not Warranted Because RBD's Claim is Frivolous and
    Designed to Leverage North Offshore into Surrendering its Security............................15

III. Countersecurity is not Warranted Because North Offshore is Financially
    Unable to Post Security....................................................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS,*
   905 F.2d 347 (11th Cir. 1990) ..................................................................................10, 11

*Boland Marine & Manufacturing Co. v. M/V BRIGHT FIELD,*
   97 Civ. 3097, 1999 WL 172940 (E.D. La. Mar. 26, 1999)........................................19

*Expert Diesel, Inc. v. Yacht FISHIN FOOL,*
   627 F. Supp. 432 (S.D. Fla. 1986) ............................................................................16

*Hercules Inc. v. Dynamic Export Corp.,*
   71 F.R.D. 101 (S.D.N.Y. 1976) ...........................................................................13, 14

*Incas and Monterey Printing and Packaging, Ltd. v. M/V SANG JIN,*
   747 F.2d 958 (5th Cir. 1984), *cert. denied sub nom,*
   *Van Weelde Brother Shipping Ltd. v. I.N.C.A.S.,*
   371 U.S. 951 (1963).................................................................................................12

*Keefe on Behalf of Keefe v. Shalala,*
   71 F.3d 1060 (2d Cir. 1995)......................................................................................10

*Pipeliners Local Union No. 798 v. Ellerd,*
   503 F.2d 1193 (10th Cir. 1974) ...............................................................................14

*Reeve v. Am. Broad Cos., Inc.,*
   580 F. Supp. 84 (S.D.N.Y.), *aff'd,* 719 F.2d 602 (2d Cir. 1983) .............................14

*Result Shipping Co. v. Ferruzzi Trading USA Inc.,*
   56 F.3d 394 (2d Cir. 1995)............................................................................10, 11, 19

*Seaplus Line Co., Ltd. v. Bulkhandling Handymax AS,*
   409 F. Supp. 2d 316 (S.D.N.Y. 2005), *overruled on other grounds by*
   *Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd.,* 460 F.3d 434 (2d Cir. 2006) .............12

*Sea-Terminals, Inc. v. Independent Container Lines,*
   89 Civ. 6931 (MBM), 1990 U.S. Dist. LEXIS 11561 (S.D.N.Y. Sept. 4, 1990).....................12

*Solomon v. Bruchhausen,*
   305 F.2d 941 (2d Cir. 1962), *cert. denied sub nom,*
   *Isbrandtsen v. Maximo,* 371 U.S. 951 (1963) .........................................................12

*Titan Navigation, Inc. v. Timsco, Inc.,*
   808 F.2d 400 (5th Cir. 1987) ............................................................................ *passim*

*Thomas v. Roach,*
  165 F.3d 137 (2d Cir. 1999)...................................................................................................10

*Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA,*
  776 F. Supp. 1555 (S.D. Fla. 1991) ..................................................................................10, 16

*United States v. Gigante,*
  39 F.3d 42 (2d Cir. 1994)....................................................................................................10

*U.S. Maritime Services, Inc. v. Trade Ventures, Inc., No. CIV. A. 98-0499,*
  1998 WL. 388669 (E.D. La. July 8, 1998) ........................................................................17, 18

*Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.,*
  263 U.S. 629 (1924).........................................................................................................11, 20

*Ythan Ltd. v. Americas Bulk Transport Ltd.,*
  336 F. Supp. 2d 305 (S.D.N.Y. 2004)...................................................................................15

## FEDERAL RULES

Fed. R. Civ. P. 13(a) .................................................................................................................12

Fed. R. Civ. P. Supp. R. E(7)(a) ........................................................................................ *passim*

## MISCELLANEOUS

6 James W. Moore & Arthur R. Wright, *Federal Practice and Procedure* (1971).......................14

7A James W. Moore et al., *Federal Practice and Procedure* (2d ed. 1995) ...................................8

# 4828866_v1

## PRELIMINARY STATEMENT

The application of defendant Rolv Berg Drive AS ("RBD") for an order directing plaintiff North Offshore AS ("North Offshore") to post countersecurity on RBD's counterclaims presents the following issues for determination:

Rule E(7)(a) limits a countersecurity application to counterclaims arising from the same transaction or occurrence that is the subject of the original action. RBD's counterclaim alleges a breach of an option contract dated March 5, 2004, while North Offshore's claims are for unpaid charter hire and redelivery expenses under an agreement dated February 16, 2004. Should this Court order North Offshore to post countersecurity where RBD's counterclaim arises out of separate facts and a separate contract?

A Court has the discretion to deny a countersecurity application for cause shown, including where the counterclaim is frivolous or clearly lacking in merit. RBD has not filed any papers supporting its application, while North Offshore has submitted an affirmation from a third party that shows that RBD's extension option was precluded by a condition precedent. Should this Court order North Offshore to post countersecurity where RBD's underlying right to its option claim is refuted by a third party?

A Court has the discretion to deny a countersecurity application for cause shown, including where the plaintiff is financially unable to post countersecurity. North Offshore has submitted affirmation and documentary proof that it is unable to post countersecurity, in large part due to RBD's failure to pay the very hire payments and redelivery expenses at issue in this proceeding. Should this Court order North Offshore to post countersecurity where it is financially unable to do so and that inability largely is attributable to the party seeking countersecurity?

1

## STATEMENT OF FACTS

### A.    The Charter Parties

North Offshore entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended) (the "Time Charter"). Affirmation of Svein Hoel dated October 1, 2007 ("Hoel Aff."), ¶ 3 & Ex. 1.[1] Shortly after the commencement of the Time Charter, North Offshore entered into a *separate* "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances. *Id.* ¶ 4. RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to [North] Offshore securing further charter with the vessel's owner." *Id.* & Ex. 2.

The ALDOMA's owner is Arktikmorneftegazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia. *Id.* ¶ 5. North Offshore had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter. *Id.* North Offshore entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter"). *Id.* & Ex. 3; *see also* Affirmation of Oleg S. Mnatsakanyan dated October 1, 2007 ("Mnatsakanyan Aff."), ¶ 3 & Ex. 1. The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with North Offshore. Hoel Aff., ¶ 5. Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced North Offshore to agree to) an increased daily rate of hire. *Id.*

---

[1]    The term "AHTS" before the ALDOMA's name refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel. Hoel Aff., ¶ 3.

The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. *Id.* ¶ 6 & Ex. 3. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. *Id.* This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. *Id.*

The Bareboat Charter included 2 one year options. *Id.* ¶ 5. AMNGR specifically reserved the right to withhold these option years unless North Offshore increased the daily charter hire to AMNGR in an amount that reflected the present rates in the market. Mnatsakanyan Aff., ¶ 4. In a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter), North Offshore and AMNGR specifically addressed the RBD Time Charter of the ALDOMA and provided that extensions of the RBD Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." Hoel Aff., ¶ 7 & Ex. 4 *Id.* It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore. *Id.*

## B.    RBD's Attempts to Re-Hire the ALDOMA

RBD sought to charter the ALDOMA for additional time past May 2007 to apparently seek to use the ALDOMA for a five year time charter with a company named Oil & Natural Gas Corp ("ONGC"). *Id.* ¶ 8; Mnatsakanyan Aff., ¶ 10. North Offshore, because of the limitations imposed by its agreements with the ALDOMA's owner AMNGR, could not grant to RBD the extension of the Time Charter.

3

One of the limitations was that the ONGC tender required a five year charter term. Hoel Aff., ¶ 9; Mnatsakanyan Aff., ¶ 11. North Offshore could not offer RBD a five year term because it only had two one year options with AMNGR to extend the Bareboat Charter. Hoel Aff., ¶ 9. In other words, even if other impediments were not present, North Offshore did not have the rights to the ALDOMA for that entire time period to sub-charter the ALDOMA to RBD. Furthermore, as made clear by the affirmation of the Director General of the ALDOMA's owner AMNGR, AMNGR refused to agree to the charter term proposed by RBD and such a term also would have had to been approved by the Russian government:

> The ONGC tender also required a five year charter term. *We would not agree to such a charter term* and, even if we were willing to agree, such a term also would have had to be approved by [the] Ministry of Natural Resources of [the]Russian Federation Federal Agency of Subsurface Use.

Mnatsakanyan Aff., ¶ 11 (emphasis added).

Another problem with the limitations imposed by the ALDOMA's owners was that AMNGR wanted to charter the ALDOMA for a substantially greater daily hire rate than proposed by RBD. *Id.* ¶¶ 8, 9 & Ex. 3. Because the Bareboat Charter contained a "profit split" provision regarding daily hire rates, AMNGR would be affected directly by the hire rate contained in North Offshore sub-charters. This is a reason why AMNGR maintained a right to refuse granting North Offshore the extension options under the Bareboat Charter. *See id.*

Nevertheless, RBD persisted in trying to charter the ALDOMA. Notwithstanding the existing charter between AMNGR and North Offshore, in November 2006 RBD's Norwegian lawyers contacted AMNGR's Norwegian lawyers to inquire regarding the terms of the ALDOMA's Bareboat Charter between AMNGR and North Offshore. Mnatsakanyan Aff., ¶ 5.

On January 8, 2007, AMNGR was contacted by RBD regarding "[h]ire of the offshore vessel MS Aldoma from AMNGR to Rolv Berg Drive when she is off-contract in April 2007."

4

*Id.* ¶ 6 & Ex. 2. On January 16, 2007, RBD's representatives met with AMNGR's representative in Murmansk, Russia seeking to hire the ALDOMA, in response to which AMNGR explained to the RBD representatives that the negotiations on the new contract for the ALDOMA would not commence until the expiration of the Bareboat Charter in 2009. *Id.* ¶ 7.

On January 29, 2007, AMNGR's Norwegian lawyers wrote to RBD's lawyers and made clear that AMNGR retained the right to refuse to grant North Offshore its option extensions unless North Offshore obtained a significant increase in the daily charter hire rate that RBD offered in the amount of US$9,000. *Id.* ¶ 8 & Ex. 3. In that correspondence, AMNGR's lawyers specifically addressed the requirements that North Offshore would have to fulfill in order to qualify for the extension option under the Bareboat Charter:

> Arktik [AMNGR] has concluded a C/P [charter party] with NO [North Offshore] for a period up to 5th May 2009, including two options on one year each. The C/P also include a right for Arktik 1) to refuse NO to extend existing agreements with sub-charterers [RBD] and 2) to refuse conclusion of new C/P or extension of C/P not giving Arktik a substantial increase in the charter hire (the sum of basic charter hire and part of profit split). *NO will not receive such approval for a rate of USD 9.000 which is the rate in the conditional option included in the C/P between RBD and NO (we have recently received a copy of this C/P). The market rate is far above USD 9.000 and Arktik as owner is seeking arrangement giving the owner of the vessel a substantial part of the marke[t] rate.*

*Id.*, Ex. 3 (emphasis added).

The same correspondence from AMNGR's lawyers also responded to following inquiry from RBD: "[i]s there anything preventing RBD from exercising their option agreement with North [Offshore]?" In response, AMNGR's lawyers made clear that control of whether RBD could obtain their option period under the Time Charter was governed by whether the charter rates offered for the extension periods satisfied AMNGR's profit requirements:

> *Arktik [AMNGR] has the right to refuse NO [North Offshore] to extend the relation with RBD without any reason and Arktik has an all over right to refuse sub-charterers not giving Arktik a certain amount in a profit split regime. Arktik has not evaluated whether RBD should be accepted or not, but want NO to conclude a sub-charter agreement on market terms entitling Arktik a profit split in the option periods.*

*Id.* (emphasis added).

Other problems also existed with RBD's asserted intention to use the ALDOMA for the ONGC tender. The ONGC invitation to tender contained requirements that the ALDOMA could not fulfill, including (a) the ALDOMA could not perform anchor handling at the depth required in the ONGC tender (1200 meters), (b) the ALDOMA does not have a chain locker capacity that met the requirements in the ONGC tender, and, perhaps most importantly, (c) the ALDOMA does not have a dynamic positioning system required under the ONGC tender which would allow the Vessel to precisely maintain station at one location. *Id.* ¶ 10; *see also* Hoel Aff., ¶ 8.

The ALDOMA's inability to perform anchor handling at the depth required in the ONGC tender (1200 meters) also was a significant requirement. Hoel Aff., ¶ 8. Earlier this year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor set at approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and sank with a loss of over half her crew. *Id.* The BOURBON DOLPHIN was a larger vessel than the ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform an operation required by the ONGC tender. *Id.* The AHTS ALDOMA – an "Anchor Handling Tug Supply" vessel – simply did not satisfy fundamental requirements anchor handling requirements of the ONGC tender. *Id.*

6

## C.    The Disputes Between North Offshore and RBD

During RBD's time charter of the ALDOMA, disputes arose between North Offshore and RBD.  Hoel Aff., ¶ 10.  North Offshore commenced an arbitration against RBD in Norway seeking crew costs and costs relating to crew changes arising from improper acts by RBD under the Time Charter.  *Id.*  On September 1, 2006, the Norwegian arbitration panel found in favor of North Offshore and awarded it damages for a variety of actions taken by RBD or costs incurred by North Offshore, including but not limited to (a) RBD's unilateral deduction of charter hire for unsupported crew costs, and (b) North Offshore's expenses related to the replacement of the ALDOMA's crew.  *Id.* ¶ 11.

The Norwegian arbitration panel subsequently issued a second award on April 13, 2007 for additional claims made by North Offshore against RBD.  *Id.* ¶ 12.  North Offshore received additional damages for a variety of actions taken by RBD or costs incurred by North Offshore, including but not limited to (a) RBD's unilateral deduction of charter hire for an alleged off-hire event lasting 7.82 days which the panel held to be unjustified, (b) RBD's unilateral deduction of hire for maintenance days despite the time charter providing that such days were to count as on-hire periods, and (c) RBD's continued improperly-documented and deducted crew costs for the period between April and December 2006.  *Id.*

Since the April 13, 2007 award, the Time Charter has expired.  *Id.* ¶ 13.  At the time of the expiration of the Time Charter and continuing to date, RBD has not paid the final hire payments for the ALDOMA, amounting to a total of US$748,521.00.  *Id.*  In addition, the ALDOMA was not redelivered within the agreed redelivery range, and North Offshore incurred US$154,190 in additional expenses (largely fuel costs) incurred as a result of this redelivery outside of the agreed redelivery range.  *Id.*  From these claims, North Offshore deducted the

7

amount of US$100,641.10 credited to RBD for the fuel remaining aboard the ALDOMA at the time of its redelivery, resulting in a net total principal claim of US$802,069.90. *Id.*

In connection with its claims of US$802,069.90 against RBD, North Offshore requested that the same panel which issued the first two awards also decide these claims. *Id.* ¶ 14. In case the panel did not accept jurisdiction, North Offshore also appointed an arbitrator on May 16, 2007 to arbitrate these claims against RBD. *Id.* RBD did not appoint an arbitrator in response within the required time of 14 days. *Id.* Last week, the panel from the previous awards decided not to accept jurisdiction over the remaining claims, therefore the newly appointed arbitrator will have jurisdiction over North Offshore's claims of US$802,069.90 against RBD. *Id.*

## D.    North Offshore's Financial Capabilities

As described in detail in the Hoel Affirmation, it would be impossible for North Offshore to comply with an order directing the posting of countersecurity in an amount of any significance. Hoel Aff., ¶ 15. North Offshore is not a large company. *Id.* ¶ 16. It is not publicly traded. *Id.* It has only one office and two business partners as company personnel. *Id.* It has a current bank account balance of approximately US$0. *Id.*

As the accompanying current balance sheet attached to Mr. Hoel's affirmation shows, North Offshore has virtually no liquid assets by which it could post the countersecurity demanded by RBD's counterclaim. *Id.* ¶ 16. Ironically, one of the largest assets that North Offshore possesses is the outstanding hire and redelivery debts owed by RBD. *See id.* ¶ 21. If the choice were given to North Offshore whether to post countersecurity or surrender its security against RBD, North Offshore would be forced to agree to surrendering its security against RBD, not because that result is desirable, but because North Offshore's posting countersecurity on RBD's claim is financially impossible. *Id.* ¶ 24.

8

## ARGUMENT

RBD has not filed a supporting brief, but its Verified Answer and Counterclaim dated August 27, 2007, its letter to the Court of last week, and its correspondence with counsel for North Offshore of last week all indicate RBD's intention to request that this Court order North Offshore to post counter-security for RBD's counter-claims under Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See* Affidavit of Michael J. Frevola dated October 1, 2007, ¶¶ 3-4 & Exs. 1 & 2.

The sum total of RBD's initial "application" is set forth in its Verified Answer and Counterclaim dated August 27, 2007:

> 7.    RBD has a monetary claim in a sum as presently may be determined of at least $14 million issuing from the wrongful refusal to renew the Charter.

> 8.    RBD is also entitled to an award of interest and legal fees and costs in the Arbitration which it calculates as follows . . . TOTAL $16,235,900.

> 9.    RBD is therefore entitled to counter-security pursuant to Supplemental Rule E(7) in the sum of at least $16,235,900.

> \*    \*    \*

> 11.    Under the terms of the Charter RBD had an option for an extension of the Charter upon its expiry, which it exercised.

> 12.    RBD, in turn, entered into a new contract with its previous sub-charterer Oil & Natural Gas Corp. ("ONGC") in respect of which it intended to use the vessel under the extended Charter.

> 13.    Plaintiff repudiated RBD's exercise of its renewal option and renewal of the Charter in breach of the Charter.

> 14.    Plaintiff's breach caused RBD damages including but not limited to the difference between rates upon which RBD would have "Sub-let" the vessel under the renewed Charter to ONGC of $7,400 per day over the five year back-to-back term or approximately $13,505,000.

Verified Answer and Counterclaim dated August 27, 2007, at 7-9, 11-14.

9

The allegations cited above are the total extent of RBD's "application." There are no supporting affidavits or declarations. There is no supporting legal brief. Under well-settled procedure, RBD cannot buttress its application through submissions accompanying its reply papers, but only can rebut arguments made by North Offshore. *See, e.g., Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (refusing to consider appellant's argument made for the first time in a reply brief because "[w]e need not consider this argument because it is raised for the first time in his reply brief.") (citing *Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995); *United States v. Gigante*, 39 F.3d 42, 50 n.2 (2d Cir. 1994)). The allegations set forth above fall well short of substantiating a valid request for countersecurity under Rule E(7)(a).

Rule E(7)(a) provides in relevant part:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the same transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.

Fed. R. Civ. P. Supp. R. E(7)(a).

While this rule's initial language makes it appear that the posting of countersecurity is mandatory whenever its conditions are satisfied, "the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order countersecurity under such conditions." *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995) (citing *Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347, 349 (11th Cir. 1990); *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987); 7A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ E.15, at E-756 (2d ed. 1995)).

While the purpose of Rule E(7)(a) is to permit a counterclaimant to likewise receive security in appropriate instances, countersecurity under Rule E(7)(a) is not appropriate where a

10

defendant asserts a frivolous counterclaim. *See, e.g., Result Shipping*, 56 F.3d at 400; *see also Titan Navigation*, 808 F.2d at 404; *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555, 1558 (S.D. Fla. 1991). The posting of countersecurity likewise is not appropriate where the plaintiff is financially unable to post countersecurity. *Result Shipping*, 56 F.3d at 400 (citing *Titan Navigation*, 808 F.2d at 403-05; also citing *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 632-36 (1924)). In each case, the court is to use its discretion to determine, based on a totality of the circumstances, whether the posting of countersecurity should be ordered. *Result Shipping*, 56 F.3d at 400 (quoting *Titan Navigation*, 808 F.2d at 404; citing *Afram Lines*, 905 F.2d at 349-50).

As shown by the supporting affirmations and documents and discussed below, RBD's countersecurity application should be denied because RBD's "counterclaim" does not qualify as a arising from the same transaction and occurrence. This prerequisite must be satisfied before any countersecurity application can be considered on its merits.

RBD's application also should be denied because its "counterclaim" is a manufactured artifice designed to place North Offshore in the very position warned against in numerous decisions. Where a plaintiff must choose between maintaining its security against the defendant at an untenable cost or having to surrender a right to what it otherwise would be entitled, courts routinely have refused to grant a defendant's countersecurity request. Here, in light of the baseless nature of RBD's claims, the leverage that RBD seeks to impose upon North Offshore to vacate North Offshore's attachment, and the minimal financial capabilities of North Offshore, it is respectfully submitted that the totality of the circumstances weighs heavily in North Offshore's favor and RBD's motion for countersecurity should be denied.

## POINT I

## COUNTERSECURITY IS NOT WARRANTED BECAUSE RBD'S COUNTERCLAIM DOES NOT ARISE OUT OF THE SAME TRANSACTION OR OCCURRENCE AS THE CLAIMS OF NORTH OFFSHORE AND, THUS, IS NOT A COMPULSORY COUNTERCLAIM

Supplemental Rule E(7) is identical to Rule 13(a) of the Federal Rules of Civil Procedure in that it only permits countersecurity for counterclaims that are compulsory. *Sea-Terminals, Inc. v. Independent Container Lines,* 89 Civ. 6931 (MBM), 1990 U.S. Dist. LEXIS 11561, *5 (S.D.N.Y. Sept. 4, 1990). Accordingly, when determining whether a counterclaim arises "out of the same transaction or occurrence" under Rule E(7), courts will apply the test for compulsory counterclaims under Rule 13(a). *See Incas & Monterey Printing & Packaging, Ltd. v. M/V SANG JIN,* 747 F.2d 958, 964-65 (5th Cir. 1984), *cert. denied sub nom Van Weelde Brother Shipping Ltd. v. I.N.C.A.S.,* 471 U.S. 1117 (1985); *Solomon v. Bruchhausen,* 305 F.2d 941 (2d Cir. 1962), *cert. denied sub nom Isbrandtsen v. Maximo,* 371 U.S. 951 (1963); *Seaplus Line Co. v. Bulkhandling Handymax AS,* 409 F. Supp. 2d 316, 324 (S.D.N.Y. 2005) (stating that "counterclaims falling within the purview of Supplemental Rule E(7) are akin to compulsory counterclaims under Rule 13(a)"), *overruled on other grounds by Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006).

RBD's purported counterclaim does not arise from the "same transaction or occurrence" as the claims of North Offshore. Hence, it is not a mandatory counterclaim entitled to countersecurity under Supplemental Rule E(7). RBD's counterclaim is based on a "side-agreement," that is a completely separate agreement from the Time Charter between North Offshore and RBD. Whereas the side agreement is dated March 5, 2004, the Time Charter is dated February 16, 2004. The Time Charter sets forth the rights and obligations of the parties with respect to the charter of the ALDOMA. The side agreement, if it is an enforceable

12

agreement at all, merely provides for a future and highly speculative "option" (i.e. "*should* Rolv Berg AS be granted extension. . .") to be exercised by RBD under certain specified and limited circumstances. *See* Hoel Aff., Ex. 2.

The side agreement itself states that an extension of time might be granted to "this contract *or new contracts.*" *Id.* As is stated in the side agreement, "this contract" refers to "the 3 year contract with contract no. MR/MM/OFF.LGTS/CH/VESSELS//10(109)/2003" *between ONGC and RBD* – not the *Time Charter between North Offshore and RBD.* The fact that the side agreement refers to the ONGC contract is not surprising, because the Time Charter does contain its own extension option. That option, however, is set forth at Clause 10 on the cover page of the Time Charter and *allows a mere 15 days extension.* Hoel Aff., Ex. 1, Part I, Clause 10 (first page). Not only does the Time Charter contain its own extension provision, but also Part II, Clause 32 of the Time Charter contains a merger clause stating that the Time Charter constitutes "the entire agreement of the parties." *Id.*, Part II, Clause 32 (last page).

The Time Charter and the side agreement are clearly two separate contracts, hence two separate transactions. Therefore, RBD's counterclaim is not compulsory even under the liberal standard applied by numerous whereby counterclaims arising out of the same contract as the plaintiff's claim are found to be compulsory. *See, e.g., Hercules Inc. v. Dynamic Export Corp.,* 71 F.R.D. 101, 109 n.10 (S.D.N.Y. 1976) (collecting cases). Indeed, RBD's counterclaim fails to satisfy any of the standards suggested by most courts when considering the compulsory or permissive nature of specific counterclaims, which are as follows:

13

(1) Are the issues of fact or law raised by the claim and counterclaim largely the same?;

(2) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?;

(3) Is there any logical relation between the claim and counterclaim?; and

(4) Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

*Id.* (citing *Pipeliners Local Union No. 798 v. Ellerd,* 503 F.2d 1193, 1198-99 (10th Cir. 1974); 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1410, at 42 (1971)). While the logical relation test is the most consistently applied standard, *id.,* RBD's counterclaim is permissive under any of the above standards.

Looking at the first two inquiries, RBD's counterclaim (for a breach of a purported charter extension) does not involve any issues of fact or law raised by North Offshore's claims, which involve non-payment of hire for the use of the ALDOMA and expenses associated with a failure to redeliver the ALDOMA within the agreed redelivery range. Nor will there be an overlap of evidence, let alone a substantial overlap. (In contrast, a counterclaim for overpayment of hire, for example, *would* qualify as compulsory).

Turning to the third inquiry, under the logical relation test applied in the Second Circuit and elsewhere, a court "must analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issue be resolved in one lawsuit." *Reeve v. Am. Broad. Cos., Inc.,* 580 F. Supp. 84, 88 (S.D.N.Y.), *aff'd,* 719 F.2d 602 (2d Cir. 1983) (citation omitted). Even though the charter party and the side-agreement are related in that the side-agreement arose out of a relationship created by the charter party, a claim for a speculative loss of profits due to a failed business option is not so logically

14

related to a claim for breach of a charter party and failure to pay charter hire as to be deemed compulsory. *See Hercules,* 71 F.R.D. at 109.

Under the fourth inquiry, RBD's counterclaim also fails because RBD would not be barred by *res judicata* from bringing its counterclaim in a subsequent suit in the absence of the compulsory counterclaim rule.

Accordingly, because RBD's counterclaim is not compulsory under *any* standard, its motion for countersecurity should be denied because RBD's claim fails to qualify under Rule E(7)(a).

## POINT II

### COUNTERSECURITY IS NOT WARRANTED BECAUSE RBD'S CLAIM IS FRIVOLOUS AND DESIGNED TO LEVERAGE NORTH OFFSHORE INTO SURRENDERING ITS SECURITY

Rule E(7)(a) should not be permitted to be employed like a bludgeon to eliminate the possibility of security for well-founded claims through the granting of countersecurity on a defendant's dubious counterclaims:

> [T]he court should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant.

*Titan Navigation,* 808 F.2d at 404. Accordingly, courts in a variety of circumstances have refused to order the posting of countersecurity where a counterclaim is frivolous, lacking in merit, or too speculative to be entitled to the normal presumption that countersecurity is appropriate. Several representative examples, discussed below, demonstrate how courts have addressed this issue.

In *Ythan Ltd. v. Americas Bulk Transport Ltd.,* 336 F. Supp. 2d 305 (S.D.N.Y. 2004), the defendant sought $4.4 million in countersecurity on a cargo indemnity claim. *Id.* at 309. In

15

denying that portion of the defendant's countersecurity request, the court ruled that the "highly

contingent" nature of the defendant's claim made posting of such countersecurity inappropriate:

> I decline to require security on the cargo indemnity claim ($4,400,000) because
> the claim is highly contingent and Ythan has already posted security for claims
> brought directly by the cargo owners against it. *The fact that a claim against
> Americas Bulk by the cargo owners for which Americas Bulk may seek to hold
> Ythan liable may not be entirely foreclosed does not mean that there is a serious
> prospect of such liability.*

*Id.* at 309 (emphasis added).

In *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA,* 776 F. Supp. 1555

(S.D. Fla. 1991), the plaintiff arrested the defendant vessel in connection with its claims for

repairs and necessaries. *Id.* at 1556. The defendant shipowner counterclaimed for damage to the

vessel due to the plaintiff's negligence, breach of warranty, and breach of contract and applied to

the court for countersecurity under Rule E(7). *Id.* at 1558. In its application, the defendant

contended that the plain language of Rule E(7) required the plaintiff to post countersecurity. *Id.*

The court disagreed and, after examining the facts surrounding defendant's purported

"counterclaim," refused to order the posting of countersecurity:

> [Defendant] argues that the plain language of Rule E(7) requires Plaintiff to
> post a bond or other security on the Counterclaims filed in this action. The Court
> is not persuaded by Defendant's reasoning in this regard. Rule E(7) mandates the
> posting of countersecurity in the instant unless the Court, for cause shown, directs
> otherwise. In the present case, *Defendants' authorized representative executed
> Plaintiff's Notice of Repairs Satisfactorily Completed, confirming that the
> repairs performed by Plaintiff to the Vessel had been satisfactorily completed.
> The Undersigned believes that this fact alone indicates that Defendants'
> Counterclaims may be frivolous, and constitutes sufficient cause shown to
> remove the presumption of countersecurity dictated by Rule E(7).* The Court
> would like to note parenthetically that this preliminary determination of the nature
> of Defendants' Counterclaims is germane only to the instant determination of the
> posting of countersecurity. It in no way speaks to the merits of Defendants'
> Counterclaims and has no *res judicata* or collateral estoppel effect.

16

*Id.* (emphasis added).

In *Expert Diesel, Inc. v. Yacht FISHIN FOOL*, 627 F. Supp. 432 (S.D. Fla. 1986), the court refused to grant the defendants' request for countersecurity on counterclaims similar to those asserted by the defendant in *KAS CAMILLA. See id.* In so holding, it stated that "the court is reluctant to compel Plaintiff to post a bond in light of Defendants' damage claims of a general, rather than a precisely detailed, nature." *Id.* at 433.

In *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.*, No. CIV. A. 98-0499, 1998 WL 388669 (E.D. La. July 8, 1998), the defendants counterclaimed (similar to RBD here) for damages arising out of an alleged lost charter party. *Id.* at *2. In denying the defendants' motion for countersecurity, the court ruled that the counterclaim was too speculative and insufficiently supported to justify an order directing the posting of countersecurity:

> the defendants' claim for the alleged lost charter is too speculative to sustain an order for countersecurity. *Unlike plaintiff's claim which is based on past events reasonably able to be ascertained and quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified. The Baldwin affidavit is insufficient by itself to determine what the defendants estimated actual loss is after expenses and other items are deducted, even assuming the voyage would have occurred but for the plaintiff's alleged broken agreement.*

*Id.* (emphasis added).

Here, RBD has offered even less substance than the defendants in the cases cited above. RBD summarily contends that it has claims for over $16 million, but it does not produce any contracts, any witness statements, or any other proof that such a claim has any basis in reality. As the cases cited above make clear, general claims or unsupported allegations are not given a presumption of validity that a well-supported and documented claim is to receive.

The reasoning of the *U.S. Maritime Services* court, quoted in the preceding paragraph, appears especially appropriate in this case. Like the plaintiff in that case, North Offshore's claim

17

here is based on RBD's use of the ALDOMA for a specified period of time and RBD's failure to redeliver that vessel within the agreed redelivery range. North Offshore's claims all are based on events that already have occurred and consideration already rendered.

In contrast, just like the defendant's claim in *U.S. Maritime Services*, here RBD seeks security for claims looking five years into the future on the speculation of a charter on which it might have been able to employ the ALDOMA, *and assuming the following facts which have been refuted by North Offshore's submissions*:

(1)     ALDOMA's registered owner would have agreed to the enterprise for the alleged price (which it clearly would not from paragraphs 8 and 9 and Exhibit 3 of the accompanying Mnatsakanyan Affirmation);

(2)     ALDOMA's registered owner would have agreed to the chartering of its vessel for five years (which it clearly would not from paragraph 11 of the accompanying Mnatsakanyan Affirmation);

(3)     The Russian government would have agreed to the proposed time charter (which is unknown); and

(4)     ALDOMA would have qualified for the ONGC tender (which it would not have because it lacked critical characteristics requested in the tender as discussed in paragraph 10 of the accompanying Mnatsakanyan Affirmation and paragraph 8 of the accompanying Hoel Affirmation).

Just like the defendants in *U.S. Maritime Services*, RBD's "claim for the alleged lost charter is too speculative to sustain an order for countersecurity. . . .[D]efendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified." *Id.* In *U.S. Maritime Services*, the defendants' countersecurity application was denied even though the defendants submitted an

18

affidavit supporting their counterclaim. Here, RBD has not even submitted that minimal level of support. Accordingly, even assuming that RBD's claims are considered as falling within the same transaction and occurrence thus making a countersecurity application facially proper, RBD's claim is too unsupported and too speculative to warrant an order directing the posting of countersecurity.

## POINT III

### COUNTERSECURITY IS NOT WARRANTED BECAUSE NORTH OFFSHORE IS FINANCIALLY UNABLE TO POST SECURITY

Generally, "when a party is financially unable to post countersecurity, courts often dispense with the requirement of [Rule E(7)(a)]." *Titan Navigation*, 808 F.2d at 403 (citing cases); *accord Result Shipping*, 56 F.3d at 400 (Rule E(7) "is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit"); *Afram Lines*, 905 F.2d at 350.

For example, in *Boland Marine & Manufacturing Co. v. M/V BRIGHT FIELD*, No. CIV. A. 97-3097, 1999 WL 172940 (E.D. La. Mar. 26, 1999), the district court held that the defendant had satisfied the elements of Rule E(7). *Id.* at *1. Nevertheless, in reviewing the position of the parties, the court refused to grant the countersecurity application despite prerequisites met where "the requested amount would leave plaintiffs at a distinct disadvantage by tying up a large portion of its resources." *Id.*

The Hoel Affirmation and the financial statement attached to that affirmation show that North Offshore similarly is a small entity without resources sufficient to post countersecurity, especially in the magnitude sought by RBD. Hoel Aff., ¶¶ 15-16, 24. Furthermore, a significant reason for North Offshore's lack of liquidity is because it has had to pay charter hire to AMNGR for the ALDOMA where it has not been paid in turn by RBD. *See id.* ¶ 21.

19

Under the well-settled precedent discussed in this section and the previous section, the Rule

E(7)(a) inquiry is to be driven by principles of equity and fairness.  Here, not only is North

Offshore financially unable to post countersecurity, but that inability to post security has been

caused by the very party now seeking to use the countersecurity rule to deprive North Offshore

of its right to use a maritime attachment to secure its claim.  This result is precisely the type that

the drafters of Rule E(7)(a) contemplating in leaving in the "for cause" exception to the

automatic provision of countersecurity, and thus leaving it within the Court's power to deny

countersecurity where the equities favor such a denial.  *See, e.g., Washington-Southern Nav. Co.*

*v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 631-39 (1924) (discussing

predecessor to Rule E(7) under old Admiralty Rules and holding that an automatic granting of

countersecurity without consideration of the circumstances was not the intention of the rule).

## CONCLUSION

Because RBD's claim is not based on the same transaction and occurrence, because

RBD's claim is frivolous, general, speculative and/or clearly lacking in merit, and because North

Offshore is incapable of posting the requested countersecurity because of RBD's own actions,

this Court should deny RBD's motion for countersecurity in its entirety.

Dated: New York, New York
      October 1, 2007

HOLLAND & KNIGHT LLP

By: _____
      Michael J. Frevola
      Christopher R. Nolan
      195 Broadway
      New York, NY 10007-3189
      Tel:   (212) 513-3200
      Fax:  (212) 385-9010

      *Attorneys for Plaintiff*
      *North Offshore AS*

**EXHIBIT B**
**TO THE AFFIDAVIT OF JEREMY J.O. HARWOOD**
**DATED DECEMBER 21, 2007**

<pre>
 1                  UNITED STATES DISTRICT COURT
 2                  SOUTHERN DISTRICT OF NEW YORK

 3    ------------------------------x
 4    NORTH OFFSHORE A.S.,

 5                   Plaintiff
 6                                     DOCKET NO.: CV-07-3095 (SHS)
 7              -vs-                    New York, New York
 8                                     October 3, 2007
 9    ROLV BERG DRIVE A.S.,


10                   Defendant
11    ------------------------------x

12          TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE

13          BEFORE THE HONORABLE SIDNEY H. STEIN
14                UNITED STATES DISTRICT JUDGE


15    A P P E A R A N C E S:

16    For the Plaintiff:          MICHAEL J. FREVOLA, ESQ.
17                                LISSA D. SCHAUPP, ESQ.
18                                Holland & Knight LLP
19                                195 Broadway
20                                New York, NY   10007


21    For the Defendant:          JEREMY O. HARWOOD, ESQ.
22                                Blank Rome LLP
23                                405 Lexington Avenue
24                                New York, NY   10174




25    Audio Operator:             No Audio Operator

26         Proceedings Recorded by Electronic Sound Recording
27          Transcript Produced by Transcription Service
28    ------------------------------------------------------------
29                         KRISTIN M RUSIN
30                     217 Pine Meadows Circle
31                        Hickory NC 28601
32                      kmrusin@earthlink.net
</pre>

1        THE CLERK:   North Offshore versus Rolv, zero seven
2   civil three zero nine five.

3        Counsel, please state your names.

4        MR. FREVOLA:   Good afternoon, Your Honor.   Michael
5   Frevola, from Holland & Knight, for plaintiff North Offshore.
6   My colleague, Lissa Schaupp, I think stepped out to get a
7   tissue.   In the event this runs till just before four o'clock,
8   she may have to step out to go see Judge Scheindlin on
9   something.   Hopefully it won't be that long.

10        THE COURT:   No, I don't think it will be.

11        MR. FREVOLA:   Thank you, Your Honor.

12        MR. HARWOOD:   Good afternoon, Your Honor.   Jeremy
13   Harwood, Blank Rome, for the defendant and counter-claimant,
14   Rolv Berg Drive A.S.

15        THE COURT:   All right.

16        Good afternoon.   Please speak loudly and clearly,
17   because we're taping this, so the microphones will pick it up.

18        Let me start off with a -- I think a partial mea
19   culpa.   The reason I brought this hearing on so quickly is
20   probably due to a misapprehension by me.   Specifically, I
21   received the letter from Mr. Harwood dated September 26th in
22   which he says:

23            The purpose of this letter is to request the
24            expedited hearing contemplated under Local Rule E.1
25            in respect of vacating the attachment and/or

1 | provision of Rule E counter security in respect
2 | thereto.

3 Now, I admit I have no idea what the phrase 'and/or provision
4 of Rule E counter security in respect thereto' means, but I do
5 know what this means: The purpose of this letter is to request
6 the expedited hearing contemplated under Local Rule E.1 in
7 respect of vacating the attachment.

8 | Now, E.1 -- Local Admiralty Rule E.1, entitled
9 Adversary Hearing Following Arrest, Attachment, or Garnishment,
10 reads as follows:

11 | The adversary hearing following arrest, or
12 | attachment, or garnishment that is called for in
13 | Supplemental Rule E(4)(f) shall be conducted by a
14 | judicial officer within three court days unless
15 | otherwise ordered.

16 So I assumed what Mr. Harwood was requesting was an immediate
17 hearing within three court days to vacate an attachment. And
18 again, the reason I say that is because that's what the letter
19 said. So I set it down for an immediate hearing.

20 | What do I then find but that the plaintiff submits --
21 obviously, you must have been working day and night for that
22 short period of time -- submits several affidavits from Russia
23 and everywhere else -- the owner of the ship, and I had the
24 sense that everybody was working around the clock, saying why
25 the counter security should not be granted, and they are asking

1   in correspondence well, where's the briefing schedule on this.

2   The reason there was no briefing schedule was the

3   rule quite properly states that when somebody's obtained an ex

4   parte attachment, the side that wasn't able to be heard before

5   -- wasn't heard because the attachment is issued always on an

6   ex parte basis, in my experience -- can come in and get a

7   prompt hearing so that they can be heard.  I thought that's

8   what we were doing.

9   I see that's what we're not doing, and it looks like

10  what I inadvertently did, then, was move up very quickly what

11  simply was a request for counter security in an answer and

12  counterclaim.  So be it.  We now are here.

13  I have received that submission of North Offshore,

14  and about ten minutes ago I was able to read the reply by Mr.

15  Harwood.  Some of the facts are a little unclear to me.  Let me

16  tell you what my understanding of the facts is, and then the

17  parties can correct my understanding of the facts.  And once I

18  understand the facts, we then will see where we stand in this

19  litigation.  Again, I think I prematurely have expedited

20  things.

21  As I understand what's happened to date, it is as

22  follows.  North Offshore and Rolv Berg Drive, who I'll call

23  RBD, entered into a time charter on February 16th, 2004 for

24  three years.  Fairly straightforward.  And it was for RBD to

25  use a ship, the Aldoma, which was owned by a Murmansk

1  corporation, or a Russian corporation headquartered in
2  Murmansk, that will go by the nemonic of AMNGR.

3      Some disputes arose in the course of that, which is
4  not unusual.  And there was an arbitration started -- again,
5  not unusual.  And there were two arbitration awards issued in
6  that arbitration, both in favor of North Offshore, one in
7  September of oh-six, September 1st oh-six, and the second one
8  on April 13th of oh-seven.

9      After those awards were issued, North Offshore
10  brought this action here in the Southern District of New York,
11  and in connection with that action I believe I signed an ex
12  parte attachment order.  And North Offshore found monies -- I
13  think about four hundred thousand dollars, right? -- which it
14  has attached.

15      And when these requests for security in the form of
16  attachment are made, it's a fairly simple showing that has to
17  be made, including the fact that the defendant isn't in this
18  district and can't be found here, and the complaint has been
19  started.  So I granted that request for the attachment.

20      I take it the -- both of the arbitration awards have
21  now been paid, is that correct, plaintiff?

22      MR. FREVOLA:  Your Honor, that's my understanding.
23  Yes, Your Honor.

24      THE COURT:  All right.

25      But what's been happening?  What's been happening is

1  the time charter expired, but before it expired, there were

2  further disputes not covered by the two arbitration awards,

3  again having to do with the charges between North Offshore and

4  RBD.

5              And apparently, at least allegedly, RBD didn't return

6  the Aldoma to North Offshore when it was supposed to pursuant

7  to the February 16, 2004 time charter.

8              North Offshore says that it is owed now about eight

9  hundred thousand dollars, and it made -- it did two things.  It

10 went to the arbitrators and said include this in your

11 arbitration, and to protect itself it also apparently filed a

12 demand for arbitration under the AAA rules.

13             In the legal memorandum submitted in opposition to

14 the request for counter security, North Offshore says last week

15 that that arbitration -- the arbitrators said they weren't

16 going to take this under advisement, and therefore North

17 Offshore, I take it, is planning on proceeding with the

18 arbitration that it's demanded.

19             Is that correct, plaintiff?

20             MR. FREVOLA:  Yes, Your Honor, and for clarity of the

21 record, the only thing that I see so far was that when you

22 mentioned the claim for re-delivery, Your Honor --

23             THE COURT:  Yes.

24             MR. FREVOLA:  -- that is not a temporal disparity.

25 It is a geographic --

1           THE COURT:  Okay, fine.

2           MR. FREVOLA:  -- in that the vessel was sent to a

3   port which -- the charter has a range of places to redeliver

4   the vessel, and the allegation is that it was delivered to a

5   port away from there, and it cost money to get it back into

6   that --

7           THE COURT:  All right.  I'm just trying to get it

8   conceptually, but by for that clarification.

9           So that's where we stood.  What happened next is RBD

10  files an answer and a counterclaim.

11          Mr. Harwood, what is the security -- how much is the

12  security you're seeking?  It's a little unclear to me whether

13  it was for six hundred thousand, or thirteen million, or about

14  one million, one hundred thousand.  Do you know -- what is the

15  amount of security you're seeking?  In your paper today, you

16  say one million, one hundred and ninety-six thousand, nine

17  hundred dollars.

18          MR. HARWOOD:  Your Honor, Jeremy Harwood, for the

19  record.  Thank you, Your Honor.  It is as -- and I apologize

20  that I couldn't file that brief earlier than today, but --

21          THE COURT:  Well, I set it down for a hearing

22  immediately, thinking I was doing the correct thing.  Go ahead.

23          MR. HARWOOD:  If I may, I will get to that later.  I

24  wasn't --

25          THE COURT:  Well, no, I don't -- I'm just trying to

1 | --

2 | MR. HARWOOD:  Yeah, it's a million --

3 | THE COURT:  -- make sure that I understand what's

4 | been happening, and we'll have a full ability for everybody to

5 | argue, and we'll be out of here before four o'clock, I hope.

6 | So answer my question, if you can.

7 | MR. HARWOOD:  I can, Your Honor.

8 | THE COURT:  What is the sum sought to be attached

9 | pursuant to your request for counter security?

10 | MR. HARWOOD:  It is limited to the cumulative amount

11 | that the plaintiff has sought to attach, which is, I think, one

12 | point one million, as stated in our opposition -- or, rather,

13 | reply brief, and it's stated in the conclusion of that brief,

14 | Your Honor.

15 | The reason is that the case law in this circuit and,

16 | indeed, in a case that I had before Judge Leisure which hasn't

17 | been reported, I said -- or I argued that a Rule E counter-

18 | claimant should be entitled to security for the full amount of

19 | its claim, but the --

20 | THE COURT:  Which is thirteen million?

21 | MR. HARWOOD:  Which is that -- yes, Your Honor.

22 | THE COURT:  All right.

23 | MR. HARWOOD:  But the case law in this circuit is

24 | that the rule -- under Rule E you are -- the counter-claimant

25 | can't get more security than the original Rule B plaintiffs

1  sought to attach in its --

2              THE COURT:  And that's one point one?

3              MR. HARWOOD:  That's -- that's right, Your Honor.

4              THE COURT:  I now understand that.  Thank you.  All
5  right.

6              So I think I understand the events so far.  Now, in
7  terms of this application itself, as I understand the dispute,
8  it is as follows.

9              The defendant says I am entitled to one point one
10  million dollars because I should have gotten the ship to use
11  pursuant to an agreement dated March 5th, 2004, which permitted
12  me, they say, to be able to, I take it, extend the bareboat
13  charter, and because we couldn't get the use of the ship, we've
14  been damaged to the tune of thirteen million dollars.  That's
15  what the counter -- that's what the counterclaim is in this
16  action.

17              And the reason they're seeking attachment on the
18  counterclaim up to, as Mr. Harwood states, the amount of the
19  original security sought in the underlying action, is pursuant
20  to Rule E of the supplementary rules entitled Security on
21  Counterclaim.

22              That provision states when a person who has given
23  security or damages in the original action -- that's RBD,
24  because about several hundred thousand dollars has been
25  attached -- asserts a counterclaim that arises from the same

1  transaction or occurrence that is the subject of the original
2  action, a plaintiff for whose benefit the security has been
3  given must give security for damages demanded in the
4  counterclaim, unless the court for cause shown directs
5  otherwise.

6          So we have a couple of requirements.  First of all,
7  RBD has filed a counterclaim.  Secondly, they're seeking
8  security.  Thirdly, North Offshore has given security.  And the
9  requirement is that it has to be a counterclaim that arises
10  from the transaction or occurrence that is the subject of the
11  original action.

12          According to the face of this, it's mandatory -- must
13  give security -- although I have the discretion to determine
14  that for cause shown, I take it, security does not have to be
15  given or the amount can be reduced.  That's the statutory
16  framework.

17          North Offshore says, first of all, this doesn't arise
18  from the same transaction or occurrence, the original suit is
19  on the February 16, 2004 time charter, and this counterclaim
20  has to do with the March 5, oh-four contract providing for an
21  option to extend the use of the Aldoma.  That's point one.

22          Point two is the counterclaim is completely
23  meritless, it's clear that that -- RBD's rights to extend the
24  Aldoma's charter were subject to North Offshore securing a
25  further charter with AMNGR, and indeed, that agreement

1  specifically says -- it's attached to somebody's papers --
2  Exhibit B to one of the North Offshore affidavits -- says this
3  agreement shall be subject only to TFDS Offshore securing
4  further charter with the vessel's owner, and so there's a
5  contingency in there, and they weren't able to extend the
6  charter with AMNGR, the vessel's owner.  So they say right on
7  its face the contingency -- contractual contingency hasn't
8  occurred.

9          And last, they say -- or not last; next, they say
10  we're a poor company and we can't pay for it, and the only way
11  we could pay for it is to release the security we already have,
12  and then they say ah-ha, that's exactly what RBD is trying to
13  do here, there's no merit to its counterclaim, all it's trying
14  to do is to get us to release the security, and that's not
15  cricket, is what they say.

16          Today's reply by RBD says pish tosh, all I have to do
17  is assert a prima facie claim, and they cite a Judge Wood case
18  and there's also a Judge Preska case in the original papers,
19  and so all I have to do is show that North Offshore is not in
20  this district -- by the way, North Offshore, is that true, that
21  you're not in this district?  I was wondering whether for
22  purposes of the underlying action you now are in this district.
23  But do you have a position on that?

24          MR. FREVOLA:  Your Honor, I have not actually asked
25  the client.  I believe it's almost certain that they are not

1  present here.

2          THE COURT:  Okay.

3          MR. FREVOLA:  I -- I -- Your Honor is raising --

4          THE COURT:  Okay.  I understand.  Nobody's -- I'm not

5  locking in -- anybody into it.  I'm trying to see what the lay

6  of the land is.

7          So RBD says all I have to do is state a prima facie

8  claim that is the same prima facie claim as if I was the --

9  just suing and seeking security.  And they say the -- North

10  Offshore's inability to pay is irrelevant.

11          Right, Mr. Harwood?  Don't you -- you take that

12  position?

13          MR. HARWOOD:  Absolutely, correct.

14          THE COURT:  Okay.

15          And then they also say the merits are not what's at

16  issue now and go back to those cases that say security is

17  issued upon a simple prima facie showing, and we've made the

18  prima facie showing.  And they also say by the way, it is the

19  same transaction or occurrence, because it deals with the

20  Aldoma, it's all the same ball of wax.

21          That's how I see the claims of the -- the positions

22  of the parties.  Have I misstated anything or left out anything

23  of importance, not the details?

24          Plaintiff?

25          MR. FREVOLA:  No, Your Honor.

1             THE COURT:  All right.

2             Mr. Harwood?

3             MR. HARWOOD:  No, that's fine, Your Honor.

4             THE COURT:  Okay.

5             So where do we go from here?

6             Plaintiff, one of defendant's positions is if I deny

7 security here, all they then do is start another suit where,

8 clearly, Mr. Harwood's right that all you have to do is state a

9 prima facie case to get an attachment.  So aren't we then all

10 back in the soup?

11             MR. FREVOLA:  Your Honor, yes and no.  There's a

12 large contingent possibility there, Your Honor, and that

13 possibility is reflected by the rules.  In the Titan Navigation

14 case that we cite, in the Fifth Circuit, the -- in deciding

15 that decision -- may I approach, Your Honor?

16             THE COURT:  Yes.

17             MR. FREVOLA:  I have a copy for counsel here.  Titan

18 Navigation was decided by the Fifth Circuit in January of 1987,

19 and there's an important lead-in in terms of dealing with the

20 court's jurisdiction that is on page three of the copy of the

21 decision I gave to you, Your Honor.  It's located on page four

22 oh two of the decision, the official reporter.  The cite for

23 the case is 808 F. 2d 400.  This is on page four oh two.

24             And it's the first paragraph on the left-hand column,

25 first full paragraph, and -- addresses this very issue, Your

1 Honor, and that is that a Rule E(7) counterclaim does not have
2 to be subject to admiralty jurisdiction in order to get the
3 counter security.  And citing Judge Friendly in Leathers Best,
4 it talks about this issue.

5         In other words, unlike a Rule B claimant coming in
6 and alleging that it's a maritime claim and they're entitled to
7 security, here is a counter security claim.  They don't have to
8 prove that.

9         And, Your Honor, in terms of this separate agreement,
10 first of all, I --

11         THE COURT:  But wait, doesn't that help Mr. Harwood?
12 You're saying if he comes in with counter security, he doesn't
13 have to prove that there's admiralty jurisdiction.

14         MR. FREVOLA:  Well, Your Honor, we're the plaintiff,
15 so --

16         THE COURT:  Yes?

17         MR. FREVOLA:  -- we've got -- we've proven our -- I
18 think we've proven our maritime claim and that it's a charter
19 party.

20         THE COURT:  Right.

21         MR. FREVOLA:  This other agreement is an option dated
22 a different date.  In terms of the consideration given --

23         THE COURT:  Oh, is this your point, that there's no
24 maritime jurisdiction under his counterclaim and therefore Rule
25 E doesn't apply, the supplemental rules don't apply?

1    MR. FREVOLA:  If this had been briefed on a normal
2  briefing schedule where they put in their position first, and
3  we could respond, and I had seen this, Your Honor --

4    THE COURT:  Well, I did see Mr. Harwood's e-mail
5  which you gave to me, although there was no intention of the
6  parties that the Court see it, and he did say no, you go first,
7  but go ahead.

8    MR. FREVOLA:  But all I'm saying is that I did -- I
9  couldn't answer this position in terms of being able to file
10  for Rule B anyway because I had not seen that position ahead of
11  time.  All I'm saying here, Your Honor, is, first of all, the
12  side agreement is a separate document from the charter.  This
13  could be -- this could very well fall into the preliminary
14  contract exception to maritime jurisdiction, which says that --

15    THE COURT:  Well, you're not even arguing that as
16  your primary point.  Your primary point is that it's a simple,
17  non-maritime option contract.  Maybe that is the same point; I
18  don't know.

19    MR. FREVOLA:  Actually, it isn't, Your Honor.  If
20  it's a maritime contract and they're unrelated, then counter
21  security shouldn't be awarded.  And then he has a right to
22  commence his Rule B.

23    THE COURT:  Right.

24    MR. FREVOLA:  I'm saying there's a step further here
25  in that he may not be able to sustain his burden of showing

1  it's a maritime claim if he goes to that Rule B.  So the kind
2  of summary assertion that I could get this if this was a Rule B
3  myself --

4            THE COURT:  Right.

5            MR. FREVOLA:  -- puts the cart before the horse, Your
6  Honor.

7            THE COURT:  I understand the point.  What do you do
8  to his statement that this is the same -- arises out of the
9  same occurrence or transaction?  Do you simply say well, it's
10  clearly not, it's two different contracts?

11            MR. FREVOLA:  Well, the -- the tests that are given,
12  Your Honor, for looking at whether it falls into the same thing
13  is like a Rule 13(a) compulsory counterclaim.  The facts that
14  we're dealing with on both claims are -- I think counsel would
15  agree there are no related facts.  One goes to the issue of the
16  vessel's use and payment not being made for it.  The other goes
17  to whether or not there was a procurement of a second contract.

18            And those are not related facts.  They're not related
19  occurrences.  And there very well may not be any related law in
20  terms of the issues either.  I think that the one way that this
21  perhaps survives those defects is what's known as the logical
22  relationship test, which tends to hump together or lump
23  together claims brought under the same contract.

24            The problem is, Your Honor, this is not a clause to
25  the charter part.

1          THE COURT:  Right.  It's a separate contract.

2          MR. FREVOLA:  It's a separate agreement.

3          THE COURT:  Okay.

4          MR. FREVOLA:  And that's why I think you have a

5    problem, because even a logical relationship argument, Your

6    Honor, falls astray here, because they're not the same

7    contract.

8          THE COURT:  All right.  I understand.  All right.

9          Mr. Harwood, what Mr. Frevola's saying is that you

10   don't get counter security because it has to arise from the

11   transaction or occurrence that is the subject of the original

12   action.  I think that's where he's putting a lot of his eggs.

13   So what's your response?

14         MR. HARWOOD:  Your Honor, certainly, our response is

15   set out -- and if that is correct -- in the brief, and if -- if

16   he is, first off, dealing -- looking at that document in itself

17   -- and I, frankly -- I'm not a Norwegian lawyer, and the

18   parties here are Norwegian.  The vessel as it was bareboat

19   chartered would have a Norwegian flag.  So everything under

20   U.S. law would point to choice of law calling for application

21   of Norwegian law.

22         THE COURT:  Sure, but, I mean, he does have -- it is

23   a separate physical document here.  That's Exhibit 2.  That I

24   understand.

25         MR. HARWOOD:  That's absolutely correct, Your Honor.

1  And that document says, at the top of it, quote, side agreement
2  to time charter party between what is, in fact, the plaintiff -
3  -

4          THE COURT:  Yes.

5          MR. HARWOOD:  -- as A.S. and Rolv Berg Drive as
6  regarding this vessel.  If this was being construed under New
7  York or general maritime law of the United States, that would
8  say a side letter or side agreement is an addendum or in
9  addition to, and then you'd do a factual finding as to what the
10 parties intended.

11         And under Norwegian law, which is applicable to the
12 charter -- in that clause thirty-one, it refers to English
13 Norwegian law, whatever that is.

14         THE COURT:  Yes.  No, I saw that reference in the
15 papers and wondered the same thing.

16         MR. HARWOOD:  Well, I guess they'll sort it out over
17 there.  But I think Mr. Frevola's arguments are good and well,
18 but they will be subject to a Norwegian lawyer or, indeed, an
19 English lawyer opining on them.

20         But the point is if we accept his assertion that this
21 is a separate agreement, then we're entitled to bring a Rule B
22 action, provided we can make the threshold showing of admiralty
23 jurisdiction.  And then Mr. Frevola, on his own Rule E
24 application, will be making these very arguments that he's
25 making today, presumably with the support of Norwegian lawyers'

1 affidavits or declarations saying under Norwegian law this does
2 not give rise to admiralty jurisdiction, or whatever the
3 argument is.

4        Your Honor, on that point -- and if I may just for
5 one minute -- the -- because the Court is entirely correct in
6 granting this application, because Rule E, just so -- for
7 future reference, Rule E does actually refer to the hearing for
8 other relief consistent with this rule.

9        A prompt Rule E(f), little F, refers to -- it shall
10 be entitled to a prompt hearing at which plaintiff shall be
11 required to show why the arrest or garnishment should not be
12 vacated or other relief granted consistent with these rules,
13 which was my request for counter security.

14        And in fact, Mr. Frevola raised this in
15 correspondence with me as to why I'm not making a motion under
16 regular motion practice, and I said I've already made it, but
17 if you want to discuss a briefing schedule -- I had mistakenly
18 wrote to Judge Scheindlin, and then the letter came -- and I
19 readdressed the letter to Your Honor, and it was our intention
20 to contact chambers to set some sort of agreed expedited
21 briefing schedule.

22        So I do apologize if this has necessitated a lot of
23 work for your court, Your Honor.

24        But if I may on the other arguments, I think, if I
25 may approach, there's a decision which I --

1            THE COURT:  Yes.

2            MR. HARWOOD:  -- I didn't have time to get from the

3   West -- Lexis --

4            THE COURT:  That's okay.

5            MR. HARWOOD:  It is -- I've given Mr. Frevola a copy.

6   Your Honor, that decision is in somewhat similar circumstances,

7   an argument of a counterclaim and request for counter security

8   being frivolous, and Judge Lynch there suggesting that the --

9   quote:

10            "On the current record it cannot be said that

11            defendant's counterclaim is frivolous.  Plaintiff, it

12            is true, proffers a purported copy of the charter

13            party that appears to preclude the premise of the

14            counterclaim.  However, defendant proffers a document

15            that it contends embodies the true agreement."

16   And then the judge continued:

17            On the record, the Court cannot determine which

18            party's document is accurate and would be beyond the

19            limited function of the Court on this motion to try

20            and determine the legal effect of the writer --

21   -- et cetera.

22            Your Honor, the point being, as we stated in the

23   brief, that the merits were a condition precedent has been

24   triggered under the side letter is really a question on the

25   merits for whichever tribunal it is, either the arbitral

 1  tribunal or the Norwegian court.

 2          THE COURT:  No, I see that's your main thrust, that

 3  you made the prima facie showing you need, and that's the end

 4  of it.

 5          And I take it the response to that, or your reply, is

 6  but none of this arises under admiralty jurisdiction.

 7          MR. FREVOLA:  More than that, Your Honor.

 8          THE COURT:  But I mean, that's part of it, correct?

 9          MR. FREVOLA:  Absolutely, Your Honor.

10          THE COURT:  Okay.  Go ahead.

11          MR. FREVOLA:  Not only that, first of all, the

12  Finecom decision itself, if you look up a little further up --

13  now, this is the one sole decision we have out there, Your

14  Honor.  This is gold.  This is a valuable decision in that it's

15  the only E(7) decision that we have found out here that is

16  post-Aqua Stoli, where the prima facie test arguably has come

17  about.

18          Other district courts have said reasonable grounds

19  test.  And I'm actually arguing the Second Circuit on this,

20  Your Honor, and I think that reasonable grounds is probably the

21  right test.

22          But in Finecom, we've got a decision that was -- I'm

23  sorry, Your Honor, I -- actually, Finecom's one decision.

24  There's another decision, actually, later I'll point to in a

25  second.  But Finecom is post-Winter Storm, pre-Aqua Stoli.

1         But in the -- at the bottom of the second page of the
2    non-reporter decision, and in the middle of the right-hand
3    column on the first page of the Westlaw decision, Your Honor,
4    before getting to this issue of this -- of a battle of the
5    sides of which one's the right one to believe, plaintiff argues
6    that the counterclaim is frivolous because the charter party on
7    its face provides that stowage was the responsibility of
8    defendant, not plaintiff.

9         The premise that counter security will not be
10   required on the basis of frivolous counterclaims is a sound
11   one.  It would hardly put the parties on an even footing to
12   permit one side to obtain security on the basis of totally
13   frivolous claims simply because its adversary had obtained
14   security on the basis of a non-frivolous claim.

15        THE COURT:  Right.  I don't -- I don't think Mr.
16   Harwood would disagree with that.  But then it looks like Judge
17   Lynch goes on and says I really can't understand the merits of
18   a dispute just when we're at the pleading stage, and I'm not
19   going to prejudge them, and that's especially true when I, the
20   judge, decide things, not a foreign arbitration panel.  So
21   what's your response there?

22        MR. FREVOLA:  Your Honor, I think it's clear in this
23   decision that you had affidavits from both sides and differing
24   battles in terms of the forms.  In this situation --

25        THE COURT:  But the affidavits -- in what decision?

1           MR. FREVOLA:  I think Finecom it looks like, Your

2    Honor, there were two opposing positions about what was the

3    governing contract.

4           THE COURT:  Well, what do I have here --

5           MR. FREVOLA:  Your Honor, here --

6           THE COURT:  -- to say that it's frivolous?

7           MR. FREVOLA:  We have the owner of the Aldoma --

8           THE COURT:  I have your people saying we're a small

9    company and we can't pay it without releasing the security

10   that's been given to us.  I have your people saying it's two

11   separate contracts so it doesn't arise out of the same

12   transaction or occurrence.  But what do I have that says it's

13   frivolous?

14          MR. FREVOLA:  Well, most significantly, Your Honor,

15   is you have the one affidavit or statement from a non-involved

16   party, --

17          THE COURT:  That's the owner, yeah.

18          MR. FREVOLA:  -- the owner of the vessel explaining

19   why they would not allow it to be rechartered under the Rolv

20   Berg --

21          THE COURT:  That has to do with the torque of -- on

22   the one side, the prior ship capsized -- is that what you're

23   meaning?

24          MR. FREVOLA:  No, Your Honor.  Actually, --

25          THE COURT:  No?

1        MR. FREVOLA:  -- it talks about economics.  The owner

2   of the Aldoma had a -- there was a rider provision to the North

3   Offshore, AMNGR charter party, the -- let me get the date right

4   -- I believe it was a March 6th --

5        THE COURT:  Well, the March 6th is the second

6   contract, isn't it?  That provides for the renewal of the

7   bareboat charter party --

8        MR. FREVOLA:  Let me make sure about this, Your

9   Honor.

10       THE COURT:  -- as of March 6th, 2006.

11       MR. FREVOLA:  Right.  It was a fourteen-month

12   contract between the head owner --

13       THE COURT:  Oh, no, no, I'm --

14       MR. FREVOLA:  The other one's --

15       THE COURT:  -- let me just make sure.

16       MR. FREVOLA:  -- March 5th, 2004, Your Honor.

17       THE COURT:  And what -- is this a different one that

18   you're talking about?

19       MR. FREVOLA:  Right.  The head charter party between

20   the Russian owner and North Offshore --

21       THE COURT:  It's as of March 6th, 2006.

22       MR. FREVOLA:  Yes, Your Honor.  It was a fourteen-

23   month --

24       THE COURT:  Okay.

25       MR. FREVOLA:  -- charter party with --

1              THE COURT:  Right.

2              MR. FREVOLA:  -- two one-year potential extensions.

3              THE COURT:  Right.

4              MR. FREVOLA:  Now, if you look at --

5              THE COURT:  And the extensions are possible

6    extensions.  Are they not found in your Exhibit 2, an agreement

7    entered into March 5, 2004?

8              MR. FREVOLA:  No, Your Honor.

9              THE COURT:  Okay.

10             MR. FREVOLA:  That is the sub-charter, saying if we

11   can get the extension from the owners, you'll get it from us.

12             THE COURT:  All right.

13             MR. FREVOLA:  Now, --

14             THE COURT:  And that's the one that you say has the

15   contingency in it.

16             MR. FREVOLA:  Yes, Your Honor.

17             THE COURT:  That is the contingency.

18             MR. FREVOLA:  Right.  Now, Exhibit 3, Your Honor, to

19   Mr. Svein Hoel's --

20             THE COURT:  Is that the same --

21             MR. FREVOLA:  -- affidavit --

22             THE COURT:  -- declaration?

23             MR. FREVOLA:  Yes, Your Honor.  Exhibit 3 is the head

24   charter, the fourteen-month head charter.

25             THE COURT:  Just a moment.  [Pause]  Yes?

1          MR. FREVOLA:  And at the very end, the last page of

2   Exhibit 3, --

3          THE COURT:  Yes?

4          MR. FREVOLA:  -- is the financial basis of

5   determining hire payments that is supposed to essentially

6   escalate with a rising market.  The owner was trying -- the

7   head owner and the Russian owner was trying to apparently

8   protect themselves against a rising hire market by saying --

9          THE COURT:  Yes.

10         MR. FREVOLA:  -- we want fifty percent of any fee you

11  get above a certain amount.

12         THE COURT:  In other words, it's like a landlord

13  wanting to obtain the profit of any sublease that a tenant --

14  that he permits a tenant to have -- I'll let you sublease this,

15  but if you rent it for more than the lease I want fifty percent

16  of the differential.

17         MR. FREVOLA:  Precisely, Your Honor.

18         THE COURT:  Is that an analogy?  Okay.

19         MR. FREVOLA:  Now, if you go to Exhibit 4, which is

20  just around the corner on the next page after the Exhibit 4

21  tab, in conjunction with that charter party there was another

22  agreement signed, and it specifically deals with the -- the way

23  that the head owner will allow North Offshore to continue to

24  charter this vessel.

25         And it says -- the second sentence of that agreement

1 says there shall not be given any extension or further charter
2 parties, inclusive of any already-signed options, with Rolv
3 Berg Drive A.S. without the prior written consent of the owner.
4 And there's another thing that talks about any charter party
5 whatsoever, saying that we are not going to unless the amount
6 is such that we're going to make essentially at least a
7 thousand dollars more on the fifty-fifty split.

8          So a third party was controlling whether or not the
9 charter could be granted to Rolv Berg Drive.

10          THE COURT:  And because they did not give their
11 consent, you say the counterclaim is frivolous.

12          MR. FREVOLA:  We've got a --

13          THE COURT:  Is that right?

14          MR. FREVOLA:  Yes, Your Honor.  We've got a third
15 party who has got -- who has the least interest of everyone
16 saying that we refuse to give it because predated contractual
17 documents say that they want to make a certain profit on the
18 vessel over a certain period of time.

19          THE COURT:  Right.  Now, let me ask two questions.

20          MR. FREVOLA:  Your Honor, if I could, before we go
21 that -- there's one other thing about this separate document
22 issue.  It's a very small thing, but -- and it may be a little
23 subtle, but just to show you why I think that the separate
24 document argument has got more weight than one would suspect --
25 and I refer you back to Exhibit 2 --

1          THE COURT:  Yes?

2          MR. FREVOLA:  Two times one year.

3          THE COURT:  Yes?

4          MR. FREVOLA:  If the Exhibit 2 side agreement were

5  merely part of the original contract and not a separate

6  contract that was signed --

7          THE COURT:  Wait just a moment.  [Pause]  If the

8  Exhibit 2 -- go ahead.

9          MR. FREVOLA:  Was not a separate contract, it was

10  merely a rider, let's say, to the original charter party as

11  oppose to a new document, then --

12          THE COURT:  Yes?

13          MR. FREVOLA:  -- you've got a disparity between the

14  extension period on the face of the first document and what

15  they're saying here in the second document.

16          THE COURT:  I see.  Go ahead.

17          MR. FREVOLA:  The extension period on the face of the

18  original charter party is fifteen days.

19          THE COURT:  And what's Exhibit 3?

20          MR. FREVOLA:  Exhibit 3 is the head charter between

21  the North Offshore and the Russian owner, and that was the

22  agreement that basically said if you're going to use your

23  extension options, if you're going to use those extra two one-

24  year periods that Rolv Berg says North Offshore could, --

25          THE COURT:  Yes?

1       THE COURT:  Same as the Hoel --

2       MR. FREVOLA:  The same -- the -- sorry -- I'm sorry,

3  --

4       THE COURT:  H O E L?

5       MR. FREVOLA:  -- Exhibit 1, yes.

6       THE COURT:  Of the H O E L affidavit?

7       MR. FREVOLA:  Yes, Your Honor.

8       THE COURT:  All right.

9       MR. FREVOLA:  Exhibit 1.

10      THE COURT:  Go ahead.

11      MR. FREVOLA:  And on the first page of Exhibit 1, if

12  you look halfway down the page on the right-hand column, there

13  is a box that's numbered ten.

14      THE COURT:  Yes, sir.

15      MR. FREVOLA:  And that box says extension of period

16  of hire, and then parentheses, optional, close paren.

17      THE COURT:  Yes?

18      MR. FREVOLA:  It says the period of extension under

19  the second --

20      THE COURT:  Fifteen days.

21      MR. FREVOLA:  -- is fifteen days.  Now, Your Honor, I

22  now turn you to Exhibit 3, which is the head charter.  Same

23  form.

24      THE COURT:  Yes?

25      MR. FREVOLA:  Same block.

1          MR. FREVOLA:  -- you're going to have to do it at a

2    price that's worth our while.

3          THE COURT:  But that's -- that's Exhibit 3.

4          MR. FREVOLA:  Yes, Your Honor.

5          THE COURT:  And the price that's worth our while is

6    in the additional agreement to supply time eighty-nine dated 12

7    May of 2005?

8          MR. FREVOLA:  Which is the rider to the contract.

9    It's part of the original charter, and there's a separate --

10          THE COURT:  Well, when you say original charter, it's

11    part of the head charter?

12          MR. FREVOLA:  Yes, Your Honor.  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. FREVOLA:  And if you take a look, I believe it's

15    signed and dated the same day as the head charter.

16          THE COURT:  Twelve May 2005?

17          MR. FREVOLA:  Yes, Your Honor.

18          THE COURT:  Where do I find the date of the -- oh,

19    yes, 12 May 2005.  Yes.

20          MR. FREVOLA:  See, unlike the other agreements, Your

21    Honor, these are all signed the same day.

22          THE COURT:  But again, isn't this asking me to look

23    at the merits, which Mr. Harwood's cases say and, I think,

24    Judge Lynch's case say I should not be doing?

25          MR. FREVOLA:  I would say if you have a -- if you

1  have competing affidavits or, more importantly, competing

2  contractual documents where there's a dispute about what

3  governs, Your Honor, that creates a problem.  But there is a --

4  see if I can find it.  I believe it's an Eastern District of

5  Louisiana case, Your Honor, that talks about this issue.

6       And the judge essentially said I am not holding this

7  decision to be res judicata or something on the merits.

8       THE COURT:  Right, it's not a decision on the merits

9  in terms of the end of this case.

10       MR. FREVOLA:  It's akin --

11       THE COURT:  It's a decision for purposes of

12  determining whether or not there should be counter security.

13       MR. FREVOLA:  It's akin, Your Honor, to, I would say,

14  a state law prejudgment attachment where there's a likelihood

15  of success on the merits.  What I'm saying here is that --

16       THE COURT:  Yeah, but again, I -- no, I understand

17  the point.  I go back to Mr. Harwood saying the cases don't --

18  there is no test of likelihood on the merits.  The only test

19  that he has to meet, he says, is a prima facie case, and he's

20  made that.

21       MR. FREVOLA:  Well, Your Honor, the three cases that

22  have been decided by Southern District of New York courts since

23  Winter Storm and the one case since Aqua Stoli -- none of them

24  point say that it's a prima facie standard.  There is no case

25  law to support this argument that a Rule E counterclaim merely

1  be pled as a prima facie claim.

2      THE COURT:  So you're saying that he's wrong after
3  Winter Storm.

4      MR. FREVOLA:  I'm saying, Your Honor, that Winter
5  Storm and Aqua Stoli never touched on this, and that the
6  analysis that has happened since back in the 1800s, you know,
7  back with Admiralty Rule -- I believe it's Admiralty Rule 50
8  and fifty-three talk about there being a presumption in favor
9  of counter security.

10     But in the -- in the case we cited, the Baltimore
11 Washington case, or Washington-Southern case -- excuse me for a
12 second, Your Honor, and I'll pull up that cite for you.
13 [Pause]  Washington-Southern Navigation Co v. Baltimore &
14 Philadelphia Steamboat Co.  It's 263 U.S. 629.  This was
15 decided in 1924, Your Honor.

16     And in that decision, the defendant was making very
17 similar arguments, saying well, the rule says we're allowed to
18 get this, and therefore we get it without any exceptions.  And
19 the Supreme Court said wait a minute, this is a codification of
20 prior federal court decisional law that we're now putting into
21 a rule to guide the courts by.

22     And it would be a perversion of the rule to create an
23 absolute right to counter security in every circumstance.

24     THE COURT:  Refer me in your memorandum of law to --
25 you said there were three post-Winter Storm and one post-Aqua

1  Stoli case.  Where are you -- where are --

2            MR. FREVOLA:  Actually, Your Honor, --

3            THE COURT:  -- you citing that?

4            MR. FREVOLA:  -- I'm going to have to give you the

5  cites -- I've got all three of them here, Your Honor.  I

6  brought them.

7            THE COURT:  Okay.  Go ahead.

8            MR. FREVOLA:  I was able to bring them out.  I've got

9  the <u>Ythan</u> v. <u>Americas Bulk Transport Limited</u>, which Mr. Harwood

10 cites.  That's Y T H A N Limited.  There is the Finecom

11 decision which Your Honor already has a copy of.  And there is

12 another case that Mr. Harwood was involved in, actually,

13 <u>Clipper Shipping Lines</u> v. <u>Global Transporte Oceanico</u> -- I'm

14 killing that name, I'm sure, Your Honor.

15           THE COURT:  And are all of these three cited in your

16 memoranda?

17           MR. FREVOLA:  No, Your Honor, because this is an

18 issue that came up today.

19           THE COURT:  Okay.

20           MR. FREVOLA:  But the case that I'd like to --

21           THE COURT:  And you're handing up Clipper and Ythan

22 Limited.  Okay.

23           MR. FREVOLA:  And you have Finecom already.  That's

24 Judge Lynch.

25           THE COURT:  And I have Finecom.  Yes, sir.

1      MR. FREVOLA:  Your Honor, in terms of Clipper, the

2  reason why Clipper is -- this is the pure gold case I was

3  talking about.  It's the only decision that appears to exist

4  since Aqua Stoli that's reported on an E(7) counterclaim.  And

5  like I said, Mr. Harwood was one of the attorneys involved in

6  it, and he was bringing, actually, the counter security claim.

7      And there is no discussion whatsoever about there

8  being need for a prima facie proof or things of that nature.

9  It's silent on it.

10     THE COURT:  Okay.

11     MR. FREVOLA:  And because of the -- like I said, the

12  Supreme Court's spoken on this so long ago.  Until we have

13  somebody saying that merely by pleading something without

14  affidavit support, documents, or anything proving their claim,

15  if an opponent comes in and says wait a minute, my hands were

16  tied by a third party, from a third-party affidavit, I submit

17  that it -- they've got some tough ground ahead of them to prove

18  that claim.

19     THE COURT:  Okay.  I understand your position.  Thank

20  you.

21     Mr. Harwood, let me ask you a question now.

22     MR. HARWOOD:  Yes, Your Honor.

23     THE COURT:  I take it your position is pre-Winter

24  Storm the test was -- all I had to do was make a prima facie

25  case on counter security, and Winter Storm and Aqua Stoli say

1    nothing about this, and therefore it's still the same -- it's

2    still the same test.  Is that your position?

3         MR. HARWOOD:  Not entirely, Your Honor.

4         THE COURT:  Okay.

5         MR. HARWOOD:  I think actually Aqua Stoli makes clear

6    that you just have to make a prima facie case.  That's what

7    Aqua Stoli does say.  Winter Storm was really about attaching

8    electronic fund transfers.

9         Aqua Stoli was really what does the plaintiff have to

10   show to survive an attack on its claim, and Judge Walker there

11   said basically -- and I've quoted his decision -- or at least

12   the reference to it is that basically you have limited

13   circumstances in which you can vacate a Rule B once there's a

14   prima facie case.  And I think Mr. Frevola recognizes that in

15   trying to, as he will, argue to the Second Circuit that, in

16   fact, the standard is, as he told us, reasonable grounds, in

17   his opinion.  The standard is a prima facie case.

18        If it's prima facie for the plaintiff, why isn't it -

19   - under Rule B, why isn't it prima facie for the Rule E counter

20   security defendant?  There's no logical reason it shouldn't be,

21   just as I argued in our brief, that just because a defendant

22   can't afford to post security is no reason for him not to have

23   to do so any more than it's a reason for the plaintiff not to

24   have to post counter security.

25        THE COURT:  No, I think that point -- I agree with

1 | that point.

2 | MR. HARWOOD:  And, Your Honor, in terms of Mr.

3 | Frevola's discussion of the attachments to the -- the Hoel

4 | affirmation, which we've been through -- and, frankly, I

5 | haven't discussed these or had the opportunity with my client,

6 | but the -- I would note that he refers to an Exhibit 4 to the

7 | Hoel affirmation which is a side letter, supply time eighty-

8 | nine, dated 12 May 2005, which is not dated.  That's Exhibit 4,

9 | Your Honor.

10 | And that's the one where the side letter says the

11 | vessel will continue operation under her present sub-charter

12 | agreement with Rolv Berg A.S. until this agreement is either

13 | terminated or otherwise expired.  There shall not be given any

14 | extension or any further charter parties.

15 | Your Honor, I'm not sure it -- how Mr. -- how the

16 | plaintiff would characterize this document as a separate

17 | contract.  Certainly, it's -- the side letter to the original

18 | charter is a separate contract.  This is clearly a separate

19 | contract.  It's also -- the Exhibit 3, which is the charter

20 | party referred to, has its own integration clause, which was a

21 | point made by the plaintiffs in their opposition brief.  The

22 | integration clause is in identical language.

23 | And, Your Honor, I do think in terms of the question

24 | of whether or not we have a valid counterclaim, that will be

25 | very quickly resolved in the appropriate Norwegian forum where,

1  presumably, there's some sort of summary dismissal motion with
2  costs and all the rest of it.  But in terms of my practice, I
3  have never dealt with issues mostly that are resolved in London
4  arbitration as to whether or not there's a meritorious claim or
5  counterclaim.

6  And indeed, Your Honor, they -- I'm grateful to Mr.
7  Frevola to referring the Court to this decision which I didn't
8  have time to refer to in my brief, which is the Judge Leisure
9  decision that I referred to earlier, which is the Clipper case.
10  The case that Finecom is clearly on point, and the Ythan-
11  Americas Bulk case I distinguished in our brief, Your Honor.

12  THE COURT:  All right.

13  MR. HARWOOD:  Thank you, Your Honor.

14  THE COURT:  Let me ask another question, Mr. Harwood.

15  MR. HARWOOD:  Yes, Your Honor.  Certainly.

16  THE COURT:  I'm a little concerned with the
17  underlying policy issue raised by plaintiff.  That is to say,
18  plaintiff says we think this a frivolous counterclaim.  You say
19  the merits are not for now.

20  What is to stop any defendant who has had its
21  property attached from asserting any counterclaim whatsoever as
22  long as it has colorable validity and seeking counter security
23  as a device to have the original security vacated, especially
24  when the defendant knows that the plaintiff is
25  undercapitalized, or illiquid, or small, or in trouble?

1    So that's the issue plaintiff raises, and I'm a
2  little troubled by it, so what's the response?

3    MR. HARWOOD:  I fully understand that, Your Honor,
4  and I think it's also probably addressed more frequently in
5  terms of plaintiff using the Rule B tool in the first place and
6  then not -- and their response in both cases, both for the
7  claim and the counterclaim, is that at some stage they have to
8  advance that claim in the appropriate forum.

9    And this Court can retain -- does retain jurisdiction
10  and can set a timely -- for that claim being advanced in that
11  forum rather than saying we have a claim, we can secure two
12  million subject to London arbitration, we didn't have to
13  proceed with London arbitration, we're just going to freeze
14  your two million, or, indeed, counter security, although,
15  obviously, in terms of the Rule E counter security or counter-
16  claimant, the counter-claimant's got as much interest in
17  prosecuting the matter because its funds have been attached or
18  can only get counter security up to the same amount which the
19  Rule B plaintiff has obtained in the first place.

20    So in fact, the pressure on the -- or the incentive
21  for the Rule B plaintiff is less than the Rule E counter-
22  claimant, but in terms of the Court's concern -- and I think
23  it's an entirely appropriate one that Judge Rakoff has
24  highlighted that Rule B is subject to abuse -- is that the
25  Court needs to basically oversee that the matter's going

1 forward, just as, for example, in a foreign non conveniens case

2 the Second Circuit decided recently.  They said yes, okay, we

3 agree that India is a more appropriate forum, and we will allow

4 you to proceed in India, provided that the case is tried within

5 one year based on the record of Indian courts proceeding for

6 decades.

7          And I think that's the same sort of -- would be a

8 very -- sensible approach in the Court's discretion in awarding

9 both security and counter security.

10          THE COURT:  But the reality of this situation is they

11 have locked up -- I think we said six hundred thousand dollars

12 of your client's money.  They've already had two arbitration

13 awards in their favor.  If that six hundred -- so it seems to

14 me the six hundred thousand is a very effective means,

15 apparently, of bringing you to the arbitration table.

16          And if that were to be released because they couldn't

17 otherwise pay an award of counter security, then their ability

18 to proceed to the next arbitration phase would be hampered

19 compared to what it now is.  Am I right about that?

20          MR. HARWOOD:  I don't think that's the case, Your

21 Honor, because the two arbitration awards have been paid in

22 full.  The present dispute giving rise to the second or third

23 amended complaints are, as the Court correctly stated, the

24 question of unpaid hire.

25          But as we stated in the answer and counterclaim, we

1    also have a claim for bunker invoices -- that's the fuel oil on

2    board -- for a hundred and fifty-four thousand dollars, plus a

3    claim for a performance bond which may or may not arise.  So

4    these presumably strictly charter claims and counterclaims will

5    be the subject of whichever arbitral panel hears them at some

6    stage.

7            But in terms of whether or not they'll be able to

8    satisfy an award, they should be no less concerned that they

9    will satisfy -- that our client will pay the award voluntarily

10   because, in fact, the attachment of the four hundred and fifty

11   thousand dollars belonging to Rolv Berg at ABN came in August,

12   and I believe the payments were made certainly prior to that.

13           But it's the same concern we would have that we

14   wouldn't get paid in respect of our claim on the side letter

15   agreement.  But the long and short of it, Your Honor, is if

16   they want to say -- and we have conceded if they want to say

17   no, you're not entitled to your counter security under the side

18   letter, because the side letter is a separate contract, then

19   I'm instructed to say fine, we don't want counter security,

20   we'll go for Rule B relief if we can get it.

21           THE COURT:  Do that again.

22           MR. HARWOOD:  If they pleaded in the alternative,

23   Your Honor, in the brief that if they -- accepting their

24   position that the side letter is a separate contract, then we

25   will take the position, then, we should be entitled, if it is a

1  separate contract, to maintain our own separate Rule B action.

2         THE COURT:  No.  No, that I understood.  And as a

3  matter of fact, I said that when we first began.  And Mr.

4  Frevola's response to that is he doesn't think there's

5  admiralty jurisdiction.  I think he's got a tough road on that

6  one, but that's his position.

7         MR. HARWOOD:  That will be for him to show if we're

8  successful in attaching any of the plaintiff's wire transfers

9  through New York.  And given their plea of poverty, it sounds

10  like we won't be.  But that's a commercial risk our client is

11  prepared to take.

12         THE COURT:  Right.  All right.

13         MR. HARWOOD:  Thank you, Your Honor.  Thank you for

14  your time.

15         THE COURT:  I thank you both.

16         Is there anything that either of you want to tell me?

17  I think I have a good understanding of now.

18         Sir?

19         MR. FREVOLA:  Your Honor, a couple of things, if I

20  may.  The side letter issue that was mentioned in terms of the

21  North Offshore and the Russian owner, head owner, side letter

22  --

23         THE COURT:  Yes.

24         MR. FREVOLA:  I don't think that there's -- if it's a

25  separate contract or not, and I think it very well could be

1  argued it's a separate contract, it's still an instrument that

2  they've signed that binds them to behave in a certain way, and

3  that's the import of it.  I'm not trying to --

4          THE COURT:  But we go back -- I understand that, but

5  we go back to the issue of why should I be looking at the

6  merits now on an application for counter security.

7          MR. FREVOLA:  Again, I would say that that's because

8  we put in this third party --

9          THE COURT:  No, I understand.

10         MR. FREVOLA:  -- saying things are one way, and

11 there's been no response to the other way.

12         THE COURT:  I understand.

13         MR. FREVOLA:  Moving on, Your Honor, the other thing,

14 also, here is that there is a big difference between a Rule E

15 counter security application and a Rule B attachment.  One of

16 the differences is that here we're having an application being

17 made for a court to order someone to post money here that has

18 not been attached or any type of securing of an asset been

19 done, but they're being asked to order to put it into -- you

20 know, into the court's coffers or being posted here in escrow,

21 or some of that nature.

22         Also, as mentioned before, it has to be done whether

23 it's an admiralty claim or not an admiralty claim, and that

24 makes it different than a Rule B application.

25         Your Honor, there's something else going on that I've

1 been told by my client.  I could be mistaken.  But I asked this
2 question specifically for purposes of this issue coming up.
3 I've asked has Rolv Berg actually submitted a counterclaim in
4 arbitration, and this arbitration was made in May, and they
5 have not done that, to my understanding.

6       So, Your Honor, we have that very situation where
7 we're five months down the line or four months down the line.
8 No counterclaim's been made.  Now, I could --

9       THE COURT:  But what do you derive from that?

10       MR. FREVOLA:  What I've derived from it, Your Honor,
11 is that they have the very issue in terms of the duress aspect
12 -- if the claim has not been made in the arbitration, perhaps
13 it's not being made in the arbitration for fear of the costs
14 and other issues that could arise if they make it and they're
15 found to be wrong, one.

16       Or two, perhaps they're seeking to extend, delay,
17 push things off to make this economically impossible for North
18 Offshore to do what they're trying to do.  In the case of North
19 Offshore's claim, Your Honor, the charter party is a very well
20 known principle in maritime law under charter parties.  And
21 that is freight or hire is payable without discount.

22       In other words, no matter what kind of a setoff claim
23 you have, arbitrators will issue a partial final award,
24 essentially almost immediately, once it's shown that the vessel
25 performed, was out at sea, working for the charter, and

1 | actually did it.

2 | And here, Your Honor, a majority of these claims here

3 | are hire claims.  The charter party specifically says it, hire

4 | payable without discount.  It's in part two of the charter.

5 | That's Exhibit 3 to the Hoel affirmation.  And it's in part

6 | two, section -- it's paragraph ten, ten E, payments.  Payments

7 | of hire, bunker invoices and disbursements for the charter's

8 | account --

9 | THE COURT:  Shall be received --

10 | MR. FREVOLA:  Yep, and shall be made --

11 | THE COURT:  -- in full without discount.

12 | MR. FREVOLA:  Precisely, Your Honor.  And that just

13 | restates well settled law on this, because the vessel has

14 | already performed.

15 | THE COURT:  Right, but again, that's a reason why,

16 | according to you, you received those arbitral awards.  But

17 | what's the relevance of that to this?

18 | MR. FREVOLA:  Well, this claim as well, Your Honor,

19 | is for performance already made, benefit already gotten.  When

20 | looking at the equities -- and again, this is a pure equitable

21 | decision by Your Honor.  If you look at the case law, it's a

22 | matter of the Court's equity.

23 | In one place, performance has been made, money

24 | earned, ship used.  Whatever benefit -- I'm sure they've been

25 | paid for the use of the ship.  It just hasn't been passed along

1  to us.  Not only that, North Offshore has paid the Russian
2  owner for the ship.

3          And so they're sitting here.  They've got accounts
4  receivable.  They've got no money to post counter security.
5  And they're being told you don't have any money, it's
6  irrelevant to whether or not you should keep your security in
7  New York.  As a court of equity, Your Honor --

8          THE COURT:  Right.  I understand.

9          MR. FREVOLA:  -- that's the equitable portion of
10 this.

11         THE COURT:  I understand.

12         MR. FREVOLA:  And, Your Honor, the only other thing
13 is on the bunkers issue.  And if you look at Mr. Hoel's
14 affidavit and our complaint, we actually in our complaint have
15 given credit to Rolv Berg for a hundred thousand dollars of
16 bunkers remaining on board.  It's in paragraph thirteen of the
17 Hoel affirmation.

18         (Pause in proceeding)

19         THE COURT:  My company has deducted the amount of a
20 hundred thousand dollars credited to RBD for the fuel remaining
21 aboard the Aldoma at the time of its redelivery.  Yes?

22         MR. FREVOLA:  So in other words, a hundred thousand
23 dollars is conceded.  And, Your Honor, in terms of -- if our
24 order, our attachment order, wants to be reduced by fifty
25 thousand dollars to take into account the last hundred and

1  fifty -- or the last fifty that's remaining of the hundred and

2  fifty that they're claiming, I'm sure my client would have no

3  problem with that.

4  THE COURT:  Say that one again.

5  MR. FREVOLA:  In other words, they're saying one

6  fifty, and we're saying one hundred.

7  THE COURT:  No, they're saying -- one fifty for what?

8  MR. FREVOLA:  They're saying one fifty for bunkers,

9  and I've actually got their --

10  THE COURT:  Oh, in other words, what you're saying,

11  if I can put it into my English, as opposed to admiralty

12  English, the counterclaim is seeking a hundred and fifty

13  thousand dollar credit for the fuel that was on the ship.

14  MR. FREVOLA:  Yes, Your Honor.

15  THE COURT:  Okay.  And you've already given them a

16  hundred thousand credit.  You've deducted it from your claim.

17  MR. FREVOLA:  Absolutely, Your Honor.

18  THE COURT:  So what is your proposal?

19  MR. FREVOLA:  I would propose that we reduce the

20  attachment order by fifty thousand dollars so that, in effect,

21  that's not fifty thousand dollars that will be sought to be

22  attached, --

23  THE COURT:  I understand.

24  MR. FREVOLA:  -- in recognition of that.

25  THE COURT:  I understand.

1        MR. FREVOLA:  Besides that, Your Honor, I believe
2   that's everything.

3        THE COURT:  Now, when you say reduce the attachment
4   order, you're talking about releasing fifty thousand of the
5   funds that have been attached?

6        MR. FREVOLA:  Well, I believe, Your Honor, also --
7   Mr. Harwood mentioned one point one million.  I believe the
8   actual order right now, the amount sought is nine hundred and
9   eighty-eight thousand.  We have four hundred and sixty-nine
10  thousand --

11       THE COURT:  Attached.

12       MR. FREVOLA:  -- attached.  It might be four seventy-
13  three, Your Honor.

14       THE COURT:  That's all right.

15       MR. FREVOLA:  But in other words, we have about a
16  little under half --

17       THE COURT:  Yes.

18       MR. FREVOLA:  -- of the full amount.

19       THE COURT:  Yes.

20       MR. FREVOLA:  And my proposal was that to reduce the
21  attachment order from nine eighty-eight down to whatever this
22  difference is, about nine thirty-eight, to take into account an
23  additional credit, not conceding --

24       THE COURT:  Oh, all right.  But that's not -- I
25  understand.

1        MR. FREVOLA:  Not conceding the merit of the claim,

2   but at least saying that we'd impact them less.

3        THE COURT:  Nor is that conceding a great deal,

4   because you haven't found the money, and presumably you've been

5   looking.

6        MR. FREVOLA:  Yes, Your Honor.

7        THE COURT:  All right.  Fine.

8        MR. FREVOLA:  Yes, Your Honor.

9        THE COURT:  All right.  Thank you, gentlemen.  I

10  appreciate it.

11        MR. FREVOLA:  Thank you, Your Honor.

12        THE COURT:  Let's go off, please.

13        MR. HARWOOD:  Thank you, Your Honor.

14        THE COURT:  Ms. Blakely, let's go -- cut the --

15        (End recording)

16              *    *    *    *    *

17      I, KRISTIN M. RUSIN, court approved transcriptionist, certify that the
18  foregoing is a correct transcript from the official electronic sound recording of the proceedings
19  in the above-entitled matter.
20      Transcript is certified original only if signed in green ink.

21        11/21/07

**EXHIBIT C**
**TO THE AFFIDAVIT OF JEREMY J.O. HARWOOD**
**DATED DECEMBER 21, 2007**

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

NORTH OFFSHORE AS,                      :        07 Civ. 3095 (SHS)
                                        :
                                        :
                    Plaintiff,          :
                                        :
       -against-                        :        MEMORANDUM OPINION
                                        :
ROLV BERG DRIVE AS,                     :
                                        :
                    Defendant.          :
------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Defendant Rolv Berg Drive AS ("RBD") seeks countersecurity in the amount of $1.1

million from plaintiff North OffShore AS pursuant to Rule E(7) of the Supplemental Rules for

Certain Admiralty and Maritime Claims. That motion was denied after oral argument in an

Order dated November 6, 2007. This Memorandum Opinion sets forth in fuller measure the

reasoning behind that Order.

## I.      BACKGROUND

        On February 16, 2004, North Offshore entered into a three-year charter party with RBD

for the ALDOMA, a vessel owned by non-party Arktikmorneftgazrazvedka ("AMNGR"), a

Russian company. Disputes arose in connection with the February 2004 charter party and North

Offshore brought various claims against RBD in binding arbitration proceedings that were held

in Norway. In September 2006 and April 2007, the arbitration panel made two separate awards

in favor of North Offshore, and RBD has since paid the monies owed pursuant to those awards to

North Offshore. However, North Offshore has asserted additional claims against RBD in the

amount of approximately $800,000 that also arise out of the February 2004 charter party; North

Offshore intends to arbitrate those claims in additional proceedings in Norway.

In connection with North Offshore's outstanding claims against RBD – as well as the portion of the arbitration awards which, at one point in the course of this litigation, had not yet been paid – North Offshore initiated an action in this Court seeking an Order of Attachment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. In April 2007, this Court authorized the attachment and garnishment of up to $532,051.08 of RBD's funds. In July 2007, the Court granted North Offshore's request to amend the Order of Attachment to authorize the attachment of up to $988,411.43 of RBD's funds. North Offshore attached approximately $400,000 of RBD's funds in September 2007.

Prior to the attachment of its funds, RBD filed an Answer and Counterclaim pursuant to Supplemental Rule E(7) in August 2007. In its counterclaim, RBD asserts that North Offshore breached a written "side agreement" dated March 5, 2004 between the two parties pursuant to which RBD had the option of extending the time charter for the ALDOMA. RBD contends that North Offshore rejected RBD's attempt in January 2007 to exercise that option, and RBD now seeks approximately $13 million in damages. North Offshore responds that a condition precedent to the exercise of RBD's option was the consent of AMNGR, the vessel's owner. Because AMNGR refused to provide that consent for various commercial reasons, North Offshore asserts that an extension of the time charter was not possible and that it therefore did not breach any side agreement with RBD.

## II.    DISCUSSION

RBD seeks $1.1 million in countersecurity pursuant to Supplemental Rule E(7). That provision provides in relevant part that:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.

2

Supp. R. E(7)(a). Here, RBD asserts that it is entitled to Rule E(7) countersecurity because RBD has had approximately $400,000 of its funds attached as security for North Offshore's claims in the original action. RBD contends that because its counterclaim arises from the same "transaction or occurrence that is the subject of the original action," it is therefore entitled to security by right. Furthermore, RBD asserts that countersecurity should issue because its counterclaim satisfies the minimal pleading requirements for admiralty claims seeking security pursuant to Supplemental Rule B.

Indeed, the rule in the Second Circuit is that "an attachment should issue [pursuant to Rule B] if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006). Furthermore, there is no "broader equitable inquiry" and the party seeking security need not show that the "the attachment is necessary to obtain jurisdiction over a defendant or to secure a potential judgment." Id. at 446.

However, the Aqua Stoli standard for a Rule B attachment is not the standard that applies to motions for countersecurity brought pursuant to Rule E(7). In particular, the language of Rule E(7) directing that security be granted "unless the court for cause shown, directs otherwise" makes it entirely clear that "the trial court possesses broad discretion in deciding whether to order countersecurity." Result Shipping Co. v. Ferruzi Trading USA Inc., 56 F.3d 394, 399 (2d Cir. 1995). In exercising that discretion, courts consider several factors but "the core purpose of the countersecurity rule is to place the parties on an even footing; if one party is deprived of the use of its property during the litigation but the adverse party is not, despite the pendency of reciprocal claims, the party with the security may have unfair leverage in the action." Finecom

3

Shipping Ltd. v. Multi Trade Enters. AG, No. 05 Civ. 6695, 2005 U.S. Dist. LEXIS 25761, at *2

(S.D.N.Y. Oct. 24, 2005).  See also Washington-Southern Navigation Co. v. Baltimore &

Philadelphia Steamboat Co., 263 U.S. 629, 638-39, 44 S. Ct. 220, 68 L. Ed. 480 (1924)

(construing former Admiralty Rule 53).  Furthermore, the trial court must be

> guided by the essential and equitable purposes of the rule. In doing so, the
> court must weigh the importance of the security interest giving rise to the
> initial seizure, and the burden of posting countersecurity, against the
> potential injustice of requiring the defendant-counterclaimant to post
> security without affording reciprocal protection.

Result Shipping, 56 F.3d at 400.  Nothing in the Second Circuit's decision in Aqua Stoli

disturbs that approach or suggests that a motion for countersecurity pursuant to Rule E(7)

need only meet the prima facie requirements of an admiralty claim brought pursuant to Rule

B.  Rather, motions for countersecurity remain – even post-Aqua Stoli – subject to the "broad

discretion" of the court.  See Clipper Shipping Lines Ltd. v. Global Transporte Oceanico S.A.,

No. 06 Civ. 15299, 2007 U.S. Dist. LEXIS 18827, at *3 (S.D.N.Y. Feb. 27, 2007).

Accordingly, whether to grant or deny RBD's motion for countersecurity is an

equitable determination within the broad discretion of this Court.  Several factors weigh in

favor of denying that motion.

First, RBD has failed to submit any evidence whatsoever to counter the proposition that

its counterclaim is entirely without merit.  By contrast, North Offshore has submitted affidavits

from Svein Hoel, the Managing Director of North Offshore, and Oleg S. Mnatsakanyan, Director

General of AMNGR.  Those affidavits support North Offshore's position that it was not possible

to extend RBD's charter party because the condition precedent to that extension – the consent of

AMNGR – was not fulfilled based on a commercial decision by AMNGR.  (See Affidavit of

Svein Hoel dated Oct. 1, 2007 ¶¶ 5-9; Affidavit of Oleg S. Mnatsakanyan dated Oct. 1, 2007 ¶¶

6-11.)  RBD has not submitted any evidence to contravene those accounts or to explain how – in

4

light of those facts – North Offshore could be deemed in breach of the March 2004 side

agreement. "The premise that countersecurity will not be required on the basis of frivolous

counterclaims is a sound one," Finecom Shipping, 2005 U.S. Dist. LEXIS 25761, at *3-4, and a

court "should not require countersecurity where the counterclaim is frivolous or so lacking in

merit that the court can only conclude that the counterclaim was advanced solely to secure a

negotiating advantage over the complainant," Titan Navigation, Inc. v. Timsco, Inc., 808 F.2d

400, 404 (5th Cir. 1987). Mindful that the "ability to understand the merits of a dispute at an

early stage is limited," Finecom Shipping, 2005 U.S. Dist. LEXIS 25761, at *4, the Court

nonetheless finds that RBD's counterclaim is highly speculative – relating to its alleged lost

profits from the failure to obtain continued use of the ALDOMA – and RBD has provided no

rebuttal to North Offshore's position that the claim is without merit. Those deficiencies weigh

against directing North Offshore to post countersecurity. See Ythan Ltd. v. Americas Bulk

Transport Ltd., 336 F. Supp. 305, 309 (S.D.N.Y. 2004) (rejecting motion for countersecurity

where the counterclaim was "highly contingent"); U.S. Maritime Services, Inc. v. Trade

Ventures, Inc., No. 98-0499 Section "C", 1998 U.S. Dist. LEXIS 10608, at *6 (E.D. La. July 8,

1998) (denying countersecurity because defendants' counterclaim was too speculative –

"[u]nlike plaintiff's claim which is based on past events reasonably due to be ascertained and

quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and

quantified").

Second, North Offshore has submitted affidavit testimony and a financial statement in

support of the proposition that it would be exceedingly burdensome for North Offshore – a small

company with limited resources – to post the requested countersecurity. In fact, such an order

would compel North Offshore to release the funds that it has already attached to secure its own

claims against RBD. (See Hoel Aff. ¶¶ 15-16, 24.) Furthermore, North Offshore contends that a

5

significant reason for its lack of liquidity arises from the fact that it has made payments to
AMNGR for the charter hire of the ALDOMA, but has not yet itself been paid by RBD for its
use of the vessel. These facts suggest that granting RBD's motion for countersecurity would not
result in putting the parties on the "equal footing" that Rule E(7) seeks to promote, but would
rather serve to thwart the purpose of North Offshore's Rule B attachment. Rule E(7) "is not
intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit,"
Result Shipping, 56 F.3d at 400, or, on that same logic, from maintaining an action.
Accordingly, North Offshore's financial circumstances – and RBD's role in North Offshore's
difficult financial position – provide additional good cause to deny RBD's motion for
countersecurity.

Finally, the parties dispute whether RBD's counterclaim even arises from the same
"transaction or occurrence that is the subject of the original action," which triggers a
counterclaimant's right to countersecurity pursuant to Rule E(7). See Sea-Terminals, Inc. v.
Independent Container Lines, Ltd., No. 89 Civ. 6931, 1990 U.S. Dist. LEXIS 11561, at *5
(S.D.N.Y. Sept. 4, 1990) ("Supplemental Rule E(7) is identical to Fed. R. Civ. P. 13(a), which
permits counter-security only for compulsory counterclaims."). North Offshore contends that the
February 2004 charter party and the March 2004 side agreement constitute entirely separate
transactions, that RBD's counterclaim cannot be considered a "compulsory" or "mandatory"
counterclaim, and that RBD cannot therefore rely on Rule E(7). Indeed, the limited evidence
before the Court at this stage suggests that RBD's counterclaim – for the breach of a purported
charter extension – and North Offshore's claim in the original action – involving non-payment of
hire for use of the ALDOMA and expenses associated with RBD's failure to redeliver the vessel
within the agreed redelivery range – raise entirely separate issues of fact and law and may not
necessarily be "so logically connected that considerations of judicial economy and fairness

6

dictate that all the issues be resolved in one lawsuit." Klein v. London Star, 26 F. Supp. 2d 689, 697 (S.D.N.Y. 1998). That would suggest that RBD's counterclaim is not a mandatory counterclaim entitled to countersecurity. Nonetheless, the Court need not reach a determination on that point given the significant other grounds on which to deny RBD's motion.

## III.    CONCLUSION

In sum, Supplemental Rule E(7) – not Supplemental Rule B – provides the basis for RBD's countersecurity motion, and whether to grant countersecurity pursuant to Rule E(7) falls firmly within the discretion of this Court. Here, at least two factors weigh against directing that North Offshore post countersecurity: first, RBD's counterclaim – based on the parties' submissions to the Court – appears frivolous and aimed primarily at thwarting North Offshore's prosecution of the original action; and second, North Offshore is not financially able to post countersecurity without releasing the RBD assets that it has already attached. In addition, RBD's counterclaim may not even constitute a mandatory counterclaim for purposes of Rule E(7). Accordingly, the motion by RBD for countersecurity is denied.

Dated: New York, New York
November 29, 2007

Sidney H. Stein, U.S.D.J.

7

**EXHIBIT D**
**TO THE AFFIDAVIT OF JEREMY J.O. HARWOOD**
**DATED DECEMBER 21, 2007**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/6/07 (hs)

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NORTH OFFSHORE AS,                    :        07 Civ. 3095 (SHS)

           Plaintiff,        :

     -against-                   :        ORDER

ROLV BERG DRIVE AS,                   :

          Defendant.        :

-------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

     A pretrial conference having been held today, with counsel for all parties present,

     IT IS HEREBY ORDERED that:

     1.    For the reasons set forth on the record, defendant's motion for counter-

security is denied; and

     2.    There will be a pretrial conference on February 8, 2008, at 10:00 a.m.

Dated: New York, New York
      November 5, 2007

                        SO ORDERED:

                              Sidney H. Stein, U.S.D.J.

**EXHIBIT E**
**TO THE AFFIDAVIT OF JEREMY J.O. HARWOOD**
**DATED DECEMBER 21, 2007**

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLV BERG DRIVE AS,<br><br>    Plaintiff,<br><br>- against -<br><br>NORTH OFFSHORE AS,<br><br>TROMS OFFSHORE AS,<br><br>    Defendants. | 07 CV<br><br>**NOTICE AND DECLARATION OF OLAV VIKØREN ON FOREIGN LAW PURSUANT TO F.R.CIV.P. RULE 44.1 AND IN SUPPORT OF RULE B PETITION** |

OLAV VIKØREN declares under penalty of perjury under the laws of the United States:

**A. JURISDICTION UNDER NORWEGIAN LAW**

  1. I am a senior lawyer at Thommessen Krefting Greve Lund AS, Olso, Norway, counsel for Rolv Berg Drive AS ("RBD"), in its disputes with North Offshore AS ("NOA" or "North Offshore") in Norway. I was admitted to the Norwegian bar in 1984 and am licensed to practice Norwegian law.

  2. I submit this declaration in support of RBD's application for a Supplemental Rule B attachment and garnishment order in respect of claims arising under

a side letter agreement dated March 5, 2005 ("Side Letter"). A true copy is Exhibit 1 hereto.

3.      The Side Letter involves the charter of an ocean-going vessel "AHTS ALDOMA" (the "Vessel"). The "subject matter" of the Side Letter is clearly a maritime claim and, under Norwegian Law, the Norwegian Court will in my opinion view disputes arising from or in relation to the Side Letter as maritime claims.

4.      The Side Letter disputes have been submitted or filed in the Nord-Troms County Court, Tromsø, Norway by way of a "writ of summons" dated November 7, 2007 (the "Norwegian Pleadings").

5.      A true copy of the Norwegian Pleadings is Exhibit 2 hereto. A "free" and accurate translation of the Norwegian portion of the Norwegian Pleadings into English is Exhibit 3 hereto.

**B.      IDENTITY OF DEFENDANTS**

6.      I attach as Exhibit 4 hereto a true copy of the webpage for the Norwegian subscription service Ravinfo (and true translation into English as Exhibit 5), which provides company information. It records the relationship between North Offshore and Troms Offshore AS ("TOAS"), and records that the Defendant North Offshore is the 100% owner of the shares of three subsidiaries North Brokers and Agency AS, (2) Troms Offshore MPSV AS and (3) TOAS.

7.      In a declaration dated October 1, 2007, Exhibit 6 hereto, submitted in the related Rule B action brought by NOA against RBD in this court (the "First Action") by NOA's Managing Director, Svein Hoel, he explained that NOA had

2

chartered the Vessel from its owner, Arktmorneptegazrasvedka ("AMNGR"). Id., ¶ 5.

8.     AMNGR's "Director General", Oleg Mnatsakanyon, also submitted a declaration, dated October 1, 2007 in his First Action (the "AMNGR Declaration"), Exhibit 7 hereto.

9.     In Exhibit 3 to the AMNGR Declaration AMNGR's lawyer advised RBD's lawyers, inter alia:

> Arktik [AMNG] has concluded a C/P [Charter party] with NO
> [North Offshore AS] for a period up to 5th May 2009,
> including two options on [sic] one year each.

10.    NOA therefore is presently the charterer or "disponant owner" of the vessel ALDOMA.

11.    In the Hoel Declaration, NOA's alleges that a Statement of Accounts dated August 31, 2007 is attached as Exhibit 5. Mr. Hoel's declaration explains that "Other Operating Costs" includes bareboat hire [payable to AMNGR] for the ALDOMA (NK 7,602,029)." Id, ¶ 18.

## TOAS AS OPERATOR OF THE VESSEL

12.    I attach as Exhibit 8 a true copy of TOAS's website pages recording that TOAS is presently "operating" the Vessel, under charter from her Russian owners AMNGR.

13.    To the extent that hire payments are being remitted to AMNGR by any of North Offshore's subsidiaries, including but not limited to hire payments received by its subsidiary TOAS as "operator" of the Vessel or paid by TOAS to AMNGR, then such payments are in respect of hire obligations by and between North Offshore and

3

AMNGR in respect of the charter for the Vessel and represent monies belonging to North

Offshore being siphoned through the subsidiaries.

I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct.

Dated: December 2007
at Oslo, Norway

OLAV VIKØREN

4

# EXHIBIT 1

## SIDE-AGREEMENT TO TIME CHARTER PARTY BETWEEN TFDS OFFSHORE AS AND ROLV BERG DRIVE AS REGARDING AHTS ALDOMA

It is understood between the parties that ONGC may offer Rolv Berg Drive AS extensions to the 3 year contract with contract no: MR/MM/OFF.LGTS./CH/VESSELS//10(109)/2003. It is further agreed between the parties that should Rolv Berg Drive AS be granted extension to this contract or new contracts with ONGC, Rolv Berg Drive shall have the right to extend the charter of AHTS Aldoma on a day-rate not to exceed USD 9.000,-.

This agreement shall be subject only to TFDS Offshore securing further charter with the vessel's owner.

It is further agreed that should Rolv Berg Drive AS secure other future contracts with ONGC TFDS Offshore AS will be given first option where they have vessels which meet the requirements at competitive rates.

Rett kopi bekreftes
Certified Copy
Kristian Lindhartsen
Advokatfullmektig

This agreement is entered into on the 5th of March 2004.

For TFDS Offshore AS

Svein Hoel
Managing Director

For Rolv Berg Drive AS

Snorre S. Stinessen
Coordinating Manager

# EXHIBIT 2

# THOMMESSEN

**THOMMESSEN KREFTING GREVE LUND AS**
Advokatfirma
Haakon VIIs gate 10
Postboks 1484 Vika, NO-0116 Oslo
Telefon +47 23 11 11 11
Telefaks +47 23 11 10 10
Fnr NO 957 423 248 MVA
**www.thommessen.no**
Oslo, Bergen, London

**Rett kopi bekreftes
Certified copy**

Kristian Lindhartsen
Advokatfullmektig

## STEVNING

### til

### Nord-Troms tingrett

Oslo, 7. november 2007
Vår referanse 1764501/1

| | |
|---|---|
| **Saksøker** | Rolv Berg Drive AS |
| | v/styrets formann Rolv Berg |
| | Postboks 96 |
| | 9257 Tromsø |
| | |
| **Prosessfullmektig** | Thommessen Krefting Greve Lund AS |
| | v/ advokatfullmektig Kristian Lindhartsen |
| | m/ rettslig medhjelper advokat Olav Vikøren |
| | Postboks 1484 Vika |
| | 0116 Oslo |
| | |
| **Saksøkt** | North Offshore AS |
| | v/styrets formann Svein Hoel |
| | 9291 Tromsø |
| | |
| **Prosessfullmektig** | Nordisk Legal Services |
| | v/advokat Magne Andersen |
| | Postboks 3033 Elisenberg |
| | 0207 Oslo |
| | |
| **Saken gjelder** | Erstatningskrav for kontraktsbrudd |

## 1    INNLEDNING – FORMALIA

Saken bringes direkte inn for tingretten, da begge parter er bistått av advokat og saksøker således ikke finner det hensiktsmessig å bringe saken inn for forliksrådet, jf tvml § 274 første ledd nr 1.

1

# THOMMESSEN



Rett kopi bekreftet
Certified copy
Kristina Lindhartsen
Advokatfullmektig

Både saksøker og saksøkte har forretningssted i Tromsø kommune, og rett verneting er Nord-Troms tingrett, jf reglene i tvml § 17.

## 2    SAKENS FAKTUM

Rolv Berg Drive AS hadde leid inn skipet "Aldoma" på et certeparti for en periode på 3 år.

> Bilag 1:    Certeparti datert 16. februar 2004

Skipet er eiet av et russisk selskap, Arktikmor Neftegaz Razvedka. Saksøkte har leid skipet på certeparti siden 1992, og har fortsatt skipet på certeparti.

Den 5. mars 2004 inngikk partene en egen avtale om mulig forlengelse av ovennevnte certeparti. Avtalen gikk ut på at saksøker kunne fortsette å leie skipet dersom visse vilkår i den nye avtalen ("opsjonsavtalen") var oppfylte.

> Bilag 2:    Side-Agreement to Time Charter Party between TFDS Offshore AS and Rolv Berg Drive AS regarding AHTS Aldoma

Den 1. august 2006 ble saksøkte informert om at saksøker ville komme til å by skipet "Aldoma" på en kontrakt med det indiske oljeselskapet Oil and Natural Gas Corporation Ltd. ("ONGC"), og for det tilfellet at man vant den anbudskonkurransen, ville utøve sin opsjon på forlengelse.

> Bilag 3:    Brev datert 1. august 2006 fra Rolv Berg Drive AS til TFDS Offshore AS

I en e-post av 7. januar 2007 og brev av 2. februar 2007 erklærte saksøker at man ønsket å gjøre gjeldende opsjon på forlengelse for tre år.

> Bilag 4:    E-post datert 7. januar 2007 fra Rolv Berg til Svein Hoel

I e-post fra saksøktes advokat til saksøkers advokat ble det opplyst at man ikke anså vilkårene i opsjonsavtalen som oppfylte, og at man derfor ikke ville stille "Aldoma" til saksøkers rådighet.

> Bilag 5:    E-post datert 8. januar 2007 fra advokat Magne Andersen til advokat Morten Lund

I telefaks datert 19. februar 2007 fikk saksøker bekreftet at de hadde vunnet en anbudskonkurranse for ytterligere operasjon av skipet "Aldoma" med ONGC for en periode på 5 år, med en daglig rate på USD 15.900.

> Bilag 6:    Telefax datert 19. februar 2007 fra ONGC til Rolv Berg

Saksøkte har forsettlig misligholdt sine forpliktelser under opsjonsavtalen ved å ikke la saksøker få leie skipet i henhold til opsjonsavtalen. Følgelig mistet saksøker kontrakten i India, og har blitt påført et tap i denne forbindelse. "Aldoma" er i dag i Nigeria, fortsatt på certeparti til saksøkte.

# THOMMESSEN



Rett kopi bekreftes
Certified Copy
Kristian Lindhartsen
Advokatfullmektig

## 3    RETTSLIGE ANFØRSLER

Saksøker anfører at saksøkte er erstatningsrettslig ansvarlig for tapet saksøker er påført som en følge av forsettelig brudd på opsjonsavtalen.

Det rettslige grunnlaget for erstatningsansvar er alminnelig erstatningsrettslige regler.

Avtalen mellom saksøker og saksøkte stipulerer to kumulative vilkår som må være oppfylt for å utøve opsjonen. For det første må saksøker ha blitt tilbudt en kontrakt fra ONGC, og for det andre må saksøkte ha rett til forlengelse av sin kontrakt for skipet fra skipets eier. Utover det stiller opsjonsavtalen ingen krav.

Det er vist ovenfor at saksøker vant anbudskonkurransen med ONGC og ble derfor tilbudt en kontrakt som nevnt i avtalen. Videre har skipet helt siden inngåelsen av opsjonsavtalen og frem til dags dato vært på certeparti fra eier til saksøkte. Vilkårene for utøvelse av opsjonen er følgelig oppfylte.

Saksøker har lidt et betydelig tap i forbindelse med forventet inntekt som følge av saksøktes kontraktsbrudd. I henhold til anbudsdokumentet fikk saksøker tildelt kontrakten for 5 år på en rate á USD 15.900 per dag. Etter opsjonsavtalen er daglig rate maks USD 9.000 per dag, hvilket gir en forventet fortjeneste for saksøker på USD 6.900 per dag. Med en varighet på 5 år, ville da saksøker hatt en inntjening på (6900 x 365 x 5) på USD 12.592.500 for perioden

I tillegg, har saksøker stilt et performance bond overfor ONGC pålydende USD 422.150. Et performance bond er en bankgaranti for rettmessig oppfyllelse av en avtale. Ved at saksøker ikke har oppfylt sin kontraktsforpliktelse overfor ONGC, har ONGC begjært utbetaling under dette performace bond, og saksøker har således lidt et mulig ytterligere tap på USD 442.150.

Saksøker noterer at saksøkte i korrespondansen mellom partene har søkt å argumentere rettslige mot saksøkers adgang til å gjøre opsjonsavtalen gjeldende. Det kan imidlertid ikke anses godtgjort av saksøkte at vilkårene i opsjonsavtalen ikke var oppfylt. Saksøker er inneforstått med at "Aldoma" ikke oppfylte samtlige anbudskrav, men klargjorde dette overfor ONGC i anbudsdokumentasjonen. Anbudet ble således vunnet på bakgrunn av skipet som beskrevet i anbudsdokumentet. Hvorvidt skipet var egnet eller ikke, er et anliggende mellom saksøker og ONGC, såfremt skipet ikke benyttes i strid med hva som var avtalt mellom saksøker og saksøkte.

Saksøkte har således urettmessig og forsettelig hevet opsjonsavtalen. Ettersom dette kontraktsbruddet har medført et tap for saksøker, foreligger det således en erstatningsplikt for saksøkte.

Etter vanlige prinsipper for beregning av erstatning, skal saksøkers tap som oppstår som følge av kontraktsbruddet legges til grunn i en slik beregning. I denne forbindelse er det påregnelig for saksøkers at saksøkers tap tilsvarer den eventuelle fortjeneste han ville hatt under den nevnte avtale. Videre er det klart at tapet i forbindelse med det ovennevnte performance bond er et erstatningsbetingende krav.

## 4    PROSESSUELT

I tilfelle uteblivelse eller for sent innkommet tilsvar, bes uteblivelsesdom avsagt.

Det tas forbehold om ytterligere anførsler og bevis, herunder innkalling og stevning av vitner.

# THOMMESSEN

Rett kopi bekreftes

Certified copy

Kristian Lindhartsen
Advokatfullmektig

Det nedlegges følgende ærbødige

### påstand:

1    North Offshore AS (org.nr. 929 987 020) dømmes til å betale Rolv Berg Drive AS et beløp oppad begrenset til USD 13.019.650, med tillegg av lovens forsinkelsesrenter til betaling finner sted.

2    North Offshore AS (org.nr. 929 987 020) dømmes til å betale til Rolv Berg Drive AS sakens omkostninger innen 14 dager med tillegg av lovens forsinkelsesrente fra forfall til betaling finner sted.

* * *

Denne stevning i fem eksemplarer, hvorav to er sendt motpartens prosessfullmektig direkte.

Oslo, 7. november 2007
Thommessen Krefting Greve Lund AS

Kristian Lindhartsen
Advokatfullmektig

Bilag 1

Rett kopi bekreftes
Certified Copy
Kristian Lindhartsen
Advokatfullmektig

# CHARTER PARTY
# AHTS "ALDOMA"

# RBD & TFDS (OH)

**MARCH 2004 – MARCH 2007**

| 1. Place and date | **UNIFORM TIME CHARTER PARTY** |
|---|---|
| **Tromsø 16th of February 2004** | **FOR OFFSHORE SERVICE VESSELS** |
| | **CODE NAME: "SUPPLYTIME 89"** |
| | PART I |

| 2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a)) | 3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a)) |
|---|---|
| **TFDS Offshore AS** | **Rolv Berg Drive AS** |
| **Strandvegen 106** | **Søndre Tollbodgate 15** |
| **P.O. box 6155** | **P.O. box 96** |
| **9291 Tromsø** | **9251 Tromsø** |
| **Norway** | **Norway** |
| **Phone: 47 77 67 99 50** | **Phone: +47 77 66 80 80** |
| **Fax: +47 77 67 99 77** | **Fax: +47 77 66 89** |
| **E-mail: offshore@tfds.no** | **E-mail: drive@rbdrive.com** |

| 4. Vessel's name (Cl. 1(a)) | 5. Date of delivery (Cl. 2(a)) | 6. Cancelling date (Cl. 2(a) and (c)) |
|---|---|---|
| **AHTS Aldoma** | **28-31.03.2004** | **31.03.2004** |

| 7. Port or place of delivery (Cl. 2(a)) | 8. Port or place redelivery/notice of redelivery (Cl. 2(d)) |
|---|---|
| **Mumbai, India** | **Mumbai, India** |
| | (i) Port or place of redelivery |
| | **15 days** |
| | (ii) Number of days' notice of redelivery |

| 9. Period of hire (Cl. 1(a)) | 10. Extension of period of hire (optional) (Cl. 1(b)) |
|---|---|
| **3 years firm** | (i) Period of extension |
| | **18 days** |
| | (ii) Advance notice for declaration of option (days) |

| 11. Automatic extension period to complete voyage or well (Cl. 1(c)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) |
|---|---|
| **As per work in progress.** | **Included in the vessel's dayrate for the first 3 years charter hire.** |
| (i) Voyage or well (state which) | **- See Clause 37** |
| **90 days.** | (i) Lump sum |
| (ii) Maximum extension period (state number of days) | **NA** |
| | (ii) When due |
| | 13. Port or place of mobilisation (Cl. 2(b)(i)) |
| | **Valletta, Malta.** |

| 14. Early termination of charter (state amount of hire payable) (Cl. 28(a)) | 15. Number of days' notice of early termination (Cl. 28(a)) | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 28(a)) |
|---|---|---|
| **As per state oil company rules and regulations (O.N.G.C.).** | **See box 14** | **Included in vessel's dayrate for the first 3 years charter hire.** |

Issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) EXPIRED 1989

Printed by BIMCO's idea

Adopted by International Support Vessel Owners' Association (ISOA), London

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                        PART I

| 17. Area of operation (Cl. 5(a)) | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a)) |
|---|---|
| The continental shelf of India. | Anchor handling, towage, fire fighting, supply services, mud services and any other services that the vessel may safely undertake to perform. Always within the vessel's capabilities and certification. |

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) ) | 20. Extension hire (if agreed, state rate) (Cl. 10(b)) |
|---|---|
| USD 8.500,- + USD 700,- (mud installation) + USD 330,- (mob/demob). Total: USD 9.530,- per day the first three years. | USD 8.500,- |

| 21. Invoicing for hire and other payments (Cl. 10(d)) | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e)) |
|---|---|
| (i) state whether to be issued in advance or arrears <br> In Arrears <br><br> (ii) state to whom to be issued if addressee other than stated in Box 2 <br> As per box 2 <br><br> (iii) state to whom to be issued if addressee other than stated in Box 3 | As per owner's Instruction <br> To: <br> SpareBank1 Nord-Norge <br> Account no: 4729.01.18455 <br> Swift code: snownu022 <br><br> By: <br> Swift transfer |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e)) | 24. Interest rate payable (Cl. 10(e)) | 25. Maximum audit period (Cl. 10(f)) |
|---|---|---|
| 35 banking days from date of invoice | NA | 60 days |

| 26. Meals (state rate agreed) (Cl. 5(c)(i)) | 27. Accommodation (state rate agreed) (Cl. 5(c)(ii)) | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f)) |
|---|---|---|
| USD 10,- per meal | USD 12,- per person | Yes |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) | 30. War (state name of countries) (Cl. 19(e)) |
|---|---|
| NA | Deleted |

| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21) | 32. Breakdown (state period) (Cl. 26(b)(iv)) |
|---|---|
| | 30 days |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) | 34. Numbers of additional clauses covering special provisions, if agreed |
|---|---|
| Norwegian Law, arbitration in Oslo | From Clause 37 to Clause 38 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 28) |
|---|---|
| As per box 3 | As per box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the Vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers. (1–5)

(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option shall be declared in accordance with Box 10(ii). (6–8)

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii). (9–11)

**2. Delivery and Redelivery**

(a) Delivery. - Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 6 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat. (12–16)

(b) Mobilisation. - (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13. (17–21)

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost. (22–28)

(c) Cancelling. - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Vessel will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party. (29–43)

(d) Redelivery. - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii). (44–48)

(e) Demobilisation. - The Charterers shall pay a lump sum without discount in the amount as stated in Box 18 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party. (49–51)

**3. Condition of Vessel**

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A", attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party. (52–56)

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5. (57–61)

**4. Survey**

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys. (62–68)

**5. Employment and Area of Operation**

(a) The Vessel shall be employed in offshore activities which are lawful in (69–70)

accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of their employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform. (71–83)

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences. (84–87)

(c) The Vessel's Space. - The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations: (88–93)

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation. (94–100)

(ii) Lawful cargo whether carried on or under deck. (101)

(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo. (102–111)

(iv) Hazardous and noxious substances, subject to Clause 12(c), proper notification and any pertinent regulations. (112–113)

(d) Laying-up of Vessel. - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel. (114–120)

**6. Master and Crew**

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents. (121–129)

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents. (130–137)

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour (138–143)

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**

**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

unions do not permit the Crew of the Vessel to carry out any of this work, then 144
the Charterers shall make, at their own expense, whatever other 145
arrangements may be necessary, always under the direction of the Master. 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the 147
Master or any Officer or member of the Crew, the Owners on receiving 148
particulars of the complaint shall promptly investigate the matter and if the 149
complaint proves to be well founded, the Owners shall as soon as reasonably 150
possible make appropriate changes in the appointment. 151
(d) The entire operation, navigation, and management of the Vessel shall be in 152
the exclusive control and command of the Owners, their Master, Officers and 153
Crew. The Vessel will be operated and the services hereunder will be 154
rendered as requested by the Charterers, subject always to the exclusive 155
right of the Owners or the Master of the Vessel to determine whether operation 156
of the Vessel may be safely undertaken. In the performance of the Charter 157
Party, the Owners are deemed to be an independent contractor, the 158
Charterers being concerned only with the results of the services performed. 159

**7. Owners to Provide** 160
(a) The Owners shall provide and pay for all provisions, wages and all other 161
expenses of the Master, Officers and Crew; all maintenance and repair of the 162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, 163
except as otherwise provided in the Charter Party, for all insurance on the 164
Vessel, all dues and charges directly related to the Vessel's flag and/or 165
registration, all deck, cabin and engineroom stores, cordage required for 166
ordinary ship's purpose mooring alongside in harbour, and all fumigation 167
expenses and de-rattsation certificates. The Owners' obligations under this 168
Clause extend to cover all liabilities for consular charges appertaining to the 169
Master, Officers and Crew, customs or import duties arising at any time during 170
the performance of this Charter Party in relation to the personal effects of the 171
Master, Officers and Crew, and in relation to the stores, provisions and other 172
matters as aforesaid which the Owners are to provide and/or pay for and the 173
Owners shall refund to the Charterers any sums they or their agents may have 174
paid or been compelled to pay in respect of such liability. 175
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' 176
expense with any towing and anchor handling equipment specified in Section 177
5(b) of ANNEX "A". If during the Charter Period any such equipment becomes 178
lost, damaged or unserviceable, other than as a result of the Owners' 179
negligence, the Charterers shall either provide, or direct the Owners to 180
provide, an equivalent replacement at the Charterers' expense. 181

**8. Charterers to Provide** 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, 183
lubricants, water, dispersants, firefighting foam and transport thereof, port 184
charges, pilotage and boatmen and canal steersmen (whether compulsory or 185
not), launch hire (unless incurred in connection with the Owners' business), 186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 187
charges, agencies and commissions incurred on the Charterers' business, 188
costs for security or other watchmen, and of quarantine (if occasioned by the 189
nature of the cargo carried or the ports visited whilst employed under this 190
Charter Party but not otherwise). 191
(b) At all times the Charterers shall provide and pay for the loading and 192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 193
cargo tanks, all necessary dunnage, uprights and shoring equipment for 194
securing deck cargo, all cordage except as to be provided by the Owners, all 195
ropes, slings and special runners (including bulk cargo discharge hoses) 196
actually used for loading and discharging, inert gas required for the 197
protection of cargo, and electrodes used for offshore works, and shall 198
reimburse the Owners for the actual cost of replacement of special mooring 199
lines to offshore units, wires, nylon spring lines etc. used for offshore work, 200
all hose connections and adaptors, and further, shall refill oxygen/acetylene 201
bottles used for offshore works. 202
(c) The Charterers shall pay for customs duties, all permits, import duties 203
(including costs involved in establishing temporary or permanent importation 204
bonds), and clearance expenses, both for the Vessel and/or equipment, 205
required for or arising out of this Charter Party. 206

**9. Bunkers** 207
Unless otherwise agreed, the Vessel shall be delivered with bunkers and 208
lubricants as on board and redelivered with sufficient bunkers to reach the 209
next bunkering stage en route to her next port of call. The Charterers upon 210
delivery and the Owners on redelivery shall take over and pay for the 211
bunkers and lubricants on board at the prices prevailing at the times and 212
ports of delivery and redelivery. 213

**10. Hire and Payments** 214
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered 216
to the Charterers until the expiration or earlier termination of this Charter 217
Party. 218
(b) Extension Hire. - If the option to extend the Charter Period under Clause 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be 220
mutually agreed between the Owners and the Charterers. 221
(c) Adjustment of Hire. - The rate of Hire shall be adjusted to reflect 222
documented changes, after the date of entering into the Charter Party or the 223
date of commencement of employment, whichever is earlier, in the Owners' 224
costs arising from changes in the Charterers' requirements or regulations 225
governing the Vessel and/or its Crew or this Charter Party. 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in 227
Box 18. In respect of reimbursable expenses incurred in currencies other 228
than the contract currency, the rate of exchange into the contract currency 229
shall be that quoted by the Central Bank of the country of such other currency 230
as at the date of the Owners' invoice. Invoices covering Hire and any other 231
payments due shall be issued monthly as stated in Box 21(l) or at the 232
expiration or earlier termination of this Charter Party. Notwithstanding the 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at 234
the time of delivery. 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the 236
Charterers' account shall be received within the number of days stated in Box 237
23 from the date of receipt of the invoice. Payment shall be made in the 238
contract currency in full without discount to the account stated in Box 22. 239
However any advances for disbursements made on behalf of and approved by 240
the Owners may be deducted from Hire due. 241
If payment is not received by the Owners within 5 banking days following the 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 243
on the amount outstanding from and including the due date until payment is 244
received. 245
Where an invoice is disputed, the Charterers shall in any event pay the 246
undisputed portion of the invoice but shall be entitled to withhold payment of 247
the disputed portion provided that such portion is reasonably disputed and 248
the Charterers specify such reason. Interest will be chargeable at the rate 249
stated in Box 24 on such disputed amounts where resolved in favour of the 250
Owners. Should the Owners prove the validity of the disputed portion of the 251
invoice, balance payment shall be received by the Owners within 5 banking 252
days after the dispute is resolved. Should the Charterers' claim be valid, a 253
corrected invoice shall be issued by the Owners. 254
In default of payment as herein specified, the Owners may require the 255
Charterers to make payment of the amount due within 5 banking days of 256
receipt of notification from the Owners; failing which the Owners shall have 257
the right to withdraw the Vessel without prejudice to any claim the Owners 258
may have against the Charterers under this Charter Party. 259
While payment remains due the Owners shall be entitled to suspend the 260
performance of any and all of their obligations hereunder and shall have no 261
responsibility whatsoever for any consequences thereof, in respect of which 262
the Charterers hereby indemnify the Owners, and Hire shall continue to 263
accrue and any extra expenses resulting from such suspension shall be for 264
the Charterers' account. 265
(f) Audit. - The Charterers shall have the right to appoint an independent 266
chartered accountant to audit the Owners' books directly related to work 267
performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

**11. Suspension of Hire** 274
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of 275
Master, Officers and Crew, breakdown of machinery, damage to hull or other 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 277
payable in respect of any time lost and any Hire paid in advance shall be 278
adjusted accordingly provided always however that Hire shall not cease in the 279
event of the Vessel being prevented from working as aforesaid as a result of 280
(i)  the carriage of cargo as noted in Clause 5(viii) and (ix); 281
(ii)  quarantine or risk of quarantine unless caused by the Master, Officers or 282
      Crew having communication with the shore at any infected area not in 283
      connection with the employment of the Vessel without the consent or the 284
      instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

| | |
|---|---|
| the request of the Charterers; | 287 |
| (iv) detention in consequence of being driven into port or to anchorage | 288 |
| through stress of weather or trading to shallow harbours or to river or | 289 |
| ports with bars or suffering an accident to her cargo, when the expenses | 290 |
| resulting from such detention shall be for the Charterers' account | 291 |
| howsoever incurred; | 292 |
| (v) detention or damage by ice; | 293 |
| (vi) any act or omission of the Charterers, their servants or agents. | 294 |
| (b) <u>Liability for Vessel not Working</u>. - The Owners' liability for any loss, | 295 |
| damage or delay sustained by the Charterers as a result of the Vessel being | 296 |
| prevented from working by any cause whatsoever shall be limited to | 297 |
| suspension of hire. | 298 |
| (c) <u>Maintenance and Drydocking</u>. - Notwithstanding sub-clause (a) hereof, the | 299 |
| Charterers shall grant the Owners a maximum of 24 hours on hire, which shall | 300 |
| be cumulative, per month or pro rata for part of a month from the | 301 |
| commencement of the Charter Period for maintenance and repairs including | 302 |
| drydocking (hereinafter referred to as "maintenance allowance"). The | 303 |
| accumulated maintenance days shall however at any time not exceed six (6) | |
| days. If the accumulated time is not utilized within six (6) months it would | |
| automatically lapse and will not be carried forward. | |
| The Vessel shall be drydocked at regular intervals. The Charterers shall place | 304 |
| the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated | 305 |
| by the Owners at a later date) having facilities suitable to the Owners for the | 306 |
| purpose of such drydocking. | 307 |
| During reasonable voyage time taken in-transits between such port and Area | 308 |
| of Operation the Vessel shall be on hire and such time shall not be counted | 309 |
| against the accumulated maintenance allowance. | 310 |
| Hire shall be suspended during any time taken in maintenance repairs and | 311 |
| drydocking in excess of the accumulated maintenance allowance. | 312 |
| In the event of less time being taken by the Owners for repairs and drydocking | 313 |
| or, alternatively, the Charterers not making the Vessel available for all or part | 314 |
| of this time, the Charterers shall, upon expiration or earlier termination of the | 315 |
| Charter Party, pay the equivalent of the daily rate of Hire then prevailing in | 316 |
| addition to Hire otherwise due under this Charter Party in respect of all such | 317 |
| time not so taken or made available. | 318 |
| Upon commencement of the Charter Period, the Owners agree to furnish the | 319 |
| Charterers with the Owners' proposed drydocking schedule and the | 320 |
| Charterers agree to make every reasonable effort to assist the Owners in | 321 |
| adhering to such predetermined drydocking schedule for the Vessel. It is | 322 |
| understood between Owner and Charter that regular dry-docking is not | |
| scheduled to take place during the first period of Charter Hire, that is during | |
| the first 36 months. | |

### 12. Liabilities and Indemnities
| | |
|---|---|
| | 323 |
| (a) <u>Owners</u>. - Notwithstanding anything else contained in this Charter Party | 324 |
| excepting <u>Clauses 5(c)(iii), 7(b), 8(b), 12(c), 15(c)</u> and <u>21</u>, the Charterers shall | 325 |
| not be responsible for loss of or damage to the property of the Owners or of | 326 |
| their contractors and sub-contractors, including the Vessel, or for personal | 327 |
| injury or death of the employees of the Owners or of their contractors and | 328 |
| sub-contractors, arising out of or in any way connected with the performance | 329 |
| of this Charter Party, even if such loss, damage, injury or death is caused | 330 |
| wholly or partially by the act, neglect, or default of the Charterers, their | 331 |
| employees, contractors or sub-contractors, and even if such loss, damage, | 332 |
| injury or death is caused wholly or partially by unseaworthiness of any vessel; | 333 |
| and the Owners and their contractors and sub-contractors shall indemnify, | 334 |
| protect, defend and hold harmless the | |
| Charterers from any and against all claims, costs, expenses, actions, | 335 |
| proceedings, suits, demands and liabilities whatsoever arising out of or in | 336 |
| connection with such loss, damage, personal injury or death. | 337 |
| (b) <u>Charterers</u>. - Notwithstanding anything else contained in this Charter | 338 |
| Party excepting <u>Clause 21</u>, the Owners shall not be responsible for loss of, | 339 |
| damage to, or any liability arising out of anything towed by the Vessel, any | 340 |
| cargo laden upon or carried by the Vessel or her tow, the property of the | 341 |
| Charterers or of their contractors and sub-contractors, including their | 342 |
| offshore units, or for personal injury or death of the employees of the | 343 |
| Charterers or of their contractors and sub-contractors (other than the Owners | 344 |
| and their contractors and sub-contractors) or of anyone on board anything | 345 |
| towed by the Vessel, arising out of or in any way connected with the | 346 |
| performance of this Charter Party, even if such loss, damage, liability, injury | 347 |
| or death is caused wholly or partially by the act, neglect or default of the | 348 |
| Owners, their employees, contractors or sub-contractors, and even if such | 349 |
| loss, damage, liability, injury or death is caused wholly or partially by the | 350 |
| unseaworthiness of any vessel; and the Charterers and their contractors and | 351 |
| sub-contractors shall indemnify, protect, | |
| defend and hold harmless the Owners from any and against all claims, costs, | 352 |
| expenses, actions, proceedings, suits, demands, and liabilities whatsoever | 353 |

| | |
|---|---|
| arising out of or in connection with such loss, damage, liability, personal | 354 |
| injury or death. | 355 |
| (c) <u>Consequential Damages</u>. -Neither party shall be liable to the other for, and | 356 |
| each party hereby agrees to protect, defend and indemnify the other against, | 357 |
| any consequential damages whatsoever arising out of or in connection with | 358 |
| the performance or non-performance of this Charter Party, including, but not | 359 |
| limited to, loss of use, loss of profits, shut-in or loss of production and cost of | 360 |
| insurance. | 361 |
| (d) <u>Limitations</u>. - Nothing contained in this Charter Party shall be construed or | 362 |
| held to deprive the Owners or the Charterers, as against any person or party, | 363 |
| including as against each other, of any right to claim limitation of liability | 364 |
| provided by any applicable law, statute or convention, save that nothing in | 365 |
| this Charter Party shall create any right to limit liability. Where the Owners or | 366 |
| the Charterers may seek an indemnity under the provisions of this Charter | 367 |
| Party or against each other in respect of a claim brought by a third party, the | 368 |
| Owners or the Charterers shall seek to limit their liability against such third | 369 |
| party. | 370 |
| (e) <u>Himalaya Clause</u>. - (i) All exceptions, exemptions, defences, immunities, | 371 |
| limitations of liability, indemnities, privileges and conditions granted or | 372 |
| provided by this Charter Party or by any applicable statute, rule or regulation | 373 |
| for the benefit of the Charterers shall also apply to and be for the benefit of the | 374 |
| Charterers' parent, affiliated, related and subsidiary companies; the | 375 |
| Charterers' contractors, sub-contractors, clients, joint venturers and joint | 376 |
| interest owners (always with respect to the job or project on which the Vessel | 377 |
| is employed); their respective employees and their respective underwriters. | 378 |
| (ii) All exceptions, exemptions, defences, immunities, limitations of liability, | 379 |
| indemnities, privileges and conditions granted or provided by this Charter | 380 |
| Party or by any applicable statute, rule or regulation for the benefit of the | 381 |
| Owners shall also apply to and be for the benefit of the Owners' parent, | 382 |
| affiliated, related and subsidiary companies, the Owners' sub-contractors, | 383 |
| the Vessel, its Master, Officers and Crew, its registered owner, its operator, its | 384 |
| demise charterer(s), their respective employees and their respective | 385 |
| underwriters. | 386 |
| (iii) The Owners or the Charterers shall be deemed to be acting as agent or | 387 |
| trustee of and for the benefit of all such persons and parties set forth above, | 388 |
| but only for the limited purpose of contracting for the extension of such | 389 |
| benefits to such persons and parties. | 390 |
| (f) <u>Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but</u> | 391 |
| <u>regardless of whether this option is exercised the other provisions of Clause 12</u> | 392 |
| <u>shall apply and shall be paramount)</u> | 393 |
| In order to avoid disputes regarding liability for personal injury or death of | 394 |
| employees or for loss of or damage to property, the Owners and the | 395 |
| Charterers have entered into, or by this Charter Party agree to enter into, an | 396 |
| Agreement for Mutual Indemnity and Waiver of Recourse (in a form | 397 |
| substantially similar to that specified in ANNEX "C") between the Owners, the | 398 |
| Charterers and the various contractors and sub-contractors of the Charterers. | 399 |
| (g) <u>Hazardous and Noxious Substances</u>. - Notwithstanding any other | 400 |
| provision of this Charter Party to the contrary, the Charterers shall always be | 401 |
| responsible for any losses, damages or liabilities suffered by the Owners, | 402 |
| their employees, contractors or sub-contractors, by the Charterers, or by | 403 |
| third parties, with respect to the Vessel or other property, personal injury or | 404 |
| death, pollution or otherwise, which losses, damages or liabilities are caused, | 405 |
| directly or indirectly, as a result of the Vessel's carriage of any hazardous and | 406 |
| noxious substances in whatever form as ordered by the Charterers, and the | 407 |
| Charterers shall defend, indemnify the Owners and hold the Owners harmless | 408 |
| for any expense, loss or liability whatsoever or howsoever arising with | 409 |
| respect to the carriage of hazardous or noxious substances. | 410 |

### 13. Pollution
| | |
|---|---|
| | 411 |
| (a) Except as otherwise provided for in <u>Clause 15(c)(iii)</u>, the Owners shall be | 412 |
| liable for, and agree to indemnify, defend and hold harmless the Charterers | 413 |
| against, all claims, costs, expenses, actions, proceedings, suits, demands | 414 |
| and liabilities whatsoever arising out of actual or potential pollution damage | 415 |
| and the cost of cleanup or control thereof arising from acts or omissions of | 416 |
| the Owners or their personnel which cause or allow discharge, spills or leaks | 417 |
| from the Vessel, except as may emanate from cargo thereon or therein. | 418 |
| (b) The Charterers shall be liable for and agree to indemnify, defend and hold | 419 |
| harmless the Owners from all claims, costs, expenses, actions, proceedings, | 420 |
| suits, demands, liabilities, loss or damage whatsoever arising out of or | 421 |
| resulting from any other actual or potential pollution damage, even where | 422 |
| caused wholly or partially by the act, neglect or default of the Owners, their | 423 |
| employees, contractors or sub-contractors or by the unseaworthiness of the | 424 |
| Vessel. | 425 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**14. Insurance** 426

(a)(i) The Owners shall procure and maintain in effect for the duration of this 427
Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". 428
Policy limits shall not be less than those indicated. Reasonable deductibles 429
are acceptable and shall be for the account of the Owners. 430
(ii) The Charterers shall upon request be named as co-insured. The Owners 431
shall upon request cause insurers to waive subrogation rights against the 432
Charterers (as encompassed in Clause 12(e)(ii)). Co-insurance and/or 433
waivers of subrogation shall be given only insofar as these relate to liabilities 434
which are properly the responsibility of the Owners under the terms of this 435
Charter Party. 436
(b) The Owners shall upon request furnish the Charterers with certificates of 437
insurance which provide sufficient information to verify that the Owners have 438
complied with the insurance requirements of this Charter Party. 439
(c) If the Owners fail to comply with the aforesaid insurance requirements, the 440
Charterers may, without prejudice to any other rights or remedies under this 441
Charter Party, purchase similar coverage and deduct the cost thereof from 442
any payment due to the Owners under this Charter Party. 443

**15. Saving of Life and Salvage** 444

(a) The Vessel shall be permitted to deviate for the purpose of saving life at 445
sea without prior approval of or notice to the Charterers and without loss of 446
Hire provided however that notice of such deviation is given as soon as 447
possible. 448
(b) Subject to the Charterers' consent, which shall not be unreasonably 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it 450
being understood that the Vessel shall be off hire from the time she leaves 451
port or commences to deviate and she shall remain off-hire until she is again 452
in every way ready to resume the Charterers' service at a position which is not 453
less favourable to the Charterers than the position at the time of leaving port 454
or deviating for the salvage services. 455
All salvage monies earned by the Vessel shall be divided equally between the 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's 457
share, legal expenses, value of fuel and lubricants consumed, Hire of the 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if 459
any, and any other extraordinary loss or expense sustained as a result of the 460
salvage. 461
The Charterers shall be bound by all measures taken by the Owners in order 462
to secure payment of salvage and to fix its amount. 463
(c) The Owners shall waive their right to claim any award for salvage 464
performed on property owned by or contracted to the Charterers, always 465
provided such property was the object of the operation the Vessel was 466
chartered for, and the Vessel shall remain on hire when rendering salvage 467
services to such property. This waiver is without prejudice to any right the 468
Vessel's Master, Officers and Crew may have under any title. 469
If the Owners render assistance to such property in distress on the basis of 470
"no claim for salvage", then, notwithstanding any other provisions contained 471
in this Charter Party and even in the event of neglect or default of the Owners, 472
Master, Officers or Crew: 473
(i) The Charterers shall be responsible for and shall indemnify the Owners 474
against payments made, under any legal rights, to the Master, Officers 475
and Crew in relation to such assistance. 476
(ii) The Charterers shall be responsible for and shall reimburse the Owners 477
for any loss or damage sustained by the Vessel or her equipment by 478
reason of giving such assistance and shall also pay the Owners' 479
additional expenses thereby incurred. 480
(iii) The Owners shall be responsible for any actual or potential spill, 481
seepage and/or emission of any pollutant howsoever caused occurring 482
within the offshore site and any pollution resulting therefrom 483
wheresoever it may occur and including but not limited to the cost of 484
such measures as are reasonably necessary to prevent or mitigate 485
pollution damage, and the Charterers shall indemnify the Owners 486
against any liability, cost or expense arising by reason of such actual or 487
potential spill, seepage and/or emission. 488
(iv) The Vessel shall not be off-hire as a consequence of giving such 489
assistance, or effecting repairs under sub-paragraph (ii) of this sub- 490
clause, and time taken for such repairs shall not count against time 491
granted under Clause 11(c). 492
(v) The Charterers shall indemnify the Owners against any liability, cost 493
and/or expense whatsoever in respect of any loss of life, injury, damage 494
or other loss to person or property howsoever arising from such 495
assistance. 496

**16. Lien** 497

The Owners shall have a lien upon all cargoes for all claims against the 498
Charterers under this Charter Party and the Charterers shall have a lien on the 499
Vessel for all monies paid in advance and not earned. The Charterers will not 500
suffer, nor permit to be continued, any lien or encumbrance incurred by them 501
or their agents, which might have priority over the title and interest of the 502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall 503
indemnify and hold the Owners harmless against any lien of whatsoever 504
nature arising upon the Vessel during the Charter Period while she is under 505
the control of the Charterers, and against any claims against the Owners 506
arising out of the operation of the Vessel by the Charterers or out of any 507
neglect of the Charterers in relation to the Vessel or the operation thereof. 508
Should the Vessel be arrested by reason of claims or liens arising out of her 509
operation hereunder, unless brought about by the act or neglect of the 510
Owners, the Charterers shall at their own expense take all reasonable steps to 511
secure that within a reasonable time the Vessel is released and at their own 512
expense put up bail to secure release of the Vessel. 513

**17. Sublet and Assignment** 514

(a) Charterers. - The Charterers shall have the option of subletting, assigning 515
or loaning the Vessel to any person or company not competing with the 516
Owners, subject to the Owners' prior approval which shall not be 517
unreasonably withheld, upon giving notice in writing to the Owners, but the 518
original Charterers shall always remain responsible to the Owners for due 519
performance of this Charter Party and contractors of the person or company 520
taking such subletting, assigning or loan shall be deemed contractors of the 521
Charterers for all the purposes of this Charter Party. The Owners make it a 522
condition of such consent that additional Hire shall be paid as agreed 523
between the Charterers and the Owners having regard to the nature and 524
period of any intended service of the Vessel. 525
~~(b) If the Vessel is sublet, assigned or leased to undertake rig anchor~~ 526
~~handling and/or towing operations connected with equipment, other than that~~ 527
~~used by the Charterers, then a daily increment to the Hire in the amount as~~ 528
~~stated in Box 39 or pro rata shall be paid for the period between departure for~~ 529
~~such operations and return to her normal duties for the Charterers.~~ 530
(d) Owners. - The Owners may not assign or transfer any part of this Charter 531
Party without the written approval of the Charterers, which approval shall not 532
be unreasonably withheld. 533
Approval by the Charterers of such subletting or assignment shall not relieve 534
the Owners of their responsibility for due performance of the part of the 535
services which is sublet or assigned. 536

**18. Substitute Vessel** 537

The Owners shall be entitled at any time, whether before delivery or at any 538
other time during the Charter Period, to provide a substitute vessel, subject to 539
the Charterers' prior approval which shall not be unreasonably withheld. 540

**19. War** 541

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be 542
ordered nor continue to any port or place or on any voyage nor be used on 543
any service which will bring the Vessel within a zone which is dangerous as a 544
result of any actual or threatened act of war, hostilities, warlike 545
operations, acts of piracy or of hostility or malicious damage against this or 546
any other vessel or its cargo by any person, body or state whatsoever, 547
revolution, civil war, civil commotion or the operation of international law, nor 548
be exposed in any way to any risks or penalties whatsoever consequent upon 549
the imposition of sanctions, nor carry any goods that may in any way expose 550
her to any risks of seizure, capture, penalties or any other interference of any 551
kind whatsoever by the belligerent or fighting powers or parties or by any 552
government or rulers. 553
(b) Should the Vessel approach or be brought or ordered within such zone, or 554
be exposed in any way to the said risks, (i) the Owners shall be entitled from 555
time to time to insure their interest in the Vessel for such terms as they deem 556
fit up to its open market value and also in the Hire against any of the risks 557
likely to be involved thereby, and the Charterers shall make a refund on 558
demand of any additional premium thereby incurred, and (ii) notwithstanding 559
the terms of Clause 11 Hire shall be payable for all time lost including any loss 560
owing to loss of or injury to the Master, Officers, Crew or passengers or to 561
refusal by any of them to proceed to such zone or to be exposed to such risks. 562
(c) In the event of additional insurance premiums being incurred or the wages 563
of the Master and/or Officers and/or Crew and/or the cost of provisions and/ 564
or stores for deck and/or engine room being increased by reason of or during 565
the existence of any of the matters mentioned in sub-clause (a) the amount of 566
any additional premium and/or increase shall be added to the Hire, and paid 567
by the Charterers on production of the Owners' account therefor, such 568

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

account being rendered monthly.    569

(d) The Vessel shall have liberty to comply with any orders or directions as to 570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in 571
any other way whatsoever given by the government of the nation under whose 572
flag the Vessel sails or any other government or any person (or body) acting 573
or purporting to act with the authority of such government or by any 574
committee or person having under the terms of the war risks insurance on the 575
Vessel the right to give any such orders or directions. 576
~~(e) In the event of the outbreak of war (whether there be a declaration of war or~~ 577
~~not) between any of the countries stated in Box 32 or in the event of the nation~~ 578
~~under whose flag the Vessel sails becoming involved in war (whether there be~~ 579
~~a declaration of war or not), either the Owners or the Charterers may terminate~~ 580
~~this Charter Party, whereupon the Charterers shall redeliver the Vessel to the~~ 581
~~Owners in accordance with PART I. If it has cargo on board after discharge~~ 582
~~thereof at destination or, if debarred under this Clause from reaching or~~ 583
~~entering it, at a near open and safe port or place as directed by the Owners, or~~ 584
~~if the Vessel has no cargo on board, at the port or place at which it then is or if~~ 585
~~at sea at a near, open and safe port or place as directed by the Owners. In all~~ 586
~~cases Hire shall continue to be paid and, except as aforesaid, all other~~ 587
~~provisions of this Charter Party shall apply until redelivery.~~ 588
(f) If in compliance with the provisions of this Clause anything is done or is not 589
done, such shall not be deemed a deviation. 590
The Charterers shall procure that all Bills of Lading (if any) issued under this 591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d) 592
and (f) of this Clause. 593

**20.Excluded Ports** 594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners' 595
written permission (a) any place where fever or epidemics are prevalent or to 596
which the Master, Officers and Crew by law are not bound to follow the Vessel; 597
(b) any ice-bound place or any place where lights, lightships, marks and 598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival 599
or where there is risk that ordinarily the Vessel will not be able on account of 600
ice to reach the place or to get out after having completed her operations. The 601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on 602
account of ice, the Master considers it dangerous to remain at the loading or 603
discharging place for fear of the Vessel being frozen in and/or damaged he 604
has liberty to sail to a convenient open place and await the Charterers' fresh 605
instructions. 606
(b) Should the Vessel approach or be brought or ordered within such place, 607
or be exposed in any way to the said risks, the Owners shall be entitled from 608
time to time to insure their interests in the Vessel and/or Hire against any of 609
the risks likely to be involved thereby on such terms as they shall think fit, the 610
Charterers to make a refund to the Owners of the premium on demand. 611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost 612
including any lost owing to loss of or sickness or injury to the Master, Officers, 613
Crew or passengers or to the action of the Crew in refusing to proceed to such 614
place or to be exposed to such risks. 615

**21.General Average and New Jason Clause** 616
General Average shall be adjusted and settled in London unless otherwise 617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 618
Hire shall not contribute to General Average. Should adjustment be made in 619
accordance with the law and practice of the United States of America, the 620
following provision shall apply: 621
"In the event of accident, damage or disaster before or after the 622
commencement of the voyage, resulting from any cause whatsoever, whether 623
due to negligence or not, for which, or for the consequence of which, the 624
Owners are not responsible, by statute, contract or otherwise, the cargo, 625
shippers, consignees or owners of the cargo shall contribute with the Owners 626
in General Average to the payment of any sacrifices, loss or expenses of a 627
General Average nature that may be made or incurred and shall pay salvage 628
and special charges incurred in respect of the cargo. 629
If a salving vessel is owned or operated by the Owners, salvage shall be paid 630
for as fully as if the said salving vessel or vessels belonged to strangers. Such 631
deposit as the Owners, or their agents, may deem sufficient to cover the 632
estimated contribution of the cargo and any salvage and special charges 633
thereon shall, if required, be made by the cargo, shippers, consignees 634
or owners of the cargo to the Owners before delivery". 635

**22.Both-to-Blame Collision Clause** 636
If the Vessel comes into collision with another ship as a result of the 637
negligence of the other ship and any act, neglect or default of the Master, 638
mariner, pilot or the servants of the Owners in the navigation or the 639

management of the Vessel, the Charterers will indemnify the Owners against 640
all loss or liability to the other or non-carrying ship or her owners insofar as 641
such loss or liability represent loss of or damage to, or any claim whatsoever 642
of the owners of any goods carried under this Charter Party paid or payable by 643
the other or non-carrying ship or her owners to the owners of the said goods 644
and set-off, recouped or recovered by the other or non-carrying ship or her 645
owners as part of their claim against the Vessel or the Owners. The foregoing 646
provisions shall also apply where the owners, operators or those in charge of 647
any ship or ships or objects other than or in addition to the colliding ships or 648
objects are at fault in respect of a collision or contact. 649

**23.Structural Alterations and Additional Equipment** 650
The Charterers shall have the option of, at their expense, making structural 651
alterations to the Vessel or installing additional equipment with the written 652
consent of the Owners which shall not be unreasonably withheld but unless 653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 654
expense, to her original condition. The Vessel is to remain on hire during any 655
period of those alterations or reinstatement. The Charterers, unless otherwise 656
agreed, shall be responsible for repair and maintenance of any such 657
alteration or additional equipment. 658

**24.Health and Safety** 659
The Owners shall comply with and adhere to all applicable international, 660
national and local regulations pertaining to health and safety, and such 661
Charterers' instructions as may be appended hereto. 662

**25.Taxes** 663
Each party shall pay taxes due on its own profit, income and personnel. The 664
Charterers shall pay all other taxes and dues arising out of the operation or 665
use of the Vessel during the Charter Period. 666
In the event of change in the Area of Operation or change in local regulation 667
and/or interpretation thereof, resulting in an unavoidable and documented 668
change of the Owners' tax liability after the date of entering into the Charter 669
Party or the date of commencement of employment, whichever is the earlier, 670
Hire shall be regulated accordingly. 671

**26.Early Termination** 672
~~(a) For Charterers' Convenience. - The Charterers may terminate this Charter~~ 673
~~Party at any time by giving the Owners written notice as stated in Box 15 and~~ 674
~~by paying the settlement stated in Box 14 and the demobilisation charge~~ 675
~~stated in Box 15, as well as Hire or other payments due under the Charter~~ 676
~~Party.~~ 677
(b) For Cause. - If either party becomes informed of the occurrence of any 678
event described in this Clause that party shall so notify the other party 679
promptly in writing and in any case within 3 days after such information is 680
received. If the occurrence has not ceased within 3 days after such 681
notification has been given, this Charter Party may be terminated by either 682
party, without prejudice to any other rights which either party may have, under 683
any of the following circumstances: 684
(i) Requisition. - If the government of the state of registry and/or the flag of 685
the Vessel, or any agency thereof, requisitions for hire or title or 686
otherwise takes possession of the Vessel during the Charter Period. 687
(ii) Confiscation. - If any government, individual or group, whether or not 688
purporting to act as a government or on behalf of any government, 689
confiscates, requisitions, expropriates, seizes or otherwise takes 690
possession of the Vessel during the Charter Period. 691
(iii) Bankruptcy. - In the event of an order being made or resolution passed 692
for the winding up, dissolution, liquidation or bankruptcy of either party 693
(otherwise than for the purpose of reconstruction or amalgamation) or if 694
a receiver is appointed or if it suspends payment or ceases to carry on 695
business. 696
(iv) Loss of Vessel. - If the Vessel is lost, actually or constructively, or 697
missing, unless the Owners provide a substitute vessel pursuant to 698
Clause 18. In the case of termination, Hire shall cease from the date the 699
Vessel was lost or, in the event of a constructive total loss, from the date 700
of the event giving rise to such loss. If the date of loss cannot be 701
ascertained or the Vessel is missing, payment of Hire shall cease from 702
the date the Vessel was last reported. 703
(v) Breakdown. - If, at any time during the term of this Charter Party, a 704
breakdown of the Owners' equipment or Vessel results in the Owners' 705
being unable to perform their obligations hereunder for a period 706
exceeding that stated in Box 32, unless the Owners provide a substitute 707
vessel pursuant to Clause 18. 708
(vi) Force Majeure. - If a force majeure condition as defined in Clause 27 709

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-
printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of
discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**

## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

prevails for a period exceeding 15 consecutive days. — 710

(vi) *Default*. - If either party is in repudiatory breach of its obligations 711
hereunder. 712
Termination as a result of any of the above mentioned causes shall not relieve 713
the Charterers of any obligation for Hire and any other payments due. 714

**27. Force Majeure** 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or 716
delay or failure in performance hereunder resulting from any force majeure 717
event, including but not limited to acts of God, fire, action of the elements, 718
epidemics, war (declared or undeclared), warlike actions, insurrection, 719
revolution or civil strife, piracy, civil war or hostile action, strikes or 720
differences with workmen (except for disputes relating solely to the Owners' 721
or the Charterers' employees), acts of the public enemy, federal or state laws, 722
rules and regulations of any governmental authorities having or asserting 723
jurisdiction in the premises or of any other group, organisation or informal 724
association (whether or not formally recognised as a government), and any 725
other cause beyond the reasonable control of either party which makes 726
continuance of operations impossible. 727

**28. Notices and Invoices** 728
Notices and invoices required to be given under this Charter Party shall be 729
given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate. 730

**29. Wreck Removal** 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and 732
has to be removed upon request by any compulsory law or authority having 733
jurisdiction over the area where the wreck is placed, the Owners shall be 734
liable for any and all expenses in connection with the raising, removal, 735
destruction, lighting or marking of the wreck. 736

**30. Confidentiality** 737
All information or data obtained by the Owners in the performance of this 738
Charter Party is the property of the Charterers, is confidential and shall not be 739
disclosed without the prior written consent of the Charterers. The Owners 740
shall use their best efforts to ensure that the Owners, any of their 741
sub-contractors, and employees and agents thereof shall not disclose any 742
such information or data. 743

**31. Law and Arbitration** 744
*) (a) This Charter Party shall be governed by English Norwegian law and any 745
dispute
arising out of this Charter Party shall be referred to arbitration in London Oslo, 746
one
arbitrator being appointed by each party, in accordance with the Norwegian 747
Arbitration
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for 748
the time being in force. On the receipt by one party of the nomination in 749
writing of the other party's arbitrator that party shall appoint their arbitrator 750

within 14 days, failing which the arbitrator already appointed shall act as sole 751
arbitrator. If two arbitrators properly appointed shall not agree they shall 752
appoint an umpire whose decision shall be final. 753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute 754
shall be referred to three persons at New York, one to be appointed by each of 755
the parties hereto, and the third by the two so chosen; their decision or that of 756
any two of them shall be final, and for purpose of enforcing any award, this 757
agreement may be made a rule of the Court. The arbitrators shall be members 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings 759
shall be conducted in accordance with the rules of the Society. 760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration 761
at the place stated in Box 33 subject to the law and procedures applicable 762
there. 763
(d) If Box 33 in PART II is not filled in, sub-clause (a) of this Clause shall apply. 764
*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 765

**32. Entire Agreement** 766
This is the entire agreement of the parties, which supersedes all previous 767
written or oral understandings and which may not be modified except by a 768
written amendment signed by both parties. 769

**33. Severability Clause** 770
If any portion of this Charter Party is held to be invalid or unenforceable for 771
any reason by a court or governmental authority of competent jurisdiction, 772
then such portion will be deemed to be stricken and the remainder of this 773
Charter Party shall continue in full force and effect. 774

**34. Demise** 775
Nothing herein contained shall be construed as creating a demise of 776
the Vessel to the Charterers. 777

**35. Definitions** 778
"Well" is defined for the purposes of this Charter Party as the time required to 779
drill, test, complete and/or abandon a single borehole including any side- 780
track thereof. 781
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, 782
offshore installation, structure and/or mobile unit used in offshore 783
exploration, construction, pipelaying or repair, exploitation or production. 784
"Offshore site" is defined for the purposes of this Charter Party as the area 785
within three nautical miles of an "offshore unit" from or to which the Owners 786
are requested to take their Vessel by the Charterers. 787
"Employee" is defined for the purpose of this Charter Party as employees, 788
directors, officers, servants, agents or invitees. 789

**36. Headings** 790
The headings of this Charter Party are for identification only and shall not be 791
deemed to be part hereof or be taken into consideration in the interpretation 792
or construction of this Charter Party. 793

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ADDITIONAL CLAUSES**
**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

37.   **Cost of Mobilization and De-Mobilization**
It is agreed between the parties that the cost of mobilization and de-mobilization shall be
included in the vessel's day-rate for the first three years of operation, as per Box 19.
There shall therefore be no other claims relating to mobilization and de-mobilization of
the vessel.

38.   **Scope of Work and Local Personnel**
The vessel shall perform it's duties on both the west and East coast of India as per
~~Scope of Work, and may from time to time~~ may be directed by ONGC for
~~these two Areas of operation.~~ Rolv Berg Drive will arrange for local support and agency
at the place(s) of deployment and further supply TFDS Offshore AS with qualified local
marine crew as per the decisions of the Vessel Master and TFDS. The local marine crew
shall be paid locally by RBD and RBD shall be responsible for the deduction of local
taxes. RBD to invoice TFDS accordingly at the end of each month as per separate
agreement.

*NA !*

*Only within the
vessel's capabilities and
certification.*
*SH*

ANNEXURE - A

## Technical Specification of AHTS of not less than 9600 BHP - 1 No.

| Sr.No | Prameter | ONGC Requirement | Bidder Specification |
|-------|----------|-------------------|----------------------|
| 1 | **GENERAL** | | |
| 1,1 | Name of Vessel | | **MV ALDOMA** |
| 1,2 | Name of owner | | **DESPONENT OWNER T.F.D.S. OFFSHORE AS** |
| 1,3 | Flag | | **BAHAMAS** |
| 1,4 | Poart of registry | | **NASSAU** |
| 1,5 | Place of build | | **NORWAY** |
| 1,6 | Year of build | | 1983 |
| 1,7 | Name of yard | | **Framnes Mekaniske, Sandefjord** |
| 1,8 | Classification | ABS/DNV/BV/IRS/GL | **DNV * 1A1 △ Tug&Supply Vessel SF EO FIFI II ICE C** |
| 1,9 | call sign/official No. | | **C6RD9** |
| 2 | **DIMENSIONS** | | |
| 2,1 | LOA [meters] | | **67,70 m** |
| 2,2 | LBP [meters] | | **59,40 m** |
| 2,3 | Breadth mld [meters] | | **14,50 m** |
| 2,4 | Depth mld [meters] | | **5,97 m** |
| 2.5.1 | Summer draugh [meters] | | **5,85 mtr. Min. draft (Light ship) 3,5 mtr. Max. draft (Tropical) 6.08 mtr** |
| 2.5.2 | Operating draugh [meters] | Not more than 5.95 M at specified min DWT | **5 m at 1000 DWT ( TOTAL DWT 2005 TON)** |
| 2,6 | Clear deck Aft | | **407 m2** |
| 2.6.1 | Length [meters] | | **37 mtrs** |
| 2.6.2 | Breadth [meters] | | **11 mtrs** |
| 2.6.3 | Area [sq. meters] | Not less than 300 sq. meters | **407m2** |

| 3 | MACHINERY | | |
|---|---|---|---|
| 3.1 | Main Engines | | |
| 3.1.1 | Number of Main Engines | Not less than 2 [two] | 4 |
| 3.1.2 | Make | | Bergen Diesel |
| 3.1.3 | Model | | KVMB 12 |
| 3.1.4 | Max continuous rating [for all main engines together] at 100% - NOMINAL | Not less than 9600 BHP | 12240 BHP |
| 3.1.5 | Year of build | New at the time of installation onboard the Vessel | 1983 [New at the time of installation onboard the Vessel] |
| 3.2 | Main Propulsion | | |
| 3.2.1 | Number of propellers | Not less than 2 [two] | 2 x Ulstein, 180 Rpm |
| 3.2.2 | Type | Shrouded CPP preferred | CPP |
| 3.2.3 | Propeller diameter [mtrs] | | 3600 mm |
| 3.2.4 | Propeller make | | ULSTEIN PROPELLER |
| 3.3 | Side Thrusters | | 3 |
| 3.3.1 | Number of bow thrusters | Not less than 2 [one] | 2 |
| 3.3.2 | Number of stern thrusters | | 1 |
| 3.3.3 | Rating of BT's [KW] | | 1180 KW |
| 3.3.4 | Rating of ST's [KW] | | 590 KW |
| 3.4 | Generators | | |
| 3.4.1 | Number of generators | At least three independent power sources | 4 Independent Power Sources [2 x Shaftgenerators, Siemens 3200Kw, 2 x |
| 3.4.2 | Total rating [KVA] | | 3690 KVA |
| 3.4.3 | Voltage rating | | 380V |
| 3.4.4 | Frequency [Hz] | | 50 Hz |
| 3.5 | Steering gear | | |
| 3.5.1 | Type | Hydraulic preferred | Hydraulic, Tennfjord I-2X [18M300/2GM620]-FU |

| 3.5.2 | Number of rudders | Not less than 2 [two] | 2 Tennfjord |
|---|---|---|---|
| **4** | **PERFORMANCE** | | |
| 4,1 | Trial speed [knots] | | 16,5 knots |
| 4,2 | Cruising speed [knots] | | 12-15 knots |
| 4,3 | Bollard pull [Max cont] | Not less than 105 Metric Tons | 140 Tons |
| 4,4 | Fuel consumption [Kl/day] | | |
| 4.4.1 | Standby | | 7,1 m3 |
| 4.4.2 | Underway | | 18 m3 |
| 4.4.3 | Towing | | 44,7 m3 |
| **5** | **TOWING AND ANCHOR HANDLING** | | |
| 5,1 | Winch | | |
| 5.1.1 | Type | Min. Double drum water fall hydraulic | Brattvaag SL 250( Double drum Water fall hydraulic) |
| 5.1.2 | Make | | Brattvaag |
| 5.1.3 | Model | | SL 250W / BSL 250 WX |
| 5.1.4 | Drum capacity | For a total length of not less than 2,000 mtrs., 72mm/76mm wire rope. | 2400 mtrs / 72mm |
| 5.1.5 | Work wire | Total length of 2000 mtrs. or more of 72/76mm required | 2400 mtrs / 72mm |
| 5.1.6 | Drum speed [M/min] | | 60 ton @ 28mtr/min & 250 ton @6,4 mtr/min |
| 5.1.7 | Winch stall capacity | Not less than 250 T | 250 ton |
| 5.1.8 | Line pull | | 350 ton |
| 5,2 | Wildcat for chains | | |
| 5.2.1 | Suitable for 70 mm Chain | | 76mm / 83mm |
| 5.2.2 | Chain lockers | Not less than 2 for 70mm stud-link chains | 600 m 3 1/4 " chain |
| 5.2.3 | Chain locker capacity [cubic meters] | 2 X 90 cu mtrs. | 203 cu. Mtrs. |
| 5 3 | Two wire and short jang | | Karm 130318/130554, 240 ton. |

| 5,3 | Tow pins and shark jaws | | Karm O 350/130318/130554, 240 ton. |
|-----|-------------------------|--|-------------------------------------|
| 5,4 | Spare Storage | | Two storage drums. One can hold 1200m. 70 mm. Wire and the other 1000 m.64 mm. We |
| 5,5 | Stern roller | | Ulstein 3,66 mtr x 2,50 mtr, 350 ton SWL |
| 5,6 | Tugger winches | | 2 Brattvaag WMA 1010 |
| 5,7 | Capstans [on aft deck] | | 2 |
| **6** | **NAVIGATION AND COMMUNICATION EQUIPMENT** | | |
| 6,1 | Gyrocompass | REQUIRED | Anshutz Standard 20 |
| 6,2 | Magnetic compass | REQUIRED | Standard |
| 6,3 | Echo sounder | REQUIRED | Simrad / ED161 |
| 6,4 | Auto pilot | REQUIRED | Racal Decca Pilot 450 |
| 6,5 | Radar | REQUIRED | 2 Furuno ARPA, X and S band, 72 nm |
| 6,6 | SSB Radio transceiver/ GMDSS | REQUIRED | JRC (GMDSS area 4) JSS-800 |
| 6,7 | Marine VHF transceiver | REQUIRED | 2 - JRC/JHS-324 & Sailor/RT2048 |
| 6,8 | GPS | REQUIRED | Phillips MK10, Furuno GP 80 |
| 6,9 | Portable VHF | REQUIRED | 5 - 3 x Jotron/Tron & 2 x Motorola GP·300 |
| 6,10 | INMAR SAT | REQUIRED | Satpol/Phillips Safecom C |
| **7** | **ACCOMODATION** | | |
| 7,1 | Crew compliment | | 17 |
| 7,2 | For charterer's use | Suitable accomodation for five persons required | 7 |
| **8** | **CAPACITIES** | | |
| 8,1 | Deck cargo | Not less than 500 Ton | 750 ton |
| 8,2 | Deck-loading [T/ sq mtrs] | | 6 T/m3 |
| 8,3 | Fuel (m³) | | 1041 m3 |

| 8,4 | Drill water (m³) | | 516 m3 |
|-----|------------------|-----|--------|
| 8,5 | Pot water (m³) | | 289 m3 |
| 8,6 | Ballast water (m³) | | 516 m3 |
| 8,7 | Liquid mud (m³) | REQUIRED | 119 m3 |
| 8,8 | Dry bulk (m³) | | 196 m3 |
| 8,9 | Dead weight [Tons] | Not less than 1000 Tons at 5.95 M draught | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 8,1 | 4" Cam lock couplings | Required on all hoses | Yes |
| 9 | RIGGING EQUIPMENT | | |
| | | **WILL BE PROVIDED** | |
| 10 | *FIFI* | | **VESSEL IS FITTED WITH FI-FI Class-II** |
| 11 | **OTHER CAPABILITIES** | | |
| | Certificates | 1. Certificate of Registry | ENCLOSED |
| | | 2. Class Certificate (H&M) | ENCLOSED |
| | | 3. Bollard Pull Certificate | ENCLOSED |
| | | 4. G.A PLAN | ENCLOSED |
| | | 5. DEAD WEIGHT SCALE | ENCLOSED |

**ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels**
**Code Name: "SUPPLYTIME 89" - dated**



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.* – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* – Protection and Indemnity or Marine Liability Insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury          per person
Property Damage          per occurrence.

(4) *Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) *Comprehensive General Automobile Liability Insurance.* – Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury          According to the local law.
Property Damage          In an amount equivalent to single limit per occurrence.

(6) Such other insurances as may be agreed.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels**
**Code Name: "SUPPLYTIME 89" - dated**



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ANNEX "D" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: "SUPPLYTIME 89" –DATED**

## OWNERS VESSEL MARINE CREW

MARINE CREW

Provided by Owners

*Bilag 2*

## SIDE-AGREEMENT TO TIME CHARTER PARTY BETWEEN TFDS OFFSHORE AS AND ROLV BERG DRIVE AS REGARDING AHTS ALDOMA

It is understood between the parties that ONGC may offer Rolv Berg Drive AS extensions to the 3 year contract with contract no: MR/MM/OFF.LGTS./CH/VESSELS//10(109)/2003. It is further agreed between the parties that should Rolv Berg Drive AS be granted extension to this contract or new contracts with ONGC, Rolv Berg Drive shall have the right to extend the charter of AHTS Aldoma on a day-rate not to exceed USD 9.000,-.

This agreement shall be subject only to TFDS Offshore securing further charter with the vessel's owner.

It is further agreed that should Rolv Berg Drive AS secure other future contracts with ONGC TFDS Offshore AS will be given first option where they have vessels which meet the requirements at competitive rates.

Rett kopi bekreftes
Certified Copy
Kristian Lindhartsen
Advokatfullmektig

This agreement is entered into on the 5th of March 2004.

For TFDS Offshore AS

Svein Hoel
**Managing Director**

For Rolv Berg Drive AS

Snorre S. Stinessen
**Coordinating Manager**



## ROLV BERG DRIVE A/S

Rett kopi bekreftes
Certified copy
Kristian Lindhartsen
Advokatfullmektig

North Offshore AS
Postboks 6155
9291 Tromsø

Ved Svein Hoel                                    Tromsø, 1. august 2006.

### Ad AHTS Aldoma.

Som De er kjent med har ONGC et anbud ute som skal besvares den 3. august
2006, for flere ulike typer skip. Anbudsnummeret er
ONG/COL/HMM/ML/VESSELS/10/2005/P761C06003. Anbudet er som De sikkert
også er kjent med delvis et svar på nye behov, men først og fremst et svar på behov
for fornyelse av eksisterende arbeidsoppgaver/kontrakter. Herunder også vår
kontrakt for Aldoma.

I tråd med vårt "Letter of Exclusivity" datert 15. oktober 2003 og vår "Side-Agreement
to Time Charter Party Between TFDS Offshore AS and Rolv Berg Drive AS
Regarding AHTS Aldoma" datert 5. mars 2004 samt certepartiet, har vi besluttet å
legge inn Aldoma på dette anbudet.

Tidspunkt for innlevering av anbudet er som kjent 3. august, avgjørelse er ventet
innen årets utgang.

Kontraktenes varighet er 5 år, oppstart vil for Aldomas del bli etter avslutning av
løpende kontraktsperiode.

Vi foreslår et møte en av de nærmeste dagene for å diskutere eventuelle nødvendige
oppgraderinger av skipet i tråd med de nye anbudskriteriene.

Med vennlig hilsen

Snorre S. Stinessen
For Rolv Berg Drive AS

*Bilag 4*

-----Opprinnelig melding-----
**Fra:** Rolv Berg [mailto:Rolv@rbdrive.com]
**Sendt:** 7. januar 2007 15:50
**Til:** svein.hoel@offshore.tfds.no
**Kopi:** Morten Lund; snorre@rbdrive.com
**Emne:** VS: Opsjonen
**Viktighet:** Høy

Rett kopi bekreftes
Certified copy
Kristian Lindhartsen
Advokatfullmektig

Svein Hoel,

North Offshore AS

Vi viser til tidligere diskusjoner om vår opsjon på å forlenge certepartiet for "Aldoma". Vi utøver med dette opsjonen for en periode på 3 pluss 2x1 års opsjoner i direkte forlengelse av det certeparti som nå løper.

Vi ber om Deres positive bekreftelse på at opsjonsavtalen er inngått innen Kl 1200 tirsdag den 9. januar 2007

Vi vil nå varsle de russiske elere om at opsjonen er utøvet.

De har tidligere opplyst til ONGC og oss at Aldoma allerede er kommitert til annen beskjeftigelse etter utløpet av den nåværende certepartiperiode. Så vidt vi har forstått er dette uriktig. Vi ber Dem om å bekrefte dette. Vennligst se bort fra e-posten angjeldende samme sak som ble sendt for noen minutter siden hvor opsjonsperiodene og svarfrist ikke var fult innsatt.

Med vennlig hilsen
Rolv Berg

---------------------------------------------------------------------------------

---------------------------------------------------------------------------------
This verifies that this e-mail has been scanned for virus and deemed virus-free
according to F-secure Content Scanner 5.0
Sun, 7 Jan 2007 17:08:47 +0100 GMT
---------------------------------------------------------------------------------

03.10.2007

*Bilag 5*

Rett kopi bekreftes
Certified copy
Kristian Lindhansen
Advokatfullmektig

-----Opprinnelig melding-----
**Fra:** Magne Andersen [mailto:mandersen@nordisk.no]
**Sendt:** 8. januar 2007 18:42
**Til:** Morten Lund
**Kopi:** Svein Hoel; Østen Mortvedt; Geir Gustavsson; Ada Schive; aevje@nordisk.no
**Emne:** FW: Opsjonen
**Viktighet:** Høy

Vi viser til nedenstående e-mail fra Rolv Berg Drive AS 7. januar 2007.

For det første kan vi ikke se at RBD har godtgjort at RBD har fått forlenget den någjeldende kontrakten med ONGC, og heller ikke at det er godtgjort at RBD har fått en ny kontrakt med ONGC, slik det er forutsatt i "Sideletter".

For det annet, som RBD allerede er gjort kjent med, har North ingen mulighet for å bekrefte inngåelse av opsjonsperioden på grunn av følgende tre forhold:

i) Det har ikke lykkes North å slutte Aldoma for en slik periode som RBD ber om.

ii) Det følger uttrykkelig av det någjeldende certepartiet mellom North og Aldomas registrerte eier at North ikke er berettiget til å slutte skipet til RBD.

iii) Det følger uttrykkelig av det någjeldende certepartiet mellom North og Aldomas registrerte eier at North ikke er berettigte til å slutte skipet på en så lav rate som følger av certepartiet mellom North og RBD.

For det tredje er det Norths syn at opsjonen under ingen omstendighet kan utøves så lenge RBD er i mislighold under certepartiet, slik tilfellet er for øyeblikket.


Vennlig hilsen
Magne Andersen

Bilag 6

RB/ snorre ,

Today we have received original NOA for Aldomo.

S.P.N.



## OIL AND NATURAL GAS CORPORATION LIMITED
## MUMBAI REGION

**Offshore Logistics, MM Section,
7th floor, 11 HIGH Office Complex,
Sion-Bandra Link Road, Mumbai-400017 (INDIA)
Tel : 24088000, 24088723 Fax : 24088600**

### FAX

Ref.No. ONG/COL/HMM/CSR/ML/CH/VESSELS/10/2005/P761C06003 Date: 19.2.2007

From: A.K.RAY, DGM-I/C-MM

To:
**ROLV BERG DRIVE**
TROMSO, NORWAY

PROJECT OFFICE:
214, AJANTA EXECUTIVE CENTRE,
AJANTA HOTEL, 8, JUHU TARA ROAD,
SANTACRUZ (W),
MUMBAI-400 049, INDIA

Kristian Lindhartsen
Advokatfullmektig
**Rett kopi bekreftes
Certified copy**

FAX: +47-77668080/+91-22-2660 8696

SUB: TENDER NO. ONG/COL/HMM/CSR/ML/CH/VESSELS/10/2005/P761C06003 FOR CHARTER HIRE OF ANCHOR HANDLING TUG-CUM-SUPPLY VESSELS, PLATFORM SUPPLY VESSELS & OFFSHORE SUPPLY VESSELS.

REF.: 1. YOUR BID NO.RBD/AHTS/SUP/VSL/ONGC/06/01 DATED 02.08.2006 SUBMITTED AGAINST THE TENDER.
2. CONFIRMATION/DEFICIENT DOCUMENTS SUBMITTED BY YOU VIDE LETTER NO. RBD/AHTS/CLR/ONGC/06/10 DTD.14.11.2006.
3. YOUR LETTER NO. RBD/AHTS/CON/ONGC/06/10 DTD. 11.01.2007 CONFIRMING THE AVAILABILITY OF VESSEL.
4. YOUR LETTER NO. RBD/AHTS/CLR/EXT/ONGC/07 DTD. 12.02.2007 EXTENDING THE BID VALIDITY UPTO 15.03.2007.

AA)   OIL AND NATURAL GAS CORPORATION LTD. (ONGC) IS PLEASED TO HEREBY PLACE THIS NOTIFICATION OF AWARD OF CONTRACT ON M/S ROLV BERG DRIVE, TROMSO, NORWAY HAVING PROJECT OFFICE AT 214, AJANTA EXECUTIVE CENTRE, AJANTA HOTEL, 8, JUHU TARA ROAD, SANTACRUZ (W), MUMBAI-400 049, INDIA (HEREIN AFTER REFERRED TO AS "CONTRACTOR") FOR CHARTER HIRE OF ANCHOR HANDLING TUG-CUM-SUPPLY VESSEL "ALDOMA" UNDER CATEGORY-I B OF THE TENDER (AHTS OF NOT LESS THAN 120 TON BOLLARD PULL) FOR SCOPE OF



WORK AS DETAILED IN ABOVE TENDER AND PRE-BID MINUTES AND ACCEPTED BY M/S. ROLV BERG DRIVE UNCONDITIONALLY.

THE CONTRACTOR MUST SUBMIT THE BOLLARD PULL TEST CERTIFICATE, LINEPULL/BREAK LOAD AND STALL CAPACITY CERTIFICATES OF THE ANCHOR WINCH (MANUFACTURERS AND/OR CLASS APPROVED) AND SMC (IN TERMS OF TECHNICAL BEC CLAUSE- B.1 (4-D)) WITHIN 10 DAYS FROM DATE OF THIS NOA. THE CERTIFICATES SUBMITTED SHOULD HAVE THE VALIDITIES AS GIVEN IN BEC CLAUSE B.1 (4-D). THE DOCUMENTS ARE TO BE SUBMITTED TO THE OFFICE OF INCHARGE MARINE PLANNING CELL. IN CASE THE CONTRACTOR FAILS TO SUBMIT THE CERTIFICATES WITHIN 10 DAYS OF NOA, THEIR CONTRACT SHALL BE TERMINATED AND BID BOND INVOKED.

BB)    FOR CARRYING OUT SUBJECT OPERATIONS AS DETAILED ABOVE, ONGC SHALL PAY TO THE CONTRACTOR, DAILY CHARTER RATE OF US$15,900/- (UNITED STATES DOLLARS FIFTEEN THOUSAND NINE HUNDRED ONLY). PRICE STATED ABOVE IS FIRM AND VALID DURING ENTIRE CONTRACT PERIOD AND SHALL NOT BE SUBJECT TO ANY ESCALATION ON ANY GROUND WHATSOEVER. THE PRICE IS INCLUSIVE OF ALL CHARGES, MOBILISATION AND DEMOBILISATION, TAXES, FEES, LEVIES, DUTIES, LUBRICANTS, GREASES ETC. WHATSOEVER, PAYABLE IN CONNECTION WITH EXECUTION OF WORKS/ SERVICES UNDER THIS TENDER. FUEL AND WATER WOULD BE PROVIDED BY ONGC AS PER CLAUSE NO.10 ("OBLIGATIONS OF CHARTERER") OF SPECIAL CONDITIONS OF CONTRACT CONTAINED IN MODEL CONTRACT.

CC)    THE PAYMENT UNDER THIS AWARD WILL BE MADE FOR ACTUAL NO. OF DAYS OF UTILISATION OF THE VESSEL FROM THE DATE OF ON-HIRE AND ACCEPTANCE BY ONGC FOR ONGC'S OPERATIONS UNDER THIS CONTRACT. ALL PAYMENTS SHALL BE MADE IN ACCORDANCE WITH THE TERMS AND CONDITIONS IN ONGC'S MODEL CONTRACT OF THE ABOVE REFERRED TENDER.

DD)    THE PERIOD OF CONTRACT FOR CHARTER HIRE SHALL BE FOR A FIRM PERIOD OF FIVE YEARS.

EE)    THE VESSEL IS TO BE MOBILISED WITHIN 90 DAYS OF RELEASE BY ONGC FROM THE ONGOING CONTRACT, AFTER TAKING DUE CLEARANCES FROM ALL THE GOVT. / REGULATORY AUTHORITIES INCLUDING DG SHIPPING INDIA, NAVAL CLEARANCE, SECURITY CLEARANCE FOR THEIR MASTERS/CREWS. THE RESPONSIBILITY OF OBTAINING STATUTORY CLEARANCES FROM GOVT. AUTHORITIES, NAVAL CLEARANCE ETC. SHALL BE OF THE CONTRACTOR AT THEIR OWN COST. IN CASE OF DELAY IN MOBILISATION, THE L.D./TERMINTION CLAUSE WILL BE APPLICABLE AS PER CLAUSE NO.18.5 OF MODEL CONTRACT/ CLAUSE NO.3 OF SPECIAL CONDITIONS OF CONTRACT CONTAINED IN MODEL CONTRACT.

THE EFFECTIVE DATE OF COMMENCEMENT OF THE CONTRACT SHALL BE DEEMED TO BE THE DATE OF THE ARRIVAL OF THE VESSEL AT THE SPECIFIED PORT AFTER DUE CLEARANCES FROM ALL GOVT. AUTHORITIES INCLUDING D.G.(SHIPPING) INDIA, NAVAL CLEARANCE AND HAVING ALL VALID CERTIFICATES/ LICENSES FROM THE CONCERNED AUTHORITIES FOR THEIR VESSEL, MASTERS/ CREW.

THE COMMENCEMENT WOULD BE AFTER SATISFACTORY "ON HIRE SURVEY".



PRIOR TO COMMENCING OPERATION FOR ONGC, THE VESSEL IS TO BE PUT UP FOR INSPECTION AS PER BEC CLAUSE B.1 (10) AND OFFERED FOR "ON HIRE SURVEY". IN CASE THE VESSEL DOES NOT ADHERE TO THE SPECIFICATIONS, THIS NOTIFICATION OF AWARD OF CONTRACT SHALL BE CANCELLED AND BANK GUARANTEE SHALL BE FOREFEITED. ONGC REQUIRES 7 DAYS PERIOD FOR CARRYING OUT TPI AND THAT THE VESSEL IS TO BE DELIVERED AS PER MOB. SCHEDULE. IN CASE THE CONTRACTOR FAILS TO ADHERE TO THE TIME SCHEDULE STIPULATED AS ABOVE, THE CHARTERER RESERVES THE RIGHT TO INVOKE THE PERFORMANCE BANK GUARANTEE SUBMITTED BY THE CONTRACTOR AND TERMINATE THE CONTRACT WITHOUT PREJUDICE TO ANY OTHER RIGHT OR REMEDY AVAILABLE AS PER THE CONTRACT.

FF)    M/S. ROLV BERG MAY CONTACT THE OFFICE OF INCHARGE MARINE PLANNING CELL & AND INCHARGE-ONGC, NHAVA SUPPLY BASE FOR NECESSARY ON-HIRE SURVEY.

THE CONTRACTOR SHALL CONFIRM COMPLETION OF INSPECTION AND COMPLETE READINESS OF THE VESSEL TO THE SATISFACTION OF ONGC INCLUDING CONFORMITY TO ONGC TENDER SPECIFICATIONS CERTIFIED BY TPI WITHIN THE MOBILIZATION PERIOD.

GG)   AS PER CLAUSE NO. 14.2 OF SPECIAL CONDITIONS OF CONTRACT, ONGC RESERVES THE ABSOLUTE RIGHT TO TERMINATE THIS AGREEMENT AT ITS SOLE DISCRETION AT ANY TIME AFTER FIRST 36 MONTHS OF THE CONTRACT, BY GIVING THIRTY (30) DAYS WRITTEN NOTICE TO THE CONTRACTOR TO THAT EFFECT WITHOUT ASSIGNING ANY REASON THEREOF AND THE CONTRACTOR SHALL NOT BE ENTITLED FOR ANY COMPENSATION OF PAYMENT OF WHATSOEVER NATURE ON ACCOUNT OF SUCH TERMINATION.

HH)   M/S. ROLV BERG SHALL SUBMIT IRREVOCABLE AND UNCONDITIONAL PERFORMANCE BANK GUARANTEE FOR US$ 442,150/- (UNITED STATES DOLLARS FOUR HUNDRED FORTY TWO THOUSAND ONE HUNDRED FIFTY ONLY). THE PERFORMANCE BANK GUARANTEE IS TO BE SUBMITTED WITHIN 15 DAYS FROM DATE OF THIS NOA.  AS PER CLAUSE 36.2 OF ANNEXURE-I OF BID DOCUMENT, FAILURE OF THE CONTRACTOR TO COMPLY WITH THE REQUIREMENT OF CLAUSE 17.7(C) OF ANNEXURE-I OF BID DOCUMENT SHALL CONSTITUTE SUFFICIENT GROUNDS FOR THE ANNULMENT OF THE AWARD AND FORFEITURE OF THE BID SECURITY.

II)    FORMAL CONTRACT WITH YOU SHALL BE SIGNED WITHIN 30 DAYS FROM DATE OF NOA AND AFTER RECEIPT OF PERFORMANCE BANK GUARANTEE AS STATED ABOVE. TILL FORMAL CONTRACT IS SIGNED, THIS NOTIFICATION OF AWARD OF CONTRACT IS BINDING ON BOTH THE PARTIES. THE CONTRACT SHALL BE GOVERNED AS PER MODEL CONTRACT ENCLOSED WITH THE TENDER DOCUMENT AND THE MINUTES OF PRE-BID CONFERENCE WHICH WAS ACCEPTED UNCONDITIONALLY BY YOU. PLEASE NOTE THAT THE VESSEL IS TO BE MOBILISED PENDING SIGNING OF FORMAL CONTRACT. IN CASE OF DELAY IN SIGNING THE CONTRACT ON THE PART OF ONGC, CONTRACTOR SHALL BE PAID 80% OF THE APPLICABLE RATES FALLING DUE AS PER THE CONTRACTUAL OBLIGATIONS ON ADHOC BASIS, TILL FORMAL SIGNING OF THE CONTACT, AFTER WHICH THE BALANCE OF DUE PAYMENTS SHALL BE RELEASED / ADJUSTED AGAINST REGULAR



BILLS. HOWEVER NO PAYMENT WILL BE MADE AND MOBLILISATION WILL NOT BE DEEMED COMPLETED, WHEN THE DELAY IS ON THE PART OF THE CONTRACTOR TO SIGN THE CONTRACT, AS PER DRAFT CONTRACT AT ANNEXURE-II OF THE TENDER.

JJ)    KINDLY ACKNOWLEDGE THE RECEIPT OF THIS NOA PER RETURN.    THE EFFECTIVE DATE OF CONTRACT REMAINING AS 19.2.2007 I.E. THE DATE OF NOTIFICATION OF AWARD.

(A.K.RAY)
DGM-I/C-MM

COPY BY POST TO:
ROLV BERG DRIVE
TROMSO, NORWAY.

PROJECT OFFICE:
214, AJANTA EXECUTIVE CENTRE,
AJANTA HOTEL, 8, JUHU TARA ROAD,
SANTACRUZ (W),
MUMBAI-400 049, INDIA

(A.K.RAY)  19/2/07
DGM-I/C-MM

# EXHIBIT 3

# THOMMESSEN

*Office translation*

Free translation of

# WRIT OF SUMMONS

## to

## Nord-Troms County Court

Oslo, 7. November 2007
Our referance 1798994/1

| | |
|---|---|
| **Plaintiff** | Rolv Berg Drive AS<br>v/Chairman of the Board of Directors, Mr Rolv Berg<br>Postboks 96<br>9257 Tromsø |
| Plaintiff's counsel | Thommessen Krefting Greve Lund AS<br>v/ assistant attorney Kristian Lindhartsen<br>and legal assistant, attorney Olav Vikøren<br>Postboks 1484 Vika<br>0116 Oslo |
| **Defendant** | North Offshore AS<br>v/Chairman of the Board of Directors, Mr Svein Hoel<br>9291 Tromsø |
| Defendant's counsel | Nordisk Legal Services<br>v/attorney Magne Andersen<br>Postboks 3033 Elisenberg<br>0207 Oslo |
| **Subject for the case** | Claim in respect of breach of contract |

# THOMMESSEN

## 1    INTRODUCTION – FORMALITIES

The case is presented directly for the County Court as attorneys represent both parties and the Plaintiff therefore considers it without purpose bringing the matter before the Conciliation Board, cf Civil Procedure Act Section 274 first paragraph.

Both Plaintiff and Defendant have their place of business in the city of Tromsø, and the correct legal domicile is therefore Nord-Troms County Court, cf the rules of Civil Procedure Act Section 17.

## 2    THE RELEVANT FACTS

Rolv Berg Drive AS had chartered the vessel "Aldoma" on a 3-year time charterparty.

> Annex 1:  Charterparty dated 16 February 2004
> [This enclosure is in English and will therefore not be provided in free translation]

The vessel's owner is a Russian company, Arktikmor Neftegaz Razvedka. The Defendant has had the vessel on charterparty since 1992, and they are still charterers of the vessel.

On 15 March 2004, the parties entered into a separate agreement regarding a possible extension of the above-mentioned charterparty. The agreement stated that the Plaintiff could continue to hire the vessel provided that certain conditions in the new agreement (the "Option Agreement") were met.

> Annex 2:  Side-Agreement to Time Charterparty between TFDS Offshore AS and Rolv Berg Drive
> AS regarding AHTS Aldoma
> [This enclosure is in English and will therefore not be provided in free translation]

August 2006, the Defendant was advised that the Plaintiff would offer the Aldoma on a tender from the Indian oil company Oil and Natural Gas Corporation Ltd. ("ONGC"), and that Rolf Berg Drive would exercise their option on extension if they were successful in bidding for the tender.

> Annex 3:  Letter dated 1 August 2006 from Rolv Berg Drive AS to TFDS Offshore AS

In an email dated 7 January 2007 and a letter dated 2 February 2007, the Plaintiff declared that they wanted to exercise their option of 3-year continuation of the charterparty.

> Annex 4:  Email dated 7 January 2007 from Mr Rolv Berg to Mr Svein Hoel

In an email sent from the Defendant's counsel to the Plaintiff's counsel it was advised that the Defendant did not consider the conditions in the Option Agreement fulfilled and that the "Aldoma" consequently would not be made available to the Plaintiff.

> Annex 5:  Email dated 8 January 2007 from attorney Magne Andersen to attorney Morten Lund

In a telefax dated 19 February 2007, it was confirmed that the Plaintiff had been successful with their bid for the tender for further operation of the vessel "Aldoma" with ONGC for a period of 5 years, with a daily rate of USD 15,900.

# THOMMESSEN

Annex 6:  Telefax dated 19 February 2007 from ONGC to Rolv Berg
[This enclosure is in English and will therefore not be provided in free translation]

With intent, the Defendant has a breached the Option Agreement by not allowing the Plaintiff further contract for the vessel in accordance with the terms of the Option Agreement. Consequently, the Plaintiff did lose their contract in India, and did therefore incur a loss. Presently, the "Aldoma" is in Nigeria, still on charterparty to the Defendant.

## 3    LEGAL SUBMISSIONS

The Plaintiff submits that the Defendant is liable to pay damages in respect of the loss incurred by the Plaintiff as a consequence of the intentional breach of the Option Agreement.

The legal basis for this claim is the rules of damages in contract. The agreement between the Plaintiff and the Defendant contains two cumulative terms that must be met in order for the option to be exercised. Firstly, the Plaintiff must have been offered a contract from ONGC, and secondly, the Defendant must have secured their contract with the vessel's owner. Beyond those requirements, there are no further obligations under the Option Agreement.

As described above, the Plaintiff was successful in winning the tender from ONGC and was therefore awarded a contract as mentioned in the Option Agreement. Further, since entering into the Option Agreement and up to and including today, the vessel has been on charter from its owner to the Defendant. Therefore, the requirements necessary to exercise the option were met.

The Plaintiff has suffered a substantial loss of income as a consequence of the breach of contract by the Plaintiff. In accordance with the tender documents, the Plaintiff was offered a contract for 5 years with a rate of USD 15,900 per day. Under the Option Agreement, the daily rate is maximum USD 9,000 per day, which gives an expected earning for the Plaintiff of USD 6,900 per day. Based on an expected duration of 5 years, the Plaintiff would have had an earning totalling to (6,900 x 365 x 5) USD 12,592,500 for the period.

In addition, the Plaintiff has provided a performance bond to ONGC for USD 422,150. A performance bond is a bank guarantee for correct fulfilment of a contract. By not fulfilling their obligations toward ONGC, ONGC has demanded payment under the performance bond, and the Plaintiff has therefore incurred a further loss of USD 442,150.

The Plaintiff notes that the Defendant in the correspondence between the parties has argued legally against the Plaintiff's right to exercise the Option Agreement. However, it cannot be considered that the requirements in the Option Agreement were not met. The Plaintiff appreciates that the "Aldoma" does not meet all the requirements contemplated under the tender requirements; however, this was clarified to ONGC in the offer documents. Therefore, the tender was awarded to the Plaintiff on basis of the vessel as described in the offer documents. Whether or not the vessel was suitable, is an issue between the Plaintiff and ONGC, inasmuch as the vessel is not utilised in breach of the contract between the Plaintiff and Defendant.

Therefore, with intention, the Defendant has unlawfully terminated the Option Agreement. As this breach of contract has resulted in a loss before the Plaintiff, there is thus an obligation for the Defendant to pay damages.

# THOMMESSEN

In accordance with the ordinary principles that apply for this calculation of damages, the Plaintiff's loss incurred as a consequence of the breach of contract shall form basis for the calculation of damages. In this regard, it is foreseeable for the Defendant that the Plaintiff's loss mirrors the possible earning under the subject agreement. Further, it is clear that the loss incurred in connection with the above-mentioned performance bond trigger a duty to pay damages.

## 4    PROCEDURAL

In case of non-appearance or too late Defence Pleading, we ask for a decision in default.

We reserve the right to further submissions and evidence, hereunder to summon witnesses.

We hereby ask for the following honourable

### d e c i s i o n:

1        North Offshore AS (org no. 929 987 020) is to pay Rolv Berg Drive AS an amount not higher than USD 13,019,650, with addition of the interest on overdue payment, as provided by the law.

2        North Offshore AS (org no. 929 987 020) is to pay Rolv Berg Drive AS the costs incurred in respect of the case within 14 days with addition of the interest on overdue payment, as provided by the law.

* * *

This Writ of Summons in five copies, whereby two is sent to the counterparty's counsel directly.

Oslo, 7. November 2007
Thommessen Krefting Greve Lund AS


_____

Kristian Lindhartsen
Assistant attorney

Rolv Berg Drive A/S

Annex 3

North Offshore AS
P.O.Box 6155
9291 Tromsø

Att: Svein Hoel

Tromsø, 1 August 2006

**Ad AHTS Aldoma**

As you are aware, ONGC has a tender out that is to be replied within 3 August 2006, regarding several different types of vessels. The tender number is ONG/COL/HMMM/ML/VESSELS/10/2005/P761C06003. As you may know, the tender is partly an answer to new requirements, but also a response to a need for extension of existing tasks/contracts; hereunder our contract for the Aldoma also.

In compliance with our Letter of Exclusivity dated 15 October 2003 and our "Side-Agreement to Time Charter Party Between TFDS Offshore AS and Rolv Berg Drive AS Regarding AHTS Aldoma" dated 5 March 2004 and the charterparty, we have decided to provide an offer for the Aldoma on this tender.

As you know, the deadline for submission of the offer is 3 August, and a decision is expected within this year.

The contract duration is 5 year, and start for the Aldoma will be after the completion of the subject period of contract.

We suggest a meeting one of the nearest days to discuss possible necessary upgrades of the vessel in accordance with the new criteria under the tender.

Kind regards,

Snorre S. Stinessen
for Rolv Berg Drive AS

*Office translation*

Annex 4

From: Rolv Berg [mailto:Rolv@rbdrive.com]
Sent: 7 January 2007 15:50
To: svein.hoel@offshore.tfds.no
Copy: Morten Lund; snorre@rbdrive.com
Subject: VS: The Option
Importance: High


Svein Hoel,

North Offshore AS

We refer to previous discussions regarding our option to extend the charter party for the "Aldoma". We hereby exercise our option for a period 3 plus 1x1 year options in direct extension of the existing charter party.

We ask for your confirmation that you will extend accordingly within 12:00 hrs Tuesday 9 January 2007.

We will also notify the Russian owners that we have exercised the option.

You have previously advised to ONGC and us that the Aldoma is already committed to another assignment after end of this charterparty period. We understand this is not correct. We ask you to confirm this. Please disregard the email regarding the same matter which was sent some minutes ago, wherein the option period and response for reply was not inserted.


Kind regards
Rolv Berg

From: Magne Andersen [mailto:mandersen@nordisik.no]
Sent: 8 January 2007 18:42
To: Morten Lund
Copy: Svein Hoel; Østen Mortvedt; Geir Gustavsson; Ada Schieve; aevje@nordisk.no
Subject: FW: The Option
Importance: High

We refer to the below email from Rolv Berg Drive AS dated 7 January 2007.

Firstly, we cannot see that RBD has satisfied that RBD has an extension of the existing contract with ONGC, and neither that it is satisfied that RBD has a new contract with ONGC, as contemplated in the "Sideletter".

Secondly, as RBD already already is made aware, North has no option to confirm the entering of the option period of the following three reasons:

(i)     North has not been successful in fixing the Aldoma for a period as asked by RBD.

(ii)    It is an expressed term under the charter party between North and the registered owners of the Aldoma, that North is not allowed to charter the vessel to RBD.

(iii)   It is an expressed term under the present charter party between North and the owners of the Aldoma that North is not allowed to charter the vessel on such low hire rate that follows by the charter party between North and RBD.

Thirdly, it is North's position that the option under no circumstances can be exercised as long as RBD is in breach of the charter party, which is the present situation.


Kind regards
Magne Andersen

# EXHIBIT 4



**Rett kopi bekreftes**
**Certified copy**
Kristian Lindhartsen
Advokatfullmektig

| Skriv ut |

## NORTH OFFSHORE AS

**GRUNNFAKTA**                                              Sist endret 06.11.2007. Se kunngjøringer.

| | |
|---|---|
| **Organisasjonsnr:** | 929 987 020 |
| **Firma navn:** | NORTH OFFSHORE AS |
| **Redigert navn:** | NORTH OFFSHORE AS |
| **Historisk navn:** | TFDS OFFSHORE AS |
| | TFDS OFFSHORE AS |
| | TROMS OFFSHORE INVEST AS |
| | TROMS OFFSHORE INVEST AS |
| **Forretningsadresse:** | Strandveien 106 Lanes Center |
| | 9008 TROMSØ |
| **Postadresse:** | Postboks 6155 |
| | 9291 TROMSØ |
| **Kommune:** | **TROMSØ** |
| **Fylke:** | **Troms fylke** |
| **Telefonnummer: \*** | 77679950 |
| **Mobil:** | |
| **Telefaks:** | 77679977 |
| **Registrert e-post:** | offshore@offshore.tfds.no |
| **Hjemmeside:** | |
| **Selskapsform:** | Aksjeselskap |
| **Bransje:** | 61101 Utenriks sjøfart |
| | 61106 Slepebåter og forsyningsskip |
| **Antall ansatte:** | 9 (25.09.2007) |
| | 28 (27.03.2007) |
| | 32 (26.09.2006) |
| | 45 (24.01.2006) |
| | 56 (2004) |
| | 112 (2003) |
| | 2 (2002) |
| | 2 (2001) |
| | 85 (2000) |
| **Aksjekapital:** | 184.652 |
| **Kontaktperson:** | Hoel Svein Harald |
| **F.dato:** | 17.07.49 |
| **Funksjon:** | DAGL |
| **Stiftelsesdato:** | 27.03.1981 |
| **Registreringsdato:** | 06.10.1989 |
| **Vedtektsdato:** | 29.10.2007 |
| **Register:** | Foretaksregisteret (06.10.1989) |
| **Registrert i MVA: \*** | Ja |
| **Revisor:** | PRICEWATERHOUSECOOPERS AS 987 009 713 |

**SIGNATUR OG PROKURA \***
**Signatur:**

Styrets leder og ett styremedlem i fellesskap.

**Prokura:**

**ROLLE- OG STYREINFORMASJON \***                          Sist endret 2007.11.06. Se kunngjøringen.

| Rolle | Andel | Valgt av | Person/firma |
|---|---|---|---|

Ravninfo.com

**Rett kopi bekreftes**

**Certified copy**

*Kristian Lindhartsen*
*Advokatfullmektig*

| | |
|---|---|
| Daglig leder / admin. dir. | Hoel Svein Harald (17.07.49) |
| Styremedlem | Mortvedt Østen (10.02.64) |
| Styrets leder | Hoel Svein Harald (17.07.49) |
| Varamedlem | Pedersen Ingunn Anita (29.08.60) |

### UNDERENHETER/AVDELINGER

Dette firma har følgende underenhet/avdeling:

| Orgnr | Navn |
|---|---|
| 872639322 | NORTH OFFSHORE AS |

### AKSJONÆRER **

| Orgnr | Navn | Eierandel |
|---|---|---|
| 966591560 | HOEL HOLDING AS | 60,00% |
| 989072021 | ØSTEN AS | 40,00% |

### AKSJEPOSTER/EIERANDELER **

| Orgnr | Navn | Eierandel |
|---|---|---|
| 987916869 | NORTH BROKERS & AGENCY AS | 100,00% |
| 988166588 | TROMS OFFSHORE AS | 100,00% |
| 988673544 | TROMS FALKEN AS | 20,00% |
| 990555346 | TROMS OFFSHORE MPSV AS | 100,00% |

### KONSERNRELASJON **

| | OrgNr | Navn | Eierandel |
|---|---|---|---|
| > | 966591560 | HOEL HOLDING AS | 0,00% |
| >> | **929987020** | **NORTH OFFSHORE AS** | **60,00%** |
| >>> | 987916869 | NORTH BROKERS & AGENCY AS | 100,00% |
| >>> | 988166588 | TROMS OFFSHORE AS | 100,00% |
| >>> | 990555346 | TROMS OFFSHORE MPSV AS | 100,00% |

* Dette er informasjon vi får fra andre kilder enn Brønnøysundregistrene. Aksjonærer, konsernrelasjon, betalingserfaring og pant er informasjon vi mottar fra D&B. Aksjer og Obligasjoner mottar vi fra Oslo Børs
* Telefonnummer oppdateres fra Brønnøysundsregistrene.

# EXHIBIT 5

**RAVNINFO**

**NORTH OFFSHORE AS**

**Basic facts**

| | |
|---|---|
| Number of incorporation: | 929 987 020 |
| Business name: | North Offshore AS |
| Edited name: | North Offshore AS |
| Historical names: | TFDS Offshore AS |
| | TFDS Offshore AS |
| | Troms Offshore Invest AS |
| | Troms Offshore Invest AS |
| Business address: | Strandveien 106 Lanes Center |
| | 9008 Tromsø |
| Postal address: | P.O.Box 6155 |
| | 9291 Tromsø |
| City | Tromsø |
| Community | Troms community |
| Phone: | 77 67 99 50 |
| Mobile: | |
| Fax: | 77 67 99 50 |
| Registered email: | offshore@offshore.tfds.no |
| Home page: | |
| Type of company: | Private Limited Company |
| Business: | 61101 Foreign shipping |
| | 61106 Tugboats and supply ships |
| Number of employees: | 9 (25.09.2007) |
| | 28 (27.03.2007) |
| | 32 (26.09.2006) |
| | 45 (24.01.2006) |
| | 56 (2004) |
| | 112 (2003) |
| | 2 (2002) |
| | 2 (2001) |
| | 85 (2000) |
| Share capital: | 184,652 |
| Person of contact: | Hoel Svein Harald |
| Date of birth: | 17.07.49 |
| Function: | CO |
| Date of incorporation: | 27.03.1981 |
| Date of register: | 06.10.1989 |
| Date of articles of association: | 29.10.2007 |
| Corporate register: | Foretaksregisteret (06.10.1989) |
| VTA register: | Yes |
| Accountant: | PriceWaterhouseCoopers AS 987 009 713 |

**Signature and proxy**

Signature:                              Chairman of the board and a board member jointly

Proxy:

**Role and board information**

| Role: | Share | Chosen by | Person/company |
|-------|-------|-----------|----------------|
| CO | | | Hoel Svein Harald (17.07.49) |
| Member of board of director | | | Mortvedt Østen (10.02.64) |
| Chairman of the board of director | | | Hoel Svein Harald (17.07.49) |
| Deputy board of member of director | | | Pedersen Ingunn Anita (29.08.60) |

**Subsidiaries/departments**

This company has the following
subsidiaries/departments:

| Number of incorporation | Name |
|-------------------------|------|
| 872639322 | North Offshore AS |

**Shareholders**

| Number of incorporation | Name | Share of ownership |
|-------------------------|------|--------------------|
| 966591560 | Hoel Holding AS | 60,00 % |
| 989072021 | Østen AS | 40,00 % |

**Post of share/ownership**

| Number of incorporation | Name | Share of ownership |
|-------------------------|------|--------------------|
| 987916869 | North Brookers & Agency AS | 100,00 % |
| 988166588 | Troms Offshore AS | 100,00 % |
| 988673544 | Troms Falken AS | 20,00 % |
| 990555346 | Troms Offshore MPSV AS | 100,00 % |

**Group of company**

| Number of incorporation | Name | Share of ownership |
|-------------------------|------|--------------------|
| 966591560 | Hoel Holding AS | 0,00 % |
| 929987020 | North Offshore AS | 60,00 % |
| 987916869 | North Brokers & Agency AS | 100,00 % |
| 988166588 | Troms Offshore AS | 100,00 % |
| 990555346 | Troms Offshore MPSV AS | 100,00 % |

# EXHIBIT 6

Michael J. Frevola (MJF 8359)
Christopher R. Nolan (CRN 4438)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
NORTH OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORTH OFFSHORE AS,

         Plaintiff,

        -against-

ROLV BERG DRIVE AS,

         Defendant.

07 Civ. 3095 (SHS)

**AFFIRMATION OF
SVEIN HOEL PURSUANT TO
28 U.S.C. § 1746 IN SUPPORT
OF PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION
FOR COUNTERSECURITY**

---

I, SVEIN HOEL, hereby affirm as follows:

1.    I am the Managing Director of North Offshore AS, previously known by the name

TFDS Offshore AS. Although certain events related below occurred while North Offshore was

named TFDS Offshore AS, Plaintiff will use "North Offshore" throughout for ease of reference.

The facts provided herein are based on my own personal knowledge.

2.    I am providing this affirmation in support of my company's opposition to a

motion filed by Rolv Berg Drive AS ("RBD") for countersecurity in the above-captioned

proceeding.



## THE CHARTER PARTIES

3.     My company entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended). I annex as Exhibit 1 a true copy of the North Offshore/RBD time charter (the "Time Charter"). The term "AHTS" refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel.

4.     At the commencement of the Time Charter, my company entered into a separate "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances. RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to [North] Offshore securing further charter with the vessel's owner." I annex as Exhibit 2 a true copy of the "side agreement" dated March 5, 2004.

5.     The ALDOMA's owner is Arktikmorneftegazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia. My company had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter. My company entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter"). The Bareboat Charter included 2 one year options. I annex as Exhibit 3 a true copy of the Bareboat Charter (which is dated May 12, 2005). The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with our company. Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced us to agree to) an increased daily rate of hire.

2



6. The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. A true copy of the "Profit Split" provision is provided in Exhibit 3 as the final page of that document.

7. Together with the Bareboat Charter, my company and AMNGR entered into a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter). I annex as Exhibit 4 a true copy of the AMNGR/North Offshore "side agreement" dated May 12, 2005. That agreement specifically addressed North Offshore's Time Charter with RBD and provided that extensions of the Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore.

8. RBD sought to charter the ALDOMA for additional time past May 2007. It is my understanding that RBD has claimed that the ALDOMA would have been used to fulfill a five year time charter that RBD claims that it entered with a company named Oil & Natural Gas Corp ("ONGC"). The ONGC invitation to tender, however, had several requirements that the ALDOMA could not fulfill, including being unable to perform anchor handling at the depth required in the ONGC tender (1200 meters). This specification was a significant requirement. Earlier this year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor

3



set at approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and

sank with a loss of over half her crew. The BOURBON DOLPHIN was a larger vessel than the

ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform

an operation required by the ONGC tender. In my view, based on my 30 years of experience in

the offshore supply vessel industry, the ALDOMA would not have satisfied the ONGC tender.

9.    The ONGC tender also required a five year charter term. We could not offer

RBD a five year term because we did not have the rights to the ALDOMA for that time period to

sub-charter the ALDOMA to RBD.

## DISPUTES BETWEEN NORTH OFFSHORE AND RBD

10.    During RBD's Time Charter of the ALDOMA, disputes arose between my

company and RBD. We commenced an arbitration against RBD in Norway seeking crew costs

and costs relating to crew changes arising from improper acts by RBD under the Time Charter.

11.    On September 1, 2006, the Norwegian arbitration panel found in favor of my

company and awarded us damages for a variety of actions taken by RBD or costs incurred by

us, including but not limited to (a) RBD's unilateral deduction of charter hire for unsupported

crew costs, and (b) North Offshore's expenses related to the replacement of the ALDOMA's

crew.

12.    The Norwegian arbitration panel subsequently issued a second award on April 13,

2007 for additional claims we made against RBD. We received additional damages for a variety

of actions taken by RBD or costs incurred by us, including but not limited to (a) RBD's

unilateral deduction of charter hire for an alleged off-hire event lasting 7.82 days which the

panel held to be unjustified, (b) RBD's unilateral deduction of hire for maintenance days

4



despite the Time Charter providing that such days were to count as on-hire periods, and (c) RBD's continued improperly-documented and deducted crew costs for the period between April and December 2006.

13.     Since the April 13, 2007 award, the Time Charter has expired. At the time of the expiration of the Time Charter and continuing to date, RBD has not paid the final hire payments for the ALDOMA, amounting to a total of US$748,521.00. In addition, the ALDOMA was not redelivered within the agreed redelivery range, and my company incurred US$154,190 in additional expenses (largely fuel costs) incurred as a result of this redelivery outside of the agreed redelivery range.    From these claims, my company has deducted the amount of US$100,641.10 credited to RBD for the fuel remaining aboard the ALDOMA at the time of its redelivery, resulting in a net total principal claim of US$802,069.90.

14.     In connection with our claims of US$802,069.90 against RBD, we requested that the same panel which issued the first two awards also decide these claims. In the event that the panel decided to not accept these claims, we also appointed an arbitrator on May 16, 2007 to arbitrate these claims against RBD.    RBD did not appoint an arbitrator in response within the required time of 14 days. Last week, the panel from the previous awards decided not to accept jurisdiction over the remaining claims, therefore the newly appointed arbitrator will have jurisdiction over our claims of US$802,069.90 against RBD.

## NORTH OFFSHORE'S FINANCIAL CAPABILITIES

15.     I understand that RBD has requested an order from the Court that my company post security on RBD's counterclaims in at least the amount of approximately US$469,000.00. As the information provided below will demonstrate, it would be impossible for my company to comply with that order.

5



16.     North Offshore is not a large company.  It is not publicly traded.  It has only one office and has only myself and my business partner as the company personnel.  It has a current bank account balance of approximately US$0.  I annex as Exhibit 5 for the Court's review a Statement of Accounts Balance Sheet dated August 31, 2007 prepared by accounting personnel for my affiliate company, Troms Offshore AS, showing the company's assets and liabilities. Please note that the figures given are in Norwegian kroner, rather than U.S. dollars.

17.     Because of the short time period given for our response to RBD's application for security, I was unable to get a certified independent accountant's confirmation of these figures, although we can obtain one for the Court if we are permitted several days to instruct the accountants and give them the opportunity to complete their review.

18.     For the Court's guidance, I provide the following information regarding certain line items on the balance sheet.   On page 1,  the item "Other Operating Costs" in the amount of NK14,090,294 for 2007 in the first section (entitled Operating Revenues and Expenses) refers to a variety of items, the most significant of which are (a) bareboat hire for the ALDOMA (NK7,602,029); (b) administration expenses (NK571,971); (c) lube oil (NK478,374); (d) Vessel maintenance (NK891,141); (e) other administration expenses (lawyers etc.) (NK1,589,932); (f) traveling expenses (NK885,289); and (g) insurance (NK248,031).  The specified items amount to more than NK12,000,000 of the total of NK14,090,294.  I have attached as Exhibit 6 a true copy of the entire list of expenses comprising our operating costs, which is in Norwegian but provides a line item recitation of these expenses.



6

19.    Turning to the immediately following section on page 1 (entitled Financial Income and Expenses), there is a line entry entitled "Other Financial Expenses" in the amount of NK586,487, which refers to (a) interest charges on open accounts payable in the amount of NK120,296 and (b) currency exchange loss dealing with the conversion of the U.S. dollar hire payments to Norwegian kroner in the amount of NK466,191.

20.    Turning to page 2, in the first section (entitled Fixed Assets), there is a line item entitled "periodical maintenance" in the amount of NK7,239,342. This entry refers to the cost of the drydocking and repairs to the ALDOMA in order to keep it class-certified by Det Norske Veritas.

21.    At the bottom of page 2, in the final section (entitled "Current Assets") the section entitled "other claims" refers to pre-paid expenses (mainly insurance) In that same section, for the "accounts receivable" amount of NK11,362,742, the claims against RBD (NK6.135.000) comprise over 50% of that amount.

22.    On page 3, in the first section (entitled "Equity"), the line entry "other equity" refers to the earned equity from former years.

23.    On page 3, in the second section (entitled "Liabilities"), the line entry "accounts payable" refers to debts owed to various suppliers/contractors (for example, the costs relating to the drydocking and repair of the ALDOMA in the amount of NK7,300,000). The "other short-term liabilities" line item refers to accrued expenses for which we have not yet received the invoices.

24.    As my company's balance sheet shows, we have virtually no liquid assets by which we could post the security demanded by RBD's counterclaim. If the choice were given to



my company whether to post countersecurity or surrender our security against RBD, I would have to agree to surrendering our security against RBD. This is not because I wish to surrender that security, it is because posting security on RBD's claim is financially impossible for my company.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of October, 2007 at the office of North Offshore AS, Tromsø, Norway.

_____
SVEIN HOEL

8

Case 1:07-cv-13502-SHS   Document 6-2   Filed 12/29/2007   Page 93 of 66

# EXHIBIT 1

**NORDISK**

**Bilag** _____

Issued by The Documentary Committee of
The Baltic and International Maritime Council (BIMCO), Copenhagen
(First edition published 1975)
REVISED 1989

Printed by BIMCO's idea

Adopted by
International Support Vessel Owners'
Association (ISOA), London

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen
September 1989

| | |
|---|---|
| **1.** Place and date<br>Tromsø 19th of February 2004 | **UNIFORM TIME CHARTER PARTY**<br>**FOR OFFSHORE SERVICE VESSELS**<br>**CODE NAME: "SUPPLYTIME 89"**<br>PART I |

| | | |
|---|---|---|
| **2.** Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>TFDS Offshore AS<br>Strandvegen 106<br>P.O. box 6155<br>9291 Tromsø<br>Norway<br>Phone: 47 77 57 94 00<br>Fax: +47 77 67 96 77<br>E-mail: offshore@tfds.no | **3.** Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>Rolv Berg Drive AS<br>Søndre Tollbodgate 15<br>P.O. box 96<br>9251 Tromsø<br>Norway<br>Phone: +47 77 66 96 96<br>Fax: +47 77 66 96 96<br>E-mail: drive@rbdrive.com | |
| **4.** Vessel's name (Cl. 1(a))<br>AHTS Aldoma | **5.** Date of delivery (Cl. 2(a))<br>20-31.03.2004 | **6.** Cancelling date (Cl. 2(a)) and (c)<br>31.03.2004 |
| **7.** Port or place of delivery (Cl. 2(a))<br>Mumbai, India | **8.** Port or place redelivery/notice of redelivery (Cl. 2(c))<br><br>Mumbai, India<br>(i) Port or place of redelivery<br><br>15 days<br>(ii) Number of days' notice of redelivery | |
| **9.** Period of hire (Cl. 1(a))<br>3 years firm | **10.** Extension of period of hire (optional) (Cl. 1(b))<br><br><br>(i) Period of extension<br><br>15 days<br>(ii) Advance notice for declaration of option (days) | |
| **11.** Automatic extension period to complete voyage or well (Cl. 1(c))<br>As per work in progress.<br>(i) Voyage or well (state which)<br><br>90 days.<br>(ii) Maximum extension period (state number of days) | **12.** Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>Included in the vessel's dayrate for the first 3 years charter hire.<br>- See Clause 37<br>(i) Lump sum<br><br>NA<br>(ii) When due | |
| | **13.** Port or place of mobilisation (Cl. 2(b)(i))<br>Valletta, Malta. | |
| **14.** Early termination of charter (state amount of hire payable) (Cl. 26(d))<br>As per state oil company rules and regulations (O.N.G.C.). | **15.** Number of days' notice of early termination (Cl. 26(d))<br>See box 14 | **16.** Demobilisation charge (lump sum) (Cl. 2(d) and Cl. 26(d))<br>Included in vessel's dayrate for the first 3 years charter hire. |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS    PART I

| 17. Area of operation (Cl. 5(a))<br>The continental shelf of India. | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>Anchor handling, towage, fire fighting, supply services, mud services and any other services that the vessel may safely undertake to perform. Always within the vessel's capabilities and certification. |
|---|---|
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) )<br>USD 8.500,- + USD 700,- (mud installation) + USD 330,- (mob/demob).<br>Total: USD 9.530,- per day the first three years. | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br>USD 9.530,-<br>USO 9000. — |
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i) state whether to be issued in advance or arrears<br>In Arrears<br><br>(ii) state to whom to be issued if addresses other than stated in Box 2<br>As per box 2<br><br>(iii) state to whom to be issued if addresses other than stated in Box 3 | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(d))<br>As per owner's instruction<br>To:<br>SpareBank1 Nord-Norge<br>Account no: 4729.91.10455<br>Swift code: snowno22<br><br>By:<br>Swift transfer |
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(d))<br>35 banking days from date of invoice | 24. Interest rate payable (Cl. 10(d))<br>NA | 25. Maximum audit period (Cl. 10(d))<br>60 days |
| 26. Meals (state rate agreed) (Cl. 6(c)(ii))<br>USD 16,- per meal | 27. Accommodation (state rate agreed) (Cl. 6(c)(ii))<br>USD 12,- per person | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br>Yes |
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>NA | 30. War (state name of countries) (Cl. 19(a))<br>Deleted |
| 31. General average (place of settlement - only to be filled in if other than London)<br>(Cl. 21) | 32. Breakdown (state period) (Cl. 26(b)(vi))<br>36 days |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>Norwegian Law, arbitration in Oslo | 34. Numbers of additional clauses covering special provisions, if agreed<br>From Clause 37 to Clause 38 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 29) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 29) |
|---|---|
| As per box 3 | As per box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 26.

| Signature (Owners) | Signature (Charterers) |
|---|---|
|  | Sorre S. Finesse |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ANNEXURE - A

Technical Specification of AHTS of not less than 9600 BHP - 1 No.

| Sr.No | Prameter | ONGC Requirement | Bidder Specification |
|---|---|---|---|
| 1 | **GENERAL** | | |
| 1.1 | Name of Vessel | | MV ALDOMA |
| 1.2 | Name of owner | | DESPONENT OWNER T.F.D.S. OFFSHORE AS |
| 1.3 | Flag | | BAHAMAS |
| 1.4 | Poart of registry | | NASSAU |
| 1.5 | Place of build | | NORWAY |
| 1.6 | Year of build | | 1983 |
| 1.7 | Name of yard | | Framnes Mekaniske, Sandefjord |
| 1.8 | Classification | ABS/DNV/BV/LRS/IRS/GL | DNV * 1A1 A Tug&Supply Vessel SF EO FIFI II ICE C |
| 1.9 | cell sign/official No. | | C5RD9 |
| 2 | **DIMENSIONS** | | |
| 2.1 | LOA [meters] | | 67,70 m |
| 2.2 | LBP [meters] | | 59,40 m |
| 2.3 | Breadth mld [meters] | | 14,50 m |
| 2.4 | Depth mld [meters] | | 5,97 m |
| 2.5.1 | Summer draugh [meters] | | 5,35 mtr. Min. draft (Light ship) 3,5 mtr. Max. draft (Tropical) 6.08 mtr |
| 2.5.2 | Operating draugh [meters] | Not more than 5.95 M at specified min DWT | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 2.6 | Clear deck Aft | | 407 m2 |
| 2.6.1 | Length [metern] | | 37 mtrs |
| 2.6.2 | Breadth [meters] | | 11 mtrs |
| 2.6.3 | Area [sq. meters] | Not less than 300 sq. meters | 407m2 |



| 3 | MACHINERY | | |
|---|---|---|---|
| 3.1 | Main Engines | | |
| 3.1.1 | Number of Main Engines | Not less than 2 (two) | 4 |
| 3.1.2 | Make | | Bergen Diesel |
| 3.1.3 | Model | | KVMB 12 |
| 3.1.4 | Max continuous rating (for all main engines together) at 100% NOMINAL | Not less than 9600 BHP | 12240 BHP |
| 3.1.5 | Year of build | New at the time of installation onboard the Vessel) | 1983 (New at the time of installation onboard the Vessel) |
| 3.2 | Main Propulsion | | |
| 3.2.1 | Number of propellers | Not less than 2 (two) | 2 x Ulstein, 180 Rpm |
| 3.2.2 | Type | Shrouded CPP preferred | CPP |
| 3.2.3 | Propeller diameter [mtrs] | | 3600 mm |
| 3.2.4 | Propeller make | | ULSTEIN PROPELLER |
| 3.3 | Side Thrusters | | |
| 3.3.1 | Number of bow thrusters | Not less than 2 (one) | 2 |
| 3.3.2 | Number of stern thrusters | | 1 |
| 3.3.3 | Rating of BTs [KW] | | 1180 KW |
| 3.3.4 | Rating of STs [KW] | | 590 KW |
| 3.4 | Generators | | |
| 3.4.1 | Number of generators | At least three independent power sources | 4 Independent Power Sources (2 x Shaftgenerators, Siemens 3200Kw, 2 x |
| 3.4.2 | Total rating [KVA] | | 3690 KVA |
| 3.4.3 | Voltage rating | | 380V |
| 3.4.4 | Frequency [Hz] | | 50 Hz |
| 3.5 | Steering gear | | |
| 3.5.1 | Type | Hydraulic preferred | Hydraulic, Tennfjord I-2X (18M300/2GM620)-FU |

| 3.5.2 | Number of rudders | Not less than 2 [two] | 2 Tenngford |
|---|---|---|---|
| 4 | **PERFORMANCE** | | |
| 4,1 | Trial speed [knots] | | 16,5 knots |
| 4,2 | Cruising speed [knots] | | 12-15 knots |
| 4,3 | Bollard pull [Max cont] | Not less than 105 Metric Tons | 140 Tons |
| 4,4 | Fuel consumption [Kl/day] | | |
| 4.4.1 | Standby | | 7,1 m3 |
| 4.4.2 | Underway | | 18 m3 |
| 4.4.3 | Towing | | 44,7 m3 |
| 5 | **TOWING AND ANCHOR HANDLING** | | |
| 5,1 | Winch | | |
| 5.1.1 | Type | Min. Double drum water fall hydraulic | Brattvaag SL 250( Double drum Water fall hydraulic) |
| 5.1.2 | Make | | Brattvaag |
| 5.1.3 | Model | | SL 250W / BSL 250 WX |
| 5.1.4 | Drum capacity | For a total length of not less than 2,000 mtrs., 72mm/76mm wire rope. | 2400 mtrs / 72mm |
| 5.1.5 | Work wire | Total length of 2000 mtrs. or more of 72/76mm required | 2400 mtrs / 72mm |
| 5.1.6 | Drum speed [M/min] | | 60 ton @ 28mtr/min & 250 ton @6,4 mtr/min |
| 5.1.7 | Winch stall capacity | Not less than 250 T | 250 ton |
| 5.1.8 | Line pull | | 350 ton |
| 5,2 | Wildcat for chains | | |
| 5.2.1 | Suitable for 70 mm Chain | | 76mm / 83mm |
| 5.2.2 | Chain lockers | Not less than 2 for 70mm stud link chains | 600 m 3 1/4 '' chain |
| 5.2.3 | Chain locker capacity [cubic meters] | 2 X 90 cu mtrs. | 203 cu. Mtrs. |
| 5.3 | Tow pins and shark jaws | | Karm 130318/130554, 240 ton. |



| | | | |
|---|---|---|---|
| 5,3 | Tow pins and snub jaws | | Karm O 350/130318/130554, 240 ton. |
| 5,4 | Spare Storage | | Two storage drums. One can hold 1200m. 70 mm. Wire and the other 1000 m.64 mm. We |
| 5,5 | Stern roller | | Ulstein 3,66 mtr x 2,50 mtr, 350 ton SWL |
| 5,6 | Tugger winches | | 2 Brattvaag WMA 1010 |
| 5,7 | Capstans [on aft deck] | | 2 |
| **6** | **NAVIGATION AND COMMUNICATION EQUIPMENT** | | |
| 6,1 | Gyrocompass | REQUIRED | Anshutz Standard 20 |
| 6,2 | Magnetic compass | REQUIRED | Standard |
| 6,3 | Echo sounder | REQUIRED | Simrad / ED161 |
| 6,4 | Auto pilot | REQUIRED | Racal Decca Pilot 450 |
| 6,5 | Radar | REQUIRED | 2 Furuno ARPA, X and S band, 72 nm ' |
| 6,6 | SSB Radio transceiver / GMDSS | REQUIRED | JRC (GMDSS area 4) JSS-800 |
| 6,7 | Marine VHF transceiver | REQUIRED | 2 - JRC/JHS-324 & Sailor/RT2048 |
| 6,8 | GPS | REQUIRED | Phillips MK10, Furuno GP 80 |
| 6,9 | Portable VHF | REQUIRED | 5 - 3 x Jotron/Tron & 2 x Motorola GP 300 |
| 6,10 | INMAR SAT | REQUIRED | Satpol/Phillips Safecom C |
| **7** | **ACCOMODATION** | | |
| 7,1 | Crew compliment | | 17 |
| 7,2 | For charterer's use | Suitable accomodation for five persons required | 7 |
| **8** | **CAPACITIES** | | |
| 8,1 | Deck cargo | Not less than 500 Ton | 750 ton |
| 8,2 | Deck-loading [T/ sq mtrs] | | 6 T/m3 |
| 8,3 | Fuel (m³) , | | 1041 m3 |

| 8.4 | Drill water (m³) | | 516 m3 |
|---|---|---|---|
| 8.5 | Pot water (m³) | | 289 m3 |
| 8.6 | Ballast water (m³) | | 516 m3 |
| 8.7 | Liquid mud (m³) | REQUIRED | 119 m3 |
| 8.8 | Dry bulk (m³) | | 196 m3 |
| 8.9 | Dead weight (Tons) | Not less than 1000 Tons at 5.95 M draught | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 8.1 | 4" Cam lock couplings | Required on all hoses | Yes |
| 9 | RIGGING EQUIPMENT | | |
| | | WILL BE PROVIDED | |
| 10 | *FIFI* | VESSEL IS FITTED WITH FI-FI Class-II | |
| 11 | OTHER CAPABILITIES | | |
| | Certificates | 1. Certificate of Registry | ENCLOSED |
| | | 2. Class Certificate (H&M) | ENCLOSED |
| | | 3. Bollard Pull Certificate | ENCLOSED |
| | | 4. G.A PLAN | ENCLOSED |
| | | 5. DEAD WEIGHT SCALE | ENCLOSED |

ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.* – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* – Protection and Indemnity or Marine Liability Insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury          per person
Property Damage        per occurrence.

(4) *Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) *Comprehensive General Automobile Liability Insurance.* – Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury          According to the local law.
Property Damage        In an amount equivalent to single limit per occurrence.

(6) Such other insurances as may be agreed.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ANNEX "D" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: "SUPPLYTIME 89" –DATED**

## OWNERS VESSEL MARINE CREW

<u>MARINE CREW</u>

Provided by Owners

PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**
(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the — 1
Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as — 2
"the Vessel"), for the period as stated in Box 9 from the time the Vessel is — 3
delivered to the Charterers. — 4
(b) Subject to Clause 10(b), the Charterers have the option to extend the — 5
Charter Period in direct continuation for the period stated in Box 100, but — 6
such an option must be declared in accordance with Box 10(b). — 7
(c) The Charter Period shall automatically be extended for the time required — 8
to complete the voyage or well (whichever is stated in Box 11(b)) in progress, — 9
such time not to exceed the period stated in Box 11(b). — 10
— 11

**2. Delivery and Redelivery**
(a) Delivery. - Subject to sub-clause (b) of this Clause the Vessel shall be — 12
delivered by the Owners free of cargo and with clean tanks at any time — 13
between the date stated in Box 5 and the date stated in Box 6 at the port or — 14
place stated in Box 7 where the Vessel can safely lie always afloat. — 15
(b) Mobilisation. - (i) The Charterers shall pay a lump sum as stated in Box 17 — 16
without discount by way of mobilisation charge in consideration of the — 17
Owners giving delivery at the port or place stated in Box 7. The mobilisation — 18
charge shall not be affected by any change in the port or place of mobilisation — 19
from that stated in Box 13. — 20
(ii) Should the Owners agree to the Vessel loading and transporting cargo — 21
and/or undertaking any other service for the Charterers en route to the port — 22
of delivery or from the port of redelivery, then all terms and conditions of this — 23
Charter Party shall apply to such loading and transporting and/or other — 24
service exactly as if performed during the Charter Period excepting only that — 25
any lump sum freight agreed in respect thereof shall be payable on shipment — 26
or commencement of the service as the case may be, the Vessel and/or goods — 27
lost or not lost. — 28
(c) Cancelling. - If the Vessel is not delivered by midnight local time on the — 29
cancelling date stated in Box 6, the Charterers shall be entitled to cancel this — 30
Charter Party. However, if despite the exercise of due diligence by the — 31
Owners, the Owners will be unable to deliver the Vessel by the cancelling — 32
date, they may give notice in writing to the Charterers at any time prior to the — 33
delivery date as stated in Box 5, and shall state in such notice the date by — 34
which they will be able to deliver the Vessel. The Charterers may within 24 — 35
hours of receipt of such notice give notice in writing to the Owners cancelling — 36
this Charter Party. If the Charterers do not give such notice, then the later date — 37
specified in the Owners' notice shall be substituted for the cancelling date for — 38
all the purposes of this Charter Party. In the event the Charterers cancel the — 39
Charter Party, it shall terminate on terms that neither party shall be liable to — 40
the other for any losses incurred by reason of the non-delivery of the Vessel — 41
or the cancellation of the Charter Party. — 42
(d) Redelivery. - The Vessel shall be redelivered on the expiration or earlier — 43
termination of this Charter Party free of cargo and with clean tanks at the port — 44
or place as stated in Box 8.0 or such other port or place as may be mutually — 45
agreed. The Charterers shall give not less than the number of days notice in — 46
writing of their intention to redeliver the Vessel, as stated in Box 8(i). — 47
(e) Demobilisation. - The Charterers shall pay a lump sum without discount in — 48
the amount as stated in Box 14 by way of demobilisation charge which amount — 49
shall be paid on the expiration or on earlier termination of this Charter Party. — 50
— 51

**3. Condition of Vessel**
(a) The Owners undertake that at the date of delivery under this Charter Party — 52
the Vessel shall be of the description and classification as specified in ANNEX — 53
"A", attached hereto, and undertake to so maintain the Vessel during the — 54
period of service under this Charter Party. — 55
(b) The Owners shall before and at the date of delivery of the Vessel and — 56
throughout the Charter Period exercise due diligence to make and maintain — 57
the Vessel tight, staunch, strong in good order and condition and, without — 58
prejudice to the generality of the foregoing, in every way fit to operate — 59
effectively at all times for the services as stated in Clause 5. — 60
— 61

**4. Survey**
The Owners and the Charterers shall jointly appoint an independent surveyor — 62
for the purpose of determining and agreeing in writing the condition of the — 63
Vessel, any anchor handling and towing equipment specified in Section 5 of — 64
ANNEX "A", and the quality and quantity of fuel, lubricants and water at the — 65
time of delivery and redelivery hereunder. The Owners and the Charterers — 66
shall jointly share the time and expense of such surveys. — 67
— 68

**5. Employment and Area of Operation**
(a) The Vessel shall be employed in offshore activities which are lawful in — 69
— 70

accordance with the law of the place of the Vessel's flag and/or registration — 71
and of the place of operation. Such activities shall be restricted to the — 72
service(s) as stated in Box 18, and to voyages between any good and safe port — 73
or place and any place or offshore unit where the Vessel can safely lie always — 74
afloat within the Area of Operation as stated in Box 17 which shall always be — 75
within Institute Warranty Limits and which shall in no circumstances be — 76
exceeded without prior agreement and adjustment of the Hire and in — 77
accordance with such other terms as appropriate to be agreed; provided — 78
always that the Charterers shall not warrant the safety of any such port or place — 79
or offshore unit but shall exercise due diligence in issuing their orders to the — 80
Vessel as if the Vessel were their own property and having regard to her — 81
capabilities and the nature of her employment. Unless otherwise agreed, the — 82
Vessel shall not be employed as a diving platform. — 83
(b) Relevant permission and licences from responsible authorities for the — 84
Vessel to enter, work in and leave the Area of Operation shall be obtained by — 85
the Charterers and the Owners shall assist, if necessary, in every way — 86
possible to secure such permission and licences. — 87
(c) The Vessel's Space. - The whole reach and burden and decks of the — 88
Vessel shall throughout the Charter Period be at the Charterers' disposal — 89
reserving proper and sufficient space for the Vessel's Master, Officers, Crew, — 90
tackle, apparel, furniture, provisions and stores. The Charterers shall be — 91
entitled to carry, so far as space is available and for their purposes in — 92
connection with their operations: — 93
(i) Persons other than crew members, other than fare paying, and for such — 94
purposes to make use of the Vessel's available accommodation not — 95
being used on the voyage by the Vessel's Crew. The Owners shall — 96
provide suitable provisions and requisites for such persons for which the — 97
Charterers shall pay at the rate as stated in Box 26 per meal and at the — 98
rate as stated in Box 27 per day for the provision of bedding and services — 99
for persons using berth accommodation. — 100
(ii) Lawful cargo whether carried on or under deck. — 101
(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided — 102
proper notification has been given and such cargo is marked and — 103
packed in accordance with the national regulations of the Vessel and/or — 104
the International Maritime Dangerous Goods Code and/or other — 105
pertinent regulations. Failing such proper notification, marking or — 106
packing the Charterers shall indemnify the Owners in respect of any loss, — 107
damage or liability whatsoever and howsoever arising therefrom. The — 108
Charterers accept responsibility for any additional expenses (including — 109
reinstatement expenses) incurred by the Owners in relation to the — 110
carriage of explosives and dangerous cargo. — 111
(iv) Hazardous and noxious substances, subject to Clause 12(c), proper — 112
notification and any pertinent regulations. — 113
(d) Laying-up of Vessel. - The Charterers shall have the option of laying up the — 114
Vessel at an agreed safe port or place for all or any portion of the Charter — 115
Period in which case the Hire hereunder shall continue to be paid but, if the — 116
period of such lay-up exceeds 30 consecutive days there shall be credited — 117
against such Hire the amount which the Owners shall reasonably have saved — 118
by way of reduction in expenses and overheads as a result of the lay-up of the — 119
Vessel. — 120
— 121

**6. Master and Crew**
(a) (i) The Master shall carry out his duties promptly and the Vessel shall — 122
render all reasonable services within her capabilities by day and by night and — 123
at such times and on such schedules as the Charterers may reasonably — 124
require without any obligations of the Charterers to pay to the Owners or the — 125
Master, Officers or the Crew of the Vessel any excess or overtime payments. — 126
The Charterers shall furnish the Master with all instructions and sailing — 127
directions and the Master and Engineer shall keep full and correct logs — 128
accessible to the Charterers or their agents. — 129
(ii) The Master shall sign cargo documents as are in the form presented, the — 130
same, however, not to be Bills of Lading, but receipts which shall be non- — 131
negotiable documents and shall be marked as such. The Charterers shall — 132
indemnify the Owners against all consequences and liabilities arising from — 133
the Master, Officers or agents signing, under the direction of the Charterers, — 134
those cargo documents or other documents inconsistent with this Charter — 135
Party or from any irregularity in the papers supplied by the Charterers or their — 136
agents. — 137
(b) The Vessel's Crew if required by Charterers will connect and disconnect — 138
electric cables, fuel, water and pneumatic hoses when placed on board the — 139
Vessel in port as well as alongside the offshore units; will operate the — 140
machinery on board the Vessel for loading and unloading cargoes; and will — 141
hook and unhook cargo on board the Vessel when loading or discharging — 142
alongside offshore units. If the port regulations or the seamen and/or labour — 143

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

unless do not permit the Crew of the Vessel to carry out any of this work, then 144
the Charterers shall make, at their own expenses, whatever other 145.
arrangements may be necessary, always under the direction of the Master. 145.
(c) If the Charterers have reason to be dissatisfied with the conduct of the 147
Master or any Officer of member of the Crew, the Owners on receiving 148
particulars of the complaint shall promptly investigate the matter and if the 149
complaint proves to be well founded, the Owners shall as soon as reasonably 150
possible make appropriate changes in the appointment. 151
(d) The entire operation, navigation, and management of the Vessel shall be in 152
the exclusive control and command of the Owners, their Master, Officers and 153
Crew. The Vessel will be operated and the services hereunder will be 154
rendered as requested by the Charterers, subject always to the exclusive 155
right of the Owners or the Master of the Vessel to determine whether operation 156
of the Vessel may be safely undertaken. In the performance of the Charter 157
Party, the Owners are deemed to be an independent contractor, the 158
Charterers being concerned only with the results of the services performed. 159

## 7.  Owners to Provide
(a) The Owners shall provide and pay for all provisions, wages and all other 160
expenses of the Master, Officers and Crew; all maintenance and repair of the 161
Vessel's hull, machinery and equipment as specified in ANNEX "A" also, 162
except as otherwise provided in the Charter Party; for all insurance on the 163
Vessel, all dues and charges directly related to the Vessel's flag and/or 164
registration, all deck, cabin and engineroom stores, cordage required for 165
ordinary ship's purposes mooring alongside in harbour, and all fumigation 166
expenses and de-ratisation certificate. The Owners' obligations under this 167
Clause extend to cover all liabilities for consular charges appertaining to the 168
Master, Officers and Crew, customs or import duties arising at any time during 169
the performance of the Charter Party in relation to the personal effects of the 170
Master, Officers and Crew, and in relation to the stores, provisions and other 171
matters as aforesaid which the Owners are to provide and/or pay for and the 172
Owners shall refund to the Charterers any sums they or their agents may have 173
paid or been compelled to pay in respect of such liability. 174
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' 175
expense with any buoing and anchor handling equipment specified in Section 176
5(h) of ANNEX "A". If during the Charter Period any such equipment becomes 177
lost, damaged or unserviceable, other than as a result of the Owners' 178
negligence, the Charterers shall either provide, or direct the Owners to 179
provide, an equivalent replacement at the Charterers' expense. 180
181

## 8.  Charterers to Provide
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, 182
lubricants, water, dispersants, firefighting foam and transport thereof, port 183
charges, pilotage and boatmen and canal steersmen (whether compulsory or 184
not), launch hire (unless incurred in connection with the Owners' business), 185
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 186
charges, agencies and commissions incurred on the Charterers' business, 187
costs for security or other watchmen, and of quarantine (if occasioned by the 188
nature of the cargo carried or the ports visited whilst employed under this 189
Charter Party but not otherwise). 190
(b) At all times the Charterers shall provide and pay for the loading and 191
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 192
cargo tanks, all necessary dunnage, uprights and shoring equipment for 193
securing deck cargo, all cordage except as to be provided by the Owners, all 194
ropes, slings and special runners (including bulk cargo discharge hoses) 195
actually used for loading and discharging, inert gas required for the 196
protection of cargo, and electrodes used for offshore works, and shall 197
reimburse the Owners for the actual cost of replacement of special mooring 198
lines to offshore units, wires, nylon spring lines etc. used for offshore works, 199
all hose connections and adaptors, and further; shall refill oxygen/acetylene 200
bottles used for offshore works. 201
202
(c) The Charterers shall pay for customs duties, all permits, import visas 203
(including costs involved in establishing temporary or permanent importation 204
bonds), and clearance expenses, both for the Vessel and/or equipment, 205
required for or arising out of this Charter Party. 206

## 9.  Bunkers
Unless otherwise agreed, the Vessel shall be delivered with bunkers and 207
lubricants as on board and redelivered with sufficient bunkers to reach the 208
next bunkering stage en route to their next port of call. The Charterers upon 209
delivery and the Owners upon redelivery shall take over and pay for the 210
bunkers and lubricants on board at the prices prevailing at the times and 211
ports of delivery and redelivery. 212
213

## 10.  Hire and Payments
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 214
18 per day or pro rata for part thereof from the time that the Vessel is delivered 215
to the Charterers until the expiration or earlier termination of this Charter 216
Party. 217
218
(b) Extension Hire. - If the option to extend the Charter Period under Clause 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be 220
mutually agreed between the Owners and the Charterers. 221
(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect 222
documented changes, after the date of entering into the Charter Party or the 223
date of commencement of employment, whichever is earlier, in the Owners' 224
costs arising from changes in the Charterers' requirements or regulations 225
governing the Vessel and/or its Crew or this Charter Party. 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in 227
Box 19. In respect of reimbursable expenses incurred in currencies other 228
than the contract currency, the rate of exchange into the contract currency 229
shall be that quoted by the Central Bank of the country of such other currency 230
as at the date of the Owners' invoice. Invoices covering Hire and any other 231
payments due shall be issued monthly as stated in Box 21(b) or at the 232
expiration or earlier termination of this Charter Party. Notwithstanding the 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at 234
the time of delivery. 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the 236
Charterers' account shall be received within the number of days stated in Box 237
22 from the date of receipt of the invoice. Payment shall be made in the 238
contract currency in full without discount to the account stated in Box 22. 239
However any advances for disbursements made on behalf of and approved by 240
the Owners may be deducted from Hire due. 241
If payment is not received by the Owners within 5 banking days following the 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 243
on the amount outstanding from and including the due date until payment is 244
received. 245
Where an invoice is disputed, the Charterers shall in any event pay the 246
undisputed portion of the invoice but shall be entitled to withhold payment of 247
the disputed portion provided that such portion is reasonably disputed and 248
the Charterers specify such reason. Interest will be chargeable at the rate 249
stated in Box 24 on such disputed amounts when resolved in favour of the 250
Owners. Should the Owners prove the validity of the disputed portion of the 251
invoice, balance payment shall be received by the Owners within 5 banking 252
days after the dispute is resolved. Should the Charterers' claim be valid, a 253
corrected invoice shall be issued by the Owners. 254
In default of payment as herein specified, the Owners may require the 255
Charterers to make payment of the amount due within 5 banking days of 256
receipt of notification from the Owners; failing which the Owners shall have 257
the right to withdraw the Vessel without prejudice to any claim the Owners 258
may have against the Charterers under this Charter Party. 259
While payment remains due the Owners shall be entitled to suspend the 260
performance of any and all of their obligations hereunder and shall have no 261
responsibility whatsoever for any consequences thereof, in respect of which 262
the Charterers hereby indemnify the Owners, and Hire shall continue to 263
accrue and any extra expenses resulting from such suspension shall be for 264
the Charterers' account. 265
(f) Audit. - The Charterers shall have the right to appoint an independent 266
chartered accountant to audit the Owners' books directly related to work 267
performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

## 11. Suspension of Hire
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of 274
Master, Officers and Crew, breakdown of machinery, damage to hull or other 275
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 276
payable in respect of any time lost and any Hire paid in advance shall be 277
adjusted accordingly provided always however that Hire shall not cease in the 278
event of the Vessel being prevented from working as aforesaid as a result of 279
(i)  the carriage of cargo as noted in Clause 5(c)(iii) and (iv); 280
281
(ii)  quarantine or risk of quarantine unless caused by the Master, Officers or 282
Crew having communication with the shore or any infected area not in 283
connection with the employment of the Vessel without the consent of the 284
instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and the computer generated document.




PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

the request of the Charterers; 287

(iv) detention in consequence of being driven into port or to anchorage 288
through stress of weather or trading to shallow harbours or to river or 289
ports with bars or suffering an accident to her cargo, when the expenses 290
resulting from such detention shall be for the Charterers' account 291
howsoever incurred; 292

(v) detention or damage by ice; 293

(vi) any act or omission of the Charterers, their servants or agents. 294

(c) Liability for Vessel not Working - The Owners' liability for any loss, 295
damage or delay sustained by the Charterers as a result of the Vessel being 296
prevented from working by any cause whatsoever shall be limited to 297
suspension of Hire. 298

(d) Maintenance and Drydocking - Notwithstanding sub-clause (a) hereof, the 299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall 300
be cumulative, per month or pro rata for part of a month from the 301
commencement of the Charter Period for maintenance and repairs including 302
drydocking (hereinafter referred to as "maintenance allowance"). The 303
accumulated maintenance days shall however at any time not exceed six (6)
days. If the accumulated time is not utilized within six (6) months it would
automatically lapse and will not be carried forward.

The Vessel shall be drydocked at regular intervals. The Charterers shall place 304
the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated 305
by the Owners at a later date) having facilities suitable to the Owners for the 306
purpose of such drydocking. 307

During reasonable voyage time taken in transits between such port and Area 308
of Operation the Vessel shall be on hire and such time shall not be counted 309
against the accumulated maintenance allowance. 310

Hire shall be suspended during any time taken in maintenance repairs and 311
drydocking in excess of the accumulated maintenance allowance. 312

In the event of less time being taken by the Owners for repairs and drydocking 313
or, alternatively, the Charterers not making the Vessel available for all or part 314
of this time, the Charterers shall, upon expiration or earlier termination of the 315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in 316
addition to Hire otherwise due under this Charter Party in respect of all such 317
time not so taken or made available. 318

Upon commencement of the Charter Period, the Owners agree to furnish the 319
Charterers with the Owners' proposed drydocking schedule and the 320
Charterers agree to make every reasonable effort to assist the Owners in 321
adhering to such predetermined drydocking schedule for the Vessel. It is 322
understood between Owner and Charterer that regular dry-docking is not
scheduled t o take place during the first period of Charter Hire, that is during
the first 36 months.

12. Liabilities and Indemnities 323

(A) Owners - Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 5(c)(ii), 7(b), 9(b), 12(c), 15(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or of 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partially by the act, neglect or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partially by unseaworthiness of any vessel; 333
and the Owners and their contractors and sub-contractors shall indemnify, 334
protect, defend and hold harmless the

Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337

(B) Charterers - Notwithstanding anything else contained in this Charter 338
Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything towed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
towed by the Vessel, arising out of or in any way connected with the 346
performance of this Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partially by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partially by the 350
unseaworthiness of any vessel; and the Charterers and their contractors and 351
sub-contractors shall indemnify, protect,

defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-
printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of
discrepancies between the original BIMCO approved document and this computer generated document.

arising out of or in connection with such loss, damage, liability, personal 354
injury or death. 355

(c) Consequential Damages - Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361

(d) Limitations - Nothing contained in this Charter Party shall be construed or 362
held to deprive the Owners or the Charterers, as against any person or party, 363
including as against each other, of any right to claim limitation of liability 364
provided by any applicable law, statute or convention, save that nothing in 365
this Charter Party shall create any right to limit liability. Where the Owners or 366
the Charterers may seek an indemnity under the provisions of this Charter 367
Party or against each other in respect of a claim brought by a third party, the 368
Owners or the Charterers shall seek to limit their liability against such third 369
party. 370

(e) Himalaya Clause - (i) All exceptions, exemptions, defences, immunities, 371
limitations of liability, indemnities, privileges and conditions granted or 372
provided by this Charter Party or by any applicable statute, rule or regulation 373
for the benefit of the Charterers shall also apply to and be for the benefit of the 374
Charterers' parent, affiliated, related and subsidiary companies; the 375
Charterers' contractors, sub-contractors, clients, joint venturers and joint 376
interest owners (always with respect to the job or project on which the Vessel 377
is employed); their respective employees and their respective underwriters. 378

(ii) All exceptions, exemptions, defences, immunities, limitations of liability, 379
indemnities, privileges and conditions granted or provided by this Charter 380
Party or by any applicable statute, rule or regulation for the benefit of the 381
Owners shall also apply to and be for the benefit of the Owners' parent, 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its 384
demise charterer(s), their respective employees and their respective 385
underwriters. 386

(iii) The Owners or the Charterers shall be deemed to be acting as agent or 387
trustee of and for the benefit of all such persons and parties set forth above, 388
but only for the limited purpose of contracting for the extension of such 389
benefits to such persons and parties. 390

(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but 391
regardless of whether this option is exercised the other provisions of Clause 12 392
shall apply and shall be paramount) 393

In order to avoid disputes regarding liability for personal injury or death of 394
employee or for loss of or damage to property, the Owners and the 395
Charterers have entered into, (by this Charter Party agree to enter into), an 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form 397
substantially similar to that specified in ANNEX "C") between the Owners, the 398
Charterers and the various contractors and sub-contractors of the Charterers. 399

(g) Hazardous and Noxious Substances - Notwithstanding any other 400
provision of this Charter Party to the contrary, the Charterers shall always be 401
responsible for any losses, damages or liabilities suffered by the Owners, 402
their employees, contractors or sub-contractors, by the Charterers, or by 403
third parties, with respect to the Vessel or other property, personal injury or 404
death, pollution or otherwise, which losses, damages or liabilities are caused, 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and 406
noxious substances in whatever form as ordered by the Charterers, and the 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless 408
for any expense, loss or liability whatsoever or howsoever arising with 409
respect to the carriage of hazardous or noxious substances. 410

13. Pollution 411

(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be 412
liable for, and agree to indemnify, defend and hold harmless the Charterers 413
against, all claims, costs, expenses, actions, proceedings, suits, demands 414
and liabilities whatsoever arising out of actual or potential pollution damage 415
and the cost of cleanup or control thereof arising from acts or omissions of 416
the Owners or their personnel which cause or allow discharge, spills or leaks 417
from the Vessel, except as may emanate from cargo thereon or therein. 418

(b) The Charterers shall be liable for and agree to indemnify, defend and hold 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, 420
suits, demands, liabilities, loss or damage whatsoever arising out of or 421
resulting from any other actual or potential pollution damage, even where 422
caused wholly or partially by the act, neglect or default of the Owners, their 423
employees, contractors or sub-contractors or by the unseaworthiness of the 424
Vessel. 425



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**14. Insurance**

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners. 426–430

(i) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party. 431–436

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party. 437–439

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party. 440–443

**15. Saving of Life and Salvage**

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible. 444–448

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. 449–456

All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage. 457–461

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount. 462–463

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title. 464–469

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew: 470–473

(i) The Vessel shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance. 474–476

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expense thereby incurred. 477–480

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom whensoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate. pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission. 481–488

(iv) The Vessel shall not be off-Hire as a consequence of giving such assistance, including repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11(c). 489–492

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance. 493–496

**16. Lien** 497

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel. 498–513

**17. Sublet and Assignment**

(a) Charterers. The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel. 514–525

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 22 pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers. 526–530

(c) Owners. The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. 531–533

Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned. 534–536

**18. Substitute Vessel**

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld. 537–540

**19. War**

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers. 541–553

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and, (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks. 554–562

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such 563–568

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II

## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

account being rendered monthly. — 569

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (for body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions. — 570-576

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART II. If the cargo on board after discharge thereof at destination or, if delivered under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery. — 577-588

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation. — 589-590

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause. — 591-593

### 20. Excluded Ports

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; (b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. — 594-606

(b) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand. Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks. — 607-615

### 21. General Average and New Jason Clause

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery". — 616-635

### 22. Both-to-Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the — 636-639

management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or object or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact. — 640-649

### 23. Structural Alterations and Additional Equipment

The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of Bona alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment. — 650-658

### 24. Health and Safety

The Owners shall comply with and adhere to all applicable International, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto. — 659-662

### 25. Taxes

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period. In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly. — 663-671

### 26. Early Termination

(a) For Charterers' Convenience. The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 14 and the demobilisation charge stated in Box 32, as well as Hire or other payments due under the Charter Party. — 672-677

(b) For Cause. If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances: — 677-684

(i) Requisition. If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period. — 685-687

(ii) Confiscation. If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period. — 688-691

(iii) Bankruptcy. In the event of an order being made or resolution passed for the winding up, dissolution, liquidation of bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business. — 692-696

(iv) Loss of Vessel. If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported. — 697-703

(v) Breakdown. If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18. — 704-708

(vi) Force Majeure. If a force majeure condition as defined in Clause 27 — 709

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

prevails for a period exceeding 15 consecutive days. 710
(vi) Default - If either party is in repudiatory breach of its obligations 711
hereunder. 712
Termination as a result of any of the above mentioned causes shall not relieve 713
the Charterers of any obligation for Hire and any other payments due. 714

**27. Force Majeure** 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or 716
delay or failure in performance hereunder resulting from any force majeure 717
event, including but not limited to acts of God, fire, action of the elements, 718
epidemics, war (declared or undeclared), warlike actions, insurrection, 719
revolution or civil strife, piracy, civil war or hostile action, strikes or 720
differences with workmen (except for disputes relating solely to the Owners' 721
or the Charterers' employees), acts of the public enemy, federal or state laws, 722
rules and regulations of any governmental authorities having or asserting 723
jurisdiction in the premises or of any other group, organization or informal 724
association (whether or not formally recognised as a government), and any 725
other cause beyond the reasonable control of either party which makes 726
continuance of operations impossible. 727

**28. Notices and Invoices** 728
Notices and invoices required to be given under this Charter Party shall be 729
given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate. 730

**29. Wreck Removal** 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and 732
has to be removed upon request by any compulsory law or authority having 733
jurisdiction over the area where the wreck is placed, the Owners shall be 734
liable for any and all expenses in connection with the raising, removal, 735
destruction, lighting or marking of the wreck. 736

**30. Confidentiality** 737
All information or data obtained by the Owners in the performance of this 738
Charter Party is the property of the Charterers, is confidential and shall not be 739
disclosed without the prior written consent of the Charterers. The Owners 740
shall use their best efforts to ensure that the Owners, any of their 741
sub-contractors, and employees and agents thereof shall not disclose any 742
such information or data. 743

**31. Law and Arbitration** 744
*) (a) This Charter Party shall be governed by English-Norwegian law and any 745
dispute
arising out of this Charter Party shall be referred to arbitration in London-Oslo, 746
one
arbitrator being appointed by each party, in accordance with the Norwegian 747
Arbitration
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for 748
the time being in force. On the receipt by one party of the nomination in 749
writing of the other party's arbitrator that party shall appoint their arbitrator 750

within 14 days, failing which the arbitrator already appointed shall act as sole 751
arbitrator. If two arbitrators properly appointed shall not agree they shall 752
appoint an umpire whose decision shall be final. 753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute 754
shall be referred to three persons at New York, one to be appointed by each of 755
the parties hereto, and the third by the two so chosen; their decision or that of 756
any two of them shall be final, and for purpose of enforcing any award, this 757
agreement may be made a rule of the Court. The arbitrators shall be members 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings 759
shall be conducted in accordance with the rules of this Society. 760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration 761
at the place stated in Box 33 subject to the law and procedures applicable 762
there. 763
(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply. 764
*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33. 765

**32. Entire Agreement** 766
This is the entire agreement of the parties, which supersedes all previous 767
written or oral understandings and which may not be modified except by a 768
written amendment signed by both parties. 769

**33. Severability Clause** 770
If any portion of this Charter Party is held to be invalid or unenforceable for 771
any reason by a court or governmental authority of competent jurisdiction, 772
then such portion will be deemed to be stricken and the remainder of this 773
Charter Party shall continue in full force and effect. 774

**34. Demise** 775
Nothing herein contained shall be construed as creating a demise of 776
the Vessel to the Charterers. 777

**35. Definitions** 778
"Well" is defined for the purposes of this Charter Party as the time required to 779
drill, test, complete and/or abandon a single borehole including any side- 780
track thereof. 781
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, 782
offshore installation, structure and/or mobile unit used in offshore 783
exploration, construction, pipelaying or repair, exploitation or production. 784
"Offshore site" is defined for the purposes of this Charter Party as the area 785
within fixed radial miles of an "offshore unit" from or to which the Owners 786
are requested to take their Vessel by the Charterers. 787
"Employees" is defined for the purposes of this Charter Party as employees, 788
directors, officers, servants, agents or invitees. 789

**36. Headings** 790
The headings of this Charter Party are for identification only and shall not be 791
deemed to be part hereof or be taken into consideration in the interpretation 792
or construction of this Charter Party. 793

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# EXHIBIT 2

## SIDE-AGREEMENT TO TIME CHARTER PARTY BETWEEN TFDS OFFSHORE AS AND ROLV BERG DRIVE AS REGARDING AHTS ALDOMA

It is understood between the parties that ONGC may offer Rolv Berg Drive AS extensions to the 3 year contract with contract no: MR/MM/OFF.LGTS./CH/VESSELS//10(109)/2003. It is further agreed between the parties that should Rolv Berg Drive AS be granted extension to this contract or new contracts with ONGC, Rolv Berg Drive shall have the right to extend the charter of AHTS Aldoma on a day-rate not to exceed USD 9.000,-.

This agreement shall be subject only to TFDS Offshore securing further charter with the vessel's owner.

It is further agreed that should Rolv Berg Drive AS secure other future contracts with ONGC TFDS Offshore AS will be given first option where they have vessels which meet the requirements at competitive rates.

This agreement is entered into on the 5th of March 2004.

For TFDS Offshore AS

Svein Hoel
Managing Director

For Rolv Berg Drive AS

Snorre S. Stinessen
Coordinating Manager

# EXHIBIT 3

Issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) REVISED 1989

Printed by BIMCO's idea

Adopted by International Support Vessel Owners' Association (ISOA), London

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989

| 1. Place and date<br>12 May 2005 | **UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS CODE NAME: "SUPPLYTIME 89"** PART I |
|---|---|
| 2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>FSUE Arktikmorneftegazrazvedka | 3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS), Enterprise no. 929 987 020<br>Strandvelen 106<br>9008 Tromsø, Norway |

| 4. Vessel's name (Cl. 1(a))<br>Aldoma | 5. Date of delivery (Cl. 2(a))<br>6 March 2006 | 6. Cancelling date (Cl. 2(a) and (c))<br>N/A |
|---|---|---|

| 7. Port or place of delivery (Cl. 2(a))<br>India, Kakinada | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>Kirkenes to be agreed<br>(i) Port or place of redelivery<br><br>30 days<br>(ii) Number of days' notice of redelivery |
|---|---|

| 9. Period of hire (Cl. 1(a))<br>14 months | 10. Extension of period of hire (optional) (Cl. 1(b))<br><br>2 x 1 year<br>(i) Period of extension<br><br>90 days<br>(ii) Advance notice for declaration of option (days) |
|---|---|

| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>N/A<br>(i) Voyage or well (state which)<br>N/A<br>(ii) Maximum extension period (state number of days) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>N/A<br>(i) Lump sum<br>N/A<br>(ii) When due |
|---|---|
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br>India, Kakinada |

| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>USD 81,000 | 15. Number of days' notice of early termination (Cl. 26(a))<br>N/A | 16. Demobilisation charge (lump sum) (Cl. 2(a) and Cl. 26(a))<br>USD 80,000<br>N/A |
|---|---|---|

| 17. Area of operation (Cl. 5(a))<br>World Wide within IWL, intention domestic India trade for ONGC | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>N/A |
|---|---|

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS        PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a)) and (d))  USD 3,600.- | 20. Extension hire (if agreed, state rate) (Cl. 10(b))  1st option USD 3,600.- per day  2nd option USD 3,600.- per day |
|---|---|

| 21. Invoicing for hire and other payments (Cl. 10(d))  (i) state whether to be issued in advance or arrears  Arrears (within 5 days after invoice)  (ii) state to whom to be issued if addressee other than stated in Box 2  As per box 2  (iii) state to whom to be issued if addressee other than stated in Box 3  As per box 3 | 22. Payment details and place of payment; also state beneficiary and bank account (Cl. 10(d))  As per invoice. |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e))  15 days | 24. Interest rate payable (Cl. 10(h))  LIBOR + 3 % | 25. Maximum audit period (Cl. 10(f)) |

| 26. Meals (state rate agreed) (Cl. 5(c)(i))  N/A | 27. Accommodation (state rate agreed) (Cl. 5(c)(i))  N/A | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))  N/A |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))  See additional clause 38 - Profit split | 30. War (state basis of countries) (Cl. 19(a))  Russia, Norway, India |

| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21)  Oslo | 32. Breakdown (grace period) (Cl. 20(b)(vi))  N/A |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)  Norwegian law, arbitration in Oslo, Norway | 34. Numbers of additional clauses covering special provisions, if agreed |

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 32)  FSUE Arktikmorneftegazrazvedka | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 32)  ... (former TFDS Offshore AS and Trore Offshore ... |

It is mutually agreed that this Contract shall be performed subject to the conditions ...

## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

accessible to the Charterers or their agents. — 129
(ii) The Master shall sign cargo documents as and in the form presented, the — 130
same, however, not to be Bills of Lading, but receipts which shall be non- — 131
negotiable documents and shall be marked as such. The Charterers shall — 132
indemnify the Owners against all consequences and liabilities arising from — 133
the Master, Officers or agents signing, under the direction of the Charterers, — 134
those cargo documents or other documents inconsistent with this Charter — 135
Party or from any irregularity in the papers supplied by the Charterers or their — 136
agents. — 137
(b) The Vessel's Crew if required by Charterers will connect and disconnect — 138
electric cables, fuel, water and pneumatic hoses when placed on board the — 139
Vessel in port as well as alongside the offshore units; will operate the — 140
machinery on board the Vessel for loading and unloading cargoes; and will — 141
hook and unhook cargo on board the Vessel when loading or discharging — 142
alongside offshore units. If the port regulations or the seamen and/or labour — 143
unions do not permit the Crew of the Vessel to carry out any of this work, then — 144
the Charterers shall make, at their own expense, whatever other — 145
arrangements may be necessary, always under the direction of the Master. — 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the — 147
Master or any Officer or member of the Crew, the Owners on receiving — 148
particulars of the complaint shall promptly investigate the matter and if the — 149
complaint proves to be well founded, the Owners shall as soon as reasonably — 150
possible make appropriate changes in the appointment. — 151
(d) The entire operation, navigation, and management of the Vessel shall be in — 152
the exclusive control and command of the Owners, their Master, Officers and — 153
Crew. The Vessel will be operated and the services hereunder will be — 154
rendered as requested by the Charterers, subject always to the exclusive — 155
right of the Owners or the Master of the Vessel to determine whether operation — 156
of the Vessel may be safely undertaken. In the performance of the Charter — 157
Party, the Owners are deemed to be an independent contractor, the — 158
Charterers being concerned only with the results of the services performed. — 159

### 7. Owners Charterers to Provide
(a) The Owners Charterers shall provide and pay for all provisions, wages and — 160 161
all other — 161
expense of the Master, Officers and Crew; all maintenance and repair of the — 162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, — 163
except as otherwise provided in this Charter Party, for all insurance on the — 164
Vessel, all dues and charges directly related to the Vessel's flag and/or — 165
registration, all deck, cabin and engineroom stores, cordage required for — 166
ordinary ship's purpose mooring alongside in harbour, and all fumigation — 167
expenses and de-ratisation certificates. The Owners-Charterers' obligations — 168
under this — 
Clause extend to cover all liabilities for consular charges appertaining to the — 169
Master, Officers and Crew, customs or import duties arising at any time during — 170
the performance of this Charter Party in relation to the personal effects of the — 171
Master, Officers and Crew, and in relation to the stores, provisions and other — 172
matters as aforesaid which the Owners-Charterers are to provide and/or pay — 173
for. and the — 
Owners shall refund to the Charterers any sums they or their agents may have — 174
paid or been compelled to pay in respect of such liability. — 175
(b) On delivery the Vessel shall be equipped, if appropriate, and the — 176
Charterers haves accepted the vessel at the Owners' — 
expense with any towing and anchor handling equipment specified in Section — 177
5(b) of ANNEX "A" on board. If during the Charter Period any such equipment — 178
becomes — 
lost, damaged or unserviceable, other than as a result of the Owners' — 179
negligence, the Charterers shall either provide, or direct the Owners to — 180
provide, an equivalent replacement at the Charterers' expense. — 181

### 8. Charterers also to Provide
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, — 182 183
lubricants, water, dispersants, firefighting foam and transport thereof, port — 184
charges, pilotage and boatmen and canal steersmen (whether compulsory or — 185
not), launch hire (unless incurred in connection with the Owners' business), — 186
light dues, tug assistance, canal, dock harbour, tonnage and other dues and — 187
charges, agencies and commissions incurred on the Charterers' business, — 188
costs for security or other watchmen, and of quarantine (if occasioned by the — 189
nature of the cargo carried or the ports visited whilst employed under this — 190
Charter Party but not otherwise). — 191
(b) At all times the Charterers shall provide and pay for the loading and — 192
unloading of cargoes as far as not done by the Vessel's crew, cleaning of — 193
cargo tanks, all necessary dunnage, uprights and shoring equipment for — 194
securing deck cargo, all cordage except as to be provided by the Owners, all — 195

ropes, slings and special runners (including bulk cargo discharge hoses) — 196
actually used for loading and discharging, inert gas required for the — 197
protection of cargo, and electrodes used for offshore works, and shall — 198
reimburse the Owners for the actual cost of replacement of special mooring — 199
lines to offshore units, wires, nylon spring lines etc. used for offshore works, — 200
all hose connections and adaptors, and further, shall refill oxygen/acetylene — 201
bottles used for offshore works. — 202
(c) The Charterers shall pay for customs duties, all permits, import duties — 203
(including costs involved in establishing temporary or permanent importation — 204
bonds), and clearance expenses, both for the Vessel and/or equipment, — 205
required for or arising out of this Charter Party. — 206

### 9. Bunkers
Unless otherwise agreed, The Vessel shall be delivered with bunkers and — 207 208
lubricants as on board and redelivered with sufficient bunkers to reach the — 209
next bunkering stage en route to her next port of call. The Charterers upon — 210
delivery and the The Owners upon redelivery shall take over and pay for the — 211
bunkers and lubricants on board at the prices prevailing at the times and — 212
ports of delivery and redelivery Charterers' cost of the bunkers and — 213
lubricants.

### 10. Hire and Payments
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box — 214 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered — 216
to the Charterers until the expiration or earlier termination of this Charter — 217
Party. — 218
(b) Extension Hire. - If the option to extend the Charter Period under Clause — 219
1(c) is exercised, Hire for such extension shall, unless stated in Box 20, be — 220
mutually agreed between the Owners and the Charterers. — 221
(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect — 222
documented changes, after the date of entering into the Charter Party or the — 223
date of commencement of employment, whichever is earlier, in the Owners' — 224
costs arising from changes in the Charterers' requirements or regulations — 225
governing the Vessel and/or its Crew or this Charter Party. — 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in — 227
Box 15. In respect of reimbursable expenses incurred in currencies other — 228
than the contract currency, the rate of exchange into the contract currency — 229
shall be that quoted by the Central Bank of the country of such other currency — 230
as at the date of the Owners' invoice. Invoices covering Hire and any other — 231
payments due shall be issued monthly as stated in Box 21(i) or at the — 232
expiration or earlier termination of this Charter Party. Notwithstanding the — 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at — 234
the time of delivery. — 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the — 236
Charterers' account shall be received within the number of days, stated in Box — 237
23 from the date of receipt of the invoice. Payment shall be made in the — 238
contract currency in full without discount to the account stated in Box 22. — 239
However any advances for disbursements made on behalf of and approved by — 240
the Owners may be deducted from Hire due. — 241
If payment is not received by the Owners within 5 banking days following the — 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 — 243
on the amount outstanding from and including the due date until payment is — 244
received. — 245
Where an invoice is disputed, the Charterers shall in any event pay the — 246
undisputed portion of the invoice but shall be entitled to withhold payment of — 247
the disputed portion provided that such portion is reasonably disputed and — 248
the Charterers specify such reason. Interest will be chargeable at the rate — 249
stated in Box 24 on such disputed amounts where resolved in favour of the — 250
Owners. Should the Owners prove the validity of the disputed portion of the — 251
invoice, balance payment shall be received by the Owners within 5 banking — 252
days after the dispute is resolved. Should the Charterers' claim be valid, a — 253
corrected invoice shall be issued by the Owners. — 254
In default of payment as herein specified, the Owners may require the — 255
Charterers to make payment of the amount due within 5 banking days of — 256
receipt of notification from the Owners; failing which the Owners shall have — 257
the right to withdraw the Vessel without prejudice to any claim the Owners — 258
may have against the Charterers under this Charter Party. — 259
While payment remains due the Owners shall be entitled to suspend the — 260
performance of any and all of their obligations hereunder and shall have no — 261
responsibility whatsoever for any consequences thereof, in respect of which — 262
the Charterers hereby indemnify the Owners, and Hire shall continue to — 263
accrue and any extra expenses resulting from such suspension shall be for — 264
the Charterers' account. — 265
(f) Audit. - The Charterers shall have the right to appoint an independent — 266
chartered accountant to audit the Owners' books directly related to work — 267

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

04

## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 26, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

**11. Suspension of Hire** 274
The hire is payable on a 365 days basis without off-hire. (a) If as a result of 275
any deficiency of Crew or of the Owners' stores, strike of 276
Master, Officers and Crew, breakdown of machinery, damage to hull or other 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 277
payable in respect of any time lost and any Hire paid in advance shall be 278
adjusted accordingly provided always however that Hire shall not cease in the 279
event of the Vessel being prevented from working as aforesaid as a result of: 280
(i) the carriage of cargo as noted in Clause 5(a)(iii) and (iv); 281
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or 282
Crew having communication with the shore or any infected area not in 283
connection with the employment of the Vessel without the consent or the 284
instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286
the request of the Charterers; 287
(iv) detention in consequence of being driven into port or to anchorage 288
through stress of weather or trading to shallow harbours or to river or 289
ports with bars or suffering an accident to her cargo, when the expenses 290
resulting from such detention shall be for the Charterers' account 291
howsoever incurred; 292
(v) detention or damage by ice; 293
(vi) any act or omission of the Charterers, their servants or agents. 294
(b) Liability for Vessel not Working. The Owners' liability for any loss, 295
damage or delay sustained by the Charterers as a result of the Vessel being 296
prevented from working by any cause whatsoever shall be limited to 297
suspension of hire. 298
(c) Maintenance and Drydocking. Notwithstanding sub-clause (a) hereof, the 299
Charterers shall grant the Owners a maximum of 24 hours on Hire, which shall 300
be cumulative, per month or pro rata for part of a month from the 301
commencement of the Charter Period for maintenance and repairs including 302
drydocking (hereinafter referred to as "maintenance allowance"). 303
The Vessel shall be drydocked at regular intervals. The Charterers shall place 304
the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated 305
by the Owners at a later date) having facilities suitable to the Owners for the 306
purpose of such drydocking. 307
During reasonable voyage time taken in transits between such port and Area 308
of Operation the Vessel shall be on hire and such time shall not be counted 309
against the accumulated maintenance allowance. 310
Hire shall be suspended during any time taken in maintenance repairs and 311
drydocking in excess of the accumulated maintenance allowance. 312
In the event of less time being taken by the Owners for repairs and drydocking 313
or, alternatively, the Charterers not making the Vessel available for all or part 314
of this time, the Charterers shall, upon expiration or earlier termination of the 315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in 316
addition to Hire otherwise due under this Charter Party in respect of all such 317
time not so taken or made available. 318
Upon commencement of the Charter Period, the Owners agree to furnish the 319
Charterers with the Owners' proposed drydocking schedule and the 320
Charterers agree to make every reasonable effort to assist the Owners in 321
adhering to such predetermined drydocking schedule for the Vessel. 322

**12. Liabilities and Indemnities** 323
(a) Owners. - Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 8(c)(ii), 7(b), 8(b), 12(c), 15(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or of 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partly by the act, neglect, or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partly by unseaworthiness of any vessel; 333
and the Owners shall indemnify, protect, defend and hold harmless the 334
Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337
(b) Charterers. - Notwithstanding anything else contained in this Charter 338

Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything towed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
towed by the Vessel, arising out of or in any way connected with the 346
performance of this Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partially by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partially by the 350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect, 351
defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353
arising out of or in connection with such loss, damage, liability, personal 354
injury or death. 355
(c) Consequential Damages. -Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or 362
held to deprive the Owners or the Charterers, as against any person or party, 363
including as against each other, of any right to claim limitation of liability 364
provided by any applicable law, statute or convention, save that nothing in 365
this Charter Party shall create any right to limit liability. Where the Owners or 366
the Charterers may seek an indemnity under the provisions of this Charter 367
Party or against each other in respect of a claim brought by a third party, the 368
Owners or the Charterers shall seek to limit their liability against such third 369
party. 370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities, 371
limitations of liability, indemnities, privileges and conditions granted or 372
provided by this Charter Party or by any applicable statute, rule or regulation 373
for the benefit of the Charterers shall also apply to and be for the benefit of the 374
Charterers' parent, affiliated, related and subsidiary companies; the 375
Charterers' contractors, sub-contractors, clients, joint venturers and joint 376
interest owners (always with respect to the job or project on which the Vessel 377
is employed); their respective employees and their respective underwriters. 378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability, 379
indemnities, privileges and conditions granted or provided by this Charter 380
Party or by any applicable statute, rule or regulation for the benefit of the 381
Owners shall also apply to and be for the benefit of the Owners' parent, 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its 384
demise charterer(s), their respective employees and their respective 385
underwriters. 386

(iii) The Owners or the Charterers shall be deemed to be acting as agent or 387
trustee of and for the benefit of all such persons and parties set forth above, 388
but only for the limited purpose of contracting for the extension of such 389
benefits to such persons and parties. 390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but 391
regardless of whether this option is exercised the other provisions of Clause 12 392
shall apply and shall be paramount) 393
In order to avoid disputes regarding liability for personal injury or death of 394
employees or for loss of or damage to property, the Owners and the 395
Charterers have entered into, or by this Charter Party agree to enter into, an 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form 397
substantially similar to that specified in ANNEX "C") between the Owners, the 398
Charterers and the various contractors and sub-contractors of the Charterers. 399
(g) Hazardous and Noxious Substances. - Notwithstanding any other 400
provision of this Charter Party to the contrary, the Charterers shall always be 401
responsible for any losses, damages or liabilities suffered by the Owners, 402
their employees, contractors or sub-contractors, by the Charterers, or by 403
third parties, with respect to the Vessel or other property, personal injury or 404
death, pollution or otherwise, which losses, damages or liabilities are caused, 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and 406
noxious substances in whatever form as ordered by the Charterers, and the 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless 408

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

for any expense, loss or liability whatsoever or howsoever arising with 409
respect to the carriage of hazardous or noxious substances. 410

**13. Pollution** 411
(a) Except as otherwise provided for in Clause 15(c)(XII), the Owners-Charterers 412
shall be
liable for, and agree to indemnify, defend and hold harmless the 413
Charterers-Owners
against, all claims, costs, expenses, actions, proceedings, suits, demands 414
and liabilities whatsoever arising out of actual or potential pollution damage 415
and the cost of cleanup or control thereof arising from acts or omissions of 416
the Owners or their personnel which cause or allow discharge, spills or leaks 417
from the Vessel, except as may emanate from cargo thereon or therein. 418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, 420
suits, demands, liabilities, loss or damage whatsoever arising out of or 421
resulting from any other actual or potential pollution damage, even where 422
caused wholly or partially by the act, neglect or default of the Owners, their 423
employees, contractors or sub-contractors or by the unseaworthiness of the 424
Vessel. 425

**14. Insurance** 426
(a)(i) The Owners-Charterers shall procure and maintain in effect for the 427
duration of this
Charter Party, with reputable insurers, with total insurance value of USD 5 428
mill with the insurances set forth in ANNEX "B".
Policy limits shall not be less than those indicated. Reasonable deductibles 429
are acceptable and shall be for the account of the Owners/Charterers. 430
(i) The Charterers-Owners shall upon request be named as co-insured 431
together with the Charterers. The Owners
shall upon request cause insurers to waive subrogation rights against the 432
Charterers (as encompassed in Clause 12(a)(iii)). Co-insurance and/or 433
waivers of subrogation shall be given only insofar as these relate to liabilities 434
which are properly the responsibility of the Owners under the terms of this 435
Charter Party. 436
(b) The Owners-Charterers shall upon request furnish the Charterers-Owners 437
with certificates of
insurance which provide sufficient information to verify that the Owners 438
Charterers have
complied with the insurance requirements of this Charter Party. 439
(c) If the Owners-Charterers fail to comply with the aforesaid insurance 440
requirements, the
Charterers-Owners may, without prejudice to any other rights or remedies 441
under this
Charter Party, purchase similar coverage and invoice an amount of the 442
insurance costs as additional hire deduct the cost thereof from
any payment due to the Owners under the Charter Party.

**15. Saving of Life and Salvage** 444
(a) The Vessel shall be permitted to deviate for the purpose of saving life at 445
sea without prior approval of or notice to the Charterers and without loss of 446
Hire provided however that notice of such deviation is given as soon as 447
possible. 448
(b) Subject to the Charterers' consent, which shall not be unreasonably 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it 450
being understood that the Vessel shall be off hire from the time she leaves 451
port or commences to deviate and she shall remain off-hire until she is again 452
in every way ready to resume the Charterers' service at a position which is not 453
less favourable to the Charterers than the position at the time of leaving port 454
or deviating for the salvage services. 455
All salvage monies earned by the Vessel shall be divided equally between the 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's 457
share, legal expenses, value of fuel and lubricants consumed, Hire of the 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if 459
any, and any other extraordinary loss or expense sustained as a result of the 460
salvage. 461
The Charterers shall be bound by all measures taken by the Owners in order 462
to secure payment of salvage and to fix its amount. 463
(c) The Owners shall waive their right to claim any award for salvage 464
performed on property owned by or contracted to the Charterers, always 465
provided such property was the object of the operation the Vessel was 466
chartered for, and the Vessel shall remain on hire when rendering salvage 467
services to such property. This waiver is without prejudice to any right the 468
Vessel's Master, Officers and Crew may have under any title. 468

If the Owners render assistance to such property in distress on the basis of 470
"no claim for salvage", then, notwithstanding any other provisions contained 471
in this Charter Party and even in the event of neglect or default of the Owners, 472
Master, Officers or Crew: 473
(i) The Charterers shall be responsible for and shall indemnify the Owners 474
against payments made, under any legal rights, to the Master, Officers 475
and Crew in relation to such assistance. 476
(ii) The Charterers shall be responsible for and shall reimburse the Owners 477
for any loss or damage sustained by the Vessel or her equipment by 478
reason of giving such assistance and shall also pay the Owners' 479
additional expenses thereby incurred. 480
(iii) The Charterers shall be responsible for any actual or potential spill, 481
seepage and/or emission of any pollutant howsoever caused occurring 482
within the offshore site and any pollution resulting therefrom 483
wheresoever it may occur and including but not limited to the cost of 484
such measures as are reasonably necessary to prevent or mitigate 485
pollution damage, and the Charterers shall indemnify the Owners 486
against any liability, cost or expense arising by reason of such actual or 487
potential spill, seepage and/or emission. 488
(iv) The Vessel shall not be off-hire as a consequence of giving such 489
assistance, or effecting repairs under sub-paragraph (ii) of this sub- 490
clause, and time taken for such repairs shall not count against time 491
granted under Clause 11(c). 492
(v) The Charterers shall indemnify the Owners against any liability, cost 493
and/or expense whatsoever in respect of any loss of life, injury, damage 494
or other loss to person or property howsoever arising from such 495
assistance. 496

**16. Lien** 497
The Owners shall have a lien upon all cargoes for all claims against the 498
Charterers under this Charter Party and the Charterers shall have a lien on the 499
Vessel for all monies paid in advance and not earned. The Charterers will not 500
suffer, nor permit to be continued, any lien or encumbrance incurred by them 501
or their agents, which might have priority over the title and interest of the 502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall 503
indemnify and hold the Owners harmless against any lien of whatsoever 504
nature arising upon the Vessel during any claims against the Owners 505
the control of the Charterers, and against any claims against the Owners 506
arising out of the operation of the Vessel by the Charterers or out of any 507
neglect of the Charterers in relation to the Vessel or the operation thereof. 508
Should the Vessel be arrested by reason of claims or liens arising out of her 509
operation hereunder, unless brought about by the act or neglect of the 510
Owners, the Charterers shall at their own expense take all reasonable steps to 511
secure that within a reasonable time the Vessel is released and at their own 512
expense put up bail to secure release of the Vessel. 513

**17. Sublet and Assignment** 514
(a) Charterers. The Charterers shall have the option of subletting, assigning 515
or leasing the Vessel to any person or company not competing with the 516
Owners, subject to the Owners' prior approval which shall not be 517
unreasonably withheld, upon giving notice in writing to the Owners, but the 518
original Charterers shall always remain responsible to the Owners for due 519
performance of the Charter Party and contractors of the person or company 520
taking such subletting, assigning or lease shall be deemed contractors of the 521
Charterers for all the purposes of this Charter Party. The Owners make it a 522
condition of such consent that additional Hire shall be paid as agreed 523
between the Charterers and the Owners having regard to the nature and 524
period of any intended service of the Vessel. 525
(b) If the Vessel is sublet, assigned or leased to undertake rig-anchor 526
handling and/or towing operations connected with equipment, other than that 527
used by the Charterers, then a daily increment to the Hire in the amount as 528
stated in Box 20 or pro-rata shall be paid for the period between departure for 529
such operations and return to her normal duties for the Charterers. 530
(c) Owners. The Owners may not assign or transfer any part of this Charter 531
Party without the written approval of the Charterers, which approval shall not 532
be unreasonably withheld. 533
Approval by the Charterers of such subletting or assignment shall not relieve 534
the Owners of their responsibility for due performance of the part of the 535
services which is sublet or assigned. 536

**18. Substitute Vessel** 537
The Owners shall be entitled at any time, whether before delivery or at any 538
other time during the Charter Period, to provide a substitute vessel, subject to 539

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II

## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

~~the Charterers' prior approval which shall not be unreasonably withheld.~~    540

**19.War**    541
(a) Unless the consent of the Owners be first obtained, the Vessel shall not be    542
ordered nor continue to any port or place or on any voyage nor be used on    543
any service which will bring the Vessel within a zone which is dangerous as a    544
result of any actual or threatened act of war, war, hostilities, warlike    545
operations, acts of piracy or of hostility or malicious damage against this or    546
any other vessel or its cargo by any person, body or state whatsoever,    547
revolution, civil war, civil commotion or the operation of international law, nor    548
be exposed in any way to any risks or penalties whatsoever consequent upon    549
the imposition of sanctions, nor carry any goods that may in any way expose    550
her to any risks of seizure, capture, penalties or any other interference of any    551
kind whatsoever by the belligerent or fighting powers or parties or by any    552
government or rulers.    553
(b) Should the Vessel approach or be brought or ordered within such zone, or    554
be exposed in any way to the said risks, (i) the Owners shall be entitled from    555
time to time to insure their interest in the Vessel for such terms as they deem    556
fit up to its open market value and also in the Hire against any of the risks    557
likely to be involved thereby, and the Charterers shall make a refund on    558
demand of any additional premium thereby incurred, and (ii) notwithstanding    559
the terms of Clause 11 Hire shall be payable for all time lost including any loss    560
owing to loss of or injury to the Master, Officers, Crew or passengers or to    561
refusal by any of them to proceed to such zone or to be exposed to such risks.    562
(c) In the event of additional insurance premiums being incurred or the wages    563
of the Master and/or Officers and/or Crew and/or the cost of provisions and/    564
or stores for deck and/or engine room being increased by reason of or during    565
the existence of any of the matters mentioned in sub-clause (a) the amount of    566
any additional premium and/or increase shall be added to the Hire, and paid    567
by the Charterers on production of the Owners' account therefor, such    568
account being rendered monthly.    569
(d) The Vessel shall have liberty to comply with any orders or directions as to    570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in    571
any other way whatsoever given by the government of the nation under whose    572
flag the Vessel sails or any other government or any person (or body) acting    573
or purporting to act with the authority of such government or by any    574
committee or person having under the terms of the war risks insurance on the    575
Vessel the right to give any such orders or directions.    576
(e) In the event of the outbreak of war (whether there be a declaration of war or    577
not) between any of the countries stated in Box 30 or in the event of the nation    578
under whose flag the Vessel sails becoming involved in war (whether there be    579
a declaration of war or not) either the Owners or the Charterers may terminate    580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the    581
Owners in accordance with PART I if it has cargo on board after discharge    582
thereof at destination or, if debarred under this Clause from reaching or    583
entering it, at a near open and safe port or place as directed by the Owners, or    584
if the Vessel has no cargo on board, at the port or place at which it then is or if    585
at sea at a near, open and safe port or place as directed by the Owners. In all    586
cases Hire shall continue to be paid and, except as aforesaid, all other    587
provisions of this Charter Party shall apply until redelivery.    588
(f) If in compliance with the provisions of this Clause anything is done or is not    589
done, such shall not be deemed a deviation.    590
The Charterers shall procure that all Bills of Lading (if any) issued under this    591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d)    592
and (f) of this Clause.    593

**20.Excluded Ports**    594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners'    595
written permission (a) any place where fever or epidemics are prevalent or to    596
which the Master, Officers and Crew by law are not bound to follow the Vessel;    597
(b) any ice-bound place or any place where lights, lightships, marks and    598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival    599
or where there is risk that ordinarily the Vessel will not be able on account of    600
ice to reach the place or to get out after having completed her operations. The    601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on    602
account of ice, the Master considers it dangerous to remain at the loading or    603
discharging place for fear of the Vessel being frozen in and/or damaged he    604
has liberty to sail to a convenient open place and await the Charterers' fresh    605
instructions.    606
(b) Should the Vessel approach or be brought or ordered within such place,    607
or be exposed in any way to the said risks, the Owners shall be entitled from    608
time to time to insure their interests in the Vessel and/or Hire against any of    609
the risks likely to be involved thereby on such terms as they shall think fit, the    610
Charterers to make a refund to the Owners of the premium on demand.    611

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost    612
including any lost owing to loss of or sickness or injury to the Master, Officers,    613
Crew or passengers or to the action of the Crew in refusing to proceed to such    614
place or to be exposed to such risks.    615

**21.General Average and New Jason Clause**    616
General Average shall be adjusted and settled in London unless otherwise    617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended.    618
Hire shall not contribute to General Average. Should adjustment be made in    619
~~accordance with the law and practice of the United States of America, the~~    620
~~following provision shall apply.~~    621
~~"In the event of accident, danger, damage or disaster before or after the~~    622
~~commencement of the voyage, resulting from any cause whatsoever, whether~~    623
~~due to negligence or not, for which, or for the consequences of which, the~~    624
~~Owners are not responsible, by statute, contract or otherwise, the cargo,~~    625
~~shippers, consignees or owners of the cargo shall contribute with the Owners~~    626
~~in General Average to the payment of any sacrifices, loss or expense of a~~    627
~~General Average nature that may be made or incurred and shall pay salvage~~    628
~~and special charges incurred in respect of the cargo.~~    629
~~If a salving vessel is owned or operated by the Owners, salvage shall be paid~~    630
~~for as fully as if the said salving vessel or vessels belonged to strangers. Such~~    631
~~deposit as the Owners, or their agents, may deem sufficient to cover the~~    632
~~estimated contribution of the cargo and any salvage and special charges~~    633
~~thereon shall, if required, be made by the cargo, shippers, consignees~~    634
~~or owners of the cargo to the Owners before delivery".~~    635

**22.Both-to-Blame Collision Clause**    636
If the Vessel comes into collision with another ship as a result of the    637
negligence of the other ship and any act, neglect or default of the Master,    638
mariner, pilot or the servants of the Owners in the navigation or the    639
management of the Vessel, the Charterers will indemnify the Owners against    640
all loss or liability to the other or non-carrying ship or her owners insofar as    641
such loss or liability represent loss of or damage to, or any claim whatsoever    642
of the owners of any goods carried under this Charter Party paid or payable by    643
the other or non-carrying ship or her owners to the owners of the said goods    644
and set-off, recouped or recovered by the other or non-carrying ship or her    645
owners as part of their claim against the Vessel or the Owners. The foregoing    646
provisions shall also apply where the owners, operators or those in charge of    647
any ship or ships or objects other than or in addition to the colliding ships or    648
objects are at fault in respect of a collision or contact.    649

**23.Structural Alterations and Additional Equipment**    650
The Charterers shall have the option of, at their expense, making structural    651
alterations to the Vessel or installing additional equipment with the written    652
consent of the Owners which shall not be unreasonably withheld but unless    653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers'    654
expense, to her original condition. The Vessel is to remain on Hire during any    655
period of these alterations or reinstatement. The Charterers, unless otherwise    656
agreed, shall be responsible for repair and maintenance of any such    657
alteration or additional equipment.    658

**24.Health and Safety**    659
The Owners-Charterers shall comply with and adhere to all applicable    660
international,    
national and local regulations pertaining to health and safety, and such    661
~~Charterers'-Owners'~~ instructions as may be appended hereto.    662

**25.Taxes**    663
Each party shall pay taxes due on its own profit, income and personnel. The    664
Charterers shall pay all other taxes and dues arising out of the operation or    665
use of the Vessel during the Charter Period.    666
In the event of change in the Area of Operation or change in local regulation    667
and/or interpretation thereof, resulting in an unavoidable and documented    668
change of the Owners' tax liability after the date of entering into the Charter    669
Party or the date of commencement of employment, whichever is the earlier,    670
Hire shall be adjusted accordingly.    671

**26.Early Termination**    672
(a) For Charterers' Convenience. - The Charterers may terminate this Charter    673
Party at any time by giving the Owners written notice as stated in Box 15 and    674
by paying the settlement stated in Box 14 and the demobilisation charge    675
stated in Box 16, as well as Hire or other payments due under the Charter    676
Party.    677
(b) For Cause. - If either party becomes informed of the occurrence of any    678

This is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-
printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of
discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) *Requisition*. – If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) *Confiscation*. – If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) *Bankruptcy*. – In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.

(iv) *Loss of Vessel*. – If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) *Breakdown*. – If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.

(vi) *Force Majeure*. – If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.

(vii) *Default*. – If either party is in repudiatory breach of its obligations hereunder.

Termination as a result of any of the above mentioned causes shall not relieve The Charterers of any obligation for Hire and any other payments due.

**27. Force Majeure**
Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

**28. Notices and Invoices**
Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.

**29. Wreck Removal**
If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

**30. Confidentiality**
All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall be

disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

**31. Law and Arbitration**
\*) (a) This Charter Party shall be governed by English-Norwegian law and any dispute

arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Norwegian Arbitration

Acts 1960 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

\*) (b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New Yorkin Oslo, one to be appointed by each of

the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.

\*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.

\*) (d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.
\*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33

**32. Entire Agreement**
This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

**33. Severability Clause**
If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect.

**34. Demise**
Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

**35. Definitions**
"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof.
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production.
"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.
"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

**36. Headings**
The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ADDITIONAL AGREEMENT**
**TO**
**SUPPLYTIME 89 DATED 12 MAY 2006**
**"ALDOMA"**

### 1.   Profit split

In addition to the charter hire payable pursuant to box 19 the Owners and
the Charterers have agreed a profit split of any average daily net earnings
(inclusive of Part II clause 7 items) above the levels set out below in any 90
day period as follows:

From 6 March 2006-5 May 2007 above USD 9.000 per day   - split 50/50
From 6 May 2007-5 May 2008 above USD 9,500 per day   - split 50/50
From 6 May 2008-5 May 2009 above USD 10.000 per day   - split 50/50

By way of example if the net daily rate is USD 10,000 in the first period an
additional USD 500 per day is payable to the Owners being 50% of the rate
above USD 9,000.

Any additional hire payable pursuant to this additional clause shall be paid
upon closing of books for the period, but not later than 10 banking days
after the expiry of each 90 day period.

The Charterers will provide the Owners with monthly reports of earnings and
will on request provide copies of sub-charterparties and freight invoices and
other relevant documentation. The Owners shall be entitled to appoint an
auditor to review the documents relevant to establishing the earning.

### 2.   Russian crew

The Owners may require that the Charterers employ Russian crew as
provided by the Owners, provided the Owners provide crew with suitable
experience and with necessary qualification to comply with any sub charter
or other contractual commitment for the vessel. The crew shall be employed
on 4 months on 4 months off basis and Charterers shall pay the crew's
replacement costs.

### 3.   Bank Guarantee

Against cancellation of the security provided for the Charterers' obligations
under the previous charter agreement between the parties for the Aldoma,
the Charterers will provide the Owners with a bank guarantee in Owners'
favour in an amount of NOK 150,000 as security for Charterers' obligations
towards the Owners hereunder.

12 May 2006

# EXHIBIT 4

## SIDELETTER SUPPLYTIME 89 DATED 12 MAY 2005

### "ALDOMA"

The vessel will continue operation under her present sub-charter arrangement with Rolv Berg Drive AS till this arrangement is either terminated or otherwise expire. There shall not be given any extension or further charter parties (inclusive of any already agreed options) with Rolv Berg Drive AS without the prior written consent of the Owner.

The Owner shall further give their prior written consent to any charter where the charterhire in any new period after the Rolv Berg Drive AS firm period give the owner an additional hire of less than USD 1000,- by way of the profit split.

The Owners:                                    The Charterers:

Oleg S Maatsakanyan                            Svein Hoel
Director General                               Director

# EXHIBIT 5

# North Offshore AS

## Statement of Accounts 31 August 2007

| | 2007 | 2006 |
|---|---|---|
| **OPERATING REVENUES AND EXPENSES** | | |
| **Operating Revenue** | | |
| Freight earnings | 12 225 310 | 15 497 430 |
| Other operating revenue | 294 191 | 510 169 |
| **Total operating revenue** | **13 519 501** | **16 007 600** |
| **Operating Costs** | | |
| Wages and other personnel expenses | 2 172 507 | 2 818 558 |
| Depreciation of business assets | 744 811 | 951 056 |
| Other operating costs | 14 090 294 | 9 255 271 |
| **Total operating costs** | **17 007 612** | **13 024 886** |
| **TOTAL OPERATING REVENUES** | **-3 488 110** | **2 982 714** |
| | | |
| **FINANCIAL INCOME AND EXPENSES** | | |
| Results from investment in | | |
| shares in limited partnerships ("KS") | 0 | 0 |
| Financial Income | 746 633 | 902 841 |
| Interest expenses relating to | | |
| entities within the same corporation | 0 | 0 |
| Other financial expenses | 586 487 | 749 939 |
| **NET FINANCIAL ITEMS** | **160 146** | **-152 902** |
| | | |
| **NET PROFIT BEFORE TAX** | **-3 327 964** | **3 135 616** |
| | | |
| Tax | 0 | 0 |
| Correction deferred tax | 0 | 0 |
| | | |
| **Profit** | **-3 327 964** | **3 135 616** |
| | | |
| **TRANSFER** | | |
| Received / Submitted group contribution | 0 | 0 |
| Transfer other equity | 0 | 0 |
| **TOTAL TRANSFER** | **0** | **0** |

# North Offshore AS

## Balance Sheet 31 August 2007

| ASSETS | 2007 | 2006 |
|---|---|---|
| **FIXED ASSETS** | | |
| **Business assets** | | |
| Vessels | 379 361 | 1 013 372 |
| Reconstruction of leased vessels | 0 | 0 |
| Periodical maintenance | 7 239 342 | 219 018 |
| Movable property, inventory, tools, office equipment | 440 187 | 818 771 |
| **Financial assets** | | |
| Investments subsidiary companies | 2 887 050 | 2 770 800 |
| Investments limited partnerships ("KS") | 587 350 | 1 152 539 |
| Other claims | 0 | 1 566 756 |
| **Total assets** | **11 533 290** | **7 541 256** |
| **CURRENT ASSETS** | | |
| Accounts receivable | 11 362 742 | 5 107 928 |
| Other claims | 1 130 539 | 7 988 622 |
| Bank deposits | 0 | 482 111 |
| **Total Current Assets** | **12 493 280** | **13 578 661** |
| **TOTAL ASSETS** | **24 026 570** | **21 119 917** |

# North Offshore AS

| EQUITY AND LIABILITES | 2007 | 2006 |
|---|---|---|
| **EQUITY** | | |
| | | |
| **Deposited equity** | | |
| Capital stock | 100 700 | 100 700 |
| Share premium account | 40 000 | 40 000 |
| **Total deposited equity** | **140 700** | **140 700** |
| | | |
| **Earned equity** | | |
| Other equity | 5 974 137 | 5 348 082 |
| This year's profit (untaxed) | -3 327 964 | 3 135 616 |
| **Total earned equity** | **2 646 173** | **8 483 697** |
| | | |
| **Total equity** | **2 786 873** | **8 624 397** |
| | | |
| **LIABILITES** | | |
| | | |
| **Long-term provisions** | | |
| Deferred tax liability | 3 976 411 | 8 986 303 |
| Payable tax | 0 | 0 |
| **Total appropriation for obligations** | **3 976 411** | **8 986 303** |
| | | |
| **Other long-term liabilities** | | |
| Credit institutions | 0 | 0 |
| Other long-term debt | 0 | 0 |
| **Total long-term liabilities** | **0** | **0** |
| | | |
| **Short-term liabilities** | | |
| Credit institutions | 2 328 523 | 0 |
| Accounts payable | 14 211 143 | 2 138 962 |
| Contributions payable | 0 | -53 555 |
| Other short-term liabilities | 723 621 | 1 423 809 |
| **Total short-term liabilties** | **17 263 286** | **3 509 217** |
| | | |
| **TOTAL EQUITY AND LIABILITIES** | **24 026 570** | **21 119 917** |

# EXHIBIT 6

**North Offshore**

**Noen spesifikasjoner på rapport pr. 31.08.09**

| | | |
|---|---|---|
| **Annen driftskostnad** | **14,090,294** | |
| Proviant | | 376550 |
| Frakt | | 8932 |
| Smørolje | | 478374 |
| Bunkers | | -323983 Inntektsført i forb. Med mob fee |
| Vann, vask og rengjøring | | 22887 |
| Bareboatleie (til russerne) | | 7602029 |
| Administrasjonskostnader | | 571971 |
| Diverse driftskostnader (agent og havnekostn.)' | | 155382 |
| Rekvistita (dette er til bruk på skipet) | | 154354 |
| Arbeidsklær | | 16830 |
| Løpende vedlikehold | | 891141 |
| Periodisk vedlikehold (avskrivning på dokking) | | 3764 |
| Disponenthonorar (til Troms) | | 666672 |
| Andre adm. Kostn (advokat/annen bistand) | | 1589932 |
| Kurskostnader (mannskap) | | 163324 |
| It-kostnader | | 27645 |
| Telekommunikasjon | | 125034 |
| Reisekostnader mannskap | | 885289 |
| Forsikring skip | | 248031 |
| Tap på fordringer | | 426134 |
| | | |
| **Annen finanskostnad** | **586,487** | |
| Rentekostnader | | 120296 |
| Agio tap | | 466191 |
| | | |
| **Periodisk vedlikehold** | **7,239,342** | |
| | | |
| **Kundefordringer** | **11,362,742** | |
| Av dette ugjør kravet mot RBD | | 6,135,000 |
| | | |
| **Andre fordringer** | **1,130,539** | |
| Dette er i hovesak periodiserte forskuddsbetalte kostnader. | | |
| | | |
| **Annen egenkapital** | **5,974,137** | |
| | | |
| **Annen kortsiktig gjeld** | **723,621** | |

# EXHIBIT 7

Michael J. Frevola (MJF 8359)
Christopher R. Nolan (CRN 4438)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
NORTH OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORTH OFFSHORE AS,

　　　　　　　　　Plaintiff,

　　　　-against-

ROLV BERG DRIVE AS,

　　　　　　　　　Defendant.

07 Civ. 3095 (SHS)

**AFFIRMATION OF OLEG S.
MNATSAKANYAN PURSUANT
TO 28 U.S.C. § 1746 IN SUPPORT
OF PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION
FOR COUNTER-SECURITY**

---

I, OLEG S. MNATSAKANYAN, hereby affirm as follows:

1.　　I am the Director General of Arktikmorneftegazrazvedka ("AMNGR"), the owner
of the AHTS ALDOMA (the "Vessel"). The facts provided herein are based on my own
personal knowledge.

2.　　I am providing this affirmation in support of the opposition of North Offshore AS
("North Offshore") to a motion filed by Rolv Berg Drive AS ("RBD") for counter-security in the
above-captioned proceeding.

3.     My company entered into a time charter party with North Offshore on March 6, 2006 for a period of 14 months until May 2007. That time charter included 2 one year options. I annex as Exhibit 1 true copies of faxes dated February 14, 2006 and March 29, 2006 from my First Deputy Director General Nikolay A. Orlov confirming the parties' entry into the time charter.

4.     With regard to the extra one year options provided under the time charter, we specifically reserved the right to withhold these options unless North Offshore increased the daily charter hire to us in an amount that reflected the present rates in the market.

5.     On or about November 28, 2006, RBD's Norwegian lawyers contacted our Norwegian lawyers to inquire regarding the terms of the Vessel's time charter between AMNGR and North Offshore.

6.     On January 8, 2007, my company was contacted by RBD regarding "[h]ire of the offshore vessel MS Aldoma from AMNGR to Rolv Berg Drive when she is off-contract in April 2007." A true copy of the letter to us from RBD and the Murmansk Consulting Group Ltd. is annexed as Exhibit 2.

7.     On January 16, 2007, we met with representatives of RBD at the offices of the Murmansk Consulting Group Ltd.   At that meeting, Mr. Valery A. Chuikov, my Deputy, explained to the RBD representatives that the negotiations on the new contract for the Vessel would not commence until the expiration of the North Offshore time charter in 2009.

8.     On January 29, 2007, my company's Norwegian lawyers wrote to RBD's lawyers and made clear that AMNGR retained the right to refuse to grant North Offshore its option extensions unless North Offshore obtained a significant increase in the daily charter hire rate that RBD offered in the amount of $9,000. A true copy of the January 29, 2007 e-mail from my

company's Norwegian lawyers to RBD's Norwegian lawyers is annexed as Exhibit 3. That e-mail specifically addressed the requirements that North Offshore would have to fulfill in order to qualify for the extension option under the AMNGR/North Offshore time charter:

> *Arktik [AMNGR] has concluded a C/P [charter party] with NO [North Offshore] for a period up to 5th May 2009, including two options on one year each. The C/P also include a right for Arktik 1) to refuse NO to extend existing agreements with sub-charterers [RBD] and 2) to refuse conclusion of new C/P or extension of C/P not giving Arktik a substantial increase in the charter hire (the sum of basic charter hire and part of profit split). ·NO will not receive such approval for a rate of USD 9.000 which is the rate in the conditional option included in the C/P between RBD and NO (we have recently received a copy of this C/P). The market rate is far above USD 9.000 and Arktik as owner is seeking arrangement giving the owner of the vessel a substantial part of the marke[t] rate.*

Exhibit 3.

9.      That same e-mail also responded to following inquiry from RBD: "[i]s there anything preventing RBD from exercising their option agreement with North [Offshore]?" In response, our lawyers made clear that control of whether RBD could obtain their option period under the RBD/North Offshore charter was governed by whether the charter rates offered for the extension periods satisfied our profit requirements:

> *Arktik has the right to refuse NO to extend the relation with RBD without any reason and Arktik has an all over right to refuse sub-charterers not giving Arktik a certain amount in a profit split regime. Arktik has not evaluated whether RBD should be accepted or not, but want NO to conclude a sub-charter agreement on market terms entitling Arktik a profit split in the option periods.*

Exhibit 3.

10.     RBD sought to charter the ALDOMA for additional time past May 2007 either through North Offshore or through Arktik directly. It is my understanding that RBD has claimed that the ALDOMA would have been used to fulfill a five year time charter that RBD claims that

it entered with a company named Oil & Natural Gas Corp ("ONGC"). The ONGC invitation to tender, however, contained requirements that the ALDOMA could not fulfill, including (a) the ALDOMA could not perform anchor handling at the depth required in the ONGC tender (1200 meters), (b) the ALDOMA does not have a chain locker capacity that met the requirements in the ONGC tender, and, perhaps most importantly, (c) the ALDOMA does not have a dynamic positioning system required under the ONGC tender which would allow the Vessel to precisely maintain station at one location.

11.     The ONGC tender also required a five year charter term. We would not agree to such a charter term and, even if we were willing to agree, such a term also would have had to be approved by Ministry of Natural Resources of Russian Federeation Federal Agency of Subsurface Use.

12.     My company's charter party with North Offshore AS dated 12 May 2005 expired on the 6 May 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of October, 2007 at the office of Arktikmornefiegazrazvedka, Kolskij.str 1, 183032, Murmansk, Russia.

OLEG S. MNATSAKANYAN

4

# EXHIBIT 1

Case 1:07-cv-03095-SHS Document 25 Filed 10/01/2007 Page 6 of 12
Case 1:07-cv-11502-SHS Document 1-6 Filed 12/21/2007 Page 58 of 66
BY : AMNGR                                    OAKC NO. :

FEB. 14 2006 16:11   CTP1

**6/10**

| Kolskij.str 1<br>183032 Murmansk<br>RUSSIA | <br>**ARKTIKMORNEFTEGAZRAZVEDKA**<br>Federal State Unitary Enterprise<br><br>**FAX MESSAGE № 2 / 93** | Fax  47 789 10 417<br>Phone 7 8152 254662<br>     47 78910508<br>e-mail:<br>amngr@amngr.ru |
|---|---|---|

| Fax № | 47 22 81 45 01<br>47 77 67 99 77<br>47 21 44 95 13 | Date 14-Feb-06 |
|---|---|---|
| To | Stemstrop Stordrange DA, Oslo<br>North Offshore AS<br>AMNGR, Oslo | Pages 1 |
| From | Arktikmorneftegazrazvedka, Murmansk | |
| Attention | Mr. Frode Henning Antonsen<br>Mr. Uvizjev | |
| Subject | AHTS Aldoma | |

Dear Sirs,

We have today agreed upon a new 14 months firm contract plus 2 years options, securing AHTS Aldoma for North Offshore AS. It remains subject to the approval from Federal Agency of Subsurface Use. Only after this approval receipt, the Contract may be signed by AMNGR. Claims regarding profit 2004 are closed as previously agreed.

Best regards,

Nikolay A. Orlov
1st Deputy Director General

Уважаемые господа,

Сегодня мы согласовали новый контракт на 14 месяцев (фиксированный) и плюс опцион 2 года на аренду ТБС Алдома компанией North Offshore AS. Он подлежит согласованию с Федеральным Агентством по недропользованию. Только после получения этого разрешения контракт может быть подписан АМНГР. Претензии по прибыли за 2004 г. сняты по предварительному соглашению.

С уважением,

Орлов Н.А.
1-й зам. ген. директора

Case 1:07-cv-03095-SHS   Document 25   Filed 10/01/2007   Page 7 of 12
Case 1:07-cv-11502-SHS   Document 1-6   Filed 12/21/2007   Page 57 of 66
OT : AMNGR   ФАКС NO. :   MAP. 29 2006 13:44   CTP1

| Kolskij av.1 183032 Murmansk RUSSIA | **ARKTIKMORNEFTEGAZRAZVEDKA** Federal State Unitary Enterprise **FAX MESSAGE No.** 2/211 | Fax     47 789 10 417 Phone  7 8152 56 43 19 47 789 10 508 e-mail: omvs@amngr.ru |

| Fax № | 47 77 67 99 77 | Date 29/03/2006 |
|---|---|---|
| To | North Offshore AS | Page 1 |
| From | Mr. Nikolay A. Orlov, 1-st Deputy Director General | |
| Attention | Mr. Svein Hoel | |
| Subject | Aldoma | |

Dear Sirs,

We refer to our fax of 14 February 2006 and can confirm that the new 14 months firm contract securing AHTS Aldoma for North Offshore AS is approved by Federal Agency of Subsurface Use. The contract will now be signed by AMNGR and is effective from 6 March 2006.

Best regards,

Nikolay A. Orlov,
1-st Deputy Director General

mark.dept.
Rada Ovcharenko,
+7 8152 254662

Case 1:07-cv-11502-SHS   Document 16   Filed 12/21/2007   Page 98 of 66

# EXHIBIT 2

OT : AMNGR                        ФАКС NO. :                        CEH. 25 2007 15:56    CTP2



# murmanskconsultinggroup

Эволюция Вашего бизнеса

ООО "Мурманск Консалтинг Групп"
Юридический адрес: Мурманск, ул. Кильдинская 1-148
Почтовый адрес: Мурманск, пр. Ленина 24-4
ИНН 5190127033/ КПП 519001001
Р/ сч 40702810705000001610
ОАО «ДНБ НОР Мончебанк», г. Мурманск
К/сч 30101810300000000709
БИК 044705709
ОКПО 71889945
ОКОНХ 71200

                                        Иск. 02    от    08.01.2007

                        To              FSUE "Arkticmorneftegazrazvedka"
                                        General Director
                                        Mr. Mnatsakanjan Oleg

                        From            Mr Antonsen, Tor Arne (Rolv Berg Drive AS)
                                        Mrs. Believa Olga (Murmansk Consulting Group, OOO)

                                        Tromsø, Norway 28. December 2006

## BUSINESS TOPICS IN THE OFFSHORE INDUSTRY

The company Rolv Berg Drive AS – situated in Tromsø, Norway – is requesting for a meeting with the top-management of the company FSUE Arktikmorneftegazrazvedka to discuss

1) Idle AMNGR-offshore vessels for international waters - specially Underwater Construction Vessels, Diving Vessels and Remotely Operated Vehicles?
2) AMNGR Newbuilding Program the coming years – possibility to hire idle vessels?
3) Hire of the offshore vessel MS Aldouna from AMNGR to Rolv Berg Drive AS when she is off-contract in April 2007
4) Possible strategic co-operation in the Arctic Waters?

Rolv Berg Drive AS is working in both Indian and Mexican waters as well as other offshore regions with major state owned companies like Oil and Natural Gas Corporation Ltd (ONGC) – a state owned company of India and the state-owned oil and gas company PEMEX in Mexico.

Proposed time for a meeting is 16th January 2007 in Murmansk.

Best regards
ROLV BERG DRIVE AS

Tor Arne Antonsen

---

ООО «Мурманск Консалтинг Групп»
183038, Мурманск, пр. Ленина 24, офис 4,
тел. +7 8152 259697, факс +7 8152 259698

ООО "Murmansk Consulting Group
183038, Murmansk, Lenin avenue 24, off. 4
tel. +7 8152 259697 fax +7 8152 259698

www.mcp-murmansk.ru

Faks fra  :                                        25/09/87    12:46    Sd: 2

# EXHIBIT 3

## Anders Evje

| From: | Frode Henning Antonsen [frode.antonsen@steenstrup.no] |
| --- | --- |
| Sent: | 29. januar 2007 16:28 |
| To: | Morten Lund |
| Cc: | suvizjev; Thor Ask Terkelsen; Magne Andersen |

**Subject:** RE: RBD - Arktik - North

We refer to your questions included in an e-mail dated 28th November 2006.

Arktik does not have any relations with Rolf Berg Drive (RBD) and have only a contract with North Offshore AS (NO). We have been told by both RBD and NO that there is a dispute between the parties. Arktik has not and will not have any opinion regarding the internal relations between RBD and NO. Arktik position is only related to the C/P with NO.

However, we have decided to answer your questions in order to clarify our position in this case towards NO.

Arktik has concluded a C/P with NO for a period up to 5th May 2009, including two options on one year each. The C/P also include a right for Arktik 1) to refuse NO to extend existing agreements with sub-charterers and 2) to refuse conclusion of new C/P or extension of C/P not giving Arktik a substantial increase in the charter hire (the sum of basic charter hire and part of profit spilt). NO will not receive such approval for a rate of USD 9.000 which is the rate in the conditional option included in the C/P between RBD and NO (we have recently received a copy of this C/P). The market rate is far above USD 9.000 and Arktik as owner is seeking arrangement giving the owner of the vessel a substantial part of the marked rate.

Question 1: The first issue is if it is correct that NO has *"no further options with the ultimate owner of the vessel that includes Rolv Berg Drive AS. We do of course not ask for any comments on the option agreement between North and RBD. We would only like your comments on the option North has towards the Russian owners. Is it anything there preventing RBD from exercising their option agreement with North?"* Answer 1: Arktik has the right to refuse NO to extend the relation with RBD without any reason and Arktik has an all over right to refuse sub-charterers not giving Arktik a certain amount in a profit split regime. Arktik has not evaluated whether RBD should be accepted or not, but want NO to conclude a sub-charter agreement on market terms entitling Arktik a profit split in the option periods.

Question 2: *The second issue is if it, to your knowledge, is correct that "Aldoma" is already committed elsewhere after mid April 2007.* Answer 2: We have not received any information from NO regarding future sub-charterers and await their proposals.

***

We hope the above clarify the position of Arktik.

-----------------------------------------------------
Med vennlig hilsen/Yours sincerely
Advokatfirmaet Steenstrup Stordrange DA
Frode Henning Antonsen

advokat

Ansvarlig advokat: Thor Ask Terkelsen

29.08.2007

email: frode.antonsen@steenstrup.no
http://www.steenstrup.no

Mobil: + 47 480 16 508

Oslo:
Tel: (+47) 22 81 45 00 - Fax: (+47) 22 81 45 01
Postboks 1829 Vika, 0123 Oslo.

Trondheim:
Tel: (+47) 73 99 27 00 - Fax: (+47) 73 99 27 01
Beddingen 8, 7014 Trondheim, Norway

**Notice:**
This e-mail may contain confidential and privileged material for the sole use of the intended recipient.
Any review or distribution by others is strictly prohibited.

If this e-mail is received by others than the intended recipient, please contact the sender and delete
all copies.

29.08.2007

# EXHIBIT 8



Kristian Lindhartsen
Advokatfullmektig

**Rett kopi bekreftes
Certified copy**



-■ **HOME**
-■ **HEAD OFFICE**
-■ **FLEET**
-■ **HSE**
-■ **HISTORY**
-■ **CONTACT**
-■ **LINKS**
-■ **JOIN US**

# Fleet



**Rett Kopi**
**Certified copy**

**MV Troms Fjord**



**GSP " Orion "**



**TBN**



**TBN**



**MV " Troms Castor"**



**MV "Troms Pollux"**



**MV " Troms Vision"**



**KV "Chieftain"**



**MV "Bucentaur"**



**MV "Sical Torino"**

Kristian Lindhartsen
Advokatfullmektig

Rett kopi bekreftes
Certified copy

**MV "Sanko Angel"**



**MV "Troms Falken"**



**RV "Lance"**



**MV "Furgo Discovery"**



**MV "Kovambo"**



**MV "Aldoma"**



**GSP "King"**

**GSP " Queen"**

---

Troms Offshore • P.O. Box 6155, NO-9291 Tromsø • Telephone: +47 77 67 99 50 • Telefax: +47 77 67 99 77