Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
ATTORNEYS FOR DEFENDANTS
NORTH OFFSHORE AS and TROMS OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLV BERG DRIVE AS,<br><br>       Plaintiff,<br><br>     -against-<br><br>NORTH OFFSHORE AS and TROMS OFFSHORE AS,<br><br>       Defendants. | 07 Civ. 11502 (SHS)<br><br>**AFFIDAVIT OF MICHAEL J. FREVOLA IN SUPPORT OF DEFENDANTS' MOTION TO <u>VACATE MARITIME ATTACHMENT</u>** |

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF NEW YORK   )

      MICHAEL J. FREVOLA, being duly sworn, deposes and says:

      1.     I am a member of the law firm Holland & Knight LLP, attorneys for Defendants North Offshore AS ("North Offshore") and Troms Offshore AS ("Troms Offshore") (collectively "Defendants"), and I am fully familiar with the facts in this case.

      2.     This Affidavit is made in support of Defendants' motion to vacate this Court's *Ex Parte* Order for Process of Maritime Attachment dated December 26, 2007 (the "Attachment Order") obtained by Plaintiff Rolv Berg Drive AS ("RBD") in this proceeding.

3.    I annex as Exhibit 1 a true copy of the Affirmation of Svein Hoel dated February 29, 2008 filed in conjunction with Troms Offshore's motion to dismiss of today's date.

4.    I annex as Exhibit 2 a true copy of RBD's Verified Complaint in this proceeding.

5.    I annex as Exhibit 3 a true copy of RBD's Answer and Counterclaim filed in *North Offshore AS v. Rolv Berg Drive AS*, No. 07 Civ. 3095.

6.    I annex as Exhibit 4 a true copy of the Affirmation of Georg Scheel dated February 29, 2008 filed in conjunction with Troms Offshore's motion to dismiss of today's date.

## THE INTERCEPTED WIRE TRANSFERS

7.    I have been advised by counsel for garnishee JPMorgan Chase Bank that there have been four wire transfers intercepted in New York in which Troms Offshore is named as an interested party, which amounts total $596,508.44.

8.    According to JPMorgan Chase Bank, the amount of $290,631.00 was attached on January 10, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for January 2008.

9.    According to JPMorgan Chase Bank, the amount of $38.26 was attached on January 16, 2008 while being wired transferred from Troms Offshore to a Belgian entity named Marlink.

10.    According to JP Morgan Chase Bank, the amount of $15,208.18 was attached on January 22, 2008 while being wired transferred from Polish Manning Services Spolka to Troms Offshore regarding the vessel VIGEO OLUFUNKE as a final balance for December 2007.

11.     According to JPMorgan Chase Bank, the amount of $290,631.00 was attached on February 27, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for February 2008.

WHEREFORE, it is respectfully requested that this Court grant Defendants' motion to vacate the Attachment Order, and grant such other and further relief to the Defendants as may be appropriate.

_____
Michael J. Frevola

Sworn to before me this
29th day of February, 2008

_____
Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

3

# EXHIBIT 1  TO FREVOLA AFFIDAVIT IN SUPPORT OF MOTION TO VACATE

Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
ATTORNEYS FOR DEFENDANTS
NORTH OFFSHORE AS and TROMS OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROLV BERG DRIVE AS,

               Plaintiff,

         -against-

NORTH OFFSHORE AS and TROMS
OFFSHORE AS,

               Defendants.

07 Civ. 11502 (SHS)

**AFFIRMATION OF
SVEIN HOEL PURSUANT
TO 28 U.S.C. § 1746**

I, SVEIN HOEL, hereby affirm as follows:

1.    I am the Managing Director of North Offshore AS, previously known by the name TFDS Offshore AS. I am also the Managing Director of Troms Offshore AS. I am providing this affirmation in support of North Offshore's and Troms Offshore's motion to vacate this Court's order of attachment issued at the request of Plaintiff Rolv Berg Drive AS ("RBD") in the above-captioned proceeding.

2.    At the time that the Time Charter referenced below at paragraph 11 first was entered, TFDS Offshore AS was a wholly-owned subsidiary of a large Norwegian shipping company called Troms Fylkes Dampskipsselskap ASA ("Troms County Steamship Company"). I was the managing Director of TFDS Offshore AS.

3.     As the subsidiary of Troms Fylkes Dampskipsselskap ASA, TFDS Offshore AS owned seven ships itself.  TFDS Offshore AS also managed two Norwegian vessels that were serving the Norwegian government.  It also had bareboat chartered in two Russian vessels, one of which was the AHTS ALDOMA (the "Vessel"), which Vessel is the subject matter of the parties' disputes herein.

4.     In November 2004, all of the ships owned by TFDS Offshore AS were sold by TFDS Offshore AS to another Norwegian company.  This left TFDS Offshore AS with responsibility for managing the two vessels serving the Norwegian government and as the bareboat charterer of the two Russian owned vessels.

5.     At the end of December 2004, I made an offer along with my business partner (through our private company Hoel Holding AS) to purchase TFDS Offshore AS from Troms Fylkes Dampskipsselskap ASA.  That offer was accepted and the sale was completed in March 2005, with the agreement providing that the transfer of ownership would be backdated to January 1, 2005, with TFDS Offshore AS becoming a subsidiary of Hoel Holding AS.  A provision in that sales agreement required us to change the name of TFDS Offshore AS to another name.  We therefore changed the name of TFDS Offshore AS to North Offshore AS.

6.     After we had purchased North Offshore AS, my partner and I approached potential investors because of an investment opportunity relating to a newbuilding vessel that would be completed in December 2005.  The investors agreed to invest with us on the condition that they have some part in the management of the company that would own the newbuilding vessel (that company was called Troms Fjord KS) and the company that also would manage the newbuilding vessel.  We therefore created a new company named Troms Offshore AS with an initial capital of 1 million Norwegian kroner, in which company North Offshore had a 10%

2

ownership interest.  Troms Offshore AS was created on June 30, 2005.  This was the management company for the newbuilding vessel.

7.     Upon the formation of Troms Offshore AS, we shifted the management of the two vessels in the service of the Norwegian government to Troms Offshore AS.  This left North Offshore AS with the two Russian bareboat chartered vessels.

8.     I was appointed the Managing Director of Troms Offshore AS at the time it was created in June 2005 and I have served in that capacity ever since.

9.     Sometime during the summer of 2006, an agreement was reached between the investors and North Offshore AS that North Offshore would buy out the investors' interests in Troms Offshore AS.  This enabled the investors to purchase a greater ownership interest in Troms Fjord KS, which they found to be more desirable.  This left North Offshore AS as the sole owner of Troms Offshore AS by the late summer of 2006.

10.    In November 2007, North Offshore entered into an agreement with two investors, the Klaveness Group and Pareto Growth, by which agreement those companies have committed to invest significant new capital into North Offshore in exchange for taking 65% ownership of North Offshore's shares.  While I remain the Managing Director of North Offshore, I am managing North Offshore in company with directors appointed by these new investors.

## THE CHARTER PARTIES

11.    TFDS Offshore AS entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended).  I annex as Exhibit 1 a true copy of the TFDS Offshore/RBD time charter (the "Time

Charter"). The term "AHTS" refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel.

12.    Shortly after the commencement of the Time Charter, TFDS Offshore entered into a separate "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances. RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to TFDS Offshore securing further charter with the vessel's owner." I annex as Exhibit 2 a true copy of the "side agreement" dated March 5, 2004.

13.    The ALDOMA's owner is Arktikmorneftegazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia. As mentioned above, TFDS Offshore had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter. TFDS Offshore AS – now renamed North Offshore AS as explained above – entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter"). In addition to the principal time period of the Bareboat Charter, which ended in May 2007, the Bareboat Charter also included 2 one year options. I annex as Exhibit 3 a true copy of the Bareboat Charter (which is dated May 12, 2005). The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with North Offshore. Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced us to agree to) an increased daily rate of hire.

4

14.     The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. A true copy of the "Profit Split" provision is provided in Exhibit 3 as the final page of that document.

15.     Together with the Bareboat Charter, North Offshore and AMNGR entered into a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter). I annex as Exhibit 4 a true copy of the AMNGR/North Offshore "side agreement" dated May 12, 2005. That agreement specifically addressed North Offshore's Time Charter with RBD and provided that extensions of the Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore.

16.     RBD sought to charter the ALDOMA for additional time past May 2007. It is my understanding that RBD has claimed that the ALDOMA would have been used to fulfill a five year time charter that RBD claims that it entered with a company named Oil & Natural Gas Corp ("ONGC"). The ONGC invitation to tender, however, had several requirements that the ALDOMA could not fulfill, including being unable to perform anchor handling at the depth required in the ONGC tender (1200 meters). This specification was a significant requirement. Last year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor set at

5

approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and sank with a loss of over half her crew. The BOURBON DOLPHIN was a larger vessel than the ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform an operation required by the ONGC tender. In my view, based on my 30 years of experience in the offshore supply vessel industry, the ALDOMA would not have satisfied the ONGC tender.

17.    The ONGC tender also required a five year charter term. We could not offer RBD a five year term because we did not have the rights to the ALDOMA for that time period to sub-charter the ALDOMA to RBD.

18.    I understand that RBD has claimed that the ALDOMA's Bareboat Charter still remains in effect and that it will remain in effect until 2009. This claim is incorrect. The Bareboat Charter was terminated in May 2007 at the completion of the principal time period under the Bareboat Charter.

19.    North Offshore and AMNGR entered into a new bareboat charter for the ALDOMA in May 2007. I visited AMNGR in Murmansk on April 16-17, 2007 and signed the new contract after 2 days of negotiations. Because AMNGR's Director General, Oleg Mnatsakanyan, required approval from the Ministry of Natural Resources of the Russian Federation Federal Agency of Subsurface Use before he could sign the new contract, the documents were sent to Moscow and returned to Murmansk more than a month later. I have reason to believe that it took that long because of the fact that RBD representatives tried to interrupt the process in Moscow as well. When the document was received back in Murmansk, Oleg signed and the date was hand written on the charter party before AMNGR couriered one original to me. A true copy of the new charter is annexed as Exhibit 5.

6

20.    You will note from reference to Exhibit 5 (second page of the Exhibit, top left hand corner of page, Box 19) that the new May 2007 bareboat charter for the ALDOMA provided for the charter hire to be paid in Euros at the amount of 4,800 Euros per day.  As the ALDOMA's owner, AMNGR demanded that we change the charter hire payments from U.S. dollars to Euros because of AMNGR's concerns that the U.S. dollar was weakening (which proved to be well-founded).  I will refer to this charter hire provision again below.

### TROMS OFFSHORE'S FLEET

21.    Troms Offshore manages a total of 14 vessels as set forth below.

22.    The following is a list of those North Offshore vessels currently managed by Troms Offshore and their respective owners:

ALDOMA            Russian owned, on bareboat contract to North Offshore AS

KOVAMBO           Russian owned, on bareboat contract to North Offshore AS

23.    The following is a list of vessels currently managed by Troms Offshore which North Offshore does not own and is not the charterer:

LANCE             Owner, The Norwegian Government

H U SVERDRUP      Owner, The Norwegian Government

FUGRO DISCOVERY   Owner, Fugro Discovery Inc.

GSP KING          Owner, Grup Cervicii Petroliere SA

GSP ORION         Owner, Grup Cervicii Petroliere SA

GSP QUEEN         Owner, Grup Cervicii Petroliere SA

BUSENTAUR         Owner, Fugro Geotechnics AS

CHIEFTAIN         Owner, Admare Shipping Company Limited

| SICAL TORINO | Owner, Sical Bergen Logistics PTY Ltd |
| TROMS FJORD | Owner, Troms Fjord KS |
| VIGEO OLUFUNKE | Owner, Vigeo Ltd. |
| TROMS FALKEN | Owner, Troms Falken KS (limited partnership), Troms Offshore holds 2% of the shares. |

24.     Under Troms Offshore's ship management agreement with North Offshore as well as with the owners of the other vessels in the Troms Offshore fleet, Troms Offshore operates each of the vessels that it manages.

### TROMS OFFSHORE'S RELATIONSHIP WITH NORTH OFFSHORE

25.     I provide the following information in response to RBD's claims in the Verified Complaint regarding the relationship between North Offshore and Troms Offshore.

26.     RBD's Verified Complaint states that, to the extent that any hire payments are being remitted to the Vessel's owner AMNGR by any of North Offshore's subsidiaries they represent monies belonging to NOS being "siphoned through the subsidiaries." RBD's claim suggests that North Offshore pays charter hire payments to AMNGR through some other entity. As explained in the next paragraph, RBD's claim is incorrect and has no basis in fact.

27.     North Offshore always pays its own hire payments to AMNGR, and does so on a monthly basis. I annex as Exhibit 6 true copies of each one of North Offshore's charter hire payment statements from the time that the new May 2007 bareboat charter of the ALDOMA commenced until this month. As can be seen, each of the payments originated from North Offshore's account and was sent to AMNGR's Murmansk account in sums of either 144,000 or 148,800 Euros (depending on whether the month at issue was 30 or 31 days, respectively, times

8

the daily hire rate of 4,800 Euros). These payments were made in accordance with Box 19 of the new May 2007 bareboat charter of the ALDOMA. Following behind each payment statement is an English version of the SWIFT payment details. Additionally, I annex as Exhibit 7 for the Court's convenience a free translation of the language at the bottom of the payment statements identifying the payments as charter hire payments.

28.    RBD claims that "Defendant [Troms Offshore] is a shell corporation through which [North Offshore] conducts the charter business of the vessel." This statement is incorrect. Troms Offshore is a vessel management company that provides its services to a wide variety of shipowners, including various foreign shipowners and even the Norwegian government. The fact that North Offshore employed Troms Offshore to manage its chartered vessels merely reflects a standard practice in the industry, whereby vessel management companies manage the day-to-day operations of the vessel for the ship's owner or charterer.

29.    RBD also claims that "Defendant [Troms Offshore] acts as a paying agent or receiving agent for hire and sub-hire payments for the vessel or arranges for non-parties to satisfy the debts and obligations of Defendant [North Offshore] . . . ." This statement also is incorrect. Troms Offshore neither receives sub-hire payments on behalf of North Offshore, nor does it pay hire payments on behalf of North Offshore. In fact, RBD has reason to know that Troms Offshore does not accept sub-hire payments for North Offshore, because Troms Offshore never received sub-hire payments from RBD during the entire three-plus years of the ALDOMA Time Charter between RBD and North Offshore.

30.    RBD also alleges that "Defendant [North Offshore] uses Defendant [Troms Offshoer] as a 'pass through' entity in order to insulate itself from charters relating to its commercial obligations." I am not certain what this allegation means to allege, but to the extent

9

that it alleges that Troms Offshore somehow acts on behalf of North Offshore, I refer the Court to paragraphs 19 through 22 above.

## THE INTERCEPTED WIRE TRANSFERS

31.    New York counsel has advised me that there have been four wire transfers intercepted in New York in which Troms Offshore is named as an interested party. I will discuss the circumstances surrounding each of those payments to show their lack of connection with North Offshore.

32.    I understand that the amount of $290,631.00 was attached on January 10, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for January 2008. The vessel SICAL-TORINO is owned by Sical Bergen Logistics PTY Ltd. and is managed by Troms Offshore. Neither Troms Offshore nor North Offshore have any ownership interest in the SICAL-TORINO or Sical Bergen Logistics PTY Ltd. The payment intercepted was originated from Sical Bergen Logistics PTY Ltd. to fund the January 2008 operational expenses of the vessel SICAL-TORINO.

33.    I understand that the amount of $38.26 was attached on January 16, 2008 while being wired transferred from Troms Offshore to a Belgian entity named Marlink. Neither Troms Offshore nor North Offshore have any ownership interest in Marlink. The payment intercepted was a payment that Troms Offshore had made as the manager of the vessel SICAL-TORINO to satisfy that vessel's communications expenses.

34.    I understand that the amount of $15,208.18 was attached on January 22, 2008 while being wired transferred from Polish Manning Services Spolka to Troms Offshore regarding the vessel VIGEO OLUFUNKE as a final balance for December 2007. The VIGEO

10

OLUFUNKE is owned by Vigeo Ltd. and managed by Troms Offshore. Neither Troms Offshore nor North Offshore have any ownership interest in the VIGEO OLUFUNKE or Polish Manning Services Spolka. The payment intercepted was payment of the final balance of crew payments for the crew of the VIGEO OLUFUNKE for December 2007.

35.    I understand that the amount of $290,631.00 was attached on February 27, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for February 2008. As with the previous SICAL TORINO payment regarding the January 2008 operational expenses, this payment intercepted was originated from Sical Bergen Logistics PTY Ltd. to fund the February 2008 operational expenses of the vessel SICAL-TORINO.

36.    In sum, similar to the Vessel under charter to North Offshore, Troms Offshore manages the vessels SICAL-TORINO and VIGEO OLUFUNKE for their owners or charters. None of the $596,508.44 under attachment was being sent for or received on behalf of North Offshore. As a result, despite the frozen payments having no connection whatsoever with North Offshore, Troms Offshore's customers have had nearly $600,000 in funds attached that Troms Offshore has had to cover for its customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of February, 2008 at Tromsø, Norway.

_____

SVEIN HOEL

# EXHIBIT 1
# HOEL AFFIRMATION

NORDISK

**Bilag** ___1___

| | |
|---|---|
| **1.** Place and date<br>Tromsø 19th of February 2004 | **UNIFORM TIME CHARTER PARTY**<br>**FOR OFFSHORE SERVICE VESSELS**<br>**CODE NAME: "SUPPLYTIME 89"**     PART I |

| | |
|---|---|
| **2.** Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>TFDS Offshore AS<br>Strandvegen 106<br>P.O. box 6155<br>9291 Tromsø<br>Norway<br>Phone: +47 77 67 98 98<br>Fax: +47 77 67 98 77<br>E-mail: offshore@tfds.no | **3.** Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>Rolv Berg Drive AS<br>Søndre Tollbodgate 13<br>P.O. box 96<br>9251 Tromsø<br>Norway<br>Phone: +47 77 66 96 96<br>Fax: +47 77 66 96<br>E-mail: drive@rbdrive.com |

| **4.** Vessel's name (Cl. 1(e)) | **5.** Date of delivery (Cl. 2(a)) | **6.** Cancelling date (Cl. 2(c)) and (d) |
|---|---|---|
| AHTS Aldona | 20-31.03.2004 | 31.03.2004 |

| **7.** Port or place of delivery (Cl. 2(a)) | **8.** Port or place redelivery/notice of redelivery (Cl. 2(d)) |
|---|---|
| Mumbai, India | Mumbai, India |
| | (i) Port or place of redelivery |
| | |
| | (ii) Number of days' notice of redelivery<br>15 days |

| **9.** Period of hire (Cl. 1(e)) | **10.** Extension of period of hire (optional) (Cl. 1(e)) |
|---|---|
| 3 years firm | |
| | (i) Period of extension<br>15 days |
| | (ii) Advance notice for declaration of option (days) |

| **11.** Automatic extension period to complete voyage or well (Cl. 1(e))<br>As per work in progress.<br>(i) Voyage or well (state which)<br>90 days.<br>(ii) Maximum extension period (state number of days) | **12.** Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>Included in the vessel's dayrate for the first 3 years charter hire.<br>- See Clause 37<br>(i) Lump sum<br>NA<br>(ii) When due |
|---|---|
| | **13.** Port or place of mobilisation (Cl. 2(b)(i))<br>Valletta, Malta. |

| **14.** Early termination of charter (state amount of hire payable) (Cl. 2(c))<br>As per state oil company rules and regulations (O.N.G.C.). | **15.** Number of days' notice of early termination (Cl. 2(c))<br>See box 14 | **16.** Demobilisation charge (lump sum) (Cl. 2(c) and Cl. 2(b)(i))<br>Included in vessel's dayrate for the first 3 years charter hire. |
|---|---|---|

This document is a computer-generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 17. Area of operation (Cl. 5(a)) | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a)) |
|---|---|
| The continental shelf of India. | Anchor handling, towage, fire fighting, supply services, mud services and any other services that the vessel may safely undertake to perform. Always within the vessel's capabilities and certification. |

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (c)) | 20. Extension hire (if agreed, state rate) (Cl. 10(b)) |
|---|---|
| USD 8,506,- + USD 700,- (mud installation) + USD 330,- (mobilemob). | USD 8,500,- |
| Total: USD 8,530,- per day the first three years. | USD 9000. - |

| 21. Invoicing for hire and other payments (Cl. 10(c)) | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(c)) |
|---|---|
| (i) state whether to be issued in advance or arrears | As per owner's instruction |
| In Arrears | To: |
| | SpareBank1 Nord-Norge |
| (ii) state to whom to be issued if addresses other than stated in Box 2 | Account no: 4720.81.10455 |
| As per Box 2 | Swift code: snownkt22 |
| | By: |
| (iii) state to whom to be issued if addresses other than stated in Box 3 | Swift transfer |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(d)) | 24. Interest rate payable (Cl. 10(e)) | 25. Maximum audit period (Cl. 10(f)) |
|---|---|---|
| 35 banking days from date of invoice | NA | 60 days |

| 26. Meals (state rate agreed) (Cl. 5(c)(i)) | 27. Accommodation (state rate agreed) (Cl. 5(c)(i)) | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f)) |
|---|---|---|
| USD 16,- per meal | USD 12,- per person | Yes |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) | 30. War (state names of countries) (Cl. 19(a)) |
|---|---|
| NA | Deleted |

| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21) | 32. Breakdown (state period) (Cl. 26(c)(vi)) |
|---|---|
| | 36 days |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) | 34. Numbers of additional clauses covering special provisions, if agreed |
|---|---|
| Norwegian Law, arbitration in Oslo | From Clause 37 to Clause 38 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 35) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 35) |
|---|---|
| As per box 3 | As per box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 25.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document, which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ANNEXURE - A

Technical Specification of ARTS of not less than 9600 BHP - 1 No.

| Sr.No | Parameter | ONGC Requirement | Bidder Specification |
|---|---|---|---|
| 1 | GENERAL | | |
| 1.1 | Name of Vessel | | MV ALDOMA |
| 1.2 | Name of owner | | DISPONENT OWNER T.F.D.S. OFFSHORE AS |
| 1.3 | Flag | | BAHAMAS |
| 1.4 | Port of registry | | NASSAU |
| 1.5 | Place of build | | NORWAY |
| 1.6 | Year of build | | 1983 |
| 1.7 | Name of yard | | Framnes Mekaniske, Sandefjord |
| 1.8 | Classification | ABS/DNV/BV/LRS/IRS/GL | DNV * 1A1 A Tug&Supply Vessel SF EO FiFi II ICE C |
| 1.9 | call sign/official No. | | C6RD9 |
| 2 | DIMENSIONS | | |
| 2.1 | LOA [meters] | | 67,70 m |
| 2.2 | LBP [meters] | | 59,40 m |
| 2.3 | Breadth mld [meters] | | 14,50 m |
| 2.4 | Depth mld [meters] | | 5,97 m |
| 2.5.1 | Summer draught [meters] | | 5,85 mtr. Min. draft (Light ship) 3,5 mtr. Max. draft (Trooball 6,08 mtr |
| 2.5.2 | Operating draught [meters] | Not more than 5.95 M at specified min DWT | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 2.6 | Clear deck Aft | | 407 m2 |
| 2.6.1 | Length [meters] | | 37 mtrs |
| 2.6.2 | Breadth [meters] | | 11 mtrs |
| 2.6.3 | Area [sq. meters] | Not less than 300 sq. meters | 407 m2 |

| 3 | *MACHINERY* | | |
|---|---|---|---|
| 3,1 | **Main Engines** | | |
| 3.1.1 | Number of Main Engines | Not less than 2 [two] | 4 |
| 3.1.2 | Make | | **Bergen Diesel** |
| 3.1.3 | Model | | **KVMB 12** |
| 3.1.4 | Max continuous rating (for all main engines together) at 100% - NOMINAL | Not less than 9600 BHP | **12240 BHP** |
| 3.1.5 | Year of build | New at the time of installation onboard the Vessel | **1983 (New at the time of installation onboard the Vessel)** |
| 3,2 | **Main Propulsion** | | |
| 3.2.1 | Number of propellers | Not less than 2 [two] | **2 x Ulstein, 180 Rpm** |
| 3.2.2 | Type | Shrouded CPP preferred | **CPP** |
| 3.2.3 | Propeller diameter [mtrs] | | **3600 mm** |
| 3.2.4 | Propeller make | | **ULSTEIN PROPELLER** |
| 3,3 | **Side Thrusters** | | **3** |
| 3.3.1 | Number of bow thrusters | Not less than 2 [one] | **2** |
| 3.3.2 | Number of stern thrusters | | **1** |
| 3.3.3 | Rating of BTs [KW] | | **1180 KW** |
| 3.3.4 | Rating of STs [KW] | | **590 KW** |
| 3,4 | **Generators** | | |
| 3.4.1 | Number of generators | At least three independent power sources | **4 Independent Power Sources (2 x Shaftgenerators, Siemens 3200Kw, 2 x** |
| 3.4.2 | Total rating [KVA] | | **3690 KVA** |
| 3.4.3 | Voltage rating | | **380V** |
| 3.4.4 | Frequency [Hz] | | **50 Hz** |
| 3,5 | **Steering gear** | | |
| 3.5.1 | Type | Hydraulic preferred | **Hydraulic,Tennfjord I-2X (18M300/2GM620)-FU** |



| 3.5.2 | Number of rudders | Not less than 2 [two] | 2 Tennfjord |
|---|---|---|---|
| 4 | *PERFORMANCE* | | |
| 4,1 | Trial speed [knots] | | 16,5 knots |
| 4,2 | Cruising speed [knots] | | 12-15 knots |
| 4,3 | Bollard pull [Max cont] | Not less than 105 Metric Tons | 140 Tons |
| 4,4 | Fuel consumption [KI/day] | | |
| 4.4.1 | Standby | | 7,1 m3 |
| 4.4.2 | Underway | | 18 m3 |
| 4.4.3 | Towing | | 44,7 m3 |
| 5 | *TOWING AND ANCHOR HANDLING* | | |
| 5,1 | Winch | | |
| 5.1.1 | Type | Min. Double drum water fall hydraulic. | Brattvaag SL 250( Double drum Water fall hydraulic). |
| 5.1.2 | Make | | Brattvaag |
| 5.1.3 | Model | | SL 250W / BSL 250 WX |
| 5.1.4 | Drum capaciy | For a total length of not less than 2,000 mtrs., 72mm/76mm wire rope. | 2400 mtrs / 72mm |
| 5.1.5 | Work wire | Total length of 2000 mtrs. or more of 72/76mm required | 2400 mtrs / 72mm |
| 5.1.6 | Drum speed [M/min] | | 60 ton @ 28mtr/min & 250 ton @6,4 mtr/min |
| 5.1.7 | Winch stall capacity | Not less than 250 T | 250 ton |
| 5.1.8 | Line pull | | 350 ton |
| 5,2 | Wildcat for chains | | |
| 5.2.1 | Suitable for 70 mm Chain | | 76mm / 83mm |
| 5.2.2 | Chain lockers | Not less than 2 for 70mm stud-link chains. | 600 m 3 1/4 " chain |
| 5.2.3 | Chain locker capacity [cubic meters] | 2 X 90 cu mtrs. | 203 cu. Mtrs. |
| 5.3 | Tow pins and shark jaws | | Karm 130318/130554, 240 ton. |




| 5.3 | Low plus two man's, jaws | |
|-----|--------------------------|---|
| 5.4 | Spare Storage | Karm O 350/13031s/130554, 240 ton. |
| 5.5 | Stern roller | Two storage drums. One can hold 1200m. 70 mm. Wire and the other 1000 m.64 mm. Wa |
| 5.6 | Tugger winches | Ukrein 2.65 mtr x 2.50 mtr, 350 ton SWL |
| 5.7 | Capstans (on aft deck) | 2 Bastrvag WMA 1010 |
| 6 | **NAVIGATION AND COMMUNICATION EQUIPMENT** | 2 |
| 6,1 | Gyrocompass | REQUIRED | Anshutz Standard 20 |
| 6,2 | Magnetic compass | REQUIRED | Standard |
| 6,3 | Echo sounder | REQUIRED | Simrad / ED161 |
| 6,4 | Auto pilot | REQUIRED | Racal Decca Pilot 450 |
| 6,5 | Radar | REQUIRED | 2 Furuno ARPA, X and S band, 72 nm |
| 6,6 | SSB Radio transceiver/ GMDSS | REQUIRED | JRC (GMDSS area 4) JSS-800 |
| 6,7 | Marine VHF transceiver | REQUIRED | 2 - JRC/JHS-32/4 & Sailor/RT2048 |
| 6,8 | GPS | REQUIRED | Phillips MK10, Furuno GP 80 |
| 6,9 | Portable VHF | REQUIRED | 5 - 3 x Jotron/Tron & 2 x Motorola, GP 300 |
| 6,10 | INMAR SAT | REQUIRED | Satpol/Phillips Safecom C |
| 7 | **ACCOMMODATION** | |
| 7,1 | Crew compliment | | 17 |
| 7,2 | For charterer's use | Suitable accommodation for five persons required | 7 |
| 8 | **CAPACITIES** | |
| 8,1 | Deck cargo | Not less than 500 Ton | 750 ton |
| 8,2 | Deck-loading (T/sq mtrs) | | 6 T/m3 |
| 8,3 | Fuel (m³) | | 1041 m3 |

| 8,4 | Drill water (m³) | | 516 m3 |
|---|---|---|---|
| 8,5 | Pot water (m³) | | 289 m3 |
| 8,6 | Ballast water (m³) | | 516 m3 |
| 8,7 | Liquid mud (m³) | REQUIRED | 119 m3 |
| 8,8 | Dry bulk (m³) | | 196 m3. |
| 8,9 | Dead weight [Tons] | Not less than 1000 Tons at 5,95 M draught | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 8,1 | 4" Cam lock couplings | Required on all hoses | Yes |
| 9 | RIGGING EQUIPMENT | | WILL BE PROVIDED |
| 10 | FiFi | | VESSEL IS FITTED WITH Fi-Fi Class-II |
| 11 | OTHER CAPABILITIES | | |
| | Certificates | 1. Certificate of Registry | ENCLOSED |
| | | 2. Class Certificate. (BKM) | ENCLOSED |
| | | 3. Bollard Pull Certificate | ENCLOSED |
| | | 4. G.A PLAN | |
| | | 5. DEAD WEIGHT SCALE | ENCLOSED |

ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME' 89" - dated



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) Marine Hull Insurance. – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) Protection and Indemnity (Marine Liability) Insurance. – Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) General Third Party Liability Insurance. – Coverage shall be for:
Bodily Injury          per person
Property Damage          per occurrence.

(4) Workmen's Compensation and Employee's Liability Insurance for Employees. – Covering non-employees for statutory benefits as set out and required by local law in areas of operation or area in which the Owners may become legally obliged to pay benefits.

(5) Comprehensive General Automobile Liability Insurance. – Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury          According to the local law.
Property Damage          In an amount equivalent to single limit per occurrence.

(6) Such other Insurances as may be agreed.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible. The text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

(Optional, only applicable if stated in Box 26 in PART I)

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including, as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts, or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. In the event of any discrepancies between the original BIMCO approved document and this computer generated document. BIMCO assumes no responsibility for any loss, damage or expense as a result



ANNEX "D" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: "SUPPLYTIME 89" —DATED

# OWNERS VESSEL MARINE CREW

## MARINE CREW

Provided by Owners

PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the Vessel"), for the period as stated in Box 6 from the time the Vessel is delivered to the Charterers.

(b) Subject to Clause 10(d), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(b), but such an option must be declared in accordance with Box 10(b).

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or part (whichever is stated in Box 11(b)) in progress, such time not to exceed the period stated in Box 11(b).

**2. Delivery and Redelivery**

(a) Delivery - Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 6 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.

(b) Mobilisation - (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 15.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery at/near the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods but not lost.

(c) Cancelling - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 6, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling the Charter Party. If the Charterers do not give such notice, the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.

(d) Redelivery - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(b) at such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(b).

(e) Demobilisation - The Charterers shall pay a lump sum without discount to the amount as stated in Box 13 by way of demobilisation charge which amount shall be paid on the expiration or an earlier termination of this Charter Party.

**3. Condition of Vessel**

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A" attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5.

**4. Survey**

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any and/or handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**

(a) The Vessel shall be employed in offshore activities which are lawful in

accordance with the law of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 16, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform.

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.

(c) The Vessel's Space - The whole reach and burden and deck of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation and being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 24 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.

(iv) Hazardous and noxious substances, subject to Clause 12(d), proper notification and any pertinent regulations.

(d) Lay-up of Vessel - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

**6. Master and Crew**

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services with her capabilities by day and by night and in such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with the Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. It is a joint regulations on the seaman and/or labour

This document is a template generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible; in the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| | |
|---|---|
| 1 | 71 |
| 2 | 72 |
| 3 | 73 |
| 4 | 74 |
| 5 | 75 |
| 6 | 76 |
| 7 | 77 |
| 8 | 78 |
| 9 | 79 |
| 10 | 80 |
| 11 | 81 |
| 12 | 82 |
| 13 | 83 |
| 14 | 84 |
| 15 | 85 |
| 16 | 86 |
| 17 | 87 |
| 18 | 88 |
| 19 | 89 |
| 20 | 90 |
| 21 | 91 |
| 22 | 92 |
| 23 | 93 |
| 24 | 94 |
| 25 | 95 |
| 26 | 96 |
| 27 | 97 |
| 28 | 98 |
| 29 | 99 |
| 30 | 100 |
| 31 | 101 |
| 32 | 102 |
| 33 | 103 |
| 34 | 104 |
| 35 | 105 |
| 36 | 106 |
| 37 | 107 |
| 38 | 108 |
| 39 | 109 |
| 40 | 110 |
| 41 | 111 |
| 42 | 112 |
| 43 | 113 |
| 44 | 114 |
| 45 | 115 |
| 46 | 116 |
| 47 | 117 |
| 48 | 118 |
| 49 | 119 |
| 50 | 120 |
| 51 | |
| 52 | 121 |
| 53 | 122 |
| 54 | 123 |
| 55 | 124 |
| 56 | 125 |
| 57 | 126 |
| 58 | 127 |
| 59 | 128 |
| 60 | 129 |
| 61 | 130 |
| | 131 |
| 62 | 132 |
| 63 | 133 |
| 64 | 134 |
| 65 | 135 |
| 66 | 136 |
| 67 | 137 |
| 68 | 138 |
| | 139 |
| 69 | 140 |
| 70 | 141 |
| | 142 |
| | 143 |



PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

unless do not permit the Crew of the Vessel to carry out any of this work, then | 144
the Charterers shall make, at their own expense, whatever other | 145
arrangements may be necessary, always under the direction of the Master. | 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the | 147
Master or any Officer or member of the Crew, the Owners on receiving | 148
particulars of the complaint shall promptly investigate the matter and if the | 149
complaint proves to be well founded, the Owners shall as soon as reasonably | 150
possible make appropriate changes in the appointment. | 151
(d) The entire operation, navigation, and management of the Vessel shall be in | 152
the exclusive control and command of the Owners, their Master, Officers and | 153
Crew. The Vessel will be operated and the services hereunder will be | 154
rendered as requested by the Charterers, subject always to the exclusive | 155
right of the Owners or the Master of the Vessel to determine whether operation | 156
of the Vessel may be safely undertaken. In the performance of the Charter | 157
Party, the Owners are deemed to be an independent contractor, the | 158
Charterers being concerned only with the results of the service performed. | 159

**7. Owners to Provide** | 160
(a) The Owners shall provide and pay for all provisions, wages and all other | 161
expenses of the Master, Officers and Crew; all maintenance and repair of the | 162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, | 163
except as otherwise provided in this Charter Party, for all insurance on the | 164
Vessel, all dues and charges directly related to the Vessel's flag and/or | 165
registration, all dock, cable and emglian coin stores, cordage required for | 166
ordinary ship's purposes mooring alongside in harbour, and all fumigation | 167
expenses and de-ratisation certificates. The Owners' obligations under this | 168
Clause extend to cover all facilities for consular charges appertaining to the | 169
Master, Officers and Crew, customs or import duties arising at any time during | 170
the performance of this Charter Party in relation to the personal effects of the | 171
Master, Officers and Crew, and in relation to the stores, provisions and other | 172
matters as aforesaid which the Owners are to provide and/or pay for and the | 173
Owners shall refund to the Charterers any sums they or their agents may have | 174
paid or been compelled to pay in respect of such facility. | 175
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' | 176
expense with any towing and anchor handling equipment specified in Section | 177
5(b) of ANNEX "C". If during the Charter Period any such equipment becomes | 178
lost, damaged or unserviceable, other than as a result of the Owners' | 179
negligence, the Charterers shall either provide, or direct the Owners to | 180
provide, an equivalent replacement at the Charterers' expense. | 181

**8. Charterers to Provide** | 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, | 183
lubricants, water, dispersants, firefighting foam and transport thereof, port | 184
charges, pilotage and business and canal clearances (whether compulsory or | 185
not), launch hire (unless incurred in connection with the Owners' business), | 186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and | 187
charges, agencies and commissions incurred as the Charterers' business, | 188
costs for security or other watchmen, and of quarantine (if occasioned by the | 189
nature of the cargo carried or the port visited whilst employed under this | 190
Charter Party but not otherwise). | 191
(b) At all times the Charterers shall provide and pay for the loading and | 192
unloading of cargoes as far as not done by the Vessel's crew, cleaning of | 193
cargo tanks, all necessary dunnage, uprights and shoring equipment for | 194
securing deck cargo, all cordage except as to be provided by the Owners, all | 195
ropes, slings and special canvas (including bulk cargo discharge hoses) | 196
actually used for loading and discharging, inert gas required for the | 197
protection of cargo, and electrodes used for offshore works, and shall | 198
reimburse the Owners for the actual cost of replacement of special mooring | 199
lines to offshore units, wires, nylon spring lines etc. used for offshore works, | 200
all hose connections and adaptors, and further, shall refill oxygen/acetylene | 201
bottles used for offshore works. | 202
(c) The Charterers shall pay for customs duties, all permits, import duties | 203
(including costs involved in establishing temporary or permanent importation | 204
bonds), and clearance expenses, both for the Vessel and/or equipment, | 205
required for or arising out of this Charter Party. | 206

**9. Bunkers** | 207
Unless otherwise agreed, the Vessel shall be delivered with bunkers and | 208
lubricants as on board and redelivered with sufficient bunkers to reach the | 209
next bunkering stage en route to her next port of call. The Charterers upon | 210
delivery and the Owners upon redelivery shall take over and pay for the | 211
bunkers and lubricants on board at the prices prevailing at the times and | 212
ports of delivery and redelivery. | 213

**10. Hire and Payments** | 214
(a) Hire. - The Charterers shall pay for the Vessel at the rate stated in Box | 215
16 per day or pro rata for part thereof from the time that the Vessel is delivered | 216
to the Charterers until the expiration or earlier termination of this Charter | 217
Party. | 218
(b) Extension Hire. - If the option to extend the Charter Period under Clause | 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be | 220
mutually agreed between the Owners and the Charterers. | 221
(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect | 222
documented changes, after the date of entering into the Charter Party or the | 223
date of commencement of employment, whichever is earlier, in the Owners' | 224
costs arising from changes in the Charterers' requirements or regulations | 225
governing the Vessel and/or its Crew or this Charter Party. | 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in | 227
Box 19. In respect of reimbursable expenses incurred in currencies other | 228
than the contract currency, the rate of exchange into the contract currency | 229
shall be that quoted by the Central Bank of the country of such other currency | 230
as at the date of the Owners' invoice. Invoices covering Hire and any other | 231
payments due shall be issued monthly as stated in Box 21(h) or at the | 232
expiration or earlier termination of this Charter Party. Notwithstanding the | 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at | 234
the time of delivery. | 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the | 236
Charterers' account shall be received within the number of days stated in Box | 237
23 from the date of receipt of the invoice. Payment shall be made in the | 238
contract currency in full without discount to the account stated in Box 22. | 239
However any advances for disbursements made on behalf of and approved by | 240
the Owners may be deducted from Hire due. | 241
If payment is not received by the Owners within 5 banking days following the | 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 | 243
on the amount outstanding from and including the due date until payment is | 244
received. | 245
Where an invoice is disputed, the Charterers shall in any event pay the | 246
undisputed portion of the invoice but shall be entitled to withhold payment of | 247
the disputed portion provided that such portion is reasonably disputed and | 248
the Charterers specify such reason. Interest will be chargeable at the rate | 249
stated in Box 24 on such disputed amounts where resolved in favour of the | 250
Owners. Should the Owners prove the validity of the disputed portion of the | 251
invoice, balance payment shall be received by the Owners within 5 banking | 252
days after the dispute is resolved. Should the Charterers' claim be valid, a | 253
corrected invoice shall be issued by the Owners. | 254
In default of payment as herein specified, the Owners may require the | 255
Charterers to make payment of the amount due within 5 banking days of | 256
receipt of notification from the Owners; failing which the Owners shall have | 257
the right to withdraw the Vessel without prejudice to any claim the Owners | 258
may have against the Charterers under this Charter Party. | 259
While payment remains due the Owners shall be entitled to suspend the | 260
performance of any and all of their obligations hereunder and shall have no | 261
responsibility whatsoever for any consequences thereof, in respect of which | 262
the Charterers hereby indemnify the Owners, and Hire shall continue to | 263
accrue and any extra expenses resulting from such suspension shall be for | 264
the Charterers' account. | 265
(f) Audit. - The Charterers shall have the right to appoint an independent | 266
chartered accountant to audit the Owners' books directly related to work | 267
performed under this Charter Party at any time after the conclusion of the | 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the | 269
validity of the Owners' charges hereunder. The Owners undertake to make | 270
their records available for such purposes at their principal place of business | 271
during normal working hours. Any discrepancies discovered in payments | 272
made shall be promptly resolved by invoice or credit as appropriate. | 273

**11. Suspension of Hire** | 274
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of | 275
Master, Officers and Crew, breakdown of machinery, damage to hull or other | 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be | 277
payable in respect of any time lost and any Hire paid in advance shall be | 278
adjusted accordingly provided always however that Hire shall not cease in the | 279
event of the Vessel being prevented from working as aforesaid as a result of | 280
the carriage of cargo as noted in Clause 5(c)(ii) and (iii). | 281
(b) quarantine or risk of quarantine/activities caused by the Master, Officers or | 282
Crew having communication with the shore at any infected area not in | 283
connection with the employment of the Vessel without the consent or the | 284
instructions of the Charterers; | 285
(c) deviation from her Charter Party duties or exposure to abnormal risks of | 286

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

the request of the Charterers; 287
(iv) detention in consequence of being driven into port or to anchorage 288
through stress of weather or trading to shallow harbours or to river or 289
ports with bars or suffering an accident to her cargo, when the expenses 290
resulting from such detention shall be for the Charterers' account, 291
howsoever incurred; 292
(v) detention or damage by ice; 293
(vi) any act or omission of the Charterers, their servants or agents. 294
(c) Liability for Vessel not Working. - The Owners' liability for any loss, 295
damage or delay sustained by the Charterers as a result of the Vessel being 296
prevented from working by any cause whatsoever shall be limited to 297
suspension of hire. 298
(d) Maintenance and Drydocking. - Notwithstanding sub-clause (a) hereof, the 299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall 300
be cumulative, per month or pro rata for part of a month from the 301
commencement of the Charter Period for maintenance and repairs including 302
drydocking (hereinafter referred to as "maintenance allowance"). The 303
accumulated maintenance days shall however at any time not exceed six (6) 304
days: if the accumulated time is not utilized within six (6) months it would 305
automatically lapse and will not be carried forward. 306

The Vessel shall be drydocked at regular intervals. The Charterers shall place 304
the Vessel at the Owners' disposal clear of cargo, at a port to be nominated 305
by the Owners at a later date) having facilities suitable in the Owners for the 306
purpose of such drydocking. 307
During reasonable voyage time taken in transits between such port and Area 308
of Operation the Vessel shall be on hire and such time shall not be counted 309
against the accumulated maintenance allowance. 310
Hire shall be suspended during any time taken in maintenance repairs and 311
drydocking in excess of the accumulated maintenance allowance. 312
In the event of time being taken by the Owners for repairs and drydocking 313
or, alternatively, the Charterers not making the Vessel available for all or part 314
of this time, the Charterers shall, upon expiration or earlier termination of the 315
Charter Party pay the equivalent of the daily rate of Hire then prevailing in 316
addition to Hire otherwise due under this Charter Party in respect of all such 317
time not so taken or made available. 318
Upon commencement of the Charter Period, the Owners agree to furnish the 319
Charterers with the Owners' proposed drydocking schedule and the 320
Charterers agree to make every reasonable effort to assist the Owners in 321
adhering to such predetermined drydocking schedule for the Vessel. It is 322
understood between Owner and Charter that regular dry-docking is not 323
scheduled to take place during the first period of Charter Hire, that is during 324
the first 36 months. 325

12. Liabilities and Indemnities 323
(a) Owners. - Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 5(c)(ii), 7(b), 9(A), 12(c), 19(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or of 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partly by the act, neglect, or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partly by unseaworthiness of any vessel; 333
and the Owners and their contractors and sub-contractors shall indemnify, 334
protect, defend and hold harmless the 335
Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337
(b) Charterers. - Notwithstanding anything else contained in this Charter 338
Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything towed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
towed by the Vessel, arising out of or in any way connected with the 346
performance of the Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partly by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partly by the 350
unseaworthiness of any vessel; and the Charterers and their contractors and 351
sub-contractors shall indemnify, protect, 352
defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353

arising out of or in connection with such loss, damage, liability, personal 354
injury or death. 355
(c) Consequential Damages. - Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or 362
held to deprive the Owners or the Charterers, as against each person or party, 363
including as against each other, of any right to claim limitation of liability 364
provided by any applicable law, statute or convention, save that nothing in 365
this Charter Party shall create any right to limit liability. Where the Owners or 366
the Charterers may seek an indemnity under the provisions of this Charter 367
Party or against each other in respect of a claim brought by a third party, the 368
Owners or the Charterers shall seek to limit their liability against such third 369
party. 370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities, 371
limitations of liability, indemnities, privileges and conditions granted or 372
provided by this Charter Party or by any applicable statute, rule or regulation 373
for the benefit of the Charterers shall also apply to and be for the benefit of the 374
Charterers' parent, affiliated, related and subsidiary companies; the 375
Charterers' contractors, sub-contractors, clients, joint venturers and joint 376
interest owners (always with respect to this job or project on which the Vessel 377
is employed); their respective employees and their respective underwriters. 378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability, 379
indemnities, privileges and conditions granted or provided by this Charter 380
Party or by any applicable statute, rule or regulation for the benefit of the 381
Owners shall also apply to and be for the benefit of the Owners' parent, 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its 384
demise charterer(s), their respective employees and their respective 385
underwriters. 386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or 387
trustee of and for the benefit of all such persons and parties set forth above, 388
but only for the limited purpose of contracting for the extension of such 389
benefits to such persons and parties. 390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 29, but 391
regardless of whether this option is exercised the other provisions of Clause 12 392
shall apply and shall be paramount) 393
In order to avoid disputes regarding liability for personal injury or death of 394
employees or for loss of or damage to property, the Owners and the 395
Charterers have entered into, or by this Charter Party agree to enter into, an 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form 397
substantially similar to that specified in ANNEX "C") between the Owners, the 398
Charterers and the various contractors and sub-contractors of the Charterers. 399
(g) Hazardous and Noxious Substances. - Notwithstanding any other 400
provision of the Charter Party to the contrary, the Charterers shall always be 401
responsible for any losses, damages or liabilities suffered by the Owners, 402
their employees, contractors or sub-contractors, by the Charterers, or by 403
third parties, with respect to the Vessel or other property, personal injury or 404
death, pollution or otherwise, which losses, damages or liabilities are caused, 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and 406
noxious substances in whatever form as ordered by the Charterers, and the 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless 408
for any expense, loss or liability whatsoever or howsoever arising with 409
respect to the carriage of hazardous or noxious substances. 410

13. Pollution 411
(a) Except as otherwise provided for in Clause 12(c)(iii), the Owners shall be 412
liable for, and agree to indemnify, defend and hold harmless the Charterers 413
against, all claims, costs, expenses, actions, proceedings, suits, demands 414
and liabilities whatsoever arising out of actual or potential pollution damage 415
and the cost of clean-up or control thereof arising from acts or omissions of 416
the Owners or their personnel which cause or allow discharge, spills or leaks 417
from the Vessel, except an any arsenals how cargo thereon or therein. 418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, 420
suits, demands, liabilities, loss or damage whatsoever arising out of or 421
resulting from any other actual or potential pollution damage, even where 422
caused wholly or partly by the act, neglect or default of the Owners, their 423
employees, contractors or sub-contractors or by the unseaworthiness of the 424
Vessel. 425

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of the document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**14. Insurance**

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners.

(ii) The Charterers shall be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party.

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party.

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party.

**15. Saving of Life and Salvage**

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services.

All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for; and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no cure no salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom whatsoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11(c).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

**16. Lien**

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

**17. Sublet and Assignment**

(a) Charterers - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed nominators of the Charterers but at the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid at agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel.

(b) If the Vessel is publicly assigned or loaned to undertake rig and/or handling and/or loving operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 22 or any extra shall be paid for the period between departure for such operations and return to base operable for the Charterers.

(c) Owners - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld.

Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

**18. Substitute Vessel**

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute Vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld.

**19. War**

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such forms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium being incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or of any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 20 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART II if the Vessel has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it at a near open and safe port or place as directed by the Owners; or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation.

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (c) and (f) of this Clause.

**20. Excluded Ports**

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel;

(b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operation. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being injured in and/or damaged he has liberty to sail to a convenient open place and await the Charterers' fresh instructions.

(b) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby at such extras as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand. Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

**21. General Average and New Jason Clause**

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as they be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

**22. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the

management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of or damage to, or any claim whatsoever of the owners of any goods carried under the Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

**23. Structural Alterations and Additional Equipment**

The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.

**24. Health and Safety**

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto.

**25. Taxes**

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.

In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly.

**26. Early Termination**

(a) For Charterers' Convenience. —The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 15 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.

(b) For Cause. — If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) Requisition. —If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) Confiscation. —If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) Bankruptcy. —In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.

(iv) Loss of Vessel. —If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) Breakdown. —If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.

(vi) Force Majeure. —If a force majeure condition as defined in Clause 27

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

prevails for a period exceeding 15 consecutive days. — 710

(vii) Default. - If either party is in repudiatory breach of its obligations — 711
hereunder. — 712

Termination as a result of any of the above mentioned causes shall not relieve — 713
the Charterers of any obligation for Hire and any other payments due. — 714

**27. Force Majeure** — 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or — 716
delay or failure in performance hereunder resulting from any force majeure — 717
event, including but not limited to acts of God, fire, action of the elements, — 718
epidemics, war (declared or undeclared), warlike actions, insurrection, — 719
revolution or civil strife, piracy, civil war or hostile action, either or — 720
difference with workmen (except for disputes relating solely to the Owners' — 721
or the Charterers' employees), acts of the public enemy, federal or state laws, — 722
rules and regulations of any governmental authorities having or asserting — 723
jurisdiction in the premises or of any other group, organization or informal — 724
association (whether or not formally recognised as a government), and any — 725
other cause beyond the reasonable control of either party which makes — 726
continuance of operations impossible. — 727

**28. Notices and Invoices** — 728
Notices and Invoices required to be given under this Charter Party shall be — 729
given in writing to the addresses stated in Boxes 21, 35 and 39 as appropriate. — 730

**29. Wreck Removal** — 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and — 732
has to be removed upon request by any compulsory law or authority having — 733
jurisdiction over the area where the wreck is placed, the Owners shall be — 734
liable for any and all expenses in connection with the raising, removal, — 735
destruction, lighting or marking of the wreck. — 736

**30. Confidentiality** — 737
All information or data obtained by the Owners in the performance of this — 738
Charter Party is the property of the Charterers, is confidential and shall not be — 739
disclosed without the prior written consent of the Charterers. The Owners — 740
shall use their best efforts to ensure that the Owners, any of their — 741
sub-contractors, and employees and agents thereof shall not disclose any — 742
such information or data. — 743

**31. Law and Arbitration** — 744
*) (a) This Charter Party shall be governed by English-Norwegian law and any — 745
dispute — 
arising out of this Charter Party shall be referred to arbitration in London Oslo, — 746
one — 
arbitrator being appointed by each party, in accordance with the Norwegian — 747
Arbitration — 
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for — 748
the time being in force. On the receipt by one party of the nomination in — 749
writing of the other party's arbitrator, that party shall appoint their arbitrator — 750

within 14 days, failing which the arbitrator already appointed shall act as sole — 751
arbitrator. If two arbitrators properly appointed shall not agree they shall — 752
appoint an umpire whose decision shall be final. — 753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute — 754
shall be referred to three persons at New York, one to be appointed by each of — 755
the parties hereto, and the third by the two so chosen; their decision or that of — 756
any two of them shall be final, and for purpose of enforcing any award, this — 757
agreement may be made a rule of the Court. The arbitrators shall be members — 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings — 759
shall be conducted in accordance with the rules of the Society. — 760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration — 761
at the place stated in Box 33 subject to the law and procedures applicable — 762
there. — 763
(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply. — 764
*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33. — 765

**32. Entire Agreement** — 766
This is the entire agreement of the parties, which supersedes all previous — 767
written or oral understandings and which may not be modified except by a — 768
written amendment signed by both parties. — 769

**33. Severability Clause** — 770
If any portion of this Charter Party is held to be invalid or unenforceable for — 771
any reason by a court or governmental authority of competent jurisdiction, — 772
then such portion will be deemed to be stricken and the remainder of this — 773
Charter Party shall continue in full force and effect. — 774

**34. Demise** — 775
Nothing herein contained shall be construed as creating a demise of — 776
the Vessel to the Charterers. — 777

**35. Definitions** — 778
"Well" is defined for the purposes of this Charter Party as the time required to — 779
drill, test, complete and/or abandon a single borehole including any side- — 780
track thereof. — 781
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, — 782
offshore installation, structure and/or mobile unit used in offshore — 783
exploration, construction, pipelaying or repair, exploitation or production. — 784
"Offshore site" is defined for the purposes of this Charter Party as the area — 785
within three nautical miles of an "offshore unit" from or to which the Owners — 786
are requested to take their Vessel by the Charterers. — 787
"Employees" is defined for the purposes of this Charter Party as employees, — 788
directors, officers, servants, agents or invitees. — 789

**36. Headings** — 790
The headings of this Charter Party are for identification only and shall not be — 791
deemed to be part hereof or be taken into consideration in the interpretation — 792
or construction of this Charter Party. — 793

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# EXHIBIT 2
# HOEL AFFIRMATION

## SIDE-AGREEMENT TO TIME CHARTER PARTY BETWEEN TFDS OFFSHORE AS AND ROLV BERG DRIVE AS REGARDING AHTS ALDOMA

It is understood between the parties that ONGC may offer Rolv Berg Drive AS extensions to the 3 year contract with contract no: MR/MM/OFF.LGTS./CH/VESSELS//10(109)/2003. It is further agreed between the parties that should Rolv Berg Drive AS be granted extension to this contract or new contracts with ONGC, Rolv Berg Drive shall have the right to extend the charter of AHTS Aldoma on a day-rate not to exceed USD 9.000,-.

This agreement shall be subject only to TFDS Offshore securing further charter with the vessel's owner.

It is further agreed that should Rolv Berg Drive AS secure other future contracts with ONGC TFDS Offshore AS will be given first option where they have vessels which meet the requirements at competitive rates.

This agreement is entered into on the 5th of March 2004.

For TFDS Offshore AS

Svein Hoel
Managing Director

For Rolv Berg Drive AS

Snorre S. Stinessen
Coordinating Manager

# EXHIBIT 3
# HOEL AFFIRMATION

| | |
|---|---|
| 1. Place and date<br>12 May 2005 | **UNIFORM TIME CHARTER PARTY**<br>**FOR OFFSHORE SERVICE VESSELS**<br>**CODE NAME: "SUPPLYTIME 89"**　　　　PART I |

| | | |
|---|---|---|
| 2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>FSUE Arktikmorneftegazrazvedka | 3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore<br>Invest AS), Enterprise no. 929 987 020<br>Strandvelen 106<br>9008 Tromsø, Norway | |
| 4. Vessel's name (Cl. 1(a))<br>Aldoma | 5. Date of delivery (Cl. 2(a))<br>6 March 2006 | 6. Cancelling date (Cl. 2(a) and (c))<br>N/A |
| 7. Port or place of delivery (Cl. 2(a))<br>India, Kakinada | 8. Port or place redelivery/notice of redelivery (Cl. 2(b))<br><br>Kirkenes to be agreed<br>(i) Port or place of redelivery<br><br>30 days<br>(ii) Number of days' notice of redelivery | |
| 9. Period of hire (Cl. 1(a))<br>14 months | 10. Extension of period of hire (optional) (Cl. 1(b))<br><br>2 x 1 year<br>(i) Period of extension<br><br>90 days<br>(ii) Advance notice for declaration of option (days) | |
| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>N/A<br>(i) Voyage or well (state which)<br>N/A<br>(ii) Maximum extension period (state number of days) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>N/A<br>(i) Lump sum<br>N/A<br>(ii) When due | |
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br>India, Kakinada | |
| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>USD 81,000 | 15. Number of days' notice of early termination (Cl. 26(a))<br>N/A | 16. Demobilisation charge (lump sum) (Cl. 2(c) and Cl. 26(a))<br>~~USD 35,000~~<br>N/A |
| 17. Area of operation (Cl. 5(a))<br>World Wide within IWL, intention domestic India trade for ONGC | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>N/A | |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document, which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) REVISED 1989

Printed by BIMCO's Idea

Adopted by International Support Vessel Owners' Association (ISOA), London

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) )<br><br>USD 3,500.- | 20. Extension hire (if agreed, state rate) (Cl. 10(d))<br>1st option USD 3,600.- per day<br>2nd option USD 3,600.- per day |
|---|---|
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i) state whether to be issued in advance or arrears<br>Arrears (within 5 days after invoice)<br><br>(ii) state to whom to be issued if address other than stated in Box 2<br>As per box 2<br><br>(iii) state to whom to be issued if address other than stated in Box 3<br>As per box 3 | 22. Payments (state funds and place of payment; also state beneficiary and bank account) (Cl. 10(d))<br>As per invoice. |
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(d))<br>15 days | 24. Interest rate payable (Cl. 10(b))<br>LIBOR + 3 % | 25. Maximum audit period (Cl. 10(f)) |
| 26. Meals (state rate agreed) (Cl. 5(c)(ii))<br>N/A | 27. Accommodation (state rate agreed) (Cl. 5(c)(ii))<br>N/A | 28. Minimal Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br>N/A |
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>See additional clause 38 - Profit split | 30. War (state name of countries) (Cl. 19(a))<br>Russia, Norway, India |
| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 20)<br>Oslo | 32. Breakdown (state period) (Cl. 26(b)(vi))<br>N/A |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>Norwegian law, arbitration in Oslo, Norway | 34. Numbers of additional clauses covering special provisions, if agreed |
| 35. Name and address for notices and other communications required to be given by the Owners (Cl. 33)<br>FSUE Arktikmorneftegazrazvedka | 36. Name and address for notices and other communications required to be given by the Charterers (Cl. 33)<br>... former TFDS Offshore AB and Troms Offshore ...<br>... Tromsø, Norway |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I, including additional clauses, if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed hereto. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. PART II, ANNEX "A" or ANNEX "B" as annexed to this Charter in agreement with ... shall only apply if expressly ... in Box 34.

## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

accessible to the Charterers or their agents. 129
(ii) The Master shall sign cargo documents as and in the form presented, the 130
same, however, not to be Bills of Lading, but receipts which shall be non- 131
negotiable documents and shall be marked as such. The Charterers shall 132
indemnify the Owners against all consequences and liabilities arising from 133
the Master, Officers or agents signing, under the direction of the Charterers, 134
those cargo documents or other documents inconsistent with this Charter 135
Party or from any irregularity in the papers supplied by the Charterers or their 136
agents. 137
(b) The Vessel's Crew if required by Charterers will connect and disconnect 138
electric cables, fuel, water and pneumatic hoses when placed on board the 139
Vessel in port as well as alongside the offshore units; will operate the 140
machinery on board the Vessel for loading and unloading cargoes; and will 141
hook and unhook cargo on board the Vessel when loading or discharging 142
alongside offshore units. If the port regulations or the seamen and/or labour 143
unions do not permit the Crew of the Vessel to carry out any of this work, then 144
the Charterers shall make, at their own expense, whatever other 145
arrangements may be necessary, always under the direction of the Master. 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the 147
Master or any Officer or member of the Crew, the Owners on receiving 148
particulars of the complaint shall promptly investigate the matter and if the 149
complaint proves to be well founded, the Owners shall as soon as reasonably 150
possible make appropriate changes in the appointment. 151
(d) The entire operation, navigation, and management of the Vessel shall be in 152
the exclusive control and command of the Owners, their Master, Officers and 153
Crew. The Vessel will be operated and the services hereunder shall be 154
rendered as requested by the Charterers, subject always to the exclusive 155
right of the Owners or the Master of the Vessel to determine whether operation 156
of the Vessel may be safely undertaken. In the performance of the Charter 157
Party, the Owners are deemed to be an independent contractor, the 158
Charterers being concerned only with the results of the services performed. 159

**7. Owners-Charterers to Provide** 160
(a) The Owners-Charterers shall provide and pay for all provisions, wages and 161
all other
expenses of the Master, Officers and Crew; all maintenance and repair of the 162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, 163
except as otherwise provided in this Charter Party, for all insurance on the 164
Vessel, all dues and charges directly related to the Vessel's flag and/or 165
registration, all deck, cabin and engineroom stores, cordage required for 166
ordinary ship's purpose mooring alongside in harbour, and all fumigation 167
expenses and de-ratisation certificates. The Owners-Charterers' obligations 168
under this
Clause extend to cover all liabilities for consular charges appertaining to the 169
Master, Officers and Crew, customs or import duties arising at any time during 170
the performance of this Charter Party in relation to the personal effects of the 171
Master, Officers and Crew, and in relation to the stores, provisions and other 172
matters as aforesaid which the Owners-Charterers are to provide and/or pay 173
for. and the
Owners shall refund to the Charterers any sums they or their agents may have 174
paid or been compelled to pay in respect of such liability. 175
(b) On delivery the Vessel shall be equipped, if appropriate, and the 176
Charterers haves accepted the vessel as the Owners'
expense with any towing and anchor handling equipment specified in Section 177
5(b) of ANNEX "A" on board. If during the Charter Period any such equipment
becomes 178
lost, damaged or unserviceable, other than as a result of the Owners' 179
negligence, the Charterers shall either provide, or direct the Owners to 180
provide, an equivalent replacement at the Charterers' expense. 181

**8. Charterers also to Provide** 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, 183
lubricants, water, dispersants, firefighting foam and transport thereof, port 184
charges, pilotage and boatmen and canal steersman (whether compulsory or 185
not), launch hire (unless incurred in connection with the Owners' business), 186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 187
charges, agencies and commissions incurred on the Charterers' business, 188
costs for security or other watchmen, and of quarantine (if occasioned by the 189
nature of the cargo carried or the ports visited whilst employed under this 190
Charter Party but not otherwise). 191
(b) At all times the Charterers shall provide and pay for the loading and 192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 193
cargo tanks, all necessary dunnage, uprights and shoring equipment for 194
securing deck cargo, all cordage except as to be provided by the Owners, all 195

ropes, slings and special runners (including bulk cargo discharge hoses) 196
actually used for loading and discharging, inert gas required for the 197
protection of cargo, and electrodes used for offshore works, and shall 198
reimburse the Owners for the actual cost of replacement of special mooring 199
lines to offshore units, wires, nylon spring lines etc. used for offshore works, 200
all hose connections and adaptors, and further, shall refill oxygen/acetylene 201
bottles used for offshore works. 202
(c) The Charterers shall pay for customs duties, all permits, import duties 203
(including costs involved in establishing temporary or permanent importation 204
bonds), and clearance expenses, both for the Vessel and/or equipment, 205
required for or arising out of this Charter Party. 206

**9. Bunkers** 207
Unless otherwise agreed, The Vessel shall be delivered with bunkers and 208
lubricants as on board and redelivered with sufficient bunkers to reach the 209
next bunkering stage en route to her next port of call. The Charterers upon 210
delivery and the The Owners upon redelivery shall take over and pay for the 211
bunkers and lubricants on board at the prices prevailing at the times and 212
ports of delivery and redelivery Charterers' cost of the bunkers and 213
lubricants.

**10. Hire and Payments** 214
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered 216
to the Charterers until the expiration or earlier termination of this Charter 217
Party. 218
(b) Extension Hire. - If the option to extend the Charter Period under Clause 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be 220
mutually agreed between the Owners and the Charterers. 221
(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect 222
documented changes, after the date of entering into the Charter Party or the 223
date of commencement of employment, whichever is earlier, in the Owners' 224
costs arising from changes in the Charterers' requirements or regulations 225
governing the Vessel and/or its Crew or this Charter Party. 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in 227
Box 19. In respect of reimbursable expenses incurred in currencies other 228
than the contract currency, the rate of exchange into the contract currency 229
shall be that quoted by the Central Bank of the country of such other currency 230
as at the date of the Owners' invoice. Invoices covering Hire and any other 231
payments due shall be issued monthly as stated in Box 21() or the 232
expiration or earlier termination of Hire. Notwithstanding the 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at 234
the time of delivery. 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the 236
Charterers' account shall be received within the number of days stated in Box 237
23 from the date of receipt of the invoice. Payment shall be made in the 238
contract currency in full without discount to the account stated in Box 22. 239
However any advances for disbursements made on behalf of and approved by 240
the Owners may be deducted from Hire due. 241
If payment is not received by the Owners within 5 banking days following the 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 243
on the amount outstanding from and including the due date until payment is 244
received. 245
Where an invoice is disputed, the Charterers shall in any event pay the 246
undisputed portion of the invoice but shall be entitled to withhold payment of 247
the disputed portion provided that such portion is reasonably disputed and 248
the Charterers specify such reason. Interest will be chargeable at the rate 249
stated in Box 24 on such disputed amounts when resolved in favour of the 250
Owners. Should the Owners prove the validity of the disputed portion of the 251
invoice, balance payment shall be received by the Owners within 5 banking 252
days after the dispute is resolved. Should the Charterers' claim be valid, a 253
corrected invoice shall be issued by the Owners. 254
In default of payment as herein specified, the Owners may require the 255
Charterers to make payment of the amount due within 5 banking days of 256
receipt of notification from the Owners, failing which the Owners shall have 257
the right to withdraw the Vessel without prejudice to any claim the Owners 258
may have against the Charterers under this Charter Party. 259
While payment remains due the Owners shall be entitled to suspend the 260
performance of any and all of their obligations hereunder and shall have no 261
responsibility whatsoever for any consequences thereof, in respect of which 262
the Charterers hereby indemnify the Owners, and Hire shall continue to 263
accrue and any extra expenses resulting from such suspension shall be for 264
the Charterers' account. 265
(f) Audit. - The Charterers shall have the right to appoint an independent 266
chartered accountant to audit the Owners' books directly related to work 267

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 26, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly resolved by invoice or credit as appropriate. — 268–273

**11.Suspension of Hire**
The hire is payable on a 365 days basis without off-hire. (a) If as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:
(i) the carriage of cargo as noted in Clause 5(d)(ii) and (iv);
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent of the Charterers;
(iii) deviation from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;
(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;
(v) detention or damage by ice;
(vi) any act or omission of the Charterers, their servants or agents.
(b) Liability for Vessel not Working - The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire.
(c) Maintenance and Drydocking - Notwithstanding sub-clause (a) hereof, the Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance").
The Vessel shall be drydocked at regular intervals. The Charterers shall place the Vessel at the Owners' disposal at such cargo, at a port (to be nominated by the Owners at a later date) having facilities suitable to the Owners for the purpose of such drydocking.
During reasonable voyage time taken in transits between such port and Area of Operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.
Hire shall be suspended during any time taken in maintenance repairs and drydocking in excess of the accumulated maintenance allowance.
In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of its time, the Charterers shall, upon expiration or earlier termination of the Charter Party, pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party in respect of all such time not so taken or made available.
Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to such predetermined drydocking schedule for the Vessel. — 274–322

**12. Liabilities and Indemnities**
(a) Owners - Notwithstanding anything else contained in this Charter Party excepting Clauses 5(d)(ii), 7(b), 8(b), 12(c), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the Vessel, or for personal injury or death of the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect, or default of the Charterers, their employees, contractors or sub-contractors, and even if such loss, damage, injury or death is caused wholly or partially by unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death.
(b) Charterers - Notwithstanding anything else contained in this Charter — 323–338

Party excepting Clause 21, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, including their offshore units, or for personal injury or death of the employees of the Charterers or of their contractors and sub-contractors (other than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death. — 339–357
(c) Consequential Damages. -Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance. — 358–361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party. — 362–370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, clients, joint venturers and joint interest owners (always with respect to the job or project on which the Vessel is employed); their respective employees and their respective underwriters. (ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters. — 371–386

(iii) The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties. — 387–390
(f) Mutual Waiver of Recourse (Optional), only applicable if stated in Box 28, but regardless of whether this option is exercised the other provisions of Clause 12 shall apply and shall be paramount) — 391–393
in order to avoid disputes regarding liability for personal injury or death of employees or for loss of or damage to property, the Owners and the Charterers have entered into, or by this Charter Party agree to enter into, an Agreement for Mutual Indemnity and Waiver of Recourse (in a form substantially similar to that specified in ANNEX "C") between the Owners, the Charterers and the various contractors and sub-contractors of the Charterers. — 394–399
(g) Hazardous and Noxious Substances. - Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by the Owners, their employees, contractors or sub-contractors, by the Charterers, or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous and noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners and hold the Owners harmless — 400–408

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

for any expense, loss or liability whatsoever or howsoever arising with | 409
respect to the carriage of hazardous or noxious substances. | 410

**13. Pollution** | 411
(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners-Charterers | 412
shall be
liable for, and agree to indemnify, defend and hold harmless the | 413
Charterers/Owners
against, all claims, costs, expenses, actions, proceedings, suits, demands | 414
and liabilities whatsoever arising out of actual or potential pollution damage | 415
and the cost of cleanup or control thereof arising from acts or omissions of | 416
the Owners or their personnel which cause or allow discharge, spills or leaks | 417
from the Vessel, except as may emanate from cargo thereon or therein. | 418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold | 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, | 420
suits, demands, liabilities, loss or damage whatsoever arising out of or | 421
resulting from any other actual or potential pollution damage, even where | 422
caused wholly or partially by the act, neglect or default of the Owners, their | 423
employees, contractors or sub-contractors or by the unseaworthiness of the | 424
Vessel. | 425

**14. Insurance** | 426
(a)(i) The Owners-Charterers shall procure and maintain in effect for the | 427
duration of this
Charter Party, with reputable insurers, with total insurance value of USD 5 | 428
mill with the insurances set forth in ANNEX "B".
Policy limits shall not be less than those indicated. Reasonable deductibles | 429
are acceptable and shall be for the account of the Owners/Charterers. | 430
(i) The Charterers-Owners shall upon request be named as co-insured | 431
together with the Owners. The Owners
shall upon request cause insurers to waive subrogation rights against the | 432
Charterers (as encompassed in Clause 12(a)(ii)). Co-insurance and/or | 433
waivers of subrogation shall be given only insofar as these relate to liabilities | 434
which are properly the responsibility of the Owners under the terms of this | 435
Charter Party. | 436
(b) The Owners-Charterers shall upon request furnish the Charterers-Owners | 437
with certificates of
insurance which provide sufficient information to verify that the Owners | 438
Charterers have
complied with the insurance requirements of this Charter Party. | 439
(c) If the Owners-Charterers fail to comply with the aforesaid insurance | 440
requirements, the
Charterers-Owners may, without prejudice to any other rights or remedies | 441
under this
Charter Party, purchase similar coverage and invoice an amount of the | 442
insurance costs as additional hire deduct the cost thereof from | 
any payment due to the Owners under this Charter Party. | 443

**15. Saving of Life and Salvage** | 444
(a) The Vessel shall be permitted to deviate for the purpose of saving life at | 445
sea without prior approval of or notice to the Charterers and without loss of | 446
Hire provided however that notice of such deviation is given as soon as | 447
possible. | 448
(b) Subject to the Charterers' consent, which shall not be unreasonably | 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it | 450
being understood that the Vessel shall be off hire from the time she leaves | 451
port or commences to deviate and she shall remain off-hire until she is again | 452
in every way ready to resume the Charterers' service at a position which is not | 453
less favourable to the Charterers than the position at the time of leaving port | 454
or deviating for the salvage services. | 455
All salvage monies earned by the Vessel shall be divided equally between the | 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's | 457
share, legal expenses, value of fuel and lubricants consumed, Hire of the | 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if | 459
any, and any other extraordinary loss or expense sustained as a result of the | 460
salvage. | 461
The Charterers shall be bound by all measures taken by the Owners in order | 462
to secure payment of salvage and to fix its amount. | 463
(c) The Owners shall waive their right to claim any award for salvage | 464
performed on property owned by or contracted to the Charterers, always | 465
provided such property was the object of the operation the Vessel was | 466
chartered for, and the Vessel shall remain on hire when rendering salvage | 467
services to such property. This waiver is without prejudice to any right the | 468
Vessel's Master, Officers and Crew may have under any title. | 468

If the Owners render assistance to such property in distress on the basis of | 470
"no claim for salvage", then, notwithstanding any other provisions contained | 471
in this Charter Party and even in the event of neglect or default of the Owners, | 472
Master, Officers or Crew: | 473
(i) The Charterers shall be responsible for and shall indemnify the Owners | 474
against payments made, under any legal rights, to the Master, Officers | 475
and Crew in relation to such assistance. | 476
(ii) The Charterers shall be responsible for and shall reimburse the Owners | 477
for any loss or damage sustained by the Vessel or her equipment by | 478
reason of giving such assistance and shall also pay the Owners' | 479
additional expenses thereby incurred. | 480
(iii) The Charterers shall be responsible for any actual or potential spill, | 481
seepage and/or emission of any pollutant howsoever caused occurring | 482
within the offshore site and any pollution resulting therefrom | 483
wheresoever it may occur and including but not limited to the cost of | 484
such measures as are reasonably necessary to prevent or mitigate | 485
pollution damage, and the Charterers shall indemnify the Owners | 486
against any liability, cost or expense arising by reason of such actual or | 487
potential spill, seepage and/or emission. | 488
(iv) The Vessel shall not be off-hire as a consequence of giving such | 489
assistance, or effecting repairs under sub-paragraph (ii) of this sub- | 490
clause, and time taken for such repairs shall not count against time | 491
granted under Clause 11(c). | 492
(v) The Charterers shall indemnify the Owners against any liability, cost | 493
and/or expense whatsoever in respect of any loss of life, injury, damage | 494
or other loss to person or property howsoever arising from such | 495
assistance. | 496

**16. Lien** | 497
The Owners shall have a lien upon all cargoes for all claims against the | 498
Charterers under this Charter Party and the Charterers shall have a lien on the | 499
Vessel for all monies paid in advance and not earned. The Charterers will not | 500
suffer, nor permit to be continued, any lien or encumbrance incurred by them | 501
or their agents, which might have priority over the title and interest of the | 502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall | 503
indemnify and hold the Owners harmless against any lien of whatsoever | 504
nature arising upon the Vessel during the Charter Period while she is under | 505
the control of the Charterers, and against any claims against the Owners | 506
arising out of the operation of the Vessel by the Charterers or out of any | 507
neglect of the Charterers in relation to the Vessel or the operation thereof. | 508
Should the Vessel be arrested by reason of claims or liens arising out of her | 509
operation hereunder, unless brought about by the act or neglect of the | 510
Owners, the Charterers shall at their own expense take all reasonable steps to | 511
secure that within a reasonable time the Vessel is released and at their own | 512
expense put up bail to secure release of the Vessel. | 513

**17. Sublet and Assignment** | 514
(a) Charterers - The Charterers shall have the option of subletting, assigning | 515
or leasing the Vessel to any person or company not competing with the | 516
Owners, subject to the Owners' prior approval which shall not be | 517
unreasonably withheld, upon giving notice in writing to the Owners, but the | 518
original Charterers shall always remain responsible to the Owners for due | 519
performance of the Charter Party and contractors of the person or company | 520
taking such subletting, assigning or lease shall be deemed contractors of the | 521
Charterers for all the purposes of this Charter Party. The Owners make it a | 522
condition of such consent that additional Hire shall be paid as agreed | 523
between the Charterers and the Owners having regard to the nature and | 524
period of any intended service of the Vessel. | 525
(b) If the Vessel is sublet, assigned or leased to undertake rig anchor | 526
handling and/or towing operations connected with equipment, other than that | 527
used by the Charterers, then a daily increment to the Hire in the amount as | 528
stated in Box 29 or pro rata shall be paid for the period between departure for | 529
such operations and return to her normal duties for the Charterers. | 530
(c) Owners - The Owners may not assign or transfer any part of this Charter | 531
Party without the written approval of the Charterers, which approval shall not | 532
be unreasonably withheld. | 533
Approval by the Charterers of such subletting or assignment shall not relieve | 534
the Owners of their responsibility for due performance of the part of the | 535
services which is sublet or assigned. | 536

**18. Substitute Vessel** | 537
The Owners shall be entitled at any time, whether before delivery or at any | 538
other time during the Charter Period, to provide a substitute vessel, subject to | 539

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

the Charterers' prior approval which shall not be unreasonably withheld.     540

**19.War**
(a) Unless the consent of the Owners be first obtained, the Vessel shall not be     541
ordered nor continue to any port or place or on any voyage nor be used on     542
any service which will bring the Vessel within a zone which is dangerous as a     543
result of any actual or threatened act of war, war, hostilities, warlike     544
operations, acts of piracy or of hostility or malicious damage against this or     545
any other vessel or its cargo by any person, body or state whatsoever,     546
revolution, civil war, civil commotion or international law, nor     547
be exposed in any way to any risks or penalties whatsoever consequent upon     548
the imposition of sanctions, nor carry any goods that may in any way expose     549
her to any risks of seizure, capture, penalties or any other interference of any     550
kind whatsoever by the belligerent or fighting powers or parties or by any     551
government or rulers.     552
(b) Should the Vessel approach or be brought or ordered within such zone, or     553
be exposed in any way to the said risks, (i) the Owners shall be entitled from     554
time to time to insure their interest in the Vessel for such terms as they deem     555
fit up to its open market value and also in the Hire against any of the risks     556
likely to be involved thereby, and the Charterers shall make a refund on     557
demand of any additional premium thereby incurred, and (ii) notwithstanding     558
the terms of Clause 11 Hire shall be payable for all time lost including any loss     559
owing to loss of or injury to the Master, Officers, Crew or passengers or to     560
refusal by any of them to proceed to such zone or to be exposed to such risks.     561
(c) In the event of additional insurance premiums being incurred or the wages     562
of the Master and/or Officers and/or Crew and/or the cost of provisions and/     563
or stores for deck and/or engine room being increased by reason of ordering     564
the existence of any of the matters mentioned in sub-clause (a) the amount of     565
any additional premium and/or increase shall be added to the Hire, and paid     566
by the Charterers on production of the Owners' account therefor, such     567
account being rendered monthly.     568
(d) The Vessel shall have liberty to comply with any orders or directions as to     569
departure, arrival, routes, ports of call, stoppages, destination, delivery or in     570
any other way whatsoever given by the government of the nation under whose     571
flag the Vessel sails or any other government or any person (or body) acting     572
or purporting to act with the authority of such government or by any     573
committee or person having under the terms of the war risks insurance on the     574
Vessel the right to give any such orders or directions.     575
(e) In the event of the outbreak of war (whether there be a declaration of war or     576
not) between any of the countries stated in Box 30 or in the event of the nation     577
under whose flag the Vessel sails becoming involved in war (whether there be     578
a declaration of war or not) either the Owners or the Charterers may terminate     579
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the     580
Owners in accordance with PART II if it has cargo on board after discharge     581
thereof at destination or, if debarred under this Clause from reaching or     582
entering it, at a near open and safe port or place as directed by the Owners, or     583
if the Vessel has no cargo on board, at the port or place at which it then is or if     584
at sea at a near, open and safe port or place as aforesaid, at other     585
cases Hire shall continue to be paid and, except as aforesaid, all other     586
provisions of this Charter Party shall apply until redelivery.     587
(f) If in compliance with the provisions of this Clause anything is done or is not     588
done, such shall not be deemed a deviation.     589
The Charterers shall procure that all Bills of Lading (if any) issued under this     590
Charter Party shall contain the stipulations contained in sub-clauses (a), (d)     591
and (f) of this Clause.     592
                                                                                     593

**20.Excluded Ports**
(a) The Vessel shall not be ordered to nor bound to enter without the Owners'     594
written permission (a) any place where fever or epidemics are prevalent or to     595
which the Master, Officers and Crew by law are not bound to follow the Vessel;     596
(b) any ice-bound place or any place where lights, lightships, marks and     597
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival     598
or where there is risk that ordinarily the Vessel will not be able on account of     599
ice to reach the place or to get out after having completed her operations. The     600
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on     601
account of ice, the Master considers it dangerous to remain at the loading or     602
discharging place for fear of the Vessel being frozen in and/or damaged he     603
has liberty to sail to a convenient open place and await the Charterers' fresh     604
instructions.     605
(b) Should the Vessel approach or be brought or ordered within such place,     606
or be exposed in any way to the said risks, the Owners shall be entitled from     607
time to time to insure their interests in the Vessel and/or Hire against any of     608
the risks likely to be involved thereby on such terms as they shall think fit, the     609
Charterers to make a refund to the Owners of the premium on demand.     610
                                                                                     611

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost     612
including any lost owing to loss of or sickness or injury to the Master, Officers,     613
Crew or passengers or to the action of the Crew in refusing to proceed to such     614
place or to be exposed to such risks.     615

**21.General Average and Jason Clause**
General Average shall be adjusted and settled in London unless otherwise     616
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended.     617
Hire shall not contribute to General Average. Should adjustment be made in     618
accordance with the law and practice of the United States of America, the     619
following provision shall apply:     620
"In the event of accident, danger, damage or disaster before or after the     621
commencement of the voyage, resulting from any cause whatsoever, whether     622
due to negligence or not, for which, or for the consequence of which, the     623
Owners are not responsible, by statute, contract or otherwise, the cargo,     624
shippers, consignees or owners of the cargo shall contribute with the Owners     625
in General Average to the payment of any sacrifices, loss or expenses of a     626
General Average nature that may be made or incurred and shall pay salvage     627
and special charges incurred in respect of the cargo.     628
If a salving vessel is owned or operated by the Owners, salvage shall be paid     629
for as fully as if the said salving vessel or vessels belonged to strangers. Such     630
deposit as the Owners, or their agents, may deem sufficient to cover the     631
estimated contribution of the cargo and any salvage and special charges     632
thereon shall, if required, be made by the cargo, shippers, consignees     633
or owners of the cargo to the Owners before delivery".     634
                                                                                     635

**22.Both-to-Blame Collision Clause**
If the Vessel comes into collision with another ship as a result of the     636
negligence of the other ship and any act, neglect or default of the Master,     637
mariner, pilot or the servants of the Owners in the navigation or the     638
management of the Vessel, the Charterers will indemnify the Owners against     639
all loss or liability to the other or non-carrying ship or her owners insofar as     640
such loss or liability represent loss of or damage to, or any claim whatsoever     641
of the owners of any goods carried under this Charter Party paid or payable by     642
the other or non-carrying ship or her owners to the owners of the said goods     643
and set-off, recouped or recovered by the other or non-carrying ship or her     644
owners as part of their claim against the Vessel or the Owners. The foregoing     645
provisions shall also apply where the owners, operators or those in charge of     646
any ship or ships or objects other than or in addition to the colliding ships or     647
objects are at fault in respect of a collision or contact.     648
                                                                                     649

**23.Structural Alterations and Additional Equipment**
The Charterers shall have the option of, at their expense, making structural     650
alterations to the Vessel or installing additional equipment with the written     651
consent of the Owners which shall not be unreasonably withheld but unless     652
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers'     653
expense, to her original condition. The Vessel is to remain on Hire during any     654
period of these alterations or reinstatement. The Charterers, unless otherwise     655
agreed, shall be responsible for repair and maintenance of any such     656
alteration or additional equipment.     657
                                                                                     658

**24.Health and Safety**
The Owners/Charterers shall comply with and adhere to all applicable     659
international,     660
national and local regulations pertaining to health and safety, and such     661
Charterers'/Owners' instructions as may be appended hereto.     662

**25.Taxes**
Each party shall pay taxes due on its own profit, income and personnel. The     663
Charterers shall pay all other taxes and dues arising out of the operation or     664
use of the Vessel during the Charter Period.     665
In the event of change in the Area of Operation or change in local regulation     666
and/or interpretation thereof, resulting in an unavoidable and documented     667
change of the Owners' tax liability after the date of entering into the Charter     668
Party or the date of commencement of employment, whichever is the earlier,     669
Hire shall be adjusted accordingly.     670
                                                                                     671

**26.Early Termination**
(a) For Charterers' Convenience. - The Charterers may terminate this Charter     672
Party at any time by giving the Owners written notice as stated in Box 15 and     673
by paying the settlement stated in Box 14 and the demobilisation charge     674
stated in Box 16, as well as Hire or other payments due under the Charter     675
Party.     676
(b) For Cause. - If either party becomes informed of the occurrence of any     677
                                                                                     678

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances: 679–684

(i) *Requisition*. – If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period. 685–687

(ii) *Confiscation*. – If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period. 688–691

(iii) *Bankruptcy*. – In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business. 692–696

(iv) *Loss of Vessel*. – If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported. 697–703

(v) *Breakdown*. – If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18. 704–708

(vi) *Force Majeure*. – If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days. 709–710

(vii) *Default*. – If either party is in repudiatory breach of its obligations hereunder. 711–712

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due. 713–714

### 27. Force Majeure
Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of performance impossible. 715–727

### 28. Notices and Invoices
Notices and Invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate. 728–730

### 29. Wreck Removal
If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck. 731–736

### 30. Confidentiality
All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be 737–739

disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data. 740–743

### 31. Law and Arbitration
*) (a) This Charter Party shall be governed by ~~English~~ Norwegian law and any dispute arising out of this Charter Party shall be referred to arbitration in ~~London~~, one arbitrator being appointed by each party, in accordance with the Norwegian Arbitration Acts ~~1950 and 1979~~ or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final. 744–753

*) (b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at ~~New York in~~ Oslo, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society. 754–760

*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there. 761–763

(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply. 764

*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 765

### 32. Entire Agreement
This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties. 766–769

### 33. Severability Clause
If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect. 770–774

### 34. Demise
Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers. 775–777

### 35. Definitions
"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof. 778–781

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production. 782–784

"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers. 785–787

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees. 788–789

### 36. Headings
The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party. 790–793

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ADDITIONAL AGREEMENT
TO
SUPPLYTIME 89 DATED 12 MAY 2005
"ALDOMA"

## 1. Profit split

In addition to the charter hire payable pursuant to box 19 the Owners and the Charterers have agreed a profit split of any average daily net earnings (inclusive of Part II clause 7 items) above the levels set out below in any 90 day period as follows:

From 6 March 2006-5 May 2007 above USD 9.000 per day   – split 50/50
From 6 May 2007-5 May 2008 above USD 9,500 per day  – split 50/50
From 6 May 2008-5 May 2009 above USD 10.000 per day  – split 50/50

By way of example if the net daily rate is USD 10,000 in the first period an additional USD 500 per day is payable to the Owners being 50% of the rate above USD 9,000.

Any additional hire payable pursuant to this additional clause shall be paid upon closing of books for the period, but not later than 10 banking days after the expiry of each 90 day period.

The Charterers will provide the Owners with monthly reports of earnings and will on request provide copies of sub-charterparties and freight invoices and other relevant documentation. The Owners shall be entitled to appoint an auditor to review the documents relevant to establish the earning.

## 2. Russian crew

The Owners may require that the Charterers employ Russian crew as provided by the Owners, provided the Owners provide crew with suitable experience and with necessary qualification to comply with any sub charter or other contractual commitment for the vessel. The crew shall be employed on 4 months on 4 months off basis and Charterers shall pay the crew's replacement costs.

## 3. Bank Guarantee

Against cancellation of the security provided for the Charterers' obligations under the previous charter agreement between the parties for the Aldoma, the Charterers will provide the Owners with a bank guarantee in Owners' favour in an amount of NOK 150,000 as security for Charterers' obligations towards the Owners hereunder.

12 May 2005

Murmanskmorgeofizrazvedka                    NORGE OFFSHORE AS

# EXHIBIT 4
# HOEL AFFIRMATION

## SIDELETTER SUPPLYTIME 89 DATED 12 MAY 2005

### "ALDOMA"

The vessel will continue operation under her present sub-charter arrangement with Rolv Berg Drive AS till this arrangement is either terminated or otherwise expire. There shall not be given any extension or further charter parties (inclusive of any already agreed options) with Rolv Berg Drive AS without the prior written consent of the Owner.

The Owner shall further give their prior written consent to any charter where the charterhire in any new period after the Rolv Berg Drive AS firm period give the owner an additional hire of less than USD 1000,- by way of the profit split.

The Owners:

Oleg S Mratsakanyan
Director General

The Charterers:

Svein Hoel
Director

# EXHIBIT 5
# HOEL AFFIRMATION

*N 393/03*

<table>
<tr><td rowspan="20" style="writing-mode:vertical-rl">Issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) REVISED 1989     Printed by BIMCO's idea     Adopted by International Support Vessel Owners' Association (ISOA), London     Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989</td><td colspan="2">1. Place and date<br>Murmansk,     30.05.07</td><td colspan="3">UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br>PART I</td></tr>
<tr><td colspan="2">2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>FSUE Arktikmorneftegazrazvedka<br>Kolskij, 1<br>183032 Murmansk, Russia<br>Tel: +78 15 255 2000</td><td colspan="3">3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS), Enterprise no. 929 987 020<br>Strandveien 106<br>9008 Tromsø, Norway</td></tr>
<tr><td colspan="2">4. Vessel's name (Cl. 1(a))<br>Aldoma</td><td colspan="2">5. Date of delivery (Cl. 2(a))<br>Expected to be 6 May 2007</td><td>6. Cancelling date (Cl. 2(a) and (c))<br>N/A</td></tr>
<tr><td colspan="2">7. Port or place of delivery (Cl. 2(a))<br>Vizag, Coast of India</td><td colspan="3">8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>Kirkenes<br>(i) Port or place of redelivery<br><br>30 days<br>(ii) Number of days' notice of redelivery</td></tr>
<tr><td colspan="2" rowspan="2">9. Period of hire (Cl. 1(a))<br>3 years</td><td colspan="3">10. Extension of period of hire (optional) (Cl. 1(b))<br>1 year to be mutually agreed<br>(i) Period of extension<br><br>90 days<br>(ii) Advance notice for declaration of option (days)</td></tr>
<tr><td colspan="3"></td></tr>
<tr><td colspan="2">11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>N/A<br>(i) Voyage or well (state which)<br>N/A<br>(ii) Maximum extension period (state number of days)</td><td colspan="3">12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>N/A<br>(i) Lump sum<br>N/A<br>(ii) When due</td></tr>
<tr><td colspan="2" rowspan="2">14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>EUR.60,000.-</td><td colspan="3">13. Port or place of mobilisation (Cl. 2(b)(iii))<br>According to box 7</td></tr>
<tr><td colspan="2">15. Number of days' notice of early termination (Cl. 26(a))<br>N/A</td><td>16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br>N/A</td></tr>
<tr><td colspan="2">17. Area of operation (Cl. 5(a))<br>World Wide within IWL.</td><td colspan="3">18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>N/A</td></tr>
</table>

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) )<br>EUR 4,800.- per day including VAT | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br>To be mutually agreed |
|---|---|
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i) state whether to be issued in advance or arrears<br>**Arrears (within 5 days after invoice)**<br><br>(ii) state to whom to be issued if addressee other than stated in Box 2<br>**As per box 2**<br><br>(iii) state to whom to be issued if addressee other than stated in Box 3<br>**As per box 3** | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e))<br>As per invoice. |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e))<br>15 days | 24. Interest rate payable (Cl. 10(e))<br>LIBOR + 3 % | 25. Maximum audit period (Cl. 10(f))<br>N/A |
|---|---|---|

| 26. Meals (state rate agreed) (Cl. 5(c)(ii))<br>N/A | 27. Accommodation (state rate agreed) (Cl. 5(c)(ii)) <br>N/A | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br>N/A |
|---|---|---|

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>N/A | 30. War (state name of countries) (Cl. 19(a))<br>Russia, Norway, Nigeria. |
|---|---|
| 31. General average (place of settlement – only to be filed in if other than London) (Cl. 21)<br>Oslo | 32. Breakdown (state period) (Cl. 25(b)(vi))<br>N/A |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>Norwegian law, arbitration in Oslo, Norway | 34. Numbers of additional clauses covering special provisions, if agreed<br>Two (additional clauses, 37 and 38). |
| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)<br>FSUE Arktikmorneftegazrazvedka<br>Kolskij, 1<br>183032 Murmansk, Russia<br>Tel: +78 15 255 2000 | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 28)<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS)<br>Strandveien 106, 9008 Tromsø, Norway<br>Tel: +47 77 67 99 50 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners)<br><br>OLEG S. MNATSAKA...<br>DIRECTOR GEN... | Signature (Charterers) |
|---|---|

This document is a computer generated ... form must be clearly visible. In the event of any modification made to the pre-printed text of this document ... BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies ... and this computer generated document.

*PART II*
*"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels*

**1. Period of rendering services**      1

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the      2

Vessel named in Box 4, as specified in ANNEX «A» (hereinafter referred to as      3
«the Vessel»), for the period as stated in Box 9 from the time the Vessel is      4
delivered to the Charterers.      5
(b) Subject to Clause 10(b), the Charterers have the option to extend the      6
Charter Period in direct continuation for the period stated in Box 10(i), but      7
such an option must be declared in accordance with Box 10(ii).      8
(c) The Charter Period shall automatically be extended for the time required to      9
complete the voyage or well (whichever is stated in Box 11 (i)) in progress,      10

such time not to exceed the period stated in Box ll(ii).      11

**2. Delivery and Redelivery**      12

(a) Delivery.— Subject to sub-clause (b) of this Clause the Vessel shall be      13
delivered by the Owners free of cargo and with clean tanks at any time      14
between the date stated in Box 5 and the date stated in Box 6 at the port or      15
place stated in Box 7 where the Vessel can safely lie always afloat.      16

~~(b) Mobilisation    (i)The Charterers shall pay a lump sum as stated in Box 12~~      ~~17~~

~~without discount by way of mobilisation charge in consideration of the~~      ~~18~~
Owners giving delivery at the port or place stated in Box 7, the parties shall sign protocol of Delivery
and Acceptance evidencing delivery. ~~The mobilisation~~      19
~~charge shall not be affected by any change in the port or place of mobilisation~~      ~~20~~
~~from that stated in Box 13.~~      ~~21~~
~~(ii) Should the Owners agree to the Vessel loading and transporting cargo~~      ~~22~~

~~and/or undertaking any other service for the Charterers en route to the port of~~      ~~23~~
~~delivery or from the port of redelivery, then all terms and conditions of this~~      ~~24~~
~~Charter Party shall apply to such loading and transporting and/or other~~      ~~25~~
~~service exactly as if performed during the Charter Period excepting only that~~      ~~26~~

~~any lump sum freight agreed in respect thereof shall be payable on shipment~~      ~~27~~

~~or commencement of the service as the case may be, the Vessel and/or goods~~      ~~28~~
~~lost or not lost.~~      ~~29~~
(c) Cancelling.— If the Vessel is not delivered by midnight local time on the      30
cancelling date stated in Box 6, the Charterers shall be entitled to cancel this      31
Service Contract. ~~However, if despite the exercise of due diligence by the~~      ~~32~~
~~Owners, the Owners will be unable to deliver the Vessel by the cancelling~~      ~~33~~

~~date, they may give notice in writing to the Charterers at any time prior to the~~      ~~34~~

~~delivery date as stated in Box 5, and shall state in such notice the date by~~      ~~35~~
~~which they will be able to deliver the Vessel. The Charterers may within 24~~      ~~36~~
~~hours of receipt of such notice give notice in writing to the Owners cancelling~~      ~~37~~

~~this Charter Party. If the Charterers do not give such notice, then the later date~~      ~~38~~
~~specified in the Owners' notice shall be substituted for the cancelling date for~~      ~~39~~
~~all the purposes of this Charter Party.~~ In the event the Charterers cancel the      40
Charter Party, it shall terminate on terms that neither party shall be liable to      41



the other for any losses incurred by reason of the non-delivery of the Vessel | 42

or the cancellation of the Charter Party. | 43
(d) *Redelivery.*— The Vessel shall be redelivered on the expiration or earlier | 44

termination of this Charter Party free of cargo and with clean tanks at the port | 45
or place as stated in Box 8(i) or such other port or place as may be mutually | 46
agreed. The Parties shall sign Delivery and Acceptance Certificate from Contract.
The Charterers shall give not less than the number of days notice in | 47

writing of their intention to redeliver the Vessel, as stated in Box 8(ii). | 48
(e) Demobilisation. — The Charterers shall pay a lump sum without discount in | 49

the amount as stated in Box 16 by way of demobilisation charge which amount | 50
shall be paid on the expiration or on earlier termination of this Charter Party. | 51

### 3. Condition of Vessel | 52
(a) The Owners undertake that at the date of delivery under this Charter Party | 53

the Vessel shall be of the description and classification as specified in ANNEX | 54
«A», attached hereto, and undertake to so maintain the Vessel during the | 55

period of service under this Charter Party. The Charterers undertake, that by the date

of the Vessel redelivery from Contract, the Vessel to be redelivered with the same class

and classification certificates, in the event that class and classification certificates were
changed by the Charterers. If class and certificates were not changed., the validity periods
of these documents are the responsibility of the Owners, the Charterers shall ensure the
redelivery of the Vessel in good condition, in the same conditions and the same class as at
the time of the Vessel's delivery in Contract, except for fair wear and tear. | 56

(b) The Owners shall before and at the date of delivery of the Vessel and | 57
throughout the Charter Period exercise due diligence to make and maintain | 58

the Vessel tight, staunch, strong in good order and condition and, without | 59
prejudice to the generality of the foregoing, in every way fit to operate | 60

effectively at all times for the services as stated
in Clause 5. | 61

### 4. Survey | 62
The Owners and the Charterers shall jointly appoint an independent surveyor | 63
for the purpose of determining and agreeing in writing the condition of the | 64
Vessel, any anchor handling and towing equipment specified in Section 5 of | 65
ANNEX «A», and the quality and quantity of fuel, lubricants and water at the | 66

time of delivery and redelivery hereunder. The Owners and the Charterers | 67
shall jointly share the time and expense of such surveys. | 68

### 5. Employment and Area of Operation | 69
(a) The Vessel shall be employed in offshore activities which are lawful in | 70

accordance with the law of the place of the Vessel's flag and/or registration | 71

and of the place of operation. Such activities shall be restricted to the | 72

service(s) as stated in Box 18, and to voyages between any good and safe port | 73

or place and any place or offshore unit where the Vessel can safely lie always                    74
afloat within the Area of Operation as stated in Box 17 which shall always be                      75
within Institute Warranty Limits and which shall in no circumstances be                            76
exceeded without prior agreement and adjustment of the Hire and in                                 77
accordance with such other terms as appropriate to be agreed; provided                            78
always that the Charterers do not warrant the safety of any such port or place                     79
or offshore unit but shall exercise due diligence in Issuing their orders to the                  80

Vessel as if the Vessel were their own property and having regard to her                           81
capabilities and the nature of her employment. Unless otherwise agreed, the                        82
Vessel shall not be employed as a diving platform.                                                 83
(b) Relevant permission and licenses from responsible authorities for the                          84
Vessel to enter, work in and leave the Area of Operation shall be obtained by                      85
the Charterers and the Owners shall assist, if necessary, in every way                             86
possible to secure such permission and licenses.                                                   87
(c) The Vessel's Space.— The whole reach and burden and decks of the                               88
Vessel shall throughout the Charter Period be at the Charterers' disposal                          89
reserving proper and sufficient space for the Vessel's Master, Officers, Crew,                     90
tackle, apparel, furniture, provisions and stores. The Charterers shall be                         91
entitled to carry, so far as space is available and for their purposes in                          92
connection with their operations:                                                                  93
(i) Persons other than crew members, other than fare paying, and for such                          94
purposes to make use of the Vessel's available accommodation not                                   95
being used on the voyage by the Vessel's Crew. The ~~Owners~~ Charterers shall                     96
provide suitable provisions and requisites for such persons for which the                          97
Charterers shall pay at the rate as stated in Box 26 per meal and at the                           98
rate as stated in Box 27 per day for the provision of bedding and services                         99
for persons using berth accommodation.——————————————————————                                       ~~100~~
(ii)  Lawful cargo whether carried on or under deck.                                               101
(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided                        102
proper notification has been given and such cargo is marked and                                    103
packed in accordance with the national regulations of the Vessel and/or                            104
the International Maritime Dangerous Goods Code and/or other                                        105
pertinent regulations. Failing such proper notification, marking or                                106
packing the Charterers shall indemnify the Owners in respect of any loss,                           107
damage or liability whatsoever and howsoever arising therefrom. The                                108
Charterers accept responsibility for any additional expenses (including                            109
reinstatement expenses) incurred by the Owners in relation to the                                  110
carriage of explosives and dangerous cargo.                                                        111
(iv) Hazardous and noxious substances, subject to Clause 12(g), proper                             112
notification and any pertinent regulations.                                                        113
(d) Laying-up of Vessel.— The Charterers shall have the option of laying up the                    114
Vessel at an agreed safe port or place for all or any portion of the Charter                        115

| | |
|---|---|
| Period in which case the Hire hereunder shall continue to be paid but, if the | 116 |
| period of such lay-up exceeds 30 consecutive days The Charterers and Owners | |
| shall jointly discuss further Vessel's work. | 117 |
| ~~against such Hire the amount which the Owners shall reasonably have saved~~ | ~~118~~ |
| ~~by way of reduction in expenses and overheads as a result of the lay-up of the~~ | ~~119~~ |
| ~~Vessel.~~ | ~~120~~ |

### 6. Master and Crew

| | |
|---|---|
| **6. Master and Crew** | 121 |
| (a) (i) The Master shall carry out his duties promptly and the Vessel shall | 122 |
| render all reasonable services within her capabilities by day and by night and | 123 |
| at such times and on such schedules as the Charterers may reasonably | 124 |
| require without any obligations of the Charterers to pay to the Owners or the | 125 |
| Master, Officers or the Crew of the Vessel any excess or overtime payments. | 126 |
| The Charterers shall furnish the Master with all instructions and sailing | 127 |
| directions and the Master and Engineer shall keep full and correct logs | 128 |
| accessible to the Charterers or their agents. | 129 |
| (ii) The Master shall sign cargo documents as and in the form presented, the | 130 |
| same, however, not to be Bills of Lading, but receipts which shall be non- | 131 |
| negotiable documents and shall be marked as such. The Charterers shall | 132 |
| indemnify the Owners against all consequences and liabilities arising from | 133 |
| the Master, Officers or agents signing, under the direction of the Charterers, | 134 |
| those cargo documents or other documents inconsistent with this Charter | 135 |
| Party from any irregularity in the papers supplied by the Charterers or their | 136 |
| agents. | 137 |
| (b) The Vessel's Crew if required by Charterers will connect and disconnect | 138 |
| electric cables, fuel, water and pneumatic hoses when placed on board the | 139 |
| Vessel in Port as well as alongside the offshore units; will operate the | 140 |
| machinery on board the Vessel for loading and unloading cargoes; and will | 141 |
| hook and unhook cargo on board the Vessel when loading or discharging | 142 |
| alongside offshore units. If the port regulations or the seamen and/or labour | 143 |
| unions do not permit the Crew of the Vessel to carry out any of this work, then | 144 |
| the Charterers shall make, at their own expense, whatever other | 145 |
| arrangements may be necessary, always under the direction of the Master. | 146 |
| (c) If the Charterers have  reason to be dissatisfied with the conduct of the | 147 |
| Master or any Officer or member of the Crew, the Owners on receiving | 148 |
| particulars of the complaint shall promptly investigate the matter and if the | 149 |
| complaint proves to be well founded, the Owners shall as soon as reasonably | 150 |
| possible make appropriate changes in the appointment. | 151 |
| (d) The entire operation, navigation, and management of the Vessel shall be in | 152 |
| the exclusive control and command of the Owners, their Master, Officers and | 153 |
| Crew. The Vessel will be operated and the services hereunder will be | 154 |
| rendered as requested by the Charterers, subject always to the exclusive | 155 |
| right of the Owners or the Master of the Vessel to determine whether operation | 156 |
| of the Vessel may be safely undertaken. In the performance of the Charter | 157 |
| Party, the Owners are deemed to be an independent contractor, the | 158 |
| Charterers being concerned only with the results of the services performed. | 159 |

### 7. Owners to Provide

| | |
|---|---|
| **7. Owners to Provide** | 160 |
| The Owners shall provide and pay for ~~all provisions~~, wages and all other | 161 |
| expenses of the Master, Officers and Crew; all maintenance and repair of the | 162 |

Vessel's hull, machinery and equipment as specified in ANNEX «A»; also, 163
except as otherwise provided in this Charter Party, for all insurance on the 164
Vessel, all dues and charges directly related to the Vessel's flag and/or 165
registration, all deck, cabin and engine room stores, cordage required for 166
ordinary ship's purposes mooring alongside in harbour, and all fumigation 167
expenses and de-ratisation certificates. The Owners' obligations under this 168
Clause extend to cover all liabilities for consular charges appertaining to the 169
Master, Officers and Crew, customs or import duties arising at any time during 170
the performance of this Charter Party in relation to the personal effects of the 171
Master, Officers and Crew, and in relation to the stores, provisions and other 172
matters as aforesaid which the Owners  Charterers are to provide and/or pay for and the 173
Owners shall refund to the Charterers any sums they or their agents may have 174
paid or been compelled to pay in respect of such liability. 175
(b) On delivery the Vessel shall be equipped, if appropriate, and the Charterers  have accepted
at the Owners'
expense with any towing and anchor handling equipment specified in Section 176
5(b) of ANNEX «A» on board.  If during the Charter Period any such equipment becomes 177
lost, damaged or unserviceable, other than as a result of the Owners' 178
negligence, the Charterers shall either provide, or direct the Owners to 179
provide, an equivalent replacement at the Charterers' expense. 180
181

## 8. Charterers to Provide

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, 182
lubricants, water, dispersants, firefighting foam and transport thereof, port 183
charges,. pilotage and boatmen and canal steersmen (whether compulsory or 184
not), launch hire (unless incurred in connection with the Owners' business), 185
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 186
charges, agencies and commissions incurred on the Charterers' business, 187
costs for security or other watchmen, and of quarantine (if occasioned by the 188
nature of the cargo carried or the ports visited whist employed under this 189
Charter Party but not otherwise). 190
(b) At all times the Charterers shall provide and pay for the loading and 191
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 192
cargo tanks, all necessary dunnage, uprights and shoring equipment for 193
securing deck cargo, all cordage except as to be provided by the Owners, all 194
ropes, slings and Special runners (including bulk cargo discharge hoses) 195
actually used for loading and discharging, inert gas required for the 196
protection of cargo, and electrodes used for offshore works, and shall 197
reimburse the Owners for the actual cost of replacement of special mooring 198
lines to offshore units, wires, nylon spring lines etc. used for offshore works, 199
all hose connections and adaptors, and further, shall refill oxygen/acetylene 200
bottles used for offshore works. 201
(c) The Charterers shall pay for customs duties, all permits, import duties 202
(Including costs involved in establishing temporary or permanent importation 203
bonds), and clearance expenses, both for the Vessel and/or equipment, 204
required for or arising out of this Charter Party. 205
206

## 9. Bunkers

Unless otherwise agreed, the Vessel shall be delivered with bunkers and 207
lubricants as on board and redelivered with sufficient bunkers to reach the 208
next bunkering stage en route to her next port of call. The Charterers upon 209
delivery and the Owners upon redelivery shall take over and pay for the 210
211

bunkers and lubricants on board at the prices prevailing at the times and    212
ports of delivery and redelivery.    213

**10. Hire and Payments**    214
(a) Hire,— The Charterers shall pay Hire for the Vessel at the rate stated in Box    215
19 per day or pro rata for part thereof from the time that the Vessel is delivered    216
to the Charterers until the expiration or earlier termination of this Charter    217
Party.    218
(b) Extension Hire.— If the option to extend the Charter Period under Clause    219
1 (b) is exercised, Hire for such extension shall, unless stated in Box 20, be    220
mutually agreed between the Owners and the Charterers.    221
(c) Adjustment of Hire.— The rate of hire shall be adjusted to reflect    222
documented changes, after the date of entering into the Charter Party or the    223
date of commencement of employment, whichever is earlier, in the Owners'    224
costs arising from changes in the Charterers' requirements or regulations    225
governing the Vessel and/or its Crew or this Charter Party.    226
(d) Invoicing.— All invoices shall be issued in the contract currency stated in    227
Box 19 and

In respect of reimbursable expenses incurred in currencies other    228
than the contract currency, the rate of exchange into the contract currency    229
shall be that quoted by the Central Bank of the country of such other currency    230
as at the date of the Owners' invoice. Invoices covering Hire and any other    231
payments due shall be issued monthly as stated in Box 21 (i) or at the    232
expiration or earlier termination of this Charter Party. Notwithstanding the    233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at    234
the time of delivery.
(e) Payments. — Payments of Hire, bunker invoices and disbursements for the    236
Charterers' account shall be received with the number of days stated in Box    237
23 from the date of receipt of the invoice. Payment shall be made in the    238
contract currency in full without discount to the account stated in Box 22.    239
~~However any advances for disbursements made on behalf of and approved by~~    ~~240~~
~~the Owners may be deducted from Hire due.~~    ~~241~~
If payment is not received by the Owners within 15 banking days following the    242
due date the Owners are entitled to charge interest at the rate stated in Box 24    243
on the amount outstanding from and including the due date until payment is    244
received.    245
Where an invoice is disputed, the Charterers shall in any event pay the    246
undisputed portion of the Invoice but shall be entitled to withhold payment of    247
the disputed portion provided that such portion is reasonably disputed and    248
the Charterers specify such reason. Interest will be chargeable at the rate    249
stated in Box 24 on such disputed amounts where resolved in favour of the    250
Owners. Should the Owners prove the validity of the disputed portion of the    251
invoice, balance payment shall be received by the Owners within 15 banking    252
days after the dispute is resolved. Should the Charterers' claim be valid, a    253
corrected invoice shall be issued by the Owners.    254
In default of payment as herein specified, the Owners may require the    255
Charterers to make payment of the amount due within 15 banking days of    256
receipt of notification from the Owners; failing which the Owners shall have    257
the right to withdraw the Vessel without prejudice to any claim the Owners    258
may have against the Charterers under this Charter Party.    259
While payment remains due the Owners shall be entitled to suspend the    260
performance of any and all of their obligations hereunder and shall have no    261

responsibility whatsoever for any consequences thereof, in respect of which          262
the Charterers hereby indemnify the Owners, and Hire shall continue to              263
accrue and any extra expenses resulting from such suspension shall be for           264
the Charterers' account.                                                            265
(f) Audit.    The Charterers shall have the right to appoint an independent          266
chartered accountant to audit the Owners' books directly related to work            267
performed under this Charter Party at any time after the conclusion of the          268
Charter Party, up to the expiry of the period stated in Box 25, to determine the    269
validity of the Owners' charges hereunder. The Owners undertake to make             270
their records available for such purposes at their principal place of business      271
during normal working hours. Any discrepancies discovered in payments               272
made shall be promptly resolved by invoice or credit as appropriate.                273

## 11. Suspension of Hire                                                           274
**(a) The Charter hire is paid during 3 years uninterruptedly.**
If as a result of any deficiency of Crew or of the Owners' stores, strike of        275
Master, Officers and Crew, breakdown of machinery, damage to hull or other          276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be     277
payable in respect of any time lost and any Hire paid in advance shall be           278
adjusted accordingly provided always however that Hire shall not cease in the       279
event of the Vessel being prevented from working as aforesaid as a result of:       280
(i)  the carriage of cargo as noted in Clause 5(e) (iii) and (iv);                  281
(ii)  quarantine or risk of quarantine unless caused by the Master, Officers or     282
Crew having communication with the shore, at any infected area not in               283
connection with the employment of the Vessel without the consent or the            284
instructions of the Charterers;                                                     285
(iii) deviation from her Charterers Party duties or exposure to abnormal risks at   286
the request of the Charterers;                                                      287
(iv) detention in consequence of being driven into port or to anchorage             288
through stress of weather or trading to shallow harbors or to river or              289
ports with bars or suffering an accident to her cargo, when the expenses            290
resulting from such detention shall be for the Charterers' account                  291
howsoever incurred;                                                                 292
(v)  detention or damage by ice;                                                    293
(vi) any act or omission of the Charterers, their servants or agents.               294
(b) Liability for Vessel not Working.    The Owners' liability for any loss,         295
damage or delay sustained by the Charterers as a result of the Vessel being         296
prevented from working by any cause whatsoever shall be limited to                  297
suspension of hire.                                                                 298
(c) Maintenance and Drydocking.    Notwithstanding sub-clause (a) hereof, the        299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall        300
be cumulative, per month or pro rata for part of a month from the                   301
commencement of the Charter Period for maintenance and repairs including            302
drydocking (hereinafter referred to as "maintenance allowance").                    303
The Vessel shall be drydocked at regular intervals. The Charterers shall place      304
the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated       305
by the Owners at a later date) having facilities suitable to the Owners for the     306
purpose of such drydocking.                                                         307
During reasonable voyage time taken in transit between such port and Area           308
of Operation the Vessel shall be on hire and such time shall not be counted         309
against the accumulated maintenance allowance.                                      310

~~Hire shall be suspended during any time taken in maintenance repairs and~~ 311
~~drydocking in excess of the accumulated maintenance allowance.~~ 312
~~In the event of less time being taken by the Owners for repairs and drydocking~~ 313
~~or, alternatively, the Charterers not making the Vessel available for all or part~~ 314
~~of this time, the Charterers shall, upon expiration or earlier termination of the~~ 315
~~Charter Party, pay the equivalent of the daily rate of Hire then prevailing in~~ 316
~~addition to Hire otherwise due under this Charter Party in respect of all such~~ 317
~~time not so taken or made available.~~ 318
~~Upon commencement of the Charter Period, the Owners agree to furnish the~~ 319
~~Charterers with the Owners' proposed drydocking schedule and the~~ 320
~~Charterers agree to make every reasonable effort to assist the Owners in~~ 321
~~adhering to such predetermined drydocking schedule for the Vessel.~~ 322

**12. Liabilities and Indemnities** 323
(a) Owners.— Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partially by the act, neglect, or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partially by unseaworthiness of any vessel; 333
and the Owners shall indemnify, protect, defend and hold harmless the 334
Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337
(b) Charterers.— Notwithstanding anything else contained in this Charter 338
Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything towed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
towed by the Vessel, arising out of or in any way connected with the 346
performance of this Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partially by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partially by the 350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect, 351
defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353
arising out of or in connection with such loss, damage, liability, personal 354
injury or death. 355
(c) Consequential Damages.— Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361

(d) Limitations.— Nothing contained in this Charter Party shall be construed or | 362
held to deprive the Owners or the Charterers, as against any person or party, | 363
including as against each other, of any right to claim limitation of liability | 364
provided by any applicable law, statute or convention, save that nothing in | 365
this Charter Party shall create any right to limit liability. Where the Owners or | 366
the Charterers may seek an indemnity under the provisions of this Charter | 367
Party or against each other in respect of a claim brought by a third party, the | 368
Owners or the Charterers shall seek to limit their liability against such third | 369
party. | 370
(e) Himalaya Clause.— (i) All exceptions, exemptions, defenses, immunities, | 371
limitations of liability, indemnities, privileges and conditions granted or | 372
provided by this Charter Party or by any applicable statute, rule or regulation | 373
for the benefit of the Charterers shall also apply to and be for the benefit of the | 374
Charterers' parent, affiliated, related and subsidiary companies; the | 375
Charterers' contractors, sub-contractors, clients, joint ventures and joint | 376
interest owners (always with respect to the job or project on which the Vessel | 377
is employed); their respective employees and their respective underwriters, | 378
(ii) All exceptions, exemptions, defenses, immunities, limitations of liability, | 379
indemnities, privileges and conditions granted or provided by this Charter | 380
Party or by any applicable statute, rule or regulation for the benefit of the | 381
Owners shall also apply to and be for the benefit of the Owners' parent, | 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, | 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its | 384
demise Charterer(s), their respective employees and their respective | 385
underwriters. | 386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or | 387
trustee of and for the benefit of all such persons and parties set forth above, | 388
but only for the limited purpose of contracting for the extension of such | 389
benefits to such persons and parties. | 390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but | 391
regardless of whether this option is exercised the other provisions of Clause 12 | 392
shall apply and shall be paramount). | 393
In order to avoid disputes regarding liability for personal injury or death of | 394
employees or for loss of or damage to property, the Owners and the | 395
Charterers have entered into, or by this Charter Party agree to enter into, an | 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form | 397
substantially similar to that specified in ANNEX "C") between the Owners, the | 398
Charterers and the various contractors and sub-contractors of the Charterers. | 399
(g) Hazardous and Noxious Substances. — Notwithstanding any other | 400
provision of this Charter Party to the contrary, the Charterers shall always be | 401
responsible for any losses, damages or liabilities suffered by the Owners, | 402
their employees, contractors or sub-contractors, by the Charterers, or by | 403
third parties, with respect to the Vessel or other property, personal injury or | 404
death, pollution or otherwise, which losses, damages or liabilities are caused, | 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and | 406
noxious substances in whatever form as ordered by the Charterers, and the | 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless | 408
for any expense, loss or liability whatsoever or howsoever arising with | 409
respect to the carriage of hazardous or noxious substances. | 410

**13. Pollution** | 411
(a) Except as otherwise provided for in Clause 15(c)(iii), the ~~Owners~~ Charterers shall be | 412
liable for, and agree to indemnify, defend and hold harmless the ~~Charterers~~ Owners | 413

against, all claims, costs, expenses, actions, proceedings, suilts, demands | 414
and liabilities whatsoever arising out of actual or potential pollution damage | 415
and the cost of cleanup or control thereof arising from acts or omissions of | 416
the Owners or their personnel which cause or allow discharge, spills or leaks | 417
from the Vessel, except as may emanate from cargo thereon or therein. | 418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold | 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, | 420
suits, demands, liabilities, loss or damage whatsoever arising out of or | 421
resulting from any other actual or potential pollution damage, even where | 422
caused wholly or partially by the act, neglect or default of the Owners, their | 423
employees, contractors or sub-contractors or by the unseaworthiness of the | 424
Vessel. | 425

**14. Insurance** | 426
(a)(i) The ~~Owners~~ Charterers shall procure and maintain in effect for the duration of this | 427
Charter Party, with reputable insurers, the insurances with total insurance value of USD 5 mill
with the insurance set forth in ANNEX "B" | 428
Policy limits shall not be less than those indicated. Reasonable deductibles | 429
are acceptable and shall be for the account of the ~~Owners~~ Charterers. | 430
(ii) The ~~Charterers~~ Owners shall upon request be named as co-insured together with the Charterers
~~The Owners~~ | 431
~~shall upon request cause insurers to waive subrogation rights against the~~ | 432
~~Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or~~ | 433
~~waivers of subrogation shall be given only insofar as these relate to liabilities~~ | 434
~~which are properly the responsibility of the Owners under the terms of this~~ | 435
~~Charter Party.~~ | 436
(b) The ~~Owners~~ Charterers shall upon request furnish the ~~Charterers~~ Owners with certificates of | 437
insurance which provide sufficient information to verify that the ~~Owners~~ Charterers have | 438
complied with the insurance requirements of this Charter Party. | 439
(c) If the ~~Owners~~ Charterers fail to comply with the aforesaid insurance requirements, the | 440
~~Charterers~~ Owners may, without prejudice to any other rights or remedies under this | 441
Charter Party, purchase similar coverage and invoice an amount of the insurance costs as additional hire
~~deduct the cost thereof from~~ | 442
~~any payment due to the Owners under~~ this Charter Party. | 443

**15. Saving of Life and Salvage** | 444
(a) The Vessel shall be permitted to deviate for the purpose of saving life at | 445
sea without prior approval of or notice to the Charterers and without loss of | 446
Hire provided however that notice of such deviation is given as soon as | 447
possible. | 448
(b) Subject to the Charterers' consent, which shall not be unreasonably | 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it | 450
being understood that the Vessel shall be off hire from the time she leaves | 451
port or commences to deviate and she shall remain off-hire until she is again | 452
in every way ready to resume the Charterers' service at a position which is not | 453
less favorable to the Charterers than the position at the time of leaving port | 454
or deviating for the salvage services. | 455
All salvage monies earned by the Vessel shall be divided equally between the | 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's | 457
share, legal expenses, value of fuel and lubricants consumed. Hire of the | 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if | 459
any, and any other extraordinary loss or expense sustained as a result of the | 460
salvage. | 461

The Charterers shall be bound by all measures taken by the Owners in order                    462
to secure payment of salvage and to fix its amount.                                            463
(c) The Owners shall waive their right to claim any award for salvage                          464
performed on property owned by or contracted to the Charterers, always                         465
provided such property was the object of the operation the Vessel was                          466
chartered for, and the Vessel shall remain on hire when rendering salvage                      467
services to such property. This waiver is without prejudice to any right the                   468
Vessel's Master, Officers and Crew may have under any title.                                   469
If the Owners render assistance to such property in distress on the basis of                   470
"no claim for salvage", then, notwithstanding any other provisions contained                   471
in this Charter Party and even in the event of neglect or default of the Owners,               472
Master, Officers or Crew:                                                                      473
(i)  The Charterers shall be responsible for and shall indemnify the Owners                    474
against payments made, under any legal rights, to the Master, Officers                         475
1 and Crew In relation to such assistance.                                                     476
(ii) The Charterers shall be responsible for and shall reimburse the Owners                    477
for any loss or damage sustained by the Vessel or her equipment by                             478
reason of giving such assistance and shall also pay the Owners'                                479
additional expenses thereby incurred.                                                          480
(iii) The Charterers shall be responsible for any actual or potential spill,                   481
seepage and/or emission of any pollutant howsoever caused occurring                            482
with the offshore site and any pollution resulting therefrom,                                  483
wheresoever It may occur and Including but not limited to the cost of                           484
such measures as are reasonably necessary to prevent or mitigate                               485
pollution damage, and the Charterers shall indemnify the Owners                                486
against any liability, cost or expense arising by reason of such actual or                     487
potential spill, seepage and/or emission.                                                      488
(iv) The Vessel shall not be off-hire as a consequence of giving such                          489
assistance, or effecting repairs under sub-paragraph (ii) of this sub-                         490
clause, and time taken for such repairs shall not count against time                           491
granted under Clause 11 (c).                                                                    492
(v)  The Charterers shall indemnify the Owners against any liability, cost                      493
and/or expense whatsoever in respect of any loss of life, injury, damage                       494
or other loss to person or property howsoever arising from such                                495
assistance.                                                                                    496

**16. Lien**                                                                                   497
~~The Owners shall have a lien upon all cargoes for all claims against the~~                   498
~~Charterers under this Charter Party and the Charterers shall have a lien on the~~            499
~~Vessel for all monies paid in advance and not earned.~~ The Charterers will not              500
suffer, nor permit to be continued, any lien or encumbrance incurred by them                   501
or their agents, which might have priority over the title and interest of the                  502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall                    503
indemnify and hold the Owners harmless against any lien of whatsoever                          504
nature arising upon the Vessel during the Charter Period while she is under                    505
the control of the Charterers, and against any claims against the Owners                        506
arising out of the operation of the Vessel by the Charterers or out of any                     507
neglect of the Charterers in relation to the Vessel or the operation thereof.                  508
Should the Vessel be arrested by reason of claims or liens arising out of her                  509
operation hereunder, unless brought about by the act or neglect of the                         510
Owners, the Charterers shall at their own expense take all reasonable steps to                 511
secure that within a reasonable time the Vessel is released and at their own                   512
expense put up ball to secure release of the Vessel.                                           513

**17. Assignment**    514
(a) Charterers.— The Charterers shall have the option of subletting, assigning    515
or loaning the Vessel to any person or company not competing with the    516
Owners, subject to the Owners' prior approval which shall not be    517
unreasonably, withheld, upon giving notice in writing to the Owners, but the    518
original Charterers shall always remain responsible to the Owners for due    519
~~performance of the Charter Party and contractors of the person or company~~    ~~520~~
~~taking such subletting, assigning or loan shall be deemed contractors of the~~    ~~521~~
~~Charterers for all' the purposes of this Charter Party. The Owners make it a~~    ~~522~~
~~condition of such consent that additional Hire shall be paid as agreed~~    ~~523~~
~~between the Charterers and the Owners having regard to the nature and~~    ~~524~~
~~period of any intended service of the Vessel.~~    ~~525~~
~~(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor~~    ~~526~~
~~handling and/or towing operations connected with equipment, other than that~~    ~~527~~
~~used by the Charterers, then a daily increment to the Hire in the amount as~~    ~~528~~
~~stated in Box 29 or pro rata shall be paid for the period between departure for~~    ~~529~~
~~such operations and return to her normal duties for the Charterers.~~    ~~530~~
(c) Owners.— The Owners may not assign or transfer any part of this Charter    531
Party without the written approval of the Charterers, which approval shall not    532
be unreasonably withheld.    533
Approval by the Charterers of such  assignment shall not relieve    534
the Owners of their responsibility for due performance of the part of the    535
services which is assigned.    536

~~**18. Substitute Vessel**~~    ~~537~~
~~The Owners shall be entitled at any time, whether before delivery or at any~~    ~~538~~
~~other time during the Charter Period, to provide a substitute vessel, subject to~~    ~~539~~
~~the Charterers' prior approval which shall not be unreasonably withheld.~~    ~~540~~

**19. War**    541
(a) Unless the consent of the Owners be first obtained, the Vessel shall not be    542
ordered nor continue to any port or place or on any voyage nor be used on    543
any service which will bring the Vessel within a zone which is dangerous as a    544
result of any actual or threatened act of war, war, hostilities, warlike    545
operations, acts of piracy or of hostility or malicious damage against this or    546
any other vessel or its cargo by any person, body or state whatsoever,    547
revolution, civil war, civil commotion or the operation of international law, nor    548
be exposed in any way to any risk or penalties whatsoever consequent upon    549
the imposition of sanctions, nor carry any goods that may in any way expose    550
her to any risks of seizure, capture, penalties or any other interference of any    551
kind whatsoever by the belligerent or fighting powers or parties or by any    552
government or rulers.    553
(b) Should the Vessel approach or be brought or ordered within such zone, or    554
be exposed in any way to the said risks, (i) the Owners shall be entitled from    555
lime to time to insure their interest in the Vessel for such terms as they deem    556
fit up to its open market value and also in the Hire against any of the risks    557
likely to be involved thereby, and the Charterers shall make a refund on    558
demand of any additional premium thereby incurred, and (ii) notwithstanding    559
the terms of Clause 11 Hire shall be payable for all time lost including any loss    560
owing to loss of or injury to the Master, Officers, Crew or passengers or to    561
refusal by any of them to proceed to such zone or to be exposed to such risks.    562
 (c) In the event of additional insurance premiums being incurred or the wages    563

of the Master and/or Officers and/or Crew and/or the cost of provisions and/   564
or stores for deck and/or engine room being increased by reason of or during   565
the existence of any of the matters mentioned in sub-clause (a) the amount of   566
any additional premium and/or increase shall be added to the Hire, and paid   567
by the Charterers on production of the Owners' account therefor, such   568
account being rendered monthly.   569
(d) The Vessel shall have liberty to comply with any orders or directions as to   570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in   571
any other way whatsoever given by the government of the nation under whose   572
flag the Vessel sails or any other government or any person (or body) acting   573
or purporting to act with the authority of such government or by any   574
committee or person having under the terms of the war risks insurance on the   575
Vessel the right to give any such orders or directions.   576
(e) In the event of the outbreak of war (whether there be a declaration of war or   577
not) ~~between any of the countries stated in Box 30~~ or in the event of the nation   578
under whose flag the Vessel sails becoming involved in war (whether there be   579
a declaration of war or not) either the Owners or the Charterers may terminate   580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the   581
Owners in accordance with PART I if it has cargo on board after discharge   582
thereof at destination or, if debarred under this Clause from reaching or   583
entering it, at a near open and safe port or place as directed by the Owners, or   584
if the Vessel has no cargo on board, at the port or place at which it then is or if   585
at sea at a near, open and safe port or place as directed by the Owners. In all   586
cases Hire shall continue to be paid and, except as aforesaid, all other   587
provisions of this Charter Party shall apply until redelivery.   588
(f) If in compliance with the provisions of this Clause anything is done or is not   589
l done, such shall not be deemed a deviation.   590
The Charterers shall procure that all Bills of Lading (if any) issued under this   591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d)   592
and (f) of this Clause.   593

**20. Excluded Ports**   594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners'   595
written permission (a) any place where fever or epidemics are prevalent or to   596
which the Master, Officers and Crew by law are not bound to follow the Vessel;   597
(b) any ice-bound place or any place where lights, lightships, marks and   598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival   599
or where there is risk that ordinarily the Vessel will not be able on account of   600
ice to reach the place or to get out after having completed her operations. The   601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on   602
account of ice, the Master considers it dangerous to remain at the loading or   603
discharging place for fear of the Vessel being frozen in and/or damaged, he   604
has liberty to sail to a convenient open place and await the Charterers' fresh   605
instructions.   606
(b) Should the Vessel approach or be brought or ordered within such place,   607
or be exposed in any way to the said risks, the Owners shall be entitled from   608
time to time to Insure their interests in the Vessel and/or Hire against any of   609
the risks likely to be involved thereby on such terms as they shall think fit, the   610
Charterers to make a refund to the Owners of the premium on demand.   611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost   612
including any lost owing to loss of or sickness or injury to the Master, Officers,   613
Crew or passengers or to the action of the Crew in refusing to proceed to such   614
place or to be exposed to such risks.   615

**21. General Average and New Jason Clause** 616
General Average shall be adjusted and settled in in London unless otherwise 617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 618
Hire shall not contribute to General Average Should adjustment be made in 619
accordance with the law and practice of the United States of America, the 620
following provision shall apply: 621
"In the event of accident, danger, damage or disaster before or after the 622
commencement of the voyage, resulting from any cause whatsoever, whether 623
due to negligence or not, for which, or for the consequence of which, the 624
Owners are not responsible, by statute, contract or otherwise, the cargo, 625
shippers, consignees or owners of the cargo shall contribute with the Owners 626
in General Average to the payment of any sacrifices, loss or expenses of a 627
General Average nature that may be made or incurred and shall pay salvage 628
and special charges incurred in respect of the cargo. 629
If a salving vessel is owned or operated by the Owners, salvage shall be paid 630
for as fully as if the said salving vessel or vessels belonged to strangers. Such 631
deposit as the Owners, or their agents, may deem sufficient to cover the 632
estimated contribution of the cargo and any salvage and special charges 633
thereon shall, if required, be made by the cargo, shippers, consignees or 634
owners of the cargo to the Owners before delivery". 635

**22. Both-to-Blame Collision Clause** 636
If the Vessel comes into collision with another ship as a result of the 637
negligence of the other ship and any act, neglect or default of the Master, 638
mariner, pilot or the servants of the Owners in the navigation or the 639
management of the Vessel, the Charterers will indemnify the Owners against 640
all loss or liability to the other or non-carrying ship or her owners insofar as 641
such loss or liability represent loss of or damage to, or any claim whatsoever 642
of the owners of any goods carried under this Charter Party paid or payable by 643
the other or non-carrying ship or her owners to the owners of the said goods 644
and set-off, recouped or recovered by the other or non-carrying ship or her 645
owners as part of their claim against the Vessel or the Owners. The foregoing 646
provisions shall also apply where the Owners, operators or those in charge of 647
any ship or ships or objects other than or in addition to the colliding ships or 648
objects are at fault in respect of a collision or contact. 649

**23. Structural Alterations and Additional Equipment** 650
The Charterers shall have the option of, at their expense, making structural 651
alterations to the Vessel or Installing additional equipment with the written 652
consent of the Owners which shall not be unreasonably withheld but unless 653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 654
expense, to her original condition. The Vessel is to remain on hire during any 655
period of these alterations or reinstatement. The Charterers, unless otherwise 656
agreed, shall be responsible for repair and maintenance of any such 657
alteration or additional equipment. 658

**24. Health and Safety** 659
The Owners The Charterers shall comply with and adhere to all applicable international, 660
national and local regulations pertaining to health and safety, and such 661
Owners' Charterers' Instructions as may be appended hereto. 662

**25. Taxes** 663

Each party shall pay taxes due on its own profit, income and personnel. The 664
Charterers shall pay all other taxes and dues arising out of the operation or 665
use of the Vessel during the Charter Period. 666
In the event of change in the Area of Operation or change in local regulation 667
and/or Interpretation thereof, resulting in an unavoidable and documented 668
change of the Owners' tax liability after the date of entering into the Charter 669
Party or the date of commencement of employment, whichever is the earlier, 670
Hire shall be adjusted accordingly. 671

## 26. Early Termination 672
(a) For Charterers' Convenience. — The Charterers may terminate this Charter 673
Party at any time by giving the Owners written notice as stated in Box 15 and 674
by paying the settlement stated in Box 14 and the demobilisation charge 675
stated in Box 16, as well as Hire or other payments due under the Charter 676
Party 677
(b) For Cause.— If either party becomes informed of the occurrence of any 678
event described in this Clause that party shall so notify the other party 679
promptly, in writing and in any case within 3 days after such information is 680
received. If the occurrence has not ceased within 3 days after such 681
notification has been given, this Charter Party may be terminated by either 682
party, without prejudice to any other rights which either party may have, under 683
any of the following circumstances: 684
(i)  Requisition.— If the government of the state of registry and/or the flag of 685
the Vessel, or any agency thereof, requisitions for hire or title or 686
otherwise takes possession of the Vessel during the Charter Period. 687
(ii)  Confiscation.— If any government, individual or group, whether or not 688
purporting to act as a government or on behalf of any government, 689
confiscates, requisitions, expropriates, seizes or otherwise takes 690
possession of the Vessel during the Charter Period. 691
(iii) Bankruptcy.— In the event of an order being made or resolution passed 692
for the winding up, dissolution, liquidation or bankrupcy of either party 693
(otherwise than for the purpose of reconstruction or amalgamation) or if 694
a receiver is appointed or if it suspends payment or ceases to carry on 695
business. 696
(iv) Loss of Vessel.— If the Vessel is lost, actually or constructively, or 697
missing, unless the Owners provide a substitute vessel pursuant to 698
Clause 18. In the case of termination, Hire shall cease from the date the 699
Vessel was lost or, In the event of a constructive total loss, from the date 700
of the, event giving rise to such loss. If the date of loss cannot be 701
ascertained or the Vessel is missing, payment of Hire shall cease from 702
the date the Vessel was last reported. 703
(v)  Breakdown.— If, at any time during the term of this Charter Party, a 704
breakdown of the Owners' equipment or Vessel results in the Owners' 705
being unable to perform their obligations hereunder for a period 706
exceeding that stated in Box 32, unless the Owners provide a substitute 707
vessel pursuant to Clause 18. 708
(vi) Force Majeure.— If a force majeure condition as defined in Clause 27 709
prevails for a period exceeding 15 consecutive days. 710
(vii) Default.— If either party is in repudiatory breach of its obligations 711
hereunder. 712
Termination as a result of any of the above mentioned causes shall not relieve 713
the Charterers of any obligation for Hire and any other payments due. 714

**27. Force Majeure** — 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or — 716
delayer failure In performance hereunder resulting from any force majeure — 717
event. Including but not limited to acts of God, fire, action of the elements, — 718
epidemics, war (declared or undeclared), warlike actions, insurrection, — 719
revolution or civil strife, piracy, civil war or hostile action, strikes or — 720
differences with workmen (except for disputes relating solely to the Owners' — 721
or the Charterers' employees), acts of the public enemy, federal or state laws, — 722
rules and regulations of any governmental authorities having or asserting — 723
jurisdiction in the premises or of any other group, organization or informal — 724
association (whether or not formally recognized as a government), and any — 725
other cause beyond the reasonable control of either party which makes — 726
continuance of operations impossible. — 727

**28. Notices and Invoices** — 728
Notices and invoices required to be given under this Charter Party shall be — 729
given In writing to the addresses stated In Boxes 21, 35 and 36 as appropriate. — 730

**29. Wreck Removal** — 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and — 732
has to be removed upon request by any compulsory law or authority having — 733
jurisdiction over the area where the wreck is placed, the Owners shall be — 734
liable for any and all expenses in connection with the raising, removal, — 735
destruction, lighting or marking of the wreck. — 736

**30. Confidentiality** — 737
All information or data obtained by the Owners in the performance of this — 738
Charter Party is the property of the Charterers, is confidential and shall not be — 739
disclosed without the prior written consent of the Charterers. The Owners — 740
shall use their best efforts to ensure that the Owners, any of their — 741
sub-contractors, and employees and agents thereof shall not disclose any — 742
such information or data. — 743

**31. Law and Arbitration** — 744
*) (a) This Charter Party shall be governed by Norway law and any dispute — 745
arising out of this Charter Party shall be referred to arbitration in Oslo , one — 746
arbitrator being appointed by each party, in accordance with the  Norwegian Arbitration — 747
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for — 748
the time being in force. On the receipt by one party of the nomination in — 749
writing of the other party's arbitrator, that party shall appoint their arbitrator — 750
within 14 days, failling which the arbitrator already appointed shall act as sole — 751
arbitrator. If two arbitrators properly appointed shall not agree they shall — 752
appoint an umpire whose decision shall be final. — 753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute — 754
shall be referred to three persons at New York  Oslo, one to be appointed by each of — 755
the parties hereto, and the third by the two so chosen; their decision or that of — 756
any two of them shall be final, and for purpose of enforcing any award, this — 757
agreement may be made a rule of the Court. The arbitrators shall be members — 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings — 759
shall be conducted in accordance with the rules of the Society. — 760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration — 761
at the place stated in Box 33 subject to the law and procedures applicable — 762
there. — 763
(d) If Box 33 In PART I is not filled in, sub-clause (a) of this Clause shall apply. — 764
*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 — 765

**32. Entire Agreement** — 766
This is the entire agreement of the parties, which supersedes all previous — 767

| | |
|---|---|
| written or oral understandings and which may not be modified except by a | 768 |
| written amendment signed by both parties. | 769 |

**33. Serverability Clause**                                                     770
If any portion of this Charter Party is held to be invalid or unenforceable for   771
any reason by a court or governmental authority of competent jurisdiction,        772
then such portion will be deemed to be stricken and the remainder of this         773
Charter Party shall continue in full force and effect.                            774

**34. Demise**                                                                    775
Nothing herein contained shall be construed as creating a demise of the           776
Vessel to the Charterers.                                                         777

**35. Definitions**                                                               778
"Well" is defined for the purposes of this Charter Party as the time required to  779
drill, test, complete and/or abandon a single borehole including any              780
sidetrack thereof.                                                                781
"Offshore unit" is defined for the purposes of this Charter Party as any vessel,  782
offshore installation, structure and/or mobile unit used in offshore             783
exploration, construction, pipe laying or repair, exploration or production.      784
"Offshore site" is defined for the purposes of this Charter Party as the area     785
within three nautical miles of an "offshore unit" from or to which the Owners     786
are requested to take their Vessel by the Charterers.                             787
"Employees" is defined for the purposes of this Charter Party as employees,       788
directors, officers, servants, agents or invitees.                                789

**36. Headings**                                                                  790
The headings of this Service Contract are for identification only and shall not be 791
deemed to be part of the Charter Party or be taken into consideration in the interpretation 792
or construction of this Charter Party.                                            793

The Owners:                                              The Charterers:

_____                          _____
Oleg S. M...                                              Svein Hoel
Director General                                    Managing Director
FSUE Arktikmorneftegaz...                          North Offshore  AS

ADDITIONAL CLAUSES TO SUPPLYTIME 89 DATED ........ MAY 2007
"ALDOMA"

37.    **Russian crew**

The Owners may require that the Charterers employ Russian crew as provided by the Owners, provided the Owners provide crew with suitable experience and with necessary qualification to comply with any sub charter or other contractual commitment for the Vessel. The crew shall be employed on 4 months on 4 months off basis and Charterers shall pay the crew's replacement costs.

38.    **Bank Guarantee**

Against cancellation of the security provided for the Charterers' obligations under the previous charter agreement between the parties for the Aldoma, the Charterers will provide the Owners with a bank guarantee in Owners' favour in an amount of USD 500,000 as security for Charterers' obligations towards the Owners hereunder.

Oleg
Director
FSUE Arktikmorneftegazrazvedka

Svein Hoel
Managing Director
North Offshore AS

# EXHIBIT 6
# HOEL AFFIRMATION

C4E    MC

**SpareBank 1 Nord-Norge**

Dato 25.07.2007
Sidenr. 1                                        00929987020          Organisasjonsnr. NO 952706365

    003318        4702                              Telefon: 02244
North Offshore AS
Postboks 6155
                                                                 Sparebanken Nord-Norge
9291 TROMSØ                                                          Bm - Troms
                                                                 Postboks 6800
                                                                 9298 TROMSØ

Vår ref. BF07072500083003

D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 7,9660000 |
| Motverdi | NOK | 1.147.104,00 |
| Våre omkostninger | NOK | 355,00 |
| Andre bankers omkostninger | NOK | 791,68 |
| Total beløp debitert | NOK | 1.148.250,68 |

Vi har debitert deres konto nr.                                      4700.05.73678
Valuteringsdato                                                      2007.07.25

Mottaker:                                        Mottakers bankforbindelse:
Kto.40502978700001000039                         MSCJRU21XXX
Arktikmorneftegazrazvedka                        Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1                   12, Prospect Lenina
Russia

                                             183032 Murmansk

Betalingen gjelder:                              Overført gjennom:
Inv.no 0777                                       Ing Belgium Sa/nv
                                              60, Cours St Michel
                                              1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
29 CHARTER-HIRE

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S    DISPLAY OF SWIFTMESSAGE                    08.02.29 11:53 NG07
                                                      4729    D701534   D-03
--------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE : 103    DATE    :  25.07.2007-09:52
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS  :  ACK ProSwitch
--------------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0707250008301A                      71A OUR
23B CRED
32A 070725EUR144000,
33B EUR144000,
50K /NO7447000573678
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A //RT
    MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.NO 0777

TRAN : _____ _      KEY   : _____
```

C2E   MC

## SpareBank 1 Nord-Norge

Dato 15.08.2007
Sidenr. 1                          00929987020        Organisasjonsnr. NO 952706365

Telefon: 02244
004394          4702
North Offshore AS
Postboks 6155                                        Sparebanken Nord-Norge
                                                     Bm - Troms
9291 TROMSØ                                          Postboks 6800
                                                     9298 TROMSØ


Vår ref. BF07081500058003


D E B E T O P P G A V E

| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
|---|---|---|
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,3540401 |
| Motverdi | USD | 201.481,17 |
| Våre omkostninger | USD | 9,35 |
| Andre bankers omkostninger | USD | 122,33 |
| Total beløp debitert | USD | 201.612,85 |

Vi har debitert deres konto nr.                                    4729.01.10455
Valuteringsdato                                                    2007.08.15


Mottaker:                                   Mottakers bankforbindelse:
Kto.40502978700001000039                    MSCJRU21XXX
Arktikmorneftegazrazvedka                   Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1              12, Prospect Lenina
Russia

                                            183032 Murmansk


Betalingen gjelder:                         Overført gjennom:
Inv.: 0899                                  Ing Belgium Sa/nv
                                            60, Cours St Michel
                                            1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.


DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S     DISPLAY OF SWIFTMESSAGE                    08.02.29 11:54 NG07
                                                      4729    D701534   D-03
------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103    DATE    :   15.08.2007-11:30
RECEIVER :   BBRUBEBBXXX   (SWIFT)          STATUS  :   ACK ProSwitch
------------------------------------------------------------------------------
SWIFT MESSAGE                                                PAGE: 001 : 001
20  BF0708150005803A
23B CRED
32A 070817EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 0899
71A OUR

TRAN : ____ _        KEY    : _____
```

C2E    MC

**SpareBank 1 Nord-Norge**

Dato 18.09.2007
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

005050        4702
North Offshore AS
Postboks 6155

9291 TROMSØ

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07091700056003

# D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,3946275 |
| Motverdi | USD | 207.520,57 |
| Våre omkostninger | USD | 9,73 |
| Andre bankers omkostninger | USD | 124,93 |
| Total beløp debitert | USD | 207.655,23 |

Vi har debitert deres konto nr.                                      4729.01.10455
Valuteringsdato                                                             2007.09.17

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv: 1029

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
29 LEIE SKIP

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S     DISPLAY OF SWIFTMESSAGE                    08.02.29 11:54 NG07
                                                      4729     D701534   D-03
--------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE : 103    DATE    :  17.09.2007-09:50
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS  :  ACK ProSwitch
--------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0709170005603A
23B CRED
32A 070919EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV: 1029
71A OUR

TRAN : _____ _         KEY    : _____
```

OIE    MC

**SpareBank 1 Nord-Norge**

Dato 19.10.2007
Sidenr. 1

00929987020    Organisasjonsnr. NO 952706365

4702    Telefon: 02244

North Offshore AS
Postboks 6155    Sparebanken Nord-Norge
Bm - Troms
9291 TROMSØ    Postboks 6800
9298 TROMSØ

Vår ref. BF07101900265003

D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 1,4370733 |
| Motverdi | USD | 206.938,56 |
| Våre omkostninger | USD | 10,23 |
| Andre bankers omkostninger | USD | 128,71 |
| Total beløp debitert | USD | 207.077,50 |

Vi har debitert deres konto nr.    4729.01.10455
Valuteringsdato    2007.10.19

Mottaker:    Mottakers bankforbindelse:
Kto.40502978700001000039    MSCJRU21XXX
Arktikmorneftegazrazvedka    Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1    12, Prospect Lenina
Russia

183032 Murmansk

Betalingen gjelder:    Overført gjennom:
Inv.: 1137    Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

12201

```
RESL S    DISPLAY OF SWIFTMESSAGE                    08.02.29 11:55 NG07
                                                     4729    D701534  D-03
------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE : 103    DATE   :  19.10.2007-12:47
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS :  ACK ProSwitch
------------------------------------------------------------------------
SWIFT MESSAGE                                            PAGE: 001 : 001
20  BP0710190026503A
23B CRED
32A 071023EUR144000,
33B EUR144000,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1137
71A OUR

TRAN : _____ __        KEY   : _____
```



C4E    MC

**SpareBank 1 Nord-Norge**

Dato 14.11.2007
Sidenr. 1                          00929987020    Organisasjonsnr. NO 952706365

003943        4702
North Offshore AS                              Telefon: 02244
Postboks 6155
                                               Sparebanken Nord-Norge
9291 TROMSØ                                     Bm - Troms
                                               Postboks 6800
                                               9298 TROMSØ

Vår ref. BF07111400229003

D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,4771381 |
| Motverdi | USD | 219.798,15 |
| Våre omkostninger | USD | 10,18 |
| Andre bankers omkostninger | USD | 131,86 |
| Total beløp debitert | USD | 219.940,19 |

Vi har debitert deres konto nr.                 4729.01.10455
Valuteringsdato                                 2007.11.14

Mottaker:                               Mottakers bankforbindelse:
Kto.40502978700001000039                MSCJRU21XXX
Arktikmorneftegazrazvedka               Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1          12, Prospect Lenina
Russia
                                        183032 Murmansk

Betalingen gjelder:                     Overført gjennom:
Inv.: 1255                              Ing Belgium Sa/nv
                                        60, Cours St Michel
                                        1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S     DISPLAY OF SWIFTMESSAGE                    08.02.29 11:56 NG07
                                                      4729     D701534   D-03
--------------------------------------------------------------------------
SENDER   :  SNOWNO22XXX   M-TYPE  :  103   DATE    :  14.11.2007-13:37
RECEIVER :  BBRUBEBBXXX   (SWIFT)         STATUS  :  ACK ProSwitch
--------------------------------------------------------------------------
SWIFT MESSAGE                                             PAGE: 001 : 001
20  BF0711140022903A
23B CRED
32A 071116EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1255
71A OUR

TRAN : ____ _        KEY    :  _____
```

O4E    MC

# SpareBank 1 Nord-Norge

Dato 13.12.2007
Sidenr. 1

00929987020    Organisasjonsnr. NO 952706365

4702    Telefon: 02244

North Offshore AS
Postboks 6155

Sparebanken Nord-Norge
9291 TROMSØ
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07121300254005

## D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 1,4781571 |
| Motverdi | USD | 212.854,62 |
| Våre omkostninger | USD | 10,17 |
| Andre bankers omkostninger | USD | 58,92 |
| Total beløp debitert | USD | 212.923,71 |

Vi har debitert deres konto nr.                                4729.01.10455
Valuteringsdato                                                      2007.12.13

Mottaker:                                         Mottakers bankforbindelse:
Kto.40502978700001000039              MSCJRU21XXX
Arktikmorneftegazrazvedka              Murmansk Social Commercial Bank Jsc
183032 Murmansk, Kolsky Pr.1           12, Prospect Lenina
                                                      183032 Murmansk

Betalingen gjelder:                             Overført gjennom:
Inv.: 1370                                          Ing Belgium Sa/nv
                                                      60, Cours St Michel
                                                      1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

39

```
RESL S    DISPLAY OF SWIFTMESSAGE                    08.02.29 11:57 NG07
                                                     4729    D701534   D-03
--------------------------------------------------------------------------
SENDER   :  SNOWNO22XXX   M-TYPE :  103    DATE    :  13.12.2007-12:26
RECEIVER :  DEUTDEFFXXX   (SWIFT)          STATUS  :  ACK ProSwitch
--------------------------------------------------------------------------
SWIFT MESSAGE                                        PAGE: 001 : 001
20  BF0712130025405A
23B CRED
32A 071217EUR144000,
33B EUR144000,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
53A BBRUBEBBXXX
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032 MURMANSK, KOLSKY PR.1
70  INV.: 1370
71A OUR

TRAN : ____ _        KEY  : _____
```

CSE   MC

**SpareBank 1 Nord-Norge**

Dato 15.01.2008
Sidenr. 1

00929987020                    Organisasjonsnr. NO 952706365

006015       4702              Telefon: 02244
North Offshore AS
Postboks 6155                  Sparebanken Nord-Norge
                               Bm - Troms
9291 TROMSØ                    Postboks 6800
                               9298 TROMSØ

Vår ref. BF08011500104003

D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,4960149 |
| Motverdi | USD | 222.607,02 |
| Våre omkostninger | USD | 10,45 |
| Andre bankers omkostninger | USD | 133,83 |
| Total beløp debitert | USD | 222.751,30 |

Vi har debitert deres konto nr.                              4729.01.10455
Valuteringsdato                                              2008.01.15

Mottaker:                              Mottakers bankforbindelse:
Kto.40502978700001000039               MSCIRU21XXX
Arktikmorneftegazrazvedka              Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1         12, Prospect Lenina
Russia
                                       183032 Murmansk

Betalingen gjelder:                    Overført gjennom:
Inv.: 1464                             Ing Belgium Sa/nv
                                       60, Cours St Michel
                                       1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

9403

```
RESL S     DISPLAY OF SWIFTMESSAGE                    08.02.29 11:57 NG07
                                                      4729     D701534   D-03
----------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE : 103    DATE     :   15.01.2008-12:03
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS   :   ACK ProSwitch
----------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0801150010403A
23B CRED
32A 080117EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1464
71A OUR

TRAN : ____ _         KEY    : _____
```

O4E    MC

**SpareBank 1 Nord-Norge**

Dato 15.02.2008
Sidenr. 1

00929987020

4702

North Offshore AS
Postboks 6155

9291 TROMSØ

Organisasjonsnr. NO 952706365

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF08021500182003

## DEBETOPPGAVE

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | . | 1,4744227 |
| Motverdi | USD | 219.394,10 |
| Våre omkostninger | USD | 10,16 |
| Andre bankers omkostninger | USD | 161,07 |
| Total beløp debitert | USD | 219.565,33 |

| | |
|---|---:|
| Vi har debitert deres konto nr. | 4729.01.10455 |
| Valuteringsdato | 2008.02.15 |

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.: 0072

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

10567

```
RESL S     DISPLAY OF SWIFTMESSAGE                      08.02.29 11:58 NG07
                                                        4729    D701534   D-03
--------------------------------------------------------------------------------
SENDER   :  SNOWNO22XXX   M-TYPE  :  103    DATE    :  15.02.2008-12:21
RECEIVER :  BBRUBEBBXXX   (SWIFT)          STATUS  :  ACK ProSwitch
--------------------------------------------------------------------------------
SWIFT MESSAGE                                           PAGE: 001 : 001
20  BF0802150018203A                    71A OUR
23B CRED
32A 080219EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
56A DNBANOKKXXX
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 0072

TRAN : ____ _        KEY    : _____
```

# EXHIBIT 7
# HOEL AFFIRMATION

**FREE TRANSLATION – BOTTOM OF WIRE PAYMENT STATEMENTS**

Information to the foreign currency register in the Norwegian Customs Department confirming that the funds transfer is charter-hire.

From 1/1-2007 it is mandatory with IBAN and BIC on transfers of EURO to receivers within the area of the European Union.  Transfers without IBAN and BIC will be rejected.

This confirmation is valid without a signature.

# EXHIBIT 2  TO FREVOLA AFFIDAVIT IN SUPPORT OF MOTION TO VACATE

*Courtesy Copy*

BLANK ROME, LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5149

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLV BERG DRIVE AS,<br><br>               Plaintiff,<br><br>    - against -<br><br>NORTH OFFSHORE AS and TROMS OFFSHORE AS,<br><br>               Defendants. | 07 Civ. 11502 (OA)<br><br>**VERIFIED COMPLAINT** |

Plaintiff ROLV BERG DRIVE AS ("RBD"), by its attorneys Blank Rome, LLP, complaining of the above-named Defendants NORTH OFFSHORE AS ("NOA") and TROMS OFFSHORE AS ("TOAS"), alleges upon information and belief as follows:

1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction.

2.     At all material times, RBD was and now is a foreign company organized and existing under the laws of Norway.

128127.00601/6595711v.3

## IDENTITY OF DEFENDANTS

3.    Defendant NOA is the 100% owner of the shares of three subsidiaries: (1) North Brokers and Agency AS, (2) Troms Offshore MPSV AS and (3) TOAS.

4.    At all material times, defendant NOA was and now is a corporation organized and existing under the laws of Norway.

5.    TOAS is also a Norwegian company and 100% owned by NOA.

## THE BASIC FACTS

### (2)    THE PRIOR ACTION

6.    NOA filed a Rule B action in the Court against RBD, as defendant (07 CIV 3095 (SHS)), by complaint dated April 17, 2007 (the "Related Rule B Action").

7.    NOA defended against RBD's claim for Supplemental Rule E counter-security in that action on the basis that RBD's claims under a side letter agreement dated March 5, 2005 (the "Side Letter") which is the basis for this action, arose from a "separate transaction or occurrence" to the claim asserted under the charter for the Vessel on which NOA sued.

8.    RBD's Rule E counter-security request was denied by Order dated November 5, 2007, as discussed in the accompanying memorandum of law.

## THE NORWEGIAN PROCEEDINGS

9.    Pursuant to the Side Letter, RBD agreed to the charter of an ocean-going vessel "AHTS ALDOMA" (the "Vessel" or "ALDOMA").

10.    The claims arising under a Side Letter agreement are maritime and, pursuant to a "writ" dated November 7, 2007, have been filed in the Nord-Troms County Court in Norway.

11.    A true copy of the Norwegian Pleadings is Exhibit 2 to the accompanying declaration of Olav Vikoren.  (Exhibit E to the Harwood Declaration)  A "free" and accurate translation of the Norwegian portion of the Norwegian Pleadings into English is Exhibit 3 thereto.

## THE CHARTER OF THE VESSEL

12.    Arktikmorneftegazrazvedka of Murmansk, Russia ("AMNGR") is the registered owner of the Vessel.

13.    In an email attached as Exhibit 1 to the affirmation of AMNGR's director general, Oleg S. Mnatsakanyan, dated October 1, 2007, filed in the Related Rule B Action (07 Civ. 3095), AMNGR's lawyers confirmed that a charter between AMNGR, as owner of the Vessel, and NOA, as charterer, does not expire until 2009.  Vikoren Dec. Ex. 7 (Id., ¶ 7):

> Artik [AMNGR] has concluded a C/P with NO [North Offshore] for a period up to 5th May 2009, including two options on [sic] one year each.

Id., Ex. 3.

14.    TOAS's website pages records that TOAS is presently "operating" the Vessel, under charter form her Russian owners. Id., Ex. 8.

15.    To the extent that hire payments are being remitted to AMNGR by any of North Offshore's subsidiaries, including but not limited to its subsidiary listed as

"operator" of the Vessel, then such payments are in respect of hire obligations by and between North Offshore and AMNGR in respect of the new charter and represent monies belonging to North Offshore being siphoned through the subsidiaries.

16.    Upon information and belief, Defendant TOAS is a shell corporation through which NOA conducts the charter business of the Vessel.

17.    Upon information and belief, Defendant TOAS acts as paying agent or receiving agent for hire and sub-hire payments for the Vessel or arranges for non-parties to satisfy the debts and obligations of Defendant NOA and/or receive payments being made to defendant NOA.

18.    Upon information and belief, Defendant NOA uses Defendant TOAS as a "pass through" entity in order to insulate itself from charters relating to its commercial obligations.

19.    AMNGR's lawyers have confirmed that NOA is the present charterer of the Vessel and the Hoel Declaration dated October 1, 2007 in the Related Rule B Action identifies hire payments it is making to AMNGR for the Vessel as "bareboat" charter hire.  Harwood Dec. Ex. E, Vikoren Dec. Ex. 6, ¶ 23.

20.    Hire payments being collected by TOAS and paid to AMNGR as operator belong to NOA.

## COUNT I

### RULE B RELIEF

21.    Plaintiff repeats paragraphs 1 through 20 as if fully set forth herein.

22.    Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims in the Norwegian Proceeding including its Norwegian attorneys' fees and costs which are routinely awarded in Norwegian proceedings and no security for Plaintiff's claim has been posted by NOA or TOAS or anyone acting on their behalf to date.

23.    At best as can now be estimated, Plaintiff expects to recover the following amounts in the Norwegian Proceeding:

| | | |
|---|---|---|
| A. | On the principal claim | $12,592,500 |
| B. | On the performance bond | $    442,150 |
| C. | Estimated Recoverable Lawyers and Arbitrators' Fees & "Costs" | $    60,000 |
| | **TOTAL:** | **$13,094,650** |

24.    Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Defendants cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime

Attachment and Garnishment pursuant to Rule B attaching all of Defendants' tangible or intangible property or any other funds held by any garnishee properly served with the process of maritime attachment and garnishment in this district, which are due and owing to Defendants up to the amount of $13,094,650 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

      C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

      D.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
      December 21, 2007

                        Respectfully submitted,
                        BLANK ROME, LLP
                        Attorneys for Plaintiff

                        By _____
                        Jeremy J.O. Harwood (JH 9012)
                        405 Lexington Avenue
                        New York, NY 10174
                        Tel.: (212) 885-5000

## **VERIFICATION**

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Blank Rome, LLP, attorneys for Plaintiff.

2.    I have read the foregoing Complaint and I believe the contents thereof are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

*Jeremy Harwood*
Jeremy J.O. Harwood

Sworn to before me this
21st day of December 2007

*[signature]*
Notary Public

**LEROY LAMBERT**
Notary Public, State of New York
No. 31-4970459
Qualified in New York County
Commission Expires November 27, 20*10*

128127.00601/6595711v.3                          7

# EXHIBIT 3  TO FREVOLA AFFIDAVIT IN SUPPORT OF MOTION TO VACATE

BLANK ROME LLP
Attorneys for Defendant
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORTH OFFSHORE AS,

         Plaintiff,

   - against -

ROLV BERG DRIVE AS,

         Defendant.

07 CV 3095 (SHS)

---

## VERIFIED ANSWER AND COUNTERCLAIM UNDER ADMIRALTY RULE E(7) OF SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS AND ASSET FORFEITURE CLAIMS OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendant ROLV BERG DRIVE AS ("RBD") answers the Rule B complaint of NORTH OFFSHORE AS ("NO" or "Plaintiff") and states as follows upon information and belief:

    1.    Admits the allegations in Paragraph 1 of the Complaint.

    2.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint.

    3.    Admits the allegations in Paragraph 3 of the Complaint.

4.     Admits the allegations in Paragraph 4 of the Complaint.

5.     Admits the allegations in Paragraph 5 of the Complaint.

6.     Admits the allegations in Paragraph 6 of the Complaint.

7.     Admits the allegations in Paragraph 7 of the Complaint.

8.     Admits the allegations in Paragraph 8 of the Complaint.

9.     Paragraph 9 of the Complaint is a legal conclusion that Defendant is not obliged to answer or deny but admits that an arbitration award dated on or about September 1, 2006 was published in Plaintiff's favor.

10.    Paragraph 10 is a legal conclusion that Defendant is not obliged to answer or deny but refers to the award dated on or about September 1, 2006 for its contents.

11.    Paragraph 11 is a legal conclusion that Defendant is not obliged to answer or deny but admits that an award dated on or about April 13, 2007 was published in Plaintiff's favor.

12.    Paragraph 12 contains legal conclusion which Defendant is not obliged to answer but, as to alleged interest calculations such allegations are denied.

13.    Denies knowledge or information sufficient to form a belief as to the allegations in ¶ 13.

14.    Admits the allegations in Paragraph 14 of the Complaint.

15.    Denies the allegations in Paragraph 15 of the Complaint.

16.    Paragraph 16 contains legal conclusions that Defendant is not obliged to answer or deny.

-2-

17.    Paragraph 17 contains legal conclusions that Defendant is not obliged to answer or deny.

## AFFIRMATIVE DEFENSES

### FIRST

1.    The Court lacks personal jurisdiction over Defendant which is specifically not waived by an appearance herein pursuant to Supplemental Rule E(8).

### SECOND

2.    The Complaint fails to state a cause of action upon which relief may be granted.

### THIRD

3.    The Complaint must be stayed or dismissed under 9 U.S.C. § 1 et seq. and §§ 201, et seq. in favor of the pending Arbitration.

## AS AND FOR A COUNTERCLAIM UNDER SUPPLEMENTAL RULE E(7)

4.    RBD entered into a charter party agreement (the "Charter") with North Offshore as referenced in paragraph 4 of the Verified Complaint.

5.    As Plaintiff alleges in paragraph 7 of the Verified Complaint Plaintiff has commenced an arbitration in Norway (the "Arbitration").

6.    RBD has nominated an arbitrator in the Arbitration and makes this application for security on its counterclaim strictly without prejudice to the Arbitration.

7.    RBD has a monetary claim in a sum as presently may be determined of at least $14 million issuing from the wrongful refusal to renew the Charter.

-3-

900200.00001/6569815v.1

8.   RBD is also entitled to an award of interest and legal fees and costs in the Arbitration which it calculates as follows:

|  |  |  |
|---|---|---|
| A. | Principal Claim: | $13,505,000 |
| B. | 3 years interest at 6% p.a.: | $ 2,430,900 |
| C. | Attorneys' and arbitrators' fees and costs: | $    300,000 |
|  | TOTAL | $16,235,900 |

9.   RBD is therefore entitled to counter-security pursuant to Supplemental Rule E(7) in the sum of at least $16,235,900.

10.   RBD reserves its rights to alter and amend its counterclaims to seek further and additional security from Plaintiff and others that may be liable.

11.   Under the terms of the Charter RBD had an option for an extension of the Charter upon its expiry, which it exercised.

12.   RBD, in turn, entered into a new contract with its previous sub-charterer Oil & Natural Gas Corp. ("ONGC") in respect of which it intended to use the vessel under the extended Charter.

13.   Plaintiff repudiated RBD's exercise of its renewal option and renewal of the Charter in breach of the Charter.

14.   Plaintiff's breach caused RBD damages including but not limited to the difference between rates upon which RBD would have "Sub-let" the vessel under the renewed Charter to ONGC of $7,400 per day over the five year back-to-back term or approximately $13,505,000.

-4-

15.     North Offshore has failed to pay bunker invoices in the sum of $157,844 for which RBD may be held liable.

16.     In addition, ONGC has made a claim on RBD's performance bond in the sum of $442,150, in respect of which RBD reserves its right to seek further security.

WHEREFORE RBD respectfully prays that an order be entered directing Plaintiff post countersecurity in a form acceptable to the Court in the sum of $16,235,900, or such other amount as the Court may determine pursuant to Supplemental Rule E(7) and provide such other relief, as may be fair and equitable.

Date: New York, New York
         August 27, 2007

Respectfully submitted,

BLANK ROME LLP

By: _____
    Jeremy J.O. Harwood
    405 Lexington Avenue
    New York, New York 10174
    (212) 885-5000

*Attorneys for Defendant*

-5-

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF NEW YORK )

## <u>VERIFICATION</u>

JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

1.      That he is a member of the firm of Blank Rome LLP attorneys for the defendant ROLV BERG DRIVE AS herein; that he has read the foregoing Answer and Counterclaim and knows the contents thereof and that the same is true to the best of his knowledge, information and belief.

2.      That the reason this verification is made by deponent and not by RBD is that RBD is a corporation, no officers or directors of which are now within this district.

3.      The sources of deponent's information and the grounds for his belief are statements made by and documents received from Owner's representatives.



JEREMY J.O. HARWOOD

Sworn to before me this
27th day of August, 2007

_____
Notary Public

NEAL MITCHELL
Notary Public, State of New York
No. 01MI6118208
Qualified in New York County
Commission Expires Aug. 16, 20__

-6-

900200.00001/6569815v.1

# EXHIBIT 4  TO FREVOLA AFFIDAVIT IN SUPPORT OF MOTION TO VACATE

Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANTS
NORTH OFFSHORE AS and TROMS OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROLV BERG DRIVE AS,

        Plaintiff,

        -against-

NORTH OFFSHORE AS and TROMS
OFFSHORE AS,

        Defendants.

07 Civ. 11502 (SHS)

**AFFIRMATION OF
GEORG SCHEEL
PURSUANT TO 28 U.S.C. § 1746**

---

I, Georg Scheel, declare under penalty of perjury, that the following is true and correct:

1.    I am an attorney with Nordisk Legal Services, the litigation department of Nordisk Skibsrederforening (the "Northern Shipowners' Defense Club"), of which I am also the Managing Director. I graduated in law at the University of Oslo in 1974. I was engaged as an assistant professor at the Scandinavian Institute of Maritime Law in Oslo from 1973 until 1975, when I joined the Office of the Attorney General of Norway. I was admitted to the Bar of the Supreme Court of Norway in 1977. I am experienced as an advocate handling litigation in the Norwegian Courts and arbitration before arbitration panels in Oslo, London and New York.

2.      I am familiar with the circumstances surrounding this dispute in the Norwegian arbitration and Norwegian lawsuit presently pending between North Offshore AS ("North Offshore") and Rolv Berg Drive AS ("RBD") concerning the claims at issue in this proceeding and the related proceeding pending before this Court entitled *North Offshore AS v. Rolv Berg Drive AS*, Civ. No. 07 CV 3095 (SHS). In this proceeding, I understand that Plaintiff RBD claims against both Defendant North Offshore and Defendant Troms Offshore AS ("Troms Offshore") for a purported breach of a "side letter agreement" dated March 5, 2004 (the "Side Letter"), on which Side Letter Troms Offshore neither is named nor is a signatory.

3.      I submit this Affirmation in support of the motion by Defendant Troms Offshore to dismiss RBD's claims against Troms Offshore on grounds that RBD fails to state a claim against Troms Offshore upon which this Court may grant RBD relief.

4.      I have reviewed the Verified Complaint filed by RBD dated December 21, 2007, which names Troms Offshore as a defendant. That Verified Complaint contains, in total, the following allegations regarding Troms Offshore:

- "Defendant [North Offshore AS] is the 100% owner of the shares of three subsidiaries [including Troms Offshore]." Verified Complaint, ¶ 3.

- "[Troms Offshore] is also a Norwegian company and 100% owned by [North Offshore AS]." Verified Complaint, ¶ 5.

- "[Troms Offshore]'s website pages records [*sic*] that [Troms Offshore] is presently 'operating' the Vessel, under charter form [*sic*] her Russian owners." Verified Complaint, ¶ 14.

2

- "Upon information and belief, Defendant [Troms Offshore] is a shell corporation through which [North Offshore] conducts the charter business of the Vessel." Verified Complaint, ¶ 16.

- Upon information and belief, Defendant [Troms Offshore] acts as paying agent or receiving agent for hire and sub-hire payments for the Vessel or arranges for non-parties to satisfy the debts and obligations of Defendant [North Offshore] and/or receive payments being made to defendant [North Offshore]." Verified Complaint, ¶ 17.

- Upon information and belief, Defendant [North Offshore] uses Defendant [Troms Offshore] as a 'pass through' entity in order to insulate itself from charters relating to its commercial obligations." Verified Complaint, ¶ 18.

- Hire payments being collected by [Troms Offshore] and paid to [the Vessel's owner] as operator belong to [North Offshore]." Verified Complaint, ¶ 20.

5.      For the purposes of this opinion, I have been asked to assume *arguendo* that the foregoing allegations made by Plaintiff RBD can be proven. I have also been asked to provide my opinion, under Norwegian law, whether these allegations, if proven, would result in Troms Offshore being found liable for North Offshore AS's actions in any manner, including but not limited to theories of corporate veil-piercing or alter ego liability. For the reasons set forth below, Plaintiff RBD, under Norwegian law, could not recover against Troms Offshore under any theory based on the allegations set forth in RBD's Verified Complaint.

6.      Under Norwegian law, there are very limited instances in which a plaintiff may impute liability of a principal defendant against another party through theories such as

3

piercing the corporate veil or alter ego. As an example, I would refer to a decision handed down by the Norwegian Supreme court in 1994 (made publicly available in Rt. 1994 page 1002, and attached hereto as Appendix I). In that case, an individual who was the sole shareholder of the company as well as the Chairman of the Board and the President of the company was prosecuted for embezzlement against the company, based on the fact that he had emptied the company of assets. The relevant section of the Norwegian Criminal Code directs itself against persons who neglect "another person's" (whether being an individual or a legal person) affairs or business which he is administering or supervising. The defendant submitted that the company could not be regarded as "another person", since he himself was the owner of all the shares and was also running the company. In the Norwegian Supreme Court there was consensus that this defense could not succeed. Two of the judges limited themselves to citing a precedent – Rt. 1993 page 513, according to which the Supreme Court found that a choice of business organization had to be respected, and that the real owners (the shareholders) were not at liberty to disregard the corporate structure (at page 518). The three other judges stated that the conclusion reached was supported by good reasons:

> "The supreme court has in other circumstances also found that when a business person chooses to organize his activities using the corporate form, then the company will be considered an independent legal activity, and the company's assets will be considered separate assets which the shareholders cannot dispose of for their own purposes other than as provided for by the law. I believe it will lead to the best systematic result also in relation to the Criminal Code provisions protecting the assets of third parties if one considers the company distinct from it's shareholders."

4

7.    I would like to emphasize that I am not aware of any Norwegian case where a subsidiary company has been held liable for debts incurred by a parent company. The limited circumstances in which a claim based on piercing the corporate veil could succeed under Norwegian law is if a number of the following circumstances are present:

- in circumstances where a company does not run a separate business, i.e. to the effect that the company does not have separate accounts, assets and/or is properly registered at the Norwegian Registry of Business Enterprises;

- where the Board of Directors do not hold Board meetings separate from the Board meetings of another entity;

- where the company does not hold an annual general meeting separate from annual general meetings of other entities;

- where the owners themselves do not treat the company in question as a separate entity;

- where the company does not have its own business clients.

8.    As Plaintiff RBD relates in the Verified Complaint at paragraphs 10 and 11, RBD has commenced a claim against Defendant North Offshore in Norway based on the Side Letter. RBD, however, fail to state that RBD has not commenced claims in Norway against Troms Offshore.

9.    Under Norwegian procedural law, a party is entitled to its attorneys' fees and expenses against its opponent if that party prevails against the opponent.

10.    In my opinion, based on the allegations made by RBD in the Verified Complaint, a similar claim brought by RBD in the Norwegian court system would result in

RBD's claim against Troms Offshore being dismissed with the court awarding attorneys' fees and expenses to Troms Offshore.

11.    For the reasons set forth above, I am confident in my opinion, that, under Norwegian law, Plaintiff RBD could not establish liability against Defendant Troms Offshore based on a theory of corporate veil-piercing or alter ego.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of February, 2008 in Oslo, Norway.

Georg Scheel

6

# APPENDIX I
# SCHEEL AFFIRMATION

# HR-1994-00096 - Rt-1994-1002 (316-94)

| | |
|---|---|
| INSTANS: | Høyesterett - Dom. |
| DATO: | 1994-08-30 |
| PUBLISERT: | HR-1994-00096 - Rt-1994-1002 (316-94) |
| STIKKORD: | Økonomisk utroskap m.v. Lovanvendelse. Straffutmåling. |
| SAMMENDRAG: | 59-årig, tidligere ustraffet mann ble idømt åtte måneder fengsel hvorav 45 dager ubetinget, for overtredelse av straffeloven §276, jfr. §275, og §276, første ledd jfr. annet ledd og overtredelse av andre bestemmelser. Utroskap var skjedd i forhold til et aksjeselskap hvor han selv eide alle aksjene og var styreformann og daglig leder. Han hadde ved kontantuttak og ved å ha belastet selskapet for privatutgifter tilegnet seg til sammen kr. 257.000,- av selskapets midler. Spørsmål om forholdet kunne anses for underslag. Særbemerkninger fra to dommere. |
| SAKSGANG: | Høyesterett HR-1994-00096 B, snr 59/1994. |
| PARTER: | Påtalemyndigheten (Aktor: statsadvokat Harald Strand) mot A (Forsvarer: advokat Ole Jakob Bae). |
| FORFATTER: | Bugge, Halvorsen, Aarbakke - Mindretall: Gussgard, Skåre. |

Nedre Romerike herredsrett avsa 29 november 1993 dom med denne domsslutning:

"1. A, f. *.*.35, dømmes for overtredelse av straffeloven §276, jfr. §275, straffeloven §275 første ledd, jfr. annet ledd, straffeloven §286, 2. straffalternativ, jfr. §288, straffeloven §183, straffeloven §182, ligningsloven §12-1 nr. 1, merverdiavgiftsloven §72 nr. 2 annet ledd, jfr. første ledd, jfr. nr. 3, alt sammenholdt med straffeloven §62, til en straff av fengsel i åtte - 8 - måneder hvorav nitti - 90 - dager gjøres ubetinget og resten betinget med en prøvetid på to - 2 - år, jfr. straffeloven §52.

2. A frifinnes for tiltalens post VIIa."

Saksforholdet og domfeltes personlige forhold fremgår av domsgrunnene.

Dommen er påanket av domfelte. Anken gjelder lovanvendelsen for så vidt han er dømt for utroskap, straffeloven §275, og dessuten straffutmålingen, som hevdes å være for streng. Jeg behandler lovanvendelsesanken først.

Herredsretten har lagt til grunn at domfelte i august 1988 stiftet et aksjeselskap, X A/S, med en aksjekapital på kr 51000. Alle aksjene eides av domfelte, som var selskapets styreformann og daglige leder. Virksomheten var mottak av fyllmasse fra forskjellige anleggsplasser og
**Side 1003**
levering av massene til et gårdsbruk for planering. Virksomheten opphørte i det vesentlige i september 1989. I oktober 1991 ble selskapet slått konkurs. Bobehandlingen måtte innstilles etter konkursloven §135.

Domfelte er overensstemmende med tiltalens post I og II blitt kjent skyldig i utroskap ved å ha tilegnet seg ved kontantuttak og ved å belaste selskapet for privatutgifter, til sammen ca kr 257000 av selskapets midler. To av enkeltforholdene er henført under §276 som grov utroskap. Herredsretten har i domsgrunnene tatt opp til vurdering spørsmålet om tiltalte kunne dømmes for utroskap når han selv var eier av alle aksjene i X A/S. Retten har under henvisning til Rt-1993-513 funnet at utroskapsbestemmelsen kan anvendes også i et slikt tilfelle.

Domfelte angriper rettsanvendelsen på dette punkt og anfører i ankeerklæringen:

"Utroskap etter straffeloven §275 forutsetter at den skyldige handler mot prinsipalens tarv. A var styreformann, daglig leder og eneeier av aksjene i X A/S. Det er således ikke tale om andre medeiere

i selskapet og As disposisjoner var helt og fullt foretatt i samsvar med prinsipalens interesser. Avgjørelsen det er vist til i herredsrettens dom på side 7, Rt-1993-513 og side 518, avviker fra nærværende sak ved at det der var tale om flere medeiere i de berørte selskapene. A var eneeier og kunne ikke være utro mot seg selv.

Selskapets kreditorer er beskyttet ved andre regler enn utroskapsbestemmelsen i straffeloven §275. Det formelle forhold ved at X

A/S var et selvstendig rettssubjekt, kan ikke være avgjørende så lenge det ikke var noen "annens tarv" det kunne handles imot.

Til støtte for dette viser jeg til Johs. Andenæs Formuesforbrytelsene (5. utg.), 135, ..."

Jeg er kommet til at anken her ikke fører frem. Spørsmålet om en aksjonær kan dømmes for utroskap i forhold til et gyldig etablert aksjeselskap hvor han innehar samtlige aksjer - om han da ved handlinger rettet mot selskapet kan sies å ha forsømt "en annens" anliggender eller handlet mot "den annens" tarv - er som herredsretten nevner drøftet av Andenæs i Formuesforbrytelsene (utg 1992 135) og av Stordrange i Den norske Advokatforenings småskrift nr 53 "Strafferettslig utroskap" (1989). Andenæs besvarer spørsmålet med nei, mens Stordrange, etter en omtale av praksis knyttet til selskapsforhold, konkluderer med (side 56) å svare ja.

Jeg er enig med herredsretten i at avgjørelsen i Rt-1993-513 må tillegges betydelig vekt. Den saken gjaldt riktignok kommandittselskapsforhold, og de tiltalte var ikke eneeiere, men de gjorde gjeldende at de transaksjoner som av herredsretten var blitt bedømt som utroskap, var skjedd i forståelse med samtlige interessenter i selskapene. Jeg kan likevel ikke oppfatte avgjørelsen annerledes enn at Høyesterett sluttet seg til Stordranges syn på lovanvendelsen, som det også vises uttrykkelig til. Førstvoterende (side 518) erklærer seg enig i herredsrettens uttalelse om at "Som aksje-/kommandittselskaper var de selvstendige rettssubjekter og det er i denne forbindelse uten betydning hvem som er eiere av selskapene". Han la for egen regning til at "den valgte selskapsform må respekteres og gis gjennomslag".

**Side 1004**

Etter min oppfatning har dette standpunkt gode grunner for seg. Høyesterett har også i andre sammenhenger lagt til grunn at når en næringsdrivende har valgt å drive sin virksomhet i aksjeselskaps form, så er selskapet å betrakte som et selvstendig rettssubjekt, og selskapsformuen å anse som fremmed formue som aksjonærene ikke kan råde over for egne formål i andre former enn dem aksjeselskapslovgivningen tillater. Jeg mener det gir best sammenheng i reglene om selskapet også i relasjon til bestemmelser i straffeloven som beskytter tredjemanns formuesinteresser, betraktes som "en annen" enn aksjonæren eller aksjonærene.

Det kan da reises spørsmål om ikke de pengeuttak saken gjelder rettelig burde vært ansett som underslag, ikke utroskap, jf henvisningen i §275 tredje ledd til §255 og §256. Dette kan sies å måtte være konsekvensen av mitt syn på X A/S som "en annen" enn domfelte. Spørsmålet om omsubsumering er imidlertid ikke tatt opp under prosedyren og jeg tar da ikke stilling til det.

Jeg tilføyer at om man i forhold til de nevnte straffebestemmelser skulle tenke seg å sondre mellom tilfelle hvor det er en eller flere aksjonærer, eller mellom tilfelle hvor selskapet på handlingstidspunktet var solvent eller insolvent, ville man etter min mening kunne bli stillet overfor vanskelige avgrensningsspørsmål.

Når det gjelder straffutmålingen, bemerker jeg at domfelte foruten for utroskap som nevnt, er dømt for regnskapsforsømmelse under særlig skjerpende omstendigheter, for dokumentfalsk, og for skatte- og avgiftsunndragelse av ikke ubetydelige beløp. Jeg er enig i det som er fremholdt av herredsretten om det skjerpende ved hans forhold, særlig når de sees i sammenheng, og i at det er nødvendig med en følbar straffereaksjon. Den samlede straffetid fastsatt i dommen vil jeg derfor ikke endre. Herredsretten peker imidlertid på at domfeltes lovbrudd ikke har fått dramatiske følger for andre fordi konkursfordringene ikke var så store, og på at domfelte i ettertid har vist vilje til å gjøre opp for seg. Når det også sees hen til reaksjonsnivået i andre sammenlignbare saker, finner jeg det forsvarlig å redusere den ubetingede del av fengselsstraffen til 45 dager.

Jeg stemmer for denne dom:

I herredsrettens dom gjøres den endring at den ubetingede del av straffen settes til fengsel i 45 - førtifem - dager. Fullbyrdelsen av den idømte straff for øvrig utsettes etter reglene i straffeloven §§ 52, §53 og §54 med en prøvetid på 2 - to - år.

*Dommer Gussgard:* Jeg anser dommen i Rt-1993-513 avgjørende for spørsmålet om selskapet må anses for "en annen" i relasjon til straffeloven §275, og tar derfor ikke stilling til om resultatet tilsies av reelle grunner. Jeg tiltrer førstvoterendes uttalelse vedrørende straffeloven §255, men reserverer meg mot at et selskap må anses som "en annen" enn eneaksjonæren ved anvendelse av andre bestemmelser i straffeloven som bruker tilsvarende uttrykk. Jeg tar heller ikke standpunkt til om straffeloven §275, eventuelt §255, kan komme til anvendelse

**Side 1005**

i tilfeller hvor selskapet kunne ha utdelt beløpet som utbytte. Mine bemerkninger innebærer ikke at jeg er uenig i at den foreliggende dommen må bli stående. Jeg er enig med førstvoterende når det gjelder straffutmålingen.

*Dommer Halvorsen:* Jeg er enig med førstvoterende dommer Bugge.

*Dommer Aarbakke:* Likeså.

*Dommer Skåre:* Jeg er enig med annenvoterende dommer Gussgard.

Etter stemmegivningen avsa Høyesterett denne dom:

I herredsrettens dom gjøres den endring at den ubetingede del av straffen settes til fengsel i 45 - førtifem - dager. Fullbyrdelsen av den idømte straff for øvrig utsettes etter reglene i straffeloven §52, §53 og §54 med en prøvetid på 2 - to - år.

Sist oppdatert 6. februar 2008