Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
ATTORNEYS FOR DEFENDANTS
NORTH OFFSHORE AS and TROMS OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLV BERG DRIVE AS,<br><br>                    Plaintiff,<br><br>          -against-<br><br>NORTH OFFSHORE AS and TROMS<br>OFFSHORE AS,<br><br>                    Defendants. | 07 Civ. 11502 (SHS)<br><br>**AFFIRMATION OF<br>SVEIN HOEL PURSUANT<br>TO 28 U.S.C. § 1746** |

I, SVEIN HOEL, hereby affirm as follows:

1.      I am the Managing Director of North Offshore AS, previously known by the name TFDS Offshore AS. I am also the Managing Director of Troms Offshore AS. I am providing this affirmation in support of North Offshore's and Troms Offshore's motion to vacate this Court's order of attachment issued at the request of Plaintiff Rolv Berg Drive AS ("RBD") in the above-captioned proceeding.

2.      At the time that the Time Charter referenced below at paragraph 11 first was entered, TFDS Offshore AS was a wholly-owned subsidiary of a large Norwegian shipping company called Troms Fylkes Dampskipsselskap ASA ("Troms County Steamship Company"). I was the managing Director of TFDS Offshore AS.

3.      As the subsidiary of Troms Fylkes Dampskipsselskap ASA, TFDS Offshore AS owned seven ships itself.  TFDS Offshore AS also managed two Norwegian vessels that were serving the Norwegian government.  It also had bareboat chartered in two Russian vessels, one of which was the AHTS ALDOMA (the "Vessel"), which Vessel is the subject matter of the parties' disputes herein.

4.      In November 2004, all of the ships owned by TFDS Offshore AS were sold by TFDS Offshore AS to another Norwegian company.  This left TFDS Offshore AS with responsibility for managing the two vessels serving the Norwegian government and as the bareboat charterer of the two Russian owned vessels.

5.      At the end of December 2004, I made an offer along with my business partner (through our private company Hoel Holding AS) to purchase TFDS Offshore AS from Troms Fylkes Dampskipsselskap ASA.  That offer was accepted and the sale was completed in March 2005, with the agreement providing that the transfer of ownership would be backdated to January 1, 2005, with TFDS Offshore AS becoming a subsidiary of Hoel Holding AS.  A provision in that sales agreement required us to change the name of TFDS Offshore AS to another name.  We therefore changed the name of TFDS Offshore AS to North Offshore AS.

6.      After we had purchased North Offshore AS, my partner and I approached potential investors because of an investment opportunity relating to a newbuilding vessel that would be completed in December 2005.  The investors agreed to invest with us on the condition that they have some part in the management of the company that would own the newbuilding vessel (that company was called Troms Fjord KS) and the company that also would manage the newbuilding vessel.  We therefore created a new company named Troms Offshore AS with an initial capital of 1 million Norwegian kroner, in which company North Offshore had a 10%

ownership interest.  Troms Offshore AS was created on June 30, 2005.  This was the management company for the newbuilding vessel.

7.    Upon the formation of Troms Offshore AS, we shifted the management of the two vessels in the service of the Norwegian government to Troms Offshore AS.  This left North Offshore AS with the two Russian bareboat chartered vessels.

8.    I was appointed the Managing Director of Troms Offshore AS at the time it was created in June 2005 and I have served in that capacity ever since.

9.    Sometime during the summer of 2006, an agreement was reached between the investors and North Offshore AS that North Offshore would buy out the investors' interests in Troms Offshore AS.  This enabled the investors to purchase a greater ownership interest in Troms Fjord KS, which they found to be more desirable.  This left North Offshore AS as the sole owner of Troms Offshore AS by the late summer of 2006.

10.    In November 2007, North Offshore entered into an agreement with two investors, the Klaveness Group and Pareto Growth, by which agreement those companies have committed to invest significant new capital into North Offshore in exchange for taking 65% ownership of North Offshore's shares.  While I remain the Managing Director of North Offshore, I am managing North Offshore in company with directors appointed by these new investors.

## THE CHARTER PARTIES

11.    TFDS Offshore AS entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended).  I annex as Exhibit 1 a true copy of the TFDS Offshore/RBD time charter (the "Time

Charter"). The term "AHTS" refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel.

12.    Shortly after the commencement of the Time Charter, TFDS Offshore entered into a separate "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances. RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to TFDS Offshore securing further charter with the vessel's owner." I annex as Exhibit 2 a true copy of the "side agreement" dated March 5, 2004.

13.    The ALDOMA's owner is Arktikmorneftegazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia. As mentioned above, TFDS Offshore had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter. TFDS Offshore AS – now renamed North Offshore AS as explained above – entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter"). In addition to the principal time period of the Bareboat Charter, which ended in May 2007, the Bareboat Charter also included 2 one year options. I annex as Exhibit 3 a true copy of the Bareboat Charter (which is dated May 12, 2005). The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with North Offshore. Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced us to agree to) an increased daily rate of hire.

4

14.    The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. A true copy of the "Profit Split" provision is provided in Exhibit 3 as the final page of that document.

15.    Together with the Bareboat Charter, North Offshore and AMNGR entered into a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter). I annex as Exhibit 4 a true copy of the AMNGR/North Offshore "side agreement" dated May 12, 2005. That agreement specifically addressed North Offshore's Time Charter with RBD and provided that extensions of the Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore.

16.    RBD sought to charter the ALDOMA for additional time past May 2007. It is my understanding that RBD has claimed that the ALDOMA would have been used to fulfill a five year time charter that RBD claims that it entered with a company named Oil & Natural Gas Corp ("ONGC"). The ONGC invitation to tender, however, had several requirements that the ALDOMA could not fulfill, including being unable to perform anchor handling at the depth required in the ONGC tender (1200 meters). This specification was a significant requirement. Last year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor set at

approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and sank with a loss of over half her crew. The BOURBON DOLPHIN was a larger vessel than the ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform an operation required by the ONGC tender. In my view, based on my 30 years of experience in the offshore supply vessel industry, the ALDOMA would not have satisfied the ONGC tender.

17.    The ONGC tender also required a five year charter term. We could not offer RBD a five year term because we did not have the rights to the ALDOMA for that time period to sub-charter the ALDOMA to RBD.

18.    I understand that RBD has claimed that the ALDOMA's Bareboat Charter still remains in effect and that it will remain in effect until 2009. This claim is incorrect. The Bareboat Charter was terminated in May 2007 at the completion of the principal time period under the Bareboat Charter.

19.    North Offshore and AMNGR entered into a new bareboat charter for the ALDOMA in May 2007. I visited AMNGR in Murmansk on April 16-17, 2007 and signed the new contract after 2 days of negotiations. Because AMNGR's Director General, Oleg Mnatsakanyan, required approval from the Ministry of Natural Resources of the Russian Federation Federal Agency of Subsurface Use before he could sign the new contract, the documents were sent to Moscow and returned to Murmansk more than a month later. I have reason to believe that it took that long because of the fact that RBD representatives tried to interrupt the process in Moscow as well. When the document was received back in Murmansk, Oleg signed and the date was hand written on the charter party before AMNGR couriered one original to me. A true copy of the new charter is annexed as Exhibit 5.

20.    You will note from reference to Exhibit 5 (second page of the Exhibit, top left hand corner of page, Box 19) that the new May 2007 bareboat charter for the ALDOMA provided for the charter hire to be paid in Euros at the amount of 4,800 Euros per day.  As the ALDOMA's owner, AMNGR demanded that we change the charter hire payments from U.S. dollars to Euros because of AMNGR's concerns that the U.S. dollar was weakening (which proved to be well-founded).  I will refer to this charter hire provision again below.

### TROMS OFFSHORE'S FLEET

21.    Troms Offshore manages a total of 14 vessels as set forth below.

22.    The following is a list of those North Offshore vessels currently managed by Troms Offshore and their respective owners:

| | |
|---|---|
| ALDOMA | Russian owned, on bareboat contract to North Offshore AS |
| KOVAMBO | Russian owned, on bareboat contract to North Offshore AS |

23.    The following is a list of vessels currently managed by Troms Offshore which North Offshore does not own and is not the charterer:

| | |
|---|---|
| LANCE | Owner, The Norwegian Government |
| H U SVERDRUP | Owner, The Norwegian Government |
| FUGRO DISCOVERY | Owner, Fugro Discovery Inc. |
| GSP KING | Owner, Grup Cervicii Petroliere SA |
| GSP ORION | Owner, Grup Cervicii Petroliere SA |
| GSP QUEEN | Owner, Grup Cervicii Petroliere SA |
| BUSENTAUR | Owner, Fugro Geotechnics AS |
| CHIEFTAIN | Owner, Admare Shipping Company Limited |

| | |
|---|---|
| SICAL TORINO | Owner, Sical Bergen Logistics PTY Ltd |
| TROMS FJORD | Owner, Troms Fjord KS |
| VIGEO OLUFUNKE | Owner, Vigeo Ltd. |
| TROMS FALKEN | Owner, Troms Falken KS (limited partnership), Troms Offshore holds 2% of the shares. |

24.      Under Troms Offshore's ship management agreement with North Offshore as well as with the owners of the other vessels in the Troms Offshore fleet, Troms Offshore operates each of the vessels that it manages.

## TROMS OFFSHORE'S RELATIONSHIP WITH NORTH OFFSHORE

25.      I provide the following information in response to RBD's claims in the Verified Complaint regarding the relationship between North Offshore and Troms Offshore.

26.      RBD's Verified Complaint states that, to the extent that any hire payments are being remitted to the Vessel's owner AMNGR by any of North Offshore's subsidiaries they represent monies belonging to NOS being "siphoned through the subsidiaries." RBD's claim suggests that North Offshore pays charter hire payments to AMNGR through some other entity. As explained in the next paragraph, RBD's claim is incorrect and has no basis in fact.

27.      North Offshore always pays its own hire payments to AMNGR, and does so on a monthly basis. I annex as Exhibit 6 true copies of each one of North Offshore's charter hire payment statements from the time that the new May 2007 bareboat charter of the ALDOMA commenced until this month. As can be seen, each of the payments originated from North Offshore's account and was sent to AMNGR's Murmansk account in sums of either 144,000 or 148,800 Euros (depending on whether the month at issue was 30 or 31 days, respectively, times

the daily hire rate of 4,800 Euros). These payments were made in accordance with Box 19 of the new May 2007 bareboat charter of the ALDOMA. Following behind each payment statement is an English version of the SWIFT payment details. Additionally, I annex as Exhibit 7 for the Court's convenience a free translation of the language at the bottom of the payment statements identifying the payments as charter hire payments.

28.    RBD claims that "Defendant [Troms Offshore] is a shell corporation through which [North Offshore] conducts the charter business of the vessel." This statement is incorrect. Troms Offshore is a vessel management company that provides its services to a wide variety of shipowners, including various foreign shipowners and even the Norwegian government. The fact that North Offshore employed Troms Offshore to manage its chartered vessels merely reflects a standard practice in the industry, whereby vessel management companies manage the day-to-day operations of the vessel for the ship's owner or charterer.

29.    RBD also claims that "Defendant [Troms Offshore] acts as a paying agent or receiving agent for hire and sub-hire payments for the vessel or arranges for non-parties to satisfy the debts and obligations of Defendant [North Offshore] . . . ." This statement also is incorrect. Troms Offshore neither receives sub-hire payments on behalf of North Offshore, nor does it pay hire payments on behalf of North Offshore. In fact, RBD has reason to know that Troms Offshore does not accept sub-hire payments for North Offshore, because Troms Offshore never received sub-hire payments from RBD during the entire three-plus years of the ALDOMA Time Charter between RBD and North Offshore.

30.    RBD also alleges that "Defendant [North Offshore] uses Defendant [Troms Offshoer] as a 'pass through' entity in order to insulate itself from charters relating to its commercial obligations." I am not certain what this allegation means to allege, but to the extent

that it alleges that Troms Offshore somehow acts on behalf of North Offshore, I refer the Court to paragraphs 19 through 22 above.

### THE INTERCEPTED WIRE TRANSFERS

31.    New York counsel has advised me that there have been four wire transfers intercepted in New York in which Troms Offshore is named as an interested party.  I will discuss the circumstances surrounding each of those payments to show their lack of connection with North Offshore.

32.    I understand that the amount of $290,631.00 was attached on January 10, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for January 2008.  The vessel SICAL-TORINO is owned by Sical Bergen Logistics PTY Ltd. and is managed by Troms Offshore.  Neither Troms Offshore nor North Offshore have any ownership interest in the SICAL-TORINO or Sical Bergen Logistics PTY Ltd.  The payment intercepted was originated from Sical Bergen Logistics PTY Ltd. to fund the January 2008 operational expenses of the vessel SICAL-TORINO.

33.    I understand that the amount of $38.26 was attached on January 16, 2008 while being wired transferred from Troms Offshore to a Belgian entity named Marlink.  Neither Troms Offshore nor North Offshore have any ownership interest in Marlink.  The payment intercepted was a payment that Troms Offshore had made as the manager of the vessel SICAL-TORINO to satisfy that vessel's communications expenses.

34.    I understand that the amount of $15,208.18 was attached on January 22, 2008 while being wired transferred from Polish Manning Services Spolka to Troms Offshore regarding the vessel VIGEO OLUFUNKE as a final balance for December 2007. The VIGEO

OLUFUNKE is owned by Vigeo Ltd. and managed by Troms Offshore. Neither Troms Offshore nor North Offshore have any ownership interest in the VIGEO OLUFUNKE or Polish Manning Services Spolka. The payment intercepted was payment of the final balance of crew payments for the crew of the VIGEO OLUFUNKE for December 2007.

35.    I understand that the amount of $290,631.00 was attached on February 27, 2008 while being wired transferred from NIBC Bank Ltd. to Troms Offshore regarding the vessel SICAL-TORINO for February 2008. As with the previous SICAL TORINO payment regarding the January 2008 operational expenses, this payment intercepted was originated from Sical Bergen Logistics PTY Ltd. to fund the February 2008 operational expenses of the vessel SICAL-TORINO.

36.    In sum, similar to the Vessel under charter to North Offshore, Troms Offshore manages the vessels SICAL-TORINO and VIGEO OLUFUNKE for their owners or charters. None of the $596,508.44 under attachment was being sent for or received on behalf of North Offshore. As a result, despite the frozen payments having no connection whatsoever with North Offshore, Troms Offshore's customers have had nearly $600,000 in funds attached that Troms Offshore has had to cover for its customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of February, 2008 at Tromsø, Norway.

_____
SVEIN HOEL

11

# EXHIBIT 1
# HOEL AFFIRMATION

NORDISK

**Bilag** ___1___

| | |
|---|---|
| 1. Place and date<br>Tromsø 19th of February 2004 | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br>PART I |
| 2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>TFDS Offshore AS<br>Strandvegen 106<br>P.O. box 6155<br>9291 Tromsø<br>Norway<br>Phone: +47 77 87 94 94<br>Fax: +47 77 87 99 77<br>E-mail: offshore@tfds.no | 3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>Rolv Berg Drive AS<br>Søndre Tollbodgate 15<br>P.O. box 96<br>9251 Tromsø<br>Norway<br>Phone: +47 77 66 96 96<br>Fax: +47 77 66 96 96<br>E-mail: drive@rbdrive.com |
| 4. Vessel's name (Cl. 1(a))<br>AHTS Aldoma | 5. Date of delivery (Cl. 2(a))<br>29-31.03.2004 / 6. Cancelling date (Cl. 2(a) and (c))<br>31.03.2004 |
| 7. Port or place of delivery (Cl. 2(a))<br>Mumbai, India | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>Mumbai, India<br>(i) Port or place of redelivery<br><br>15 days<br>(ii) Number of days' notice of redelivery |
| 9. Period of hire (Cl. 1(a))<br>3 years firm | 10. Extension of period of hire (optional) (Cl. 1(b))<br><br>(i) Period of extension<br>15 days<br>(ii) Advance notice for declaration of option (days) |
| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>As per work in progress.<br>(i) Voyage or well (state which)<br>94 days.<br>(ii) Maximum extension period (state number of days) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>Included in the vessel's dayrate for the first 3 years charter hire.<br>- See Clause 37<br>(i) Lump sum<br>NA<br>(ii) When due |
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br>Valletta, Malta. |
| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>As per state oil company rules and regulations (O.N.G.C.) | 15. Number of days' notice of early termination (Cl. 26(a))<br>See box 14 / 16. Demobilisation charge (lump sum) (Cl. 2(b) and (2.26(a))<br>Included in vessel's dayrate for the first 3 years charter hire. |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                                    PART I

| | |
|---|---|
| 17. Area of operation (Cl. 5(a)) <br> The continental shelf of India. | 18. Employment of vessel restricted to (state nature of services(s)) (Cl. 5(a)) <br> Anchor handling, towage, fire fighting, supply services, mud services and any other services that the vessel may safely undertake to perform. Always within the vessel's capabilities and certification. |
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) ) <br> USD 8,506,- + USD 700,- (mud installation) + USD 330,- (mob/demob). <br> Total: USD 9,536,- per day the first three years. | 20. Extension hire (if agreed, state rate) (Cl. 10(b)) <br> USD 9,536,- <br> USD 9000.- |
| 21. Invoicing for hire and other payments (Cl. 10(d)) <br> (i) state whether to be issued in advance or arrears <br> In Arrears <br><br> (ii) state to whom to be issued if addresses other than stated in Box 2 <br> As per box 2 <br><br> (iii) state to whom to be issued if addresses other than stated in Box 3 | 22. Payment (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(d)) <br> As per owner's instruction <br> To: <br> SpareBank1 Nord-Norge <br> Account no: 4723.91.10455 <br> Swift code: snownk22 <br><br> By: <br> Swift transfer |
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(d)) <br> 35 banking days from date of invoice | 24. Interest rate payable (Cl. 10(d)) <br> NA | 25. Maximum audit period (Cl. 10(f)) <br> 60 days |
| 26. Meals (state rate agreed) (Cl. 6(c)(i)) <br> USD 19,- per meal | 27. Accommodation (state rate agreed) (Cl. 6(c)(i)) <br> USD 12,- per person | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f)) <br> Yes |
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) <br> NA | 30. War (state name of countries) (Cl. 19(a)) <br> Deleted |
| 31. General average (place of settlement – only to be filled if other than London) (Cl. 21) | 32. Breakdown (state period) (Cl. 26(b)(vi)) <br> 36 days |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) <br> Norwegian Law; arbitration in Oslo | 34. Numbers of additional clauses covering special provisions, if agreed <br> From Clause 37 to Clause 38 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS

PART I

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 26) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 26) |
|---|---|
| As per box 3 | As per box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to the Charter; in the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 29.

| Signature (Owners) | Signature (Charterers) |
|---|---|

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ANNEXURE - A**

| Sr.No | Prameter | ONGC Requirement | Bidder Specification |
|---|---|---|---|
| | Technical Specification of AHTS of not less than 9600 BHP - 1 No. | | |
| 1 | *GENERAL* | | |
| 1,1 | Name of Vessel | | MV ALDOMA |
| 1,2 | Name of owner | | DESPONENT OWNER T.F.D.S. OFFSHORE AS |
| 1,3 | Flag | | BAHAMAS |
| 1,4 | Poart of registry | | NASSAU |
| 1,5 | Place of build | | NORWAY |
| 1,6 | Year of build | | 1983 |
| 1,7 | Name of yard | | Framnes Mekaniske, Sandefjord |
| 1,8 | Classification | ABS/DNV/BV/LRS/IRS/GL | DNV * 1A1 △  Tug&Supply Vessel SF EO FIFI II ICE C |
| 1,9 | call sign/official No. | | C6RD9 |
| 2 | *DIMENSIONS* | | |
| 2,1 | LOA [meters] | | 67,70 m |
| 2,2 | LBP [meters] | | 59,40 m |
| 2,3 | Breadth mld [meters] | | 14,50 m |
| 2,4 | Depth mld [meters] | | 5,97 m |
| 2.5.1 | Summer draugh [meters] | | 5,85 mtr. Min. draft (Light ship) 3,5 mtr. Max. draft (Tropical) 6.08 mtr |
| 2.5.2 | Operating draugh [meters] | Not more than 5.95 M at specified min DWT | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 2,6 | Clear deck Aft | | 407 m2 |
| 2.6.1 | Length [meters] | | 37 mtrs |
| 2.6.2 | Breadth [meters] | | 11 mtrs |
| 2.6.3 | Area [sq. meters] | Not less than 300 sq. meters | 407m2 |





| 3 | *MACHINERY* | | |
|---|---|---|---|
| 3,1 | **Main Engines** | | |
| 3.1.1 | Number of Main Engines | Not less than 2 [two] | **4** |
| 3.1.2 | Make | | **Bergen Diesel** |
| 3.1.3 | Model | | **KVMB 12** |
| 3.1.4 | Max continuous rating (for all main engines together) at 100% - NOMINAL | Not less than 9600 BHP | **12240 BHP** |
| 3.1.5 | Year of build | New at the time of installation onboard the Vessel | **1983 (New at the time of installation onboard the Vessel)** |
| 3,2 | **Main Propulsion** | | |
| 3.2.1 | Number of propellers | Not less than 2 [two] | **2 x Ulstein, 180 Rpm** |
| 3.2.2 | Type | Shrouded CPP preferred | **CPP** |
| 3.2.3 | Propeller diameter [mtrs] | | **3600 mm** |
| 3.2.4 | Propeller make | | **ULSTEIN PROPELLER** |
| 3,3 | **Side Thrusters** | | **3** |
| 3.3.1 | Number of bow thrusters | Not less than 2 [one] | **2** |
| 3.3.2 | Number of stern thrusters | | **1** |
| 3.3.3 | Rating of BTs [KW] | | **1180 KW** |
| 3.3.4 | Rating of STs [KW] | | **590 KW** |
| 3,4 | **Generators** | | |
| 3.4.1 | Number of generators | At least three independent power sources | **4 Independent Power Sources (2 x Shaftgenerators, Siemens 3200Kw, 2 x** |
| 3.4.2 | Total rating [KVA] | | **3690 KVA** |
| 3.4.3 | Voltage rating | | **380V** |
| 3.4.4 | Frequency [Hz] | | **50 Hz** |
| 3,5 | **Steering gear** | | |
| 3.5.1 | Type | Hydraulic preferred | **Hydraulic, Tennfjord I-2X (18M300/2GM620)-FU** |



| 3.5.2 | Number of rudders | Not less than 2 [two] | 2 Tennfjord |
|---|---|---|---|
| 4 | *PERFORMANCE* | | |
| 4,1 | Trial speed [knots] | | 16,5 knots |
| 4,2 | Cruising speed [knots] | | 12-15 knots |
| 4,3 | Bollard pull [Max cont] | Not less than 105 Metric Tons | 140 Tons |
| 4,4 | Fuel consumption [Kl/day] | | |
| 4.4.1 | Standby | | 7,1 m3 |
| 4.4.2 | Underway | | 18 m3 |
| 4.4.3 | Towing | | 44,7 m3 |
| 5 | *TOWING AND ANCHOR HANDLING* | | |
| 5,1 | Winch | | |
| 5.1.1 | Type | Min. Double drum water fall hydraulic | Brattvaag SL 250( Double drum Water fall hydraulic) |
| 5.1.2 | Make | | Brattvaag |
| 5.1.3 | Model | | SL 250W / BSL 250 WX |
| 5.1.4 | Drum capaciy | For a total length of not less than 2,000 mtrs., 72mm/76mm wire rope. | 2400 mtrs / 72mm |
| 5.1.5 | Work wire | Total length of 2000 mtrs. or more of 72/76mm required | 2400 mtrs / 72mm |
| 5.1.6 | Drum speed [M/min] | | 60 ton @ 28mtr/min & 250 ton @6,4 mtr/min |
| 5.1.7 | Winch stall capacity | Not less than 250 T | 250 ton |
| 5.1.8 | Line pull | | 350 ton |
| 5,2 | Wildcat for chains | | |
| 5.2.1 | Suitable for 70 mm Chain | | 76mm / 83mm |
| 5.2.2 | Chain lockers | Not less than 2 for 70mm stud-link chains | 600 m 3 1/4 '" chain |
| 5.2.3 | Chain locker capacity [cubic meters] | 2 X 90 cu mtrs. | 203 cu. Mtrs. |
| 5.3 | Tow pins  and shark jaws | | Karm 130318/130554, 240 ton. |



| | | | |
|---|---|---|---|
| 5,3 | Tow pins and shark jaws | | Karm O 350/130318/130554, 240 ton. |
| 5,4 | Spare Storage | | Two storage drums. One can hold 1200m. 70 mm. Wire and the other 1000 m.64 mm. We |
| 5,5 | Stern roller | | Ulstein 3,66 mtr x 2,50 mtr, 350 ton SWL |
| 5,6 | Tugger winches | | 2 Brattvaag WMA 1010 |
| 5,7 | Capstans [on aft deck] | | 2 |
| 6 | *NAVIGATION AND COMMUNICATION EQUIPMENT* | | |
| 6,1 | Gyrocompass | REQUIRED | Anshutz Standard 20 |
| 6,2 | Magnetic compass | REQUIRED | Standard |
| 6,3 | Echo sounder | REQUIRED | Simrad / ED161 |
| 6,4 | Auto pilot | REQUIRED | Racal Decca Pilot 450 |
| 6,5 | Radar | REQUIRED | 2 Furuno ARPA, X and S band, 72 nm |
| 6,6 | SSB Radio transceiver/ GMDSS | REQUIRED | JRC (GMDSS area 4) JSS-800 |
| 6,7 | Marine VHF transceiver | REQUIRED | 2 - JRC/JHS-324 & Sailor/RT2048 |
| 6,8 | GPS | REQUIRED | Phillips MK10, Furuno GP 80 |
| 6,9 | Portable VHF | REQUIRED | 5 - 3 x Jotron/Tron & 2 x Motorola GP 300 |
| 6,10 | INMAR SAT | REQUIRED | Satpol/Phillips Safecom C |
| 7 | *ACCOMODATION* | | |
| 7,1 | Crew compliment | | 17 |
| 7,2 | For charterer's use | Suitable accomodation for five persons required | 7 |
| 8 | *CAPACITIES* | | |
| 8,1 | Deck cargo | Not less than 500 Ton | 750 ton |
| 8,2 | Deck-loading [T/sq mtrs] | | 6 T/m3 |
| 8,3 | Fuel (m³) | | 1041 m3 |




| 8,4 | Drill water (m³) | | 516 m3 |
|---|---|---|---|
| 8,5 | Pot water (m³) | | 289 m3 |
| 8,6 | Ballast water (m³) | | 516 m3 |
| 8,7 | Liquid mud (m³) | REQUIRED | 119 m3 |
| 8,8 | Dry bulk (m³) | | 196 m3 |
| 8,9 | Dead weight [Tons] | Not less than 1000 Tons at 5.95 M draught | 5 m at 1000 DWT ( TOTAL DWT 2005 TON) |
| 8,1 | 4" Cam lock couplings | Required on all hoses | Yes |
| 9 | **RIGGING EQUIPMENT** | | |
| | | WILL BE PROVIDED | |
| 10 | *FIFI* | VESSEL IS FITTED WITH FI-FI Class-II | |
| 11 | **OTHER CAPABILITIES** | | |
| | Certificates | 1.  Certificate of Registry | ENCLOSED |
| | | 2.   Class Certificate (H&M) | ENCLOSED |
| | | 3.   Bollard Pull Certificate | ENCLOSED |
| | | 4. G.A PLAN | ENCLOSED |
| | | 5. DEAD WEIGHT SCALE | ENCLOSED |



ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.* – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* – Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury        per person
Property Damage        per occurrence.

(4) *Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) *Comprehensive General Automobile Liability Insurance.* – Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury        According to the local law.
Property Damage        In an amount equivalent to single limit per occurrence.

(6) Such other insurances as may be agreed.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to make those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ANNEX "D" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: "SUPPLYTIME 89" –DATED

# OWNERS VESSEL MARINE CREW

## MARINE CREW

Provided by Owners

PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**1. Period**
(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the
Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as
"the Vessel"), for the period as stated in Box 8 from the time the Vessel is
delivered to the Charterers.
(b) Subject to Clause 10(b), the Charterers have the option to extend the
Charter Period in direct continuation for the period stated in Box 10(b), but
such an option must be declared in accordance with Box 10(b).
(c) The Charter Period shall automatically be extended for the time required
to complete the voyage or well (whichever is stated in Box 11(b)) in progress,
such time not to exceed the period stated in Box 11(b).

**2. Delivery and Redelivery**
(a) Delivery - Subject to sub-clause (c) of this Clause the Vessel shall be
delivered by the Owners free of cargo and with clean tanks at any time
between the date stated in Box 9 and the date stated in Box 9, at the port or
place stated in Box 7 where the Vessel can safely lie always afloat.
(b) Mobilisation - (i) The Charterers shall pay a lump sum as stated in Box 12
without discount by way of mobilisation charge in consideration of the
Owners giving delivery at the port or place stated in Box 7. The mobilisation
charge shall not be affected by any change in the port or place of mobilisation
from that stated in Box 13.
(ii) Should the Owners agree to the Vessel loading and transporting cargo
and/or undertaking any other service for the Charterers en route to the port of
delivery or from the port of redelivery, then all terms and conditions of this
Charter Party shall apply to such loading and transporting and/or other
service exactly as if performed during the Charter Period excepting only that
any lump sum freight agreed in respect thereof shall be payable on shipment
or commencement of the service as the case may be, the Vessel and/or goods
lost or not lost.
(c) Cancelling - If the Vessel is not delivered by midnight local time on the
cancelling date stated in Box 8, the Charterers shall be entitled to cancel this
Charter Party. However, if despite the exercise of due diligence by the
Owners, the Owners will be unable to deliver the Vessel by the cancelling
date, they may give notice in writing to the Charterers at any time prior to the
delivery date as stated in Box 8, and shall state in such notice the date by
which they will be able to deliver the Vessel. The Charterers may within 24
hours of receipt of such notice give notice in writing to the Owners cancelling
the Charter Party. If the Charterers do not give such notice, then the later date
specified in the Owners' notice shall be substituted for the cancelling date for
all the purposes of this Charter Party. In the event the Charterers cancel the
Charter Party, it shall terminate on lease that neither party shall be liable to
the other for any losses incurred by reason of the non-delivery of the Vessel
or the cancellation of the Charter Party.
(d) Redelivery - The Vessel shall be redelivered on the expiration or earlier
termination of this Charter Party free of cargo and with clean tanks at the port
or place as stated in Box 80 or such other port or place as may be mutually
agreed. The Charterers shall give not less than the number of days notice in
writing of their intention to redeliver the Vessel, as stated in Box 8(b).
(e) Demobilisation - The Charterers shall pay a lump sum without discount in
the amount as stated in Box 14 by way of demobilisation charge which amount
shall be paid on the expiration or on earlier termination of this Charter Party.

**3. Condition of Vessel**
(a) The Owners undertake that at the date of delivery under this Charter Party
the Vessel shall be of the description and classification as specified in ANNEX
"A", attached hereto, and undertake to so maintain the Vessel during the
period of service under this Charter Party.
(b) The Owners shall before and at the date of delivery of the Vessel and
throughout the Charter Period exercise due diligence to make and maintain
the Vessel tight, staunch, strong in good order and condition and, without
prejudice to the generality of the foregoing, in every way fit to operate
effectively at all times for the services as stated in Clause 5.

**4. Survey**
The Owners and the Charterers shall jointly appoint an independent surveyor
for the purpose of determining and agreeing in writing the condition of the
Vessel, any anchor handling and diving equipment specified in Section 5 of
ANNEX "A", and the quality and quantity of fuel, lubricants and water at the
time of delivery and redelivery hereunder. The Owners and the Charterers
shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**
(a) The Vessel shall be employed in offshore activities which are lawful in

accordance with the law of the place of the Vessel's flag and/or registration
and of the place of operation. Such activities shall be restricted to the
service(s) as stated in Box 16, and to voyages between any good and safe port
or place and any place or offshore unit where the Vessel can safely lie always
afloat within the Area of Operation as stated in Box 17 which shall always be
within Institute Warranty Limits and which shall in no circumstances be
exceeded without prior agreement and adjustment of the Hire and in
accordance with such other terms as appropriate to be agreed; provided
always that the Charterers do not warrant the safety of any such port or place
or offshore unit but shall exercise due diligence in issuing their orders to the
Vessel so if the Vessel were their own properly and having regard to her
capabilities and the nature of her employment. Unless otherwise agreed, the
Vessel shall not be employed as a diving platform.
(b) Relevant permission and licences from responsible authorities for the
Vessel to enter, work in and leave the Area of Operation shall be obtained by
the Charterers and the Owners shall assist, if necessary, in every way
possible to secure such permission and licences.
(c) The Vessel's Space - The whole reach and burden and decks of the
Vessel shall throughout the Charter Period be at the Charterers' disposal
reserving proper and sufficient space for the Vessel's Master, Officers, Crew,
tackle, apparel, furniture, provisions and stores. The Charterers shall be
entitled to carry, so far as space is available and for their purposes in
connection with their operations:
(i) Persons other than crew members, other than fare paying, and for such
purposes to make use of the Vessel's available accommodation not
being used on the voyage by the Vessel's Crew. The Owners shall
provide suitable provisions and regulations for such persons for which the
Charterers shall pay at the rate as stated in Box 26 per meal and at the
rate as stated in Box 27 per day for the provision of bedding and services
for persons using berth accommodation.
(ii) Lawful cargo whether carried on or under deck.
(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided
proper notification has been given and such cargo is marked and
packed in accordance with the national regulations of the Vessel and/or
the International Maritime Dangerous Goods Code and/or other
pertinent regulations. Failing such proper notification, marking or
packing the Charterers shall indemnify the Owners in respect of any loss,
damage or liability whatsoever and howsoever arising therefrom. The
Charterers accept responsibility for any additional expenses (including
reinstatement expenses) incurred by the Owners in relation to the
carriage of explosives and dangerous cargo.
(iv) Hazardous and noxious substances, subject to Clause 12(c), proper
notification and any pertinent regulations.
(d) Laying-up of Vessel - The Charterers shall have the option of laying up the
Vessel at an agreed safe port or place for all or any portion of the Charter
Period in which case the Hire hereunder shall continue to be paid but, if the
period of such lay-up exceeds 30 consecutive days there shall be credited
against such Hire the amount which the Owners shall reasonably have saved
by way of reduction in expenses and overheads as a result of the lay-up of the
Vessel.

**6. Master and Crew**
(a) (i) The Master shall carry out his duties promptly and the Vessel shall
render all reasonable services with her capabilities by day and by night and
at such times and on such schedules as the Charterers may reasonably
require without any interruption or liability to pay to the Owners or the
Master, Officers or the Crew of the Vessel any excess or overtime payments.
The Charterers shall furnish the Master with all instructions and sailing
directions and the Master and Engineer shall keep full and correct logs
accessible to the Charterers or their agents.
(ii) The Master shall sign cargo documents as and in the form presented, the
same, however, not to be Bills of Lading, but receipts which shall be non-
negotiable documents and shall be marked as such. The Charterers shall
indemnify the Owners against all consequences and liabilities arising from
the Master, Officers or agents signing, under the direction of the Charterers,
those cargo documents or other documents inconsistent with this Charter
Party or from any irregularity in the papers supplied by the Charterers or their
agents.
(b) The Vessel's Crew if required by the Charterers will connect and disconnect
electric cables, fuel, water and pneumatic hoses when placed on board the
Vessel in port as well as alongside the offshore units; will operate the
machinery on board the Vessel for loading and unloading cargoes; and will
hook and unhook cargo on board the Vessel when loading or discharging
alongside offshore units. If the port regulations or the seamen and/or labour

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



| | |
|---|---|
| 1 | 71 |
| 2 | 72 |
| 3 | 73 |
| 4 | 74 |
| 5 | 75 |
| 6 | 76 |
| 7 | 77 |
| 8 | 78 |
| 9 | 79 |
| 10 | 80 |
| 11 | 81 |
| 12 | 82 |
| 13 | 83 |
| 14 | 84 |
| 15 | 85 |
| 16 | 86 |
| 17 | 87 |
| 18 | 88 |
| 19 | 89 |
| 20 | 90 |
| 21 | 91 |
| 22 | 92 |
| 23 | 93 |
| 24 | 94 |
| 25 | 95 |
| 26 | 96 |
| 27 | 97 |
| 28 | 98 |
| 29 | 99 |
| 30 | 100 |
| 31 | 101 |
| 32 | 102 |
| 33 | 103 |
| 34 | 104 |
| 35 | 105 |
| 36 | 106 |
| 37 | 107 |
| 38 | 108 |
| 39 | 109 |
| 40 | 110 |
| 41 | 111 |
| 42 | 112 |
| 43 | 113 |
| 44 | 114 |
| 45 | 115 |
| 46 | 116 |
| 47 | 117 |
| 48 | 118 |
| 49 | 119 |
| 50 | 120 |
| 51 | 121 |
| 52 | 122 |
| 53 | 123 |
| 54 | 124 |
| 55 | 125 |
| 56 | 126 |
| 57 | 127 |
| 58 | 128 |
| 59 | 129 |
| 60 | 130 |
| 61 | 131 |
| 62 | 132 |
| | 133 |
| | 134 |
| | 135 |
| | 136 |
| | 137 |
| 65 | 138 |
| 66 | 139 |
| 67 | 140 |
| 68 | 141 |
| 69 | 142 |
| 70 | 143 |

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

unless do not permit the Crew of the Vessel to carry out any of this work, then    144
the Charterers shall make, at their own expense, whatever other    145
arrangements may be necessary, always under the direction of the Master.    146
(c) If the Charterers have reason to be dissatisfied with the conduct of the    147
Master or any Officer or member of the Crew, the Owners on receiving    148
particulars of the complaint shall promptly investigate the matter and if the    149
complaint proves to be well founded, the Owners shall as soon as reasonably    150
possible make appropriate changes in the appointment.    151
(d) The entire operation, navigation, and management of the Vessel shall be in    152
the exclusive control and command of the Master, Officers and    153
Crew. The Vessel will be operated and the services hereunder will be    154
rendered as requested by the Charterers, subject always to the exclusive    155
right of the Owners or the Master of the Vessel to determine whether operation    156
of the Vessel may be safely undertaken. In the performance of the Charter    157
Party, the Owners are deemed to be an independent contractor, the    158
Charterers being concerned only with the results of the services performed.    159

7. Owners to Provide    160
(a) The Owners shall provide and pay for all provisions, wages and all other    161
expenses of the Master, Officers and Crew; all maintenance and repair of the    162
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also,    163
except as otherwise provided in the Charter Party, for all insurance on the    164
Vessel, all dues and charges directly related to the Vessel's flag and/or    165
registration; all deck, cable and engineroom stores, cordage required for    166
ordinary ship's purposes mooring alongside in harbour, and all fumigation    167
expenses and de-ratisation certificates. The Owners' obligations under this    168
Clause extend to cover all liabilities for consular charges appertaining to the    169
Master, Officers and Crew, customs or import duties arising at any time during    170
the performance of the Charter Party in relation to the personal effects of the    171
Master, Officers and Crew, and in relation to the stores, provisions and other    172
matters as aforesaid which the Owners are to provide and/or pay for and the    173
Owners shall refund to the Charterers any sums they or their agents may have    174
paid or been compelled to pay in respect of such liability.    175
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners'    176
expense with any towing and anchor handling equipment specified in Section    177
5(b) of ANNEX "A". If during the Charter Period any such equipment becomes    178
lost, damaged or unserviceable, other than as a result of the Owners'    179
negligence, the Charterers shall either provide, or direct the Owners to    180
provide, an equivalent replacement at the Charterers' expense.    181

8. Charterers to Provide    182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel,    183
lubricants, water, dispersants, firefighting foam and transport thereof, port    184
charges, pilotage and boatmen and canal steersman (whether compulsory or    185
not), launch hire (unless incurred in connection with the Owners' business),    186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and    187
charges, agencies and commissions incurred on the Charterers' business,    188
costs for security or other watchmen, and of quarantine (if occasioned by the    189
nature of the cargo carried or the ports visited whilst employed under this    190
Charter Party but not otherwise).    191
(b) At all times the Charterers shall provide and pay for the loading and    192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of    193
cargo tanks, all necessary dunnage, uprights and shoring equipment for    194
securing deck cargo, all cordage except as to be provided by the Owners, all    195
ropes, slings and special fenders (including bulk cargo discharge hoses)    196
actually used for loading and discharging, inert gas required for the    197
protection of cargo, and electricity used for offshore works, and shall    198
reimburse the Owners for the actual cost of replacement of special mooring    199
lines to offshore units, wires, nylon spring lines etc. used for offshore work,    200
all hose connections and adaptors, and further; shall refit oxygen/acetylene    201
bottles used for offshore works.    202
(c) The Charterers shall pay for customs duties, all permits, import duties    203
(including costs involved in establishing temporary or permanent importation    204
bonds), and clearance expenses, both for the Vessel and/or equipment,    205
required for or arising out of this Charter Party.    206

9. Bunkers    207
Unless otherwise agreed, the Vessel shall be delivered with bunkers and    208
lubricants as on board and redelivered with sufficient bunkers to reach the    209
next bunkering stage en route to her next port of call. The Charterers upon    210
delivery and the Owners upon redelivery shall take over and pay for the    211
bunkers and lubricants on board at the prices prevailing at the times and    212
ports of delivery and redelivery.    213

10. Hire and Payments    214
(a) Hire - The Charterers shall pay Hire for the Vessel at the rate stated in Box    215
19 per day or pro rata for part thereof from the time that the Vessel is delivered    216
to the Charterers until the expiration or earlier termination of this Charter    217
Party.    218
(b) Extension Hire - If the option to extend the Charter Period under Clause    219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be    220
mutually agreed between the Owners and the Charterers.    221
(c) Adjustment of Hire - The rate of hire shall be adjusted to reflect    222
documented changes, after the date of entering into the Charter Party or the    223
date of commencement of employment, whichever is earlier, in the Owners'    224
costs arising from changes in the Charterers' requirements or regulations    225
governing the Vessel and/or its Crew or this Charter Party.    226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in    227
Box 18. In respect of reimbursable expenses incurred in currencies other    228
than the contract currency, the rate of exchange into the contract currency    229
shall be that quoted by the Central Bank of the country of such other currency    230
as at the date of the Owners' invoice. Invoices covering Hire and any other    231
payments due shall be issued monthly as stated in Box 21(f) or at the    232
expiration or earlier termination of this Charter Party. Notwithstanding the    233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at    234
the time of delivery.    235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the    236
Charterers' account shall be received within the number of days stated in Box    237
23 from the date of receipt of the invoice. Payment shall be made in the    238
contract currency in full without discount to the account stated in Box 22.    239
However any advances for disbursements made on behalf of and approved by    240
the Owners may be deducted from Hire due.    241
If payment is not received by the Owners within 5 banking days following the    242
due date the Owners are entitled to charge interest at the rate stated in Box 24    243
on the amount outstanding from and including the due date until payment is    244
received.    245
Where an invoice is disputed, the Charterers shall in any event pay the    246
undisputed portion of the invoice but shall be entitled to withhold payment of    247
the disputed portion provided that such portion is reasonably disputed and    248
the Charterers specify such reason. Interest will be chargeable at the rate    249
stated in Box 24 on such disputed amounts where resolved in favour of the    250
Owners. Should the Owners prove the validity of the disputed portion of the    251
invoice, balance payment shall be received by the Owners within 5 banking    252
days after the dispute is resolved. Should the Charterers' claim be valid, a    253
corrected invoice shall be issued by the Owners.    254
In default of payment as herein specified, the Owners may require the    255
Charterers to make payment of the amount due within 5 banking days of    256
receipt of notification from the Owners; failing which the Owners shall have    257
the right to withdraw the Vessel without prejudice to any claim the Owners    258
may have against the Charterers under this Charter Party.    259
While payment remains due the Owners shall be entitled to suspend the    260
performance of any and all of their obligations hereunder and shall have no    261
responsibility whatsoever for any consequences thereof, in respect of which    262
the Charterers hereby indemnify the Owners, and Hire shall continue to    263
accrue and any extra expenses resulting from such suspension shall be for    264
the Charterers' account.    265
(f) Audit. - The Charterers shall have the right to appoint an independent    266
chartered accountant to audit the Owners' books directly related to work    267
performed under the Charter Party at any time after the conclusion of the    268
Charter Party, up to the expiry of the period stated in Box 25, to determine the    269
validity of the Owners' charges hereunder. The Owners undertake to make    270
their records available for such purposes at their principal place of business    271
during normal working hours. Any discrepancies discovered in payments    272
made shall be promptly received by invoice or credit as appropriate.    273

11. Suspension of Hire    274
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of    275
Master, Officers and Crew, breakdown of machinery, damage to hull or other    276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be    277
payable in respect of any time lost and any Hire paid in advance shall be    278
adjusted accordingly provided always however that Hire shall not cease in the    279
event of the Vessel being prevented from working as aforesaid as a result of:    280
(i)  the carriage of cargo as noted in Clause 5(c)(ii) and 5(v);    281
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or    282
Crew having communication with the shore at any infected area not in    283
connection with the employment of the Vessel without the consent or the    284
instructions of the Charterers;    285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at    286

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and the computer generated document.




PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

the request of the Charterers;    287
(iv) detention in consequence of being driven into port or to anchorage    288
through stress of weather or trading to shallow harbours or to river or    289
ports with bars or suffering an accident to her cargo, when the expenses    290
resulting from such detention shall be for the Charterers' account    291
howsoever incurred;    292
(v) detention or damage by ice;    293
(vi) any act or omission of the Charterers, their servants or agents.    294
(b) Liability for Vessel not Working. - The Owners' liability for any loss,    295
damage or delay sustained by the Charterers as a result of the Vessel being    296
prevented from working by any cause whatsoever shall be limited to    297
suspension of hire.    298
(c) Maintenance and Drydocking. - Notwithstanding sub-clause (a) hereof, the    299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall    300
be cumulative, per month or pro rata for part of a month from the    301
commencement of the Charter Period for maintenance and repairs including    302
drydocking (hereinafter referred to as "maintenance allowance"). This    303
accumulated maintenance days shall however at any time not exceed six (6)
days. If the accumulated time is not utilized within six (6) months it would
automatically lapse and will not be carried forward.
The Vessel shall be drydocked at regular intervals. The Charterers shall place    304
the Vessel at the Owners' disposal clear of cargo, at a port (to be nominated    305
by the Owners at a later date) having facilities suitable to the Owners for the    306
purpose of such drydocking.    307
During reasonable voyage time taken in transits between such port and Area    308
of Operation the Vessel shall be on hire and such time shall not be counted    309
against the accumulated maintenance allowance.    310
Hire shall be suspended during any time taken in maintenance repairs and    311
drydocking in excess of the accumulated maintenance allowance.    312
In the event of loss time being taken by the Owners for repairs and drydocking    313
or, alternatively, the Charterers not making the Vessel available for all or part    314
of this time, the Charterers shall, upon expiration or earlier termination of the    315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in    316
addition to Hire otherwise due under this Charter Party in respect of all such    317
time not as taken or made available.    318
Upon commencement of the Charter Period, the Owners agree to furnish the    319
Charterers with the Owners' proposed drydocking schedule and the    320
Charterers agree to make every reasonable effort to assist the Owners in    321
achieving to such predetermined drydocking schedule for the Vessel. It is    322
understood between Owner and Charter that regular dry-docking is not
scheduled to take place during the first period of Charter Hire, that is during
the first 36 months.

12. Liabilities and Indemnities    322
(a) Owners. - Notwithstanding anything else contained in this Charter Party    324
excepting Clauses 5(c)(i), 7(c), 8(b), 12(c), 16(c) and 21, the Charterers shall    325
not be responsible for loss of or damage to the property of the Owners or of    326
their contractors and sub-contractors, including the Vessel, or for personal    327
injury or death of the employees of the Owners or of their contractors and    328
sub-contractors, arising out of or in any way connected with the performance    329
of this Charter Party, even if such loss, damage, injury or death is caused    330
wholly or partially by the act, neglect, or default of the Charterers, their    331
employees, contractors or sub-contractors, and even if such loss, damage,    332
injury or death is caused wholly or partially by unseaworthiness of any vessel;    333
and the Owners and their contractors and sub-contractors shall indemnify,    334
protect, defend and hold harmless the
Charterers from any and against all claims, costs, expenses, actions,    335
proceedings, suits, demands and liabilities whatsoever arising out of or in    336
connection with such loss, damage, personal injury or death.    337
(b) Charterers. - Notwithstanding anything else contained in this Charter    338
Party excepting Clause 21, the Owners shall not be responsible for loss of    339
damage to, or any liability arising out of anything towed by the Vessel, any    340
cargo laden upon or carried by the Vessel or her bar, the property of the    341
Charterers or of their contractors and sub-contractors, including their    342
offshore units, or for personal injury or death of the employees of the    343
Charterers or of their contractors and sub-contractors (other than the Owners    344
and their contractors and sub-contractors) or of anyone on board anything    345
towed by the Vessel, arising out of or in any way connected with the    346
performance of this Charter Party, even if such loss, damage, liability, injury    347
or death is caused wholly or partially by the act, neglect or default of the    348
Owners, their employees, contractors or sub-contractors, and even if such    349
loss, damage, liability, injury or death is caused wholly or partially by the    350
unseaworthiness of any vessel; and the Charterers and their contractors and    351
sub-contractors shall indemnify, protect,
defend and hold harmless the Owners from any and against all claims, costs,    352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever    353

arising out of or in connection with such loss, damage, liability, personal    354
injury or death.    355
(c) Consequential Damages. - Neither party shall be liable to the other for, and    356
each party hereby agrees to protect, defend and indemnify the other against,    357
any consequential damages whatsoever arising out of or in connection with    358
the performance or non-performance of this Charter Party, including, but not    359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of    360
insurance.    361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or    362
held to deprive the Owners or the Charterers, as against any person or party,    363
including as against each other, of any right to claim limitation of liability    364
provided by any applicable law, statute or convention, save that nothing in    365
this Charter Party shall create any right to limit liability. Where the Owners or    366
the Charterers may seek an indemnity under the provisions of this Charter    367
Party or against each other in respect of a claim brought by a third party, the    368
Owners or the Charterers shall seek to limit their liability against such third    369
party.    370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities,    371
limitations of liability, indemnities, privileges and conditions granted or    372
provided by this Charter Party or any applicable statute, rule or regulation    373
for the benefit of the Charterers shall also apply to and be for the benefit of the    374
Charterers' parent, affiliated, related and subsidiary companies; the    375
Charterers' contractors, sub-contractors, clients, joint venturers and joint    376
interest owners (always with respect to the job or project on which the Vessel    377
is employed); their respective employees and their respective underwriters.    378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability,    379
indemnities, privileges and conditions granted or provided by this Charter    380
Party or by any applicable statute, rule or regulation for the benefit of the    381
Owners shall also apply to and be for the benefit of the Owners' parent,    382
affiliated, related and subsidiary companies; the Owners' sub-contractors,    383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its    384
demise charterer(s), their respective employees and their respective    385
underwriters.    386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or    387
trustee of and for the benefit of all such persons and parties set forth above,    388
but only for the limited purpose of contracting for the extension of such    389
benefits to such persons and parties.    390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but    391
regardless of whether this option is exercised the other provisions of Clause 12    392
shall apply and shall be paramount).    393
In order to avoid disputes regarding liability for personal injury or death of    394
employees or for loss of or damage to property, the Owners and the    395
Charterers have entered into, or by this Charter Party agree to enter into, an    396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form    397
substantially similar to that specified in ANNEX "C") between the Owners, the    398
Charterers and the various contractors and sub-contractors of the Charterers.    399
(g) Hazardous and Noxious Substances. - Notwithstanding any other    400
provision of this Charter Party to the contrary, the Charterers shall always be    401
responsible for any losses, damages or liabilities suffered by the Owners,    402
their employees, contractors or sub-contractors, by the Charterers, or by    403
third parties, with respect to the Vessel or other property, personal injury or    404
death, pollution or otherwise, which losses, damages or liabilities are caused,    405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and    406
noxious substances in whatever form as ordered by the Charterers, and the    407
Charterers shall defend, indemnify the Owners and hold the Owners harmless    408
for any expense, loss or liability whatsoever or howsoever arising with    409
respect to the carriage of hazardous or noxious substances.    410

13. Pollution    411
(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be    412
liable for, and agree to indemnify, defend and hold harmless the Charterers    413
against, all claims, costs, expenses, actions, proceedings, suits, demands    414
and liabilities whatsoever arising out of actual or potential pollution damage    415
and the cost of cleanup or control thereof arising from acts or omissions of    416
the Owners or their personnel which cause or allow discharge, spills or leaks    417
from the Vessel, except as they emanate from cargo thereon or therein.    418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold    419
harmless the Owners from all claims, costs, expenses, actions, proceedings,    420
suits, demands, liabilities, loss or damage whatsoever arising out of or    421
resulting from any other actual or potential pollution damage, even where    422
caused wholly or partially by the act, neglect or default of the Owners, their    423
employees, contractors or sub-contractors or by the unseaworthiness of the    424
Vessel.    425

This document is a computer generated SUPPLYTIME 89 form produced by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expenses as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**14. Insurance**

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners. 426–430

(ii) The Charterers shall request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party. 431–436

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party. 437–439

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party. 440–443

**15. Saving of Life and Salvage**

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible. 444–448

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. 449–455

All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage. 456–461

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount. 462–463

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title. 464–469

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew: 470–473

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance. 474–476

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred. 477–480

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom whosoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission. 481–488

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11(c). 489–492

(b) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance. 493–496

**16. Lien** 497

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel. 498–513

**17. Sublet and Assignment** 514

(a) Charterers. - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel. 515–525

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers. 526–530

(c) Owners. - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. 531–533

Approval for the assignment of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned. 534–536

**18. Substitute Vessel** 537

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld. 538–540

**19. War** 541

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers. 542–553

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and seeks in that Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks. (c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, to such 554–562

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

account being rendered monthly. 569
(d) The Vessel shall have liberty to comply with any orders or directions as to 570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in 571
any other way whatsoever given by the government of the nation under whose 572
flag the Vessel sails or any other government or any person (or body) acting 573
or purporting to act with the authority of such government or by any 574
committee or person having under the terms of the war risks insurance on the 575
Vessel the right to give any such orders or directions. 576
(e) In the event of the outbreak of war (whether there be a declaration of war or 577
not) between any of the countries stated in Box 20 or in the event of the nation 578
under whose flag the Vessel sails becoming involved in war (whether there be 579
a declaration of war or not) either the Owners or the Charterers may terminate 580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the 581
Owners in accordance with Clause 11 If it has cargo on board after discharge 582
thereof at destination or, if debarred under this Clause from reaching or 583
entering it, at a near open and safe port or place as directed by the Owners, or 584
if the Vessel has no cargo on board, at the port or place at which it then is or if 585
at sea at a near, open and safe port or place as directed by the Owners. In all 586
cases Hire shall continue to be paid and, except as aforesaid, all other 587
provisions of this Charter Party shall apply until redelivery. 588
(f) If in compliance with the provisions of this Clause anything is done or is not 589
done, such shall not be deemed a deviation. 590
The Charterers shall procure that all Bills of Lading (if any) issued under this 591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d) 592
and (f) of this Clause. 593

**20. Excluded Ports** 594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners' 595
written permission (a) any place where fever or epidemics are prevalent or to 596
which the Master, Officers and Crew by law are not bound to follow the Vessel; 597
(b) any ice-bound place or any place where lights, lightships, marks and 598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival 599
or where there is risk that ordinarily the Vessel will not be able on account of 600
ice to reach the place or to get out after having completed her operations. The 601
Vessel shall not be obliged to force her nor to follow an ice-breaker. If, on 602
account of ice, the Master considers it dangerous to remain at the loading or 603
discharging place for fear of the Vessel being frozen in and/or damaged he 604
has liberty to sail to a convenient open place and await the Charterers' fresh 605
instructions. 606
(b) Should the Vessel approach or be brought or ordered within such place, 607
or be exposed in any way to the said risks, the Owners shall be entitled from 608
time to time to insure their interests in the Vessel and/or Hire against any of 609
the risks likely to be involved thereby as such terms as they shall think fit, the 610
Charterers to make a refund to the Owners of the premium on demand. 611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost 612
including any lost owing to loss of or sickness or injury to the Master, Officers, 613
Crew or passengers or to the action of the Crew in refusing to proceed to such 614
place or to be exposed to such risks. 615

**21. General Average and New Jason Clause** 616
General Average shall be adjusted and settled in London unless otherwise 617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 618
Hire shall not contribute to General Average. Should adjustment be made in 619
accordance with the law and practice of the United States of America, the 620
following provision shall apply: 621
"In the event of accident, danger, damage or disaster before or after the 622
commencement of the voyage, resulting from any cause whatsoever, whether 623
due to negligence or not, for which, or for the consequence of which, the 624
Owners are not responsible, by statute, contract or otherwise, the cargo, 625
shippers, consignees or owners of the cargo shall contribute with the Owners 626
in General Average to the payment of any sacrifices, loss or expenses of a 627
General Average nature that may be made or incurred and shall pay salvage 628
and special charges incurred in respect of the cargo. 629
If a salving vessel is owned or operated by the Owners, salvage shall be paid 630
for as fully as if the said salving vessel or vessels belonged to strangers. Such 631
deposit as the Owners, or their agents, may deem sufficient to cover the 632
estimated contribution of the cargo and any salvage and special charges 633
thereon shall, if required, be made by the cargo, shippers, consignees 634
or owners of the cargo to the Owners before delivery". 635

**22. Both-to-Blame Collision Clause** 636
If the Vessel comes into collision with another ship as a result of the 637
negligence of the other ship and any act, neglect or default of the Master, 638
mariner, pilot or the servants of the Owners in the navigation or the 639

management of the Vessel, the Charterers will indemnify the Owners against 640
all loss or liability to the other or non-carrying ship or her owners insofar as 641
such loss or liability represents loss of or damage to, or any claim whatsoever 642
of the owners of any goods carried under the Charter Party paid or payable by 643
the other or non-carrying ship or her owners to the owners of the said goods 644
and set-off, recouped or recovered by the other or non-carrying ship or her 645
owners as part of their claim against the Vessel or the Owners. The foregoing 646
provisions shall also apply where the owners, operators or those in charge of 647
any ship or ships or objects other than or in addition to the colliding ships or 648
objects are at fault in respect of a collision or contact. 649

**23. Structural Alterations and Additional Equipment** 650
The Charterers shall have the option of, at their expense, making structural 651
alterations to the Vessel or installing additional equipment with the written 652
consent of the Owners which shall not be unreasonably withheld but unless 653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 654
expense, to her original condition. The Vessel is to remain on hire during any 655
period of those alterations or reinstatement. The Charterers, unless otherwise 656
agreed, shall be responsible for repair and maintenance of any such 657
alteration or additional equipment. 658

**24. Health and Safety** 659
The Owners shall comply with and adhere to all applicable international, 660
national and local regulations pertaining to health and safety, and such 661
Charterers' instructions as may be appended hereto. 662

**25. Taxes** 663
Each party shall pay taxes due on its own profit, income and personnel. The 664
Charterers shall pay all other taxes and dues arising out of the operation or 665
use of the Vessel during the Charter Period. 666
In the event of change in the Area of Operation or change in local regulation 667
and/or interpretation thereof, resulting in an unavoidable and documented 668
change of the Owners' tax liability after the date of entering into the Charter 669
Party or the date of commencement of employment, whichever is the earlier, 670
Hire shall be adjusted accordingly. 671

**26. Early Termination** 672
(a) For Charterers' Convenience.- The Charterers may terminate this Charter 673
Party at any time by giving the Owners written notice as stated in Box 15 and 674
by paying the settlement stated in Box 16 and the demobilisation charge 675
stated in Box 16, as well as Hire or other payments due under the Charter 676
Party. 677
(b) For Cause. - If either party becomes informed of the occurrence of any 678
event described in this Clause that party shall so notify the other party 679
promptly in writing and in any case within 3 days after such information is 680
received. If the occurrence has not ceased within 3 days after such 681
notification has been given, this Charter Party may be terminated by either 682
party, without prejudice to any other rights which either party may have, under 683
any of the following circumstances: 684
(i) Requisition. - If the government of the state of registry and/or the flag of 685
the Vessel, or any agency thereof, requisitions for hire or title or 686
otherwise takes possession of the Vessel during the Charter Period. 687
(ii) Confiscation. - If any government, individual or group, whether or not 688
purporting to act as a government or on behalf of any government, 689
confiscates, requisitions, expropriates, seizes or otherwise takes 690
possession of the Vessel during the Charter Period. 691
(iii) Bankruptcy. - In the event of an order being made or resolution passed 692
for the winding up, dissolution, liquidation or bankruptcy of either party 693
(otherwise than for the purpose of reconstruction or amalgamation) or if 694
a receiver is appointed or if it suspends payment or ceases to carry on 695
business. 696
(iv) Loss of Vessel. - If the Vessel is lost, actually or constructively, or 697
missing, unless the Owners provide a substitute vessel pursuant to 698
Clause 18. In the case of termination, Hire shall cease from the date the 699
Vessel was lost or, in the event of a constructive total loss, from the date 700
of the event giving rise to such loss. If the date of loss cannot be 701
ascertained or the Vessel is missing, payment of Hire shall cease from 702
the date the Vessel was last reported. 703
(v) Breakdown. - If, at any time during the term of this Charter Party, a 704
breakdown of the Owners' equipment or Vessel results in the Owners' 705
being unable to perform their obligations hereunder for a period 706
exceeding that stated in Box 32, unless the Owners provide a substitute 707
vessel pursuant to Clause 18. 708
(vi) Force Majeure. - If a force majeure condition as defined in Clause 27 709

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply; BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

| | |
|---|---|
| prevails for a period exceeding 15 consecutive days. | 710 |
| (vi) Default. – If either party is in repudiatory breach of its obligations | 711 |
| hereunder. | 712 |
| Termination as a result of any of the above mentioned causes shall not relieve | 713 |
| the Charterers of any obligation for Hire and any other payments due. | 714 |

**27. Force Majeure**

| | |
|---|---|
| Neither the Owners nor the Charterers shall be liable for any loss, damages or | 715 |
| delay or failure in performance hereunder resulting from any force majeure | 716 |
| event, including but not limited to acts of God, fire, action of the elements, | 717 |
| epidemics, war (declared or undeclared), warlike actions, insurrection, | 718 |
| revolution or civil strife, piracy, civil war or hostile action, strikes or | 719 |
| differences with workmen (except for disputes relating solely to the Owners' | 720 |
| or the Charterers' employees), acts of the public enemy, federal or state laws, | 721 |
| rules and regulations of any governmental authorities having or asserting | 722 |
| jurisdiction in the premises or of any other group, organisation or informal | 723 |
| association (whether or not formally recognised as a government), and any | 724 |
| other cause beyond the reasonable control of either party which makes | 725 |
| continuance of operations impossible. | 726 |

**28. Notices and Invoices**

| | |
|---|---|
| Notices and invoices required to be given under this Charter Party shall be | 728 |
| given in writing to the addresses stated in Boxes 21, 35 and 39 as appropriate. | 729 |

**29. Wreck Removal**

| | |
|---|---|
| If the Vessel sinks and becomes a wreck and an obstruction to navigation and | 730 |
| has to be removed upon request by any compulsory law or authority having | 731 |
| jurisdiction over the area where the wreck is placed, the Owners shall be | 733 |
| liable for any and all expenses in connection with the raising, removal, | 734 |
| destruction, lighting or marking of the wreck. | 736 |

**30. Confidentiality**

| | |
|---|---|
| All information or data obtained by the Owners in the performance of this | 737 |
| Charter Party is the property of the Charterers, is confidential and shall not be | 738 |
| disclosed without the prior written consent of the Charterers. The Owners | 739 |
| shall use their best efforts to ensure that the Owners, any of their | 740 |
| sub-contractors, and employees and agents thereof shall not disclose any | 741 |
| such information or data. | 743 |

**31. Law and Arbitration**

| | |
|---|---|
| ? (a) This Charter Party shall be governed by English/Norwegian law and any | 745 |
| dispute | |
| arising out of this Charter Party shall be referred to arbitration in London Oslo, | 746 |
| one | |
| arbitrator being appointed by each party, in accordance with the Norwegian | 747 |
| Arbitration | |
| Acts 1950 and 1979 or any statutory modification thereof for the | 748 |
| time being in force. On the receipt by one party of the nomination in | 749 |
| writing of the other party's arbitrator that party shall appoint their arbitrator | 750 |

| | |
|---|---|
| within 14 days, failing which the arbitrator already appointed shall act as sole | 751 |
| arbitrator. If two arbitrators properly appointed shall not agree they shall | 752 |
| appoint an umpire whose decision shall be final. | 753 |
| ? (b) Should any dispute arise out of this Charter Party, the matter in dispute | 754 |
| shall be referred to three persons at New York, one to be appointed by each of | 755 |
| the parties hereto, and the third by the two so chosen; their decision or that of | 756 |
| any two of them shall be final, and for purpose of enforcing any award, this | 757 |
| agreement may be made a rule of the Court. The arbitration shall be members | 758 |
| of the Society of Maritime Arbitrators, Inc. of New York and the proceedings | 759 |
| shall be conducted in accordance with the rules of the Society. | 760 |
| ? (c) Any dispute arising out of this Charter Party shall be referred to arbitration | 761 |
| at the place stated in Box 33 subject to the law and procedures applicable | 762 |
| there. | 763 |
| (d) If Box 33 in PART II is not filled in, sub-clause (a) of this Clause shall apply. | 764 |
| ? (a), (b) and (c) are alternatives; state alternative agreed in Box 33 | 765 |

**32. Entire Agreement**

| | |
|---|---|
| This is the entire agreement of the parties, which supersedes all previous | 766 |
| written or oral understandings and which may not be modified except by a | 767 |
| written amendment signed by both parties. | 768 |

**33. Severability Clause**

| | |
|---|---|
| If any portion of this Charter Party is held to be invalid or unenforceable for | 770 |
| any reason by a court or governmental authority of competent jurisdiction, | 771 |
| then such portion will be deemed to be stricken and the remainder of this | 772 |
| Charter Party shall continue in full force and effect. | 773 |

**34. Demise**

| | |
|---|---|
| Nothing herein contained shall be construed as creating a demise of | 775 |
| the Vessel to the Charterers. | 776 |

**35. Definitions**

| | |
|---|---|
| "Well" is defined for the purposes of this Charter Party as the time required to | 778 |
| drill, test, complete and/or abandon a single borehole including any side- | 779 |
| track thereof. | 781 |
| "Offshore unit" is defined for the purposes of this Charter Party as any vessel, | 782 |
| offshore installation, structure and/or anchor mobile unit used in offshore | 783 |
| exploration, construction, pipelaying or repair, exploitation or production. | 784 |
| "Offshore site" is defined for the purposes of this Charter Party as the area | 785 |
| within three nautical miles of an "offshore unit" from or to which the Owners | 786 |
| are requested to take their Vessel by the Charterers. | 787 |
| "Employees" is defined for the purposes of this Charter Party as employees, | 788 |
| directors, officers, servants, agents or invitees. | 789 |

**36. Headings**

| | |
|---|---|
| The headings of this Charter Party are for identification only and shall not be | 790 |
| deemed to be part hereof or be taken into consideration in the interpretation | 792 |
| or construction of this Charter Party. | 793 |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# EXHIBIT 2
# HOEL AFFIRMATION

## SIDE-AGREEMENT TO TIME CHARTER PARTY BETWEEN TFDS OFFSHORE AS AND ROLV BERG DRIVE AS REGARDING AHTS ALDOMA

It is understood between the parties that ONGC may offer Rolv Berg Drive AS extensions to the 3 year contract with contract no: MR/MM/OFF.LGTS./CH/VESSELS//10(109)/2003. It is further agreed between the parties that should Rolv Berg Drive AS be granted extension to this contract or new contracts with ONGC, Rolv Berg Drive shall have the right to extend the charter of AHTS Aldoma on a day-rate not to exceed USD 9.000,-.

This agreement shall be subject only to TFDS Offshore securing further charter with the vessel's owner.

It is further agreed that should Rolv Berg Drive AS secure other future contracts with ONGC TFDS Offshore AS will be given first option where they have vessels which meet the requirements at competitive rates.

This agreement is entered into on the 5th of March 2004.

For TFDS Offshore AS

Svein Hoel
Managing Director

For Rolv Berg Drive AS

Snorre S. Stinessen
Coordinating Manager

# EXHIBIT 3
# HOEL AFFIRMATION

| 1. Place and date<br>12 May 2005 | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br>PART I | |
|---|---|---|
| 2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>FSUE Arktikmorneftegazrazvedka | 3. Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a))<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS), Enterprise no. 929 987 020<br>Strandveien 106<br>9008 Tromsø, Norway | |
| 4. Vessel's name (Cl. 1(a))<br>Aldoma | 5. Date of delivery (Cl. 2(a))<br>6 March 2006 | 6. Cancelling date (Cl. 2(a) and (c))<br>N/A |
| 7. Port or place of delivery (Cl. 2(a))<br>India, Kakinada | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>Kirkenes to be agreed<br>(i) Port or place of redelivery<br><br>30 days<br>(ii) Number of days' notice of redelivery | |
| 9. Period of hire (Cl. 1(a))<br>14 months | 10. Extension of period of hire (optional) (Cl. 1(b))<br><br>2 x 1 year<br>(i) Period of extension<br><br>90 days<br>(ii) Advance notice for declaration of option (days) | |
| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>N/A<br>(i) Voyage or well (state which)<br>N/A<br>(ii) Maximum extension period (state number of days) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>N/A<br>(i) Lump sum<br>N/A<br>(ii) When due | |
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br>India, Kakinada | |
| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>USD 81,000 | 15. Number of days' notice of early termination (Cl. 26(a))<br>N/A | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br>~~USD 85,000~~<br>N/A |
| 17. Area of operation (Cl. 5(a))<br>World Wide within IWL, intention domestic India trade for ONGC | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>N/A | |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Issued by The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) REVISED 1989

Printed by BIMCO's Idea

Adopted by International Support Vessel Owners' Association (ISOA), London

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a)) and (d) ) | 20. Extension hire (if agreed, state rate) (Cl. 10(d)) |
|---|---|
| USD 3,600.- | 1st option USD 3,600.- per day |
|  | 2nd option USD 3,600.- per day |

| 21. Invoicing for hire and other payments (Cl. 10(d)) | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(d)) |
|---|---|
| (i) state whether to be issued in advance or arrears | As per Invoice. |
| Arrears (within 5 days after Invoice) |  |
| (ii) state to whom to be issued if addressee other than stated in Box 2 |  |
| As per box 2 |  |
| (iii) state to whom to be issued if addressee other than stated in Box 3 |  |
| As per box 3 |  |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(a)) | 24. Interest rate payable (Cl. 10(a)) | 25. Maximum audit period (Cl. 10(f)) |
|---|---|---|
| 15 days | LIBOR + 3 % |  |

| 26. Meals (state rate agreed) (Cl. 5(c)(ii)) | 27. Accommodation (state rate agreed) (Cl. 5(c)(ii)) | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f)) |
|---|---|---|
| N/A | N/A | N/A |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) | 30. War (state basis of countries) (Cl. 19(a)) |
|---|---|
| See additional clause 38 - Profit split | Russia, Norway, India |

| 31. General average (place of settlement—only to be filled in if other than London) (Cl. 21) | 32. Breakdown (state period) (Cl. 25(c)(vi)) |
|---|---|
| Oslo | N/A |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) | 34. Numbers of additional clauses covering special provisions, if agreed |
|---|---|
| Norwegian law, arbitration in Oslo, Norway |  |

| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 35) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 35) |
|---|---|
| FSUE Arktikmorneftegazrazvedka | [illegible] former TFDS Offshore AS and Troms Offshore [illegible] AS [illegible] [illegible] |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I, including additional clauses, if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed hereto. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is applicable and shall only apply if expressly agreed and stated in Box 38.

[signatures and official stamp/seal]

[illegible] TIME 89 form printed by authority of [illegible] of this form shall be clearly visible. In the event of any modification [illegible] which is not clearly visible, the text [illegible] shall apply. BIMCO assumes no responsibility for any loss, [illegible] between the original BIMCO approved document [illegible]

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

accessible to the Charterers or their agents. 129

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents. 130–137

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master. 138–146

(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment. 147–151

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed. 152–159

7. Owners-Charterers to Provide 160
(a) The Owners-Charterers shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, all insurance provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purpose mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners-Charterers' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners-Charterers are to provide and/or pay for, and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability. 161–175

(b) On delivery the Vessel shall be/is equipped, if appropriate, and the Charterers have/es accepted the Vessel at the Owners' expense with any towing and anchor handling equipment specified in Section 5(b) of ANNEX "A" on board. If during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners' negligence, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense. 176–181

8. Charterers also to Provide 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise). 183–191

(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, inert gas required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hose connections and adaptors, and further, shall refill oxygen/acetylene bottles used for offshore works. 196–202

(c) The Charterers shall pay for customs duties, all permits, import duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the Vessel and/or equipment, required for or arising out of this Charter Party. 203–206

9. Bunkers 207
Unless otherwise agreed, The Vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering stage en route to her next port of call. The Charterers upon delivery and the/the The Owners upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and ports of delivery and redelivery. Charterers' cost of the bunkers and lubricants. 208–213

10. Hire and Payments 214
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 19 per day or pro rata for part thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier termination of this Charter Party. 215–218

(b) Extension Hire. - If the option to extend the Charter Period under Clause 1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be mutually agreed between the Owners and the Charterers. 219–221

(c) Adjustment of Hire. - The rate of Hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party or the date of commencement of employment, whichever is earlier, in the Owners' costs arising from changes in the Charterers' requirements or regulations governing the Vessel and/or its Crew or this Charter Party. 222–226

(d) Invoicing. - All invoices shall be issued in the contract currency stated in Box 19. In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into the contract currency shall be that quoted by the Central Bank of the country of such other currency as at the date of the Owners' invoice. Invoices covering Hire and any other payments due shall be issued monthly as stated in Box 21(i) or at the expiration or earlier termination of this Charter Party. Notwithstanding the foregoing, bunkers and lubricants on board at delivery shall be invoiced at the time of delivery. 227–235

(e) Payments. - Payments of Hire, bunker invoices and disbursements for the Charterers' account shall be received within the number of days stated in Box 23 from the date of receipt of the invoice. Payment shall be made in the contract currency in full without discount to the account stated in Box 22. However any advances for disbursements made on behalf of and approved by the Owners may be deducted from Hire due. 236–241

If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 24 on the amount outstanding from and including the due date until payment is received. 242–245

Where an invoice is disputed, the Charterers shall in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the Charterers specify such reason. Interest will be chargeable at the rate stated in Box 24 on such disputed amounts where resolved in favour of the Owners. Should the Owners prove the validity of the disputed portion of the invoice, balance payment shall be received by the Owners within 5 banking days after the dispute is resolved. Should the Charterers' claim be valid, a corrected invoice shall be issued by the Owners. 246–253

In default of payment as herein specified, the Owners may require the Charterers to make payment of the amount due within 5 banking days of receipt of notification from the Owners; failing which the Owners shall have the right to withdraw the Vessel without prejudice to any claim the Owners may have against the Charterers under this Charter Party. 254–259

While payment remains due the Owners shall be entitled to suspend the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and Hire shall continue to accrue and any extra expenses resulting from such suspension shall be for the Charterers' account. 260–265

(f) Audit. - The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to work 266–267

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

04

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

11. Suspension of Hire 274
The hire is payable on a 365 days basis without off-hire. (a) If as a result of 275
any deficiency of Crew of the Owners' stores, strike of 
Master, Officers and Crew, breakdown of machinery, damage to hull or other 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 277
payable in respect of any time lost and any Hire paid in advance shall be 278
adjusted accordingly provided always however that Hire shall not cease in the 279
event of the Vessel being prevented from working as aforesaid as a result of: 280
(i) the carriage of cargo as noted in Clause 5(c)(ii) and 5(i) 281
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or 282
Crew having communication with the shore at any infected area not in 283
connection with the employment of the Vessel without the consent or the 284
instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286
the request of the Charterers; 287
(iv) detention in consequence of being driven into port or to anchorage 288
through stress of weather or trading to shallow harbours or to river or 289
ports with bars or suffering an accident to her cargo, when the expense 290
resulting from such detention shall be for the Charterers' account 291
howsoever incurred; 292
(v) detention or damage by ice; 293
(vi) any act or omission of the Charterers, their servants or agents. 294
(b) Liability for Vessel not Working. - The Owners' liability for any loss; 295
damage or delay sustained by the Charterers as a result of the Vessel being 296
prevented from working by any cause whatsoever shall be limited to 297
suspension of hire. 298
(c) Maintenance and Drydocking. - Notwithstanding sub-clause (a) hereof, the 299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall 300
be cumulative, per month or pro rata for part of a month from the 301
commencement of the Charter Period for maintenance and repairs including 302
drydocking (hereinafter referred to as "maintenance allowance"). 303
The Vessel shall be drydocked at regular intervals. The Charterers shall place 304
the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated 305
by the Owners at a later date) having facilities suitable to the Owners for the 306
purpose of such drydocking. 307
During reasonable voyage time taken in transits between such port and Area 308
of Operation the Vessel shall be on hire and such time shall not be counted 309
against the accumulated maintenance allowance. 310
Hire shall be suspended during any time taken in maintenance repairs and 311
drydocking in excess of the accumulated maintenance allowance. 312
In the event of less time being taken by the Owners for repairs and drydocking 313
or, alternatively, the Charterers not making the Vessel available for all or part 314
of this time, the Charterers shall, upon expiration or earlier termination of the 315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in 316
addition to Hire otherwise due under the Charter Party in respect of all such 317
time not so taken or made available. 318
Upon commencement of the Charter Period, the Owners agree to furnish the 319
Charterers with the Owners' proposed drydocking schedule and the 320
Charterers agree to make every reasonable effort to assist the Owners in 321
adhering to such predetermined drydocking schedule for the Vessel. 322

12. Liabilities and Indemnities 323
(a) Owners. - Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 5(c)(iii), 7(b), 8(b), 12(a), 15(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or of 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partially by the act, neglect, or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partially by unseaworthiness of any vessel; 333
and the Owners shall indemnify, protect, defend and hold harmless the 334
Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337
(b) Charterers. - Notwithstanding anything else contained in this Charter 338

Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything lowed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
lowed by the Vessel, arising out of or in any way connected with the 346
performance of this Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partially by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partially by the 350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect, 351
defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353
arising out of or in connection with such loss, damage, liability, personal 354
injury or death. 355
(c) Consequential Damages. - Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or 362
held to deprive the Owners or the Charterers, as against any person or party, 363
including as against each other, of any right to claim limitation of liability 364
provided by any applicable law, statute or convention, save that nothing in 365
this Charter Party shall create any right to limit liability. Where the Owners or 366
the Charterers may seek an indemnity under the provisions of this Charter 367
Party or against each other in respect of a claim brought by a third party, the 368
Owners or the Charterers shall seek to limit their liability against such third 369
party. 370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities, 371
limitations of liability, indemnities, privileges and conditions granted or 372
provided by this Charter Party or by any applicable statute, rule or regulation 373
for the benefit of the Charterers shall also apply to and be for the benefit of the 374
Charterers' parent, affiliated, related and subsidiary companies; the 375
Charterers' contractors, sub-contractors, clients, joint venturers and joint 376
interest owners (always with respect to the job or project on which the Vessel 377
is employed); their respective underwriters and their respective underwriters. 378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability, 379
indemnities, privileges and conditions granted or provided by this Charter 380
Party or by any applicable statute, rule or regulation for the benefit of the 381
Owners shall also apply to and be for the benefit of the Owners' parent, 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its 384
demise charterer(s), their respective employees and their respective 385
underwriters. 386

(iii) The Owners or the Charterers shall be deemed to be acting as agent or 387
trustee of and for the benefit of all such persons and parties set forth above, 388
but only for the limited purpose of contracting for the extension of such 389
benefits to such persons and parties. 390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but 391
regardless of whether this option is exercised the other provisions of Clause 12 392
shall apply and shall be paramount) 393
In order to avoid disputes regarding liability for personal injury or death of 394
employees or for loss of or damage to property, the Owners and the 395
Charterers have entered into, or by this Charter Party agree to enter into, an 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form 397
substantially similar to that specified in ANNEX "C") between the Owners, the 398
Charterers and the various contractors and sub-contractors of the Charterers. 399
(g) Hazardous and Noxious Substances. - Notwithstanding any other 400
provision of this Charter Party to the contrary, the Charterers shall always be 401
responsible for any losses, damages or liabilities suffered by the Owners, 402
their employees, contractors or sub-contractors, by the Charterers, or by 403
third parties, with respect to the Vessel or other property, personal injury or 404
death, pollution or otherwise, which losses, damages or liabilities are caused, 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and 406
noxious substances in whatever form as ordered by the Charterers, and the 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless 408

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

for any expense, loss or liability whatsoever or howsoever arising with 409
respect to the carriage of hazardous or noxious substances. 410

13. Pollution 411
(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners Charterers 412
shall be
liable for, and agree to indemnify, defend and hold harmless the 413
Charterers Owners
against, all claims, costs, expenses, actions, proceedings, suits, demands 414
and liabilities whatsoever arising out of actual or potential pollution damage 415
and the cost of cleanup or control thereof arising from acts or omissions of 416
the Owners or their personnel which cause or allow discharge, spills or leaks 417
from the Vessel, except as may emanate from cargo thereon or therein. 418
(b) The Owners Charterers shall be liable for and agree to indemnify, defend and hold 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, 420
suits, demands, liabilities, loss or damage whatsoever arising out of or 421
resulting from any other actual or potential pollution damage, even where 422
caused wholly or partially by the act, neglect or default of the Owners, their 423
employees, contractors or sub-contractors or by the unseaworthiness of the 424
Vessel. 425

14. Insurance 426
(a)(i) The Owners Charterers shall procure and maintain in effect for the 427
duration of this
Charter Party, with reputable insurers, with total insurance value of USD 5 428
mill with the insurances set forth in ANNEX "E".
Policy limits shall not be less than those indicated. Reasonable deductibles 429
are acceptable and shall be for the account of the Owners Charterers. 430
(ii) The Charterers Owner shall upon request be named as co-insured 431
together with the Charterers. The Owners
shall upon request cause insurers to waive subrogation rights against the 432
Charterers (as encompassed in Clause 12(b)(iii)). Co-insurance and/or 433
waivers of subrogation shall be given only insofar as these relate to liabilities 434
which are properly the responsibility of the Owners under the terms of this 435
Charter Party. 436
(b) The Owners Charterers shall upon request furnish the Charterers Owners 437
with certificates of
insurance which provide sufficient information to verify that the Owners 438
Charterers have
complied with the insurance requirements of this Charter Party. 439
(c) If the Owners Charterers fail to comply with the aforesaid insurance 440
requirements, the
Charterers Owners may, without prejudice to any other rights or remedies 441
under this
Charter Party, purchase similar coverage and invoice an amount of the 442
insurance costs as additional hire deduct the cost thereof from 443
any payment due to the Owners under this Charter Party.

15. Saving of Life and Salvage 444
(a) The Vessel shall be permitted to deviate for the purpose of saving life at 445
sea without prior approval of or notice to the Charterers and without loss of 446
Hire provided however that notice of such deviation is given as soon as 447
possible. 448
(b) Subject to the Charterers' consent, which shall not be unreasonably 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it 450
being understood that the Vessel shall be off hire from the time she leaves 451
port or commences to deviate and she shall remain off-hire until she is again 452
in every way ready to resume the Charterers' service at a position which is not 453
less favourable to the Charterers than the position at the time of leaving port 454
or deviating for the salvage services. 455
All salvage monies earned by the Vessel shall be divided equally between the 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's 457
share, legal expenses, value of fuel and lubricants consumed, Hire of the 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if 459
any, and any other extraordinary loss or expense sustained as a result of the 460
salvage. 461
The Charterers shall be bound by all measures taken by the Owners in order 462
to secure payment of salvage and to fix its amount. 463
(c) The Owners shall waive their right to claim any award for salvage 464
performed on property owned by or contracted to the Charterers, always 465
provided such property was the object of the operation the Vessel was 466
chartered for, and the Vessel shall remain on hire when rendering salvage 467
services to such property. This waiver is without prejudice to any right the 468
Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of 470
"no claim for salvage", then, notwithstanding any other provisions contained 471
in this Charter Party and even in the event of neglect or default of the Owners, 472
Master, Officers or Crew: 473
(i) The Charterers shall be responsible for and shall indemnify the Owners 474
against payments made, under any legal rights, to the Master, Officers 475
and Crew in relation to such assistance. 476
(ii) The Charterers shall be responsible for and shall reimburse the Owners 477
for any loss or damage sustained by the Vessel or her equipment by 478
reason of giving such assistance and shall also pay the Owners' 479
additional expenses thereby incurred. 480
(iii) The Charterers shall be responsible for any actual or potential spill, 481
seepage and/or emission of any pollutant howsoever caused occurring 482
within the offshore site and any pollution resulting therefrom 483
whatsoever it may occur and including but not limited to the cost of 484
such measures as are reasonably necessary to prevent or mitigate 485
pollution damage, and the Charterers shall indemnify the Owners 486
against any liability, cost or expense arising by reason of such actual or 487
potential spill, seepage and/or emission. 488
(iv) The Charterers shall not be off-hire as a consequence of giving such 489
assistance, or effecting repairs under sub-paragraph (ii) of this sub- 490
clause, and time taken for such repairs shall not count against time 491
granted under Clause 11(c). 492
(v) The Charterers shall indemnify the Owners against any liability, cost 493
and/or expense whatsoever in respect of any loss of life, injury, damage 494
or other loss to person or property howsoever arising from such 495
assistance. 496

16. Lien 497
The Owners shall have a lien upon all cargoes for all claims against the 498
Charterers under this Charter Party and the Charterers shall have a lien on the 499
Vessel for all monies paid in advance and not earned. The Charterers will not 500
suffer, nor permit to be continued, any lien or encumbrance incurred by them 501
or their agents, which might have priority over the title and interest of the 502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall 503
indemnify and hold the Owners harmless against any lien of whatsoever 504
nature arising upon the Vessel during the Charter Period while she is under 505
the control of the Charterers, and against any claims against the Owners 506
arising out of the operation of the Vessel by the Charterers or out of any 507
neglect of the Charterers in relation to the Vessel or the operation thereof. 508
Should the Vessel be arrested by reason of claims or liens arising out of her 509
operation hereunder, unless brought about by the act or neglect of the 510
Owners, the Charterers shall at their own expense take all reasonable steps to 511
secure that within a reasonable time the Vessel is released and at their own 512
expense put up bail to secure release of the Vessel. 513

17. Sublet and Assignment 514
(a) Charterers — The Charterers may have the option of subletting, assigning 515
or loaning the Vessel to any person or company not competing with the 516
Owners, subject to the Owners' prior approval which shall not be 517
unreasonably withheld, upon giving notice in writing to the Owners, but the 518
original Charterers shall always remain responsible to the Owners for due 519
performance of the Charter Party and contractors of the person or company 520
taking such subletting, assigning or loan shall be deemed contractors of the 521
Charterers for all the purposes of this Charter Party. The Owners make it a 522
condition of such consent that additional Hire shall be paid as agreed 523
between the Charterers and the Owners having regard to the nature and 524
period of any intended service of the Vessel. 525
(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor 526
handling and/or towing operations connected with equipment, other than that 527
used by the Charterers, then a daily increment to the Hire in the amount as 528
stated in Box 30 or pro rata shall be paid for the period between departure for 529
such operations and return to her normal duties for the Charterers. 530
(c) Owners — The Owners may not assign or transfer any part of this Charter 531
Party without the written approval of the Charterers, which approval shall not 532
be unreasonably withheld. 533
Approval by the Charterers of such subletting or assignment shall not relieve 534
the Owners of their responsibility for due performance of the part of the 535
services which is sublet or assigned. 536

18. Substitute Vessel 537
The Owners shall be entitled at any time, whether before delivery or at any 538
other time during the Charter Period, to provide a substitute vessel, subject to 539

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

the Charterers' prior approval which shall not be unreasonably withheld. 540

**19.War**
(a) Unless the consent of the Owners be first obtained, the Vessel shall not be 541
ordered nor continue to any port or place or on any voyage nor be used on 542
any service which will bring the Vessel within a zone which is dangerous as a 543
result of any actual or threatened act of war, war, hostilities, warlike 544
operations, acts of piracy or of hostility or malicious damage against this or 545
any other vessel or its cargo by any person, body or state whatsoever, 546
revolution, civil war, civil commotion or the operation of international law, nor 547
be exposed in any way to any risks or penalties whatsoever consequent upon 548
the imposition of sanctions, nor carry any goods that may in any way expose 549
her to any risks of seizure, capture, penalties or any other interference of any 550
kind whatsoever by the belligerent or fighting powers or parties or by any 551
government or rulers. 552
(b) Should the Vessel approach or be brought or ordered within such zone, or 553
be exposed in any way to the said risks, (I) the Owners shall be entitled from 554
time to time to insure their interest in the Vessel for such terms as they deem 555
fit up to its open market value and also in the Hire against any of the risks 556
likely to be involved thereby, and the Charterers shall make a refund on 557
demand of any additional premium thereby incurred, and (ii) notwithstanding 558
the terms of Clause 11 Hire shall be payable for all time lost including any loss 559
owing to loss of or injury to the Master, Officers, Crew or passengers or to 560
refusal by any of them to proceed to such zone or to be exposed to such risks. 561
(c) In the event of additional insurance premiums being incurred or the wages 562
of the Master and/or Officers and/or Crew and/or the cost of provisions and 563
or stores for deck and/or engine room being increased by reason of or during 564
the existence of any of the matters mentioned in Box 30 or in the amount of 565
any additional premium and/or increase shall be added to the Hire, and paid 566
by the Charterers on production of the Owners' account therefor, such 567
account being rendered monthly. 568
(d) The Vessel shall have liberty to comply with any orders or directions as to 569
departure, arrival, routes, ports of call, stoppages, destination, delivery or in 570
any other way whatsoever given by the government of the nation under whose 571
flag the Vessel sails or any other government or any person (or body) acting 572
or purporting to act with the authority of such government or by any 573
committee or person having under the terms of the War Risks insurance on the 574
Vessel the right to give any such orders or directions. 575
(e) In the event of the outbreak of war (whether there be a declaration of war or 576
not) between any of the countries stated in Box 30 or in the event of the nation 577
under whose flag the Vessel sails becoming involved in war (whether there be 578
a declaration of war or not) either the Owners or the Charterers may terminate 579
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the 580
Owners in accordance with PART II if it has cargo on board after discharge 581
thereof at destination or, if debarred under this Clause from reaching or 582
entering it, at a near open and safe port or place as directed by the Owners, or 583
if the Vessel has no cargo on board, at the port or place at which it then is or if 584
at sea at a near, open and safe port or place as directed by the Owners. In all 585
cases Hire shall continue to be paid and, except as aforesaid, all other 586
provisions of this Charter Party shall apply until redelivery. 587
(f) If in compliance with the provisions of this Clause anything is done or is not 588
done, such shall not be deemed a deviation. 589
The Charterers shall procure that all Bills of Lading (if any) issued under this 590
Charter Party shall contain the stipulations contained in sub-clauses (a), (d) 591
and (f) of this Clause. 592
593

**20.Excluded Ports**
(a) The Vessel shall not be ordered to nor bound to enter without the Owners' 594
written permission (a) any place where fever or epidemics are prevalent or to 595
which the Master, Officers and Crew by law are not bound to follow the Vessel; 596
(b) any ice-bound place or any place where lights, lightships, marks and 597
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival 598
or where there is risk that ordinarily the Vessel will not be able on account of 599
ice to reach the place or to get out after having completed her operations. The 600
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on 601
account of ice, the Master considers it dangerous to remain at the loading or 602
discharging place for fear of the Vessel being frozen in and/or damaged he 603
has liberty to sail to a convenient open place and await the Charterers' fresh 604
instructions. 605
(b) Should the Vessel approach or be brought or ordered within such place, 606
or be exposed in any way to the said risks, the Owners shall be entitled from 607
time to time to insure their interests in the Vessel and/or Hire against any of 608
the risks likely to be involved thereby on such terms as they shall think fit, the 609
Charterers to make a refund to the Owners of the premium on demand. 610
611

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost 612
including any lost owing to loss of or sickness or injury to the Master, Officers, 613
Crew or passengers or to the action of the Crew in refusing to proceed to such 614
place or to be exposed to such risks. 615

**21.General Average and New Jason Clause**
General Average shall be adjusted and settled in London unless otherwise 616
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 617
Hire shall not contribute to General Average. Should adjustment be made in 618
accordance with the law and practice of the United States of America, the 619
following provision shall apply: 620
"In the event of accident, danger, damage or disaster before or after the 621
commencement of the voyage, resulting from any cause whatsoever, whether 622
due to negligence or not, for which, or for the consequence of which, the 623
Owners are not responsible, by statute, contract or otherwise, the cargo, 624
shippers, consignees or owners of the cargo shall contribute with the Owners 625
in General Average to the payment of any sacrifices, loss or expense of a 626
General Average nature that may be made or incurred and shall pay salvage 627
and special charges incurred in respect of the cargo. 628
If a salving vessel is owned or operated by the Owners, salvage shall be paid 629
for as fully as if the said salving vessel or vessels belonged to strangers. Such 630
deposit as the Owners, or their agents, may deem sufficient to cover the 631
estimated contribution of the cargo and any salvage and special charges 632
thereon shall, if required, be made by the cargo, shippers, consignees 633
or owners of the cargo to the Owners before delivery". 634
635

**22.Both-to-Blame Collision Clause**
If the Vessel comes into collision with another ship as a result of the 636
negligence of the other ship and any act, neglect or default of the Master, 637
mariner, pilot or the servants of the Owners in the navigation or the 638
management of the Vessel, the Charterers will indemnify the Owners against 639
all loss or liability to the other or non-carrying ship or her owners insofar as 640
such loss or liability represent loss of or damage to, or any claim whatsoever 641
of the owners of any goods carried under this Charter Party paid or payable by 642
the other or non-carrying ship or her owners to the owners of the said goods 643
and set-off, recouped or recovered by the other or non-carrying ship or her 644
owners as part of their claim against the Vessel or the Owners. The foregoing 645
provisions shall also apply where the owners, operators or those in charge of 646
any ship or ships or objects other than or in addition to the colliding ships or 647
objects are at fault in respect of a collision or contact. 648
649

**23.Structural Alterations and Additional Equipment**
The Charterers shall have the option of, at their expense, making structural 650
alterations to the Vessel or installing additional equipment with the written 651
consent of the Owners which shall not be unreasonably withheld but unless 652
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 653
expense, to her original condition. The Vessel is to remain on hire during any 654
period of these alterations or reinstatement. The Charterers, unless otherwise 655
agreed, shall be responsible for repair and maintenance of any such 656
alteration or additional equipment. 657
658

**24.Health and Safety**
The Owners-Charterers shall comply with and adhere to all applicable 659
international, 660
national and local regulations pertaining to health and safety, and such 661
Charterers'-Owners' instructions as may be appended hereto. 662

**25.Taxes**
Each party shall pay taxes due on its own profit, income and personnel. The 663
Charterers shall pay all other taxes and dues arising out of the operation or 664
use of the Vessel during the Charter Period. 665
In the event of change in the Area of Operation or change in local regulation 666
and/or interpretation thereof, resulting in an unavoidable and documented 667
change of the Owners' tax liability after the date of entering into the Charter 668
Party or the date of commencement of employment, whichever is the earlier, 669
Hire shall be adjusted accordingly. 670
671

**26.Early Termination**
(a) For Charterers' Convenience. - The Charterers may terminate this Charter 672
Party at any time by giving the Owners written notice as stated in Box 15 and 673
by paying the settlement stated in Box 14 and the demobilisation charge 674
stated in Box 16, as well as Hire or other payments due under the Charter 675
Party. 676
(b) For Cause. - If either party becomes informed of the occurrence of any 677
678

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances: 679–684

(i) *Requisition.* – If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period. 685–687

(ii) *Confiscation.* – If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period. 688–691

(iii) *Bankruptcy.* – In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business. 692–696

(iv) *Loss of Vessel.* – If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained and the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported. 697–703

(v) *Breakdown.* – If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18. 704–708

(vi) *Force Majeure.* – If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days. 709–710

(vii)*Default.* – If either party is in repudiatory breach of its obligations hereunder. 711–712

Termination as a result of any of the above mentioned causes shall not relieve The Charterers of any obligation for Hire and other payments due. 713–714

**27.Force Majeure** 715

Neither the Owners nor the Charterers shall be liable for any loss, damage or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strike, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible. 716–727

**28.Notices and Invoices** 728

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate. 729–730

**29.Wreck Removal** 731

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck. 732–736

**30.Confidentiality** 737

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be 738–739

disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data. 740–743

**31.Law and Arbitration** 744

*) (a) This Charter Party shall be governed by English-Norwegian law and any dispute 745

arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Norwegian Arbitration 746–747

Acts 1960 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final. 748–753

*) (b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York in Oslo, one to be appointed by each of 754–755

the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society. 756–760

*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there. 761–763

(d) If Box 33 in PART II is not filled in, sub-clause (a) of this Clause shall apply. 764

*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 765

**32.Entire Agreement** 766

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties. 767–769

**33.Severability Clause** 770

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect. 771–774

**34.Demise** 775

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers. 776–777

**35.Definitions** 778

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof. 779–781

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production. 782–785

"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers. 786–787

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees. 788–789

**36.Headings** 790

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party. 791–793

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**ADDITIONAL AGREEMENT**
**TO**
**SUPPLYTIME 89 DATED 12 MAY 2005**
**"ALDOMA"**

### 1.  Profit split

In addition to the charter hire payable pursuant to box 19 the Owners and the Charterers have agreed a profit split of any average daily net earnings (inclusive of Part II clause 7 items) above the levels set out below in any 90 day period as follows:

From 6 March 2006-5 May 2007 above USD 9.000 per day  - split 50/50
From 6 May 2007-5 May 2008 above USD 9.500 per day  - split 50/50
From 6 May 2008-5 May 2009 above USD 10.000 per day  - split 50/50

By way of example if the net daily rate is USD 10,000 in the first period an additional USD 500 per day is payable to the Owners being 50% of the rate above USD 9,000.

Any additional hire payable pursuant to this additional clause shall be paid upon closing of books for the period, but not later than 10 banking days after the expiry of each 90 day period.

The Charterers will provide the Owners with monthly reports of earnings and will on request provide copies of sub-charterparties and freight invoices and other relevant documentation. The Owners shall be entitled to appoint an auditor to review the documents relevant to establish the earning.

### 2.  Russian crew

The Owners may require that the Charterers employ Russian crew as provided by the Owners, provided the Owners provide crew with suitable experience and with necessary qualification to comply with any sub charter or other contractual commitment for the vessel. The crew shall be employed on 4 months on 4 months off basis and Charterers shall pay the crew's replacement costs.

### 3.  Bank Guarantee

Against cancellation of the security provided for the Charterers' obligations under the previous charter agreement between the parties for the Aldoma, the Charterers will provide the Owners with a bank guarantee in Owners' favour in an amount of NOK 150,000 as security for Charterers' obligations towards the Owners hereunder.

12 May 2005

# EXHIBIT 4
# HOEL AFFIRMATION

## SIDELETTER SUPPLYTIME 89 DATED 12 MAY 2005

### "ALDOMA"

The vessel will continue operation under her present sub-charter arrangement with Rolv Berg Drive AS till this arrangement is either terminated or otherwise expire. There shall not be given any extension or further charter parties (inclusive of any already agreed options) with Rolv Berg Drive AS without the prior written consent of the Owner.

The Owner shall further give their prior written consent to any charter where the charterhire in any new period after the Rolv Berg Drive AS firm period give the owner an additional hire of less than USD 1000,- by way of the profit split.

The Owners:                                      The Charterers:


Oleg S Maatsakanyan                              Svein Hoel
Director General                                 Director

# EXHIBIT 5
# HOEL AFFIRMATION

N 393/03

| 1. Place and date<br>Murmansk, **30.05.07** | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"    PART I |
|---|---|

<table>
<tr>
<td>2. Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(b))<br>FSUE Arktikmorneftegazrazvedka<br>Kolskij, 1<br>183032 Murmansk, Russia<br>Tel: +78 15 255 2000</td>
<td colspan="2">3. Charterers/Place of business (full style, address and telex/telex/fax no.) (Cl. 1(a))<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS), Enterprise no. 929 987 020<br>Strandveien 106<br>9008 Tromsø, Norway</td>
</tr>
<tr>
<td>4. Vessel's name (Cl. 1(a))<br>Aldoma</td>
<td>5. Date of delivery (Cl. 2(a))<br>Expected to be 6 May 2007</td>
<td>6. Cancelling date (Cl. 2(a) and (c))<br>N/A</td>
</tr>
<tr>
<td>7. Port or place of delivery (Cl. 2(a))<br>Vizag, Coast of India</td>
<td colspan="2">8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br><br>Kirkenes<br>(i) Port or place of redelivery<br><br>30 days<br>(ii) Number of days' notice of redelivery</td>
</tr>
<tr>
<td>9. Period of hire (Cl. 1(a))<br>3 years</td>
<td colspan="2">10. Extension of period of hire (optional) (Cl. 1(a))<br>1 year to be mutually agreed<br>(i) Period of extension<br><br>90 days<br>(ii) Advance notice for declaration of option (days)</td>
</tr>
<tr>
<td>11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>N/A<br>(i) Voyage or well (state which)<br>N/A<br>(ii) Maximum extension period (state number of days)</td>
<td colspan="2">12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i))<br>N/A<br>(i) Lump sum<br>N/A<br>(ii) When due<br>13. Port or place of mobilisation (Cl. 2(b)(i))<br>According to box 7</td>
</tr>
<tr>
<td>14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br>EUR 60,000.-</td>
<td>15. Number of days' notice of early termination (Cl. 26(a))<br>N/A</td>
<td>16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br>N/A</td>
</tr>
<tr>
<td>17. Area of operation (Cl. 5(a))<br>World Wide within IWL.</td>
<td colspan="2">18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>N/A</td>
</tr>
</table>

*Issued by: The Documentary Committee of The Baltic and International Maritime Council (BIMCO), Copenhagen (First edition published 1975) REVISED 1989*

*Printed by BIMCO's idea*

*Adopted by International Support Vessel Owners' Association (ISOA), London*

*Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen September 1989*

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                                    PART I

| | |
|---|---|
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) )<br>EUR 4,800.- per day including VAT | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br>To be mutually agreed |
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i) state whether to be issued in advance or arrears<br>Arrears (within 5 days after invoice)<br><br>(ii) state to whom to be issued if addressee other than stated in Box 2<br>As per box 2<br><br>(iii) state to whom to be issued if addressee other than stated in Box 3<br>As per box 3 | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e))<br>As per invoice. |

| | | |
|---|---|---|
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e))<br>15 days | 24. Interest rate payable (Cl. 10(e))<br>LIBOR + 3 % | 25. Maximum audit period (Cl. 10(f))<br>N/A |

| | | |
|---|---|---|
| 26. Meals (state rate agreed) (Cl. 5(c)(ii))<br>N/A | 27. Accommodation (state rate agreed) (Cl. 5(c)(ii))<br>N/A | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br>N/A |

| | |
|---|---|
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>N/A | 30. War (state name of countries) (Cl. 19(e))<br>Russia, Norway, Nigeria. |
| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21)<br>Oslo | 32. Breakdown (state period) (Cl. 26(b)(v))<br>N/A |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>Norwegian law, arbitration in Oslo, Norway | 34. Numbers of additional clauses covering special provisions, if agreed<br>Two (additional clauses. 37 and 38). |
| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)<br>FSUE Arktikmorneftegazrazvedka<br>Kolskij, 1<br>183032 Murmansk, Russia<br>Tel: +78 15 255 2000 | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 28)<br>North Offshore AS (former TFDS Offshore AS and Troms Offshore Invest AS)<br>Strandveien 106, 9008 Tromsø, Norway<br>Tel: +47 77 67 99 50 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| OLEG S. MNATSAKA<br>DIRECTOR GEN | |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document ... BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancy ... and this computer generated document.

*PART II*
*"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels*

**1. Period of rendering services**     1
(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the     2

Vessel named in Box 4, as specified in ANNEX «A» (hereinafter referred to as     3
«the Vessel»), for the period as stated in Box 9 from the time the Vessel is     4
delivered to the Charterers.     5
(b) Subject to Clause 10(b), the Charterers have the option to extend the     6
Charter Period in direct continuation for the period stated in Box 10(i), but     7
such an option must be declared in accordance with Box 10(ii).     8
(c) The Charter Period shall automatically be extended for the time required to     9
complete the voyage or well (whichever is stated in Box 11 (i)) in progress,     10

such time not to exceed the period stated in Box 11(ii).     11

**2. Delivery and Redelivery**     12
(a) Delivery.— Subject to sub-clause (b) of this Clause the Vessel shall be     13
delivered by the Owners free of cargo and with clean tanks at any time     14
between the date stated in Box 5 and the date stated in Box 6 at the port or     15
place stated in Box 7 where the Vessel can safely lie always afloat.     16

~~(b) Mobilisation    (i)The Charterers shall pay a lump sum as stated in Box 12~~     ~~17~~

~~without discount by way of mobilisation charge in consideration of the~~     ~~18~~
Owners giving delivery at the port or place stated in Box 7, the parties shall sign protocol of Delivery
and Acceptance evidencing delivery. ~~The mobilisation~~     19
~~charge shall not be affected by any change in the port or place of mobilisation~~     ~~20~~
~~from that stated in Box 13.~~     ~~21~~
~~(ii) Should the Owners agree to the Vessel loading and transporting cargo~~     ~~22~~

~~and/or undertaking any other service for the Charterers en route to the port of~~     ~~23~~
~~delivery or from the port of redelivery, then all terms and conditions of this~~     ~~24~~
~~Charter Party shall apply to such loading and transporting and/or other~~     ~~25~~
~~service exactly as if performed during the Charter Period excepting only that~~     ~~26~~

~~any lump sum freight agreed in respect thereof shall be payable on shipment~~     ~~27~~

~~or commencement of the service as the case may be, the Vessel and/or goods~~     ~~28~~
~~lost or not lost.~~     ~~29~~
(c) Cancelling.— If the Vessel is not delivered by midnight local time on the     30
cancelling date stated in Box 6, the Charterers shall be entitled to cancel this     31
Service Contract. ~~However, if despite the exercise of due diligence by the~~     ~~32~~
~~Owners, the Owners will be unable to deliver the Vessel by the cancelling~~     ~~33~~

~~date, they may give notice in writing to the Charterers at any time prior to the~~     ~~34~~

~~delivery date as stated in Box 5, and shall state in such notice the date by~~     ~~35~~
~~which they will be able to deliver the Vessel. The Charterers may within 24~~     ~~36~~
~~hours of receipt of such notice give notice in writing to the Owners cancelling~~     ~~37~~

~~this Charter Party. If the Charterers do not give such notice, then the later date~~     ~~38~~
~~specified in the Owners' notice shall be substituted for the cancelling date for~~     ~~39~~
~~all the purposes of this Charter Party.~~ In the event the Charterers cancel the     40
Charter Party, it shall terminate on terms that neither party shall be liable to     41



the other for any losses incurred by reason of the non-delivery of the Vessel                                    42

or the cancellation of the Charter Party.                                                                          43
(d) *Redelivery.*— The Vessel shall be redelivered on the expiration or earlier                                    44

termination of this Charter Party free of cargo and with clean tanks at the port                                   45
or place as stated in Box 8(i) or such other port or place as may be mutually                                      46
agreed. The Parties shall sign Delivery and Acceptance Certificate from Contract.
The Charterers shall give not less than the number of days notice in                                               47

writing of their intention to redeliver the Vessel, as stated in Box 8(ii).                                        48
~~(e) Demobilisation.    The Charterers shall pay a lump sum without discount in~~                                49

~~the amount as stated in Box 16 by way of demobilisation charge which amount~~                                   50
~~shall be paid on the expiration or on earlier termination of this Charter Party.~~                              51

## 3. Condition of Vessel                                                                                          52
(a) The Owners undertake that at the date of delivery under this Charter Party                                     53

the Vessel shall be of the description and classification as specified in ANNEX                                    54
«A», attached hereto, ~~and undertake to so maintain the Vessel during the~~                                      55

~~period of service under this Charter Party~~. The Charterers undertake, that by the date

of the Vessel redelivery from Contract, the Vessel to be  redelivered with the same class

and classification certificates, in the event that class and classification certificates were
changed by the Charterers. If class and certificates were not changed., the validity periods
of these documents are the responsibility of the Owners, the Charterers shall ensure the
redelivery of the Vessel in good condition, in the same conditions and the same class as at
the time of the Vessel's delivery in Contract, except for fair wear and tear.                                      56

(b) The Owners shall before and at the date of delivery of the Vessel and                                          57
throughout the Charter Period exercise due diligence to make and maintain                                          58

the Vessel tight, staunch, strong in good order and condition and, without                                         59
prejudice to the generality of the foregoing, in every way fit to operate                                          60

effectively at all times for the services as stated
in Clause 5.                                                                                                       61

## 4. Survey                                                                                                       62
The Owners and the Charterers shall jointly appoint an independent surveyor                                        63
for the purpose of determining and agreeing in writing the condition of the                                        64
Vessel, any anchor handling and towing equipment specified in Section 5 of                                         65
ANNEX «A», and the quality and quantity of fuel, lubricants and water at the                                       66

time of delivery and redelivery hereunder.  The Owners and the Charterers                                          67
shall jointly share the time and expense of such surveys.                                                          68

## 5. Employment and Area of Operation                                                                             69
(a) The Vessel shall be employed in offshore activities which are lawful in                                        70

accordance with the law of the place of the Vessel's flag and/or registration                                      71

and of the place of operation. Such activities shall be restricted to the                                          72

service(s) as stated in Box 18, and to voyages between any good and safe port                                      73

| | |
|---|---|
| or place and any place or offshore unit where the Vessel can safely lie always | 74 |
| afloat within the Area of Operation as stated in Box 17 which shall always be | 75 |
| within Institute Warranty Limits and which shall in no circumstances be | 76 |
| exceeded without prior agreement and adjustment of the Hire and in | 77 |
| accordance with such other terms as appropriate to be agreed; provided | 78 |
| always that the Charterers do not warrant the safety of any such port or place | 79 |
| or offshore unit but shall exercise due diligence in Issuing their orders to the | 80 |
| | |
| Vessel as if the Vessel were their own property and having regard to her | 81 |
| capabilities and the nature of her employment. Unless otherwise agreed, the | 82 |
| Vessel shall not be employed as a diving platform. | 83 |
| (b) Relevant permission and licenses from responsible authorities for the | 84 |
| Vessel to enter, work in and leave the Area of Operation shall be obtained by | 85 |
| the Charterers and the Owners shall assist, if necessary, in every way | 86 |
| possible to secure such permission and licenses. | 87 |
| (c) The Vessel's Space.— The whole reach and burden and decks of the | 88 |
| Vessel shall throughout the Charter Period be at the Charterers' disposal | 89 |
| reserving proper and sufficient space for the Vessel's Master, Officers, Crew, | 90 |
| tackle, apparel, furniture, provisions and stores. The Charterers shall be | 91 |
| entitled to carry, so far as space is available and for their purposes in | 92 |
| connection with their operations: | 93 |
| (i) Persons other than crew members, other than fare paying, and for such | 94 |
| purposes to make use of the Vessel's available accommodation not | 95 |
| being used on the voyage by the Vessel's Crew. The ~~Owners~~ Charterers shall | 96 |
| provide suitable provisions and requisites for such persons for which the | 97 |
| Charterers shall pay at the rate as stated in Box 26 per meal and at the | 98 |
| rate as stated in Box 27 per day for the provision of bedding and services | 99 |
| for persons using berth accommodation.————————————————— | ~~100~~ |
| (ii)   Lawful cargo whether carried on or under deck. | 101 |
| (iii) Explosives and dangerous cargo, whether in bulk or packaged, provided | 102 |
| proper notification has been given and such cargo is marked and | 103 |
| packed in accordance with the national regulations of the Vessel and/or | 104 |
| the International Maritime Dangerous Goods Code and/or other | 105 |
| pertinent regulations. Failing such proper notification, marking or | 106 |
| packing the Charterers shall indemnify the Owners in respect of any loss, | 107 |
| damage or liability whatsoever and howsoever arising therefrom. The | 108 |
| Charterers accept responsibility for any additional expenses (including | 109 |
| reinstatement expenses) incurred by the Owners in relation to the | 110 |
| carriage of explosives and dangerous cargo. | 111 |
| (iv) Hazardous and noxious substances, subject to Clause 12(g), proper | 112 |
| notification and any pertinent regulations. | 113 |
| (d) Laying-up of Vessel.— The Charterers shall have the option of laying up the | 114 |
| Vessel at an agreed safe port or place for all or any portion of the Charter | 115 |

Period in which case the Hire hereunder shall continue to be paid but, if the                116
period of such lay-up exceeds 30 consecutive days The Charterers and Owners
shall jointly discuss further Vessel's work.                                                 117
~~against such Hire the amount which the Owners shall reasonably have saved~~                 ~~118~~
~~by way of reduction in expenses and overheads as a result of the lay-up of the~~            ~~119~~
~~Vessel.~~                                                                                    ~~120~~

### 6. Master and Crew                                                                       121
(a) (i) The Master shall carry out his duties promptly and the Vessel shall                  122
render all reasonable services within her capabilities by day and by night and              123
at such times and on such schedules as the Charterers may reasonably                        124
require without any obligations of the Charterers to pay to the Owners or the               125
Master, Officers or the Crew of the Vessel any excess or overtime payments.                 126
The Charterers shall furnish the Master with all instructions and sailing                   127
directions and the Master and Engineer shall keep full and correct logs                     128

accessible to the Charterers or their agents.                                               129
(ii) The Master shall sign cargo documents as and in the form presented, the                130
same, however, not to be Bills of Lading, but receipts which shall be non-                  131
negotiable documents and shall be marked as such. The Charterers shall                      132
indemnify the Owners against all consequences and liabilities arising from                  133
the Master, Officers or agents signing, under the direction of the Charterers,              134
those cargo documents or other documents inconsistent with this Charter                     135
Party from any irregularity in the papers supplied by the Charterers or their               136
agents.                                                                                     137
(b) The Vessel's Crew if required by Charterers will connect and disconnect                  138
electric cables, fuel, water and pneumatic hoses when placed on board the                   139
Vessel in Port as well as alongside the offshore units; will operate the                    140
machinery on board the Vessel for loading and unloading cargoes; and will                   141
hook and unhook cargo on board the Vessel when loading or discharging                       142
alongside offshore units. If the port regulations or the seamen and/or labour               143
unions do not permit the Crew of the Vessel to carry out any of this work, then             144
the Charterers shall make, at their own expense, whatever other                             145
arrangements may be necessary, always under the direction of the Master.                    146
(c) If the Charterers have reason to be dissatisfied with the conduct of the                147
Master or any Officer or member of the Crew, the Owners on receiving                        148
particulars of the complaint shall promptly investigate the matter and if the               149
complaint proves to be well founded, the Owners shall as soon as reasonably                 150
possible make appropriate changes in the appointment.                                       151
(d) The entire operation, navigation, and management of the Vessel shall be in              152
the exclusive control and command of the Owners, their Master, Officers and                 153
Crew. The Vessel will be operated and the services hereunder will be                        154
rendered as requested by the Charterers, subject always to the exclusive                    155
right of the Owners or the Master of the Vessel to determine whether operation              156
of the Vessel may be safely undertaken. In the performance of the Charter                   157
Party, the Owners are deemed to be an independent contractor, the                           158
Charterers being concerned only with the results of the services performed.                 159

### 7. Owners to Provide                                                                     160
The Owners shall provide and pay for ~~all provisions~~, wages and all other                 161
expenses of the Master, Officers and Crew; all maintenance and repair of the                162

Vessel's hull, machinery and equipment as specified in ANNEX «A»; also,                                    163
except as otherwise provided in this Charter Party, for all insurance on the                              164
Vessel, all dues and charges directly related to the Vessel's flag and/or                                  165
registration, ~~all deck, cabin and engine room stores, cordage required for~~                             166
~~ordinary ship's purposes mooring alongside in harbour,~~ and all fumigation                               167
expenses and de-ratisation certificates. The Owners' obligations under this                                168
Clause extend to cover all liabilities for consular charges appertaining to the                           169
Master, Officers and Crew, customs or import duties arising at any time during                            170
the performance of this Charter Party in relation to the personal effects of the                          171
Master, Officers and Crew, and in relation to ~~the stores, provisions~~ and other                         172
matters as aforesaid which the ~~Owners~~ Charterers are to provide and/or pay for and the                 173
~~Owners shall refund to the Charterers any sums they or their agents may have~~                           ~~174~~
~~paid or been compelled to pay in respect of such liability.~~                                            ~~175~~
(b) On delivery the Vessel shall be equipped, if appropriate, and the Charterers have accepted
~~at the Owners'~~                                                                                         176
~~expense~~ with any towing and anchor handling equipment ~~specified in Section~~                         177
~~5(b) of ANNEX «A»~~ on board. If during the Charter Period any such equipment becomes                    178
lost, damaged or unserviceable, other than as a result of the Owners'                                      179
negligence, the Charterers shall either provide, or direct the Owners to                                  180
provide, an equivalent replacement at the Charterers' expense.                                            181


**8. Charterers to Provide**    .                                                                          182
(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel,                         183
lubricants, water, dispersants, firefighting foam and transport thereof, port                             184
charges,. pilotage and boatmen and canal steersmen (whether compulsory or                                 185
not), launch hire (unless incurred in connection with the Owners' business),                              186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and                              187
charges, agencies and commissions incurred on the Charterers' business,                                   188
costs for security or other watchmen, and of quarantine (if occasioned by the                             189
nature of the cargo carried or the ports visited whist employed under this                                190
Charter Party but not otherwise).                                                                          191
(b) At all times the Charterers shall provide and pay for the loading and                                  192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of                                  193
cargo tanks, all necessary dunnage, uprights and shoring equipment for                                    194
securing deck cargo, all cordage ~~except as to be provided by the Owners,~~ all                           195
ropes, slings and Special runners (including bulk cargo discharge hoses)                                   196
actually used for loading and discharging, inert gas required for the                                      197
protection of cargo, and electrodes used for offshore works, and shall                                    198
reimburse the Owners for the actual cost of replacement of special mooring                                199
lines to offshore units, wires, nylon spring lines etc. used for offshore works,                          200
all hose connections and adaptors, and further, shall refill oxygen/acetylene                             201
bottles used for offshore works.                                                                          202
(c) The Charterers shall pay for customs duties, all permits, import duties                                203
(Including costs involved in establishing temporary or permanent importation                              204
bonds), and clearance expenses, both for the Vessel and/or equipment,                                     205
required for or arising out of this Charter Party.                                                         206


**9. Bunkers**                                                                                             207
~~Unless otherwise agreed, the~~ Vessel shall be delivered with bunkers and                                208
lubricants as on board and redelivered with sufficient bunkers to reach the                               209
next bunkering stage en route to her next port of call. ~~The Charterers upon~~                            210
~~delivery and the~~ Owners upon redelivery shall take over and pay for the                                211

| | |
|---|---|
| bunkers and lubricants on board at the prices prevailing at the times and | 212 |
| ports of delivery and redelivery. | 213 |

**10. Hire and Payments** — 214

(a) Hire,— The Charterers shall pay Hire for the Vessel at the rate stated in Box — 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered — 216
to the Charterers until the expiration or earlier termination of this Charter — 217
Party. — 218
(b) Extension Hire.— If the option to extend the Charter Period under Clause — 219
1 (b) is exercised. Hire for such extension shall, unless stated in Box 20, be — 220
mutually agreed between the Owners and the Charterers. — 221
(c) Adjustment of Hire.— The rate of hire shall be adjusted to reflect — 222
documented changes, after the date of entering into the Charter Party or the — 223
date of commencement of employment, whichever is earlier, in the Owners' — 224
costs arising from changes in the Charterers' requirements or regulations — 225
governing the Vessel and/or its Crew or this Charter Party. — 226
(d) Invoicing.— All invoices shall be issued in the contract currency stated in — 227
.Box 19 and
In respect of reimbursable expenses incurred in currencies other — 228
than the contract currency, the rate of exchange into the contract currency — 229
shall be that quoted by the Central Bank of the country of such other currency — 230
as at the date of the Owners' invoice. Invoices covering Hire and any other — 231
payments due shall be issued monthly as stated in Box 21 (i) or at the — 232
expiration or earlier termination of this Charter Party. Notwithstanding the — 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at — 234
the time of delivery.
(e) Payments. — Payments of Hire, bunker invoices and disbursements for the — 236
Charterers' account shall be received with the number of days stated in Box — 237
23 from the date of receipt of the invoice. Payment shall be made in the — 238
contract currency in full without discount to the account stated in Box 22. — 239
~~However any advances for disbursements made on behalf of and approved by~~ — ~~240~~
~~the Owners may be deducted from Hire due.~~ — ~~241~~

If payment is not received by the Owners within 15 banking days following the — 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 — 243
on the amount outstanding from and including the due date until payment is — 244
received. — 245
Where an invoice is disputed, the Charterers shall in any event pay the — 246
undisputed portion of the Invoice but shall be entitled to withhold payment of — 247
the disputed portion provided that such portion is reasonably disputed and — 248
the Charterers specify such reason. Interest will be chargeable at the rate — 249
stated in Box 24 on such disputed amounts where resolved in favour of the — 250
Owners. Should the Owners prove the validity of the disputed portion of the — 251
invoice, balance payment shall be received by the Owners within 15 banking — 252
days after the dispute is resolved. Should the Charterers' claim be valid, a — 253
corrected invoice shall be issued by the Owners. — 254
In default of payment as herein specified, the Owners may require the — 255
Charterers to make payment of the amount due within 15 banking days of — 256
receipt of notification from the Owners; failing which the Owners shall have — 257
the right to withdraw the Vessel without prejudice to any claim the Owners — 258
may have against the Charterers under this Charter Party. — 259
While payment remains due the Owners shall be entitled to suspend the — 260
performance of any and all of their obligations hereunder and shall have no — 261

responsibility whatsoever for any consequences thereof, in respect of which          262
the Charterers hereby indemnify the Owners, and Hire shall continue to               263
accrue and any extra expenses resulting from such suspension shall be for            264
the Charterers' account.                                                             265
(f) Audit.    The Charterers shall have the right to appoint an independent          266
chartered accountant to audit the Owners' books directly related to work             267
performed under this Charter Party at any time after the conclusion of the           268
Charter Party, up to the expiry of the period stated in Box 25, to determine the     269
validity of the Owners' charges hereunder. The Owners undertake to make              270
their records available for such purposes at their principal place of business       271
during normal working hours. Any discrepancies discovered in payments                272
made shall be promptly resolved by invoice or credit as appropriate,                 273

**11. Suspension of Hire**                                                           274
**(a) The Charter hire is paid during 3 years uninterruptedly.**
If as a result of any deficiency of Crew or of the Owners' stores, strike of         275
Master, Officers and Crew, breakdown of machinery, damage to hull or other           276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be      277
payable in respect of any time lost and any Hire paid in advance shall be            278
adjusted accordingly provided always however that Hire shall not cease in the        279
event of the Vessel being prevented from working as aforesaid as a result of:        280
(i)  the carriage of cargo as noted in Clause 5(c) (iii) and (iv);                   281
(ii)  quarantine or risk of quarantine unless caused by the Master, Officers or      282
Crew having communication with the shore, at any infected area not in                283
connection with the employment of the Vessel without the consent or the             284
instructions of the Charterers;                                                      285
(iii) deviation from her Charterers Party duties or exposure to abnormal risks at    286
the request of the Charterers;                                                       287
(iv) detention in consequence of being driven into port or to anchorage             288
through stress of weather or trading to shallow harbors or to river or              289
ports with bars or suffering an accident to her cargo, when the expenses            290
resulting from such detention shall be for the Charterers' account                  291
howsoever incurred;                                                                  292
(v)  detention or damage by ice;                                                     293
(vi) any act or omission of the Charterers, their servants or agents.                294
(b) Liability for Vessel not Working    The Owners' liability for any loss,          295
damage or delay sustained by the Charterers as a result of the Vessel being          296
prevented from working by any cause whatsoever shall be limited to                   297
suspension of hire.                                                                  298
(c) Maintenance and Drydocking    Notwithstanding sub-clause (a) hereof, the         299
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall         300
be cumulative, per month or pro rata for part of a month from the                    301
commencement of the Charter Period for maintenance and repairs including             302
drydocking (hereinafter referred to as "maintenance allowance").                     303
The Vessel shall be drydocked at regular intervals. The Charterers shall place       304
the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated        305
by the Owners at a later date) having facilities suitable to the Owners for the      306
purpose of such drydocking.                                                          307
During reasonable voyage time taken in transit between such port and Area            308
of Operation the Vessel shall be on hire and such time shall not be counted          309
against the accumulated maintenance allowance.                                       310

Hire shall be suspended during any time taken in maintenance repairs and                    311
drydocking in excess of the accumulated maintenance allowance.                               312
In the event of less time being taken by the Owners for repairs and drydocking              313
or, alternatively, the Charterers not making the Vessel available for all or part           314
of this time, the Charterers shall, upon expiration or earlier termination of the           315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in             316
addition to Hire otherwise due under this Charter Party in respect of all such              317
time not so taken or made available.                                                        318
Upon commencement of the Charter Period, the Owners agree to furnish the                   319
Charterers with the Owners' proposed drydocking schedule and the                           320
Charterers agree to make every reasonable effort to assist the Owners in                   321
adhering to such predetermined drydocking schedule for the Vessel                          322

**12. Liabilities and Indemnities**                                                         323
(a) Owners.— Notwithstanding anything else contained in this Charter Party                 324
excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall         325
not be responsible for loss of or damage to the property of the Owners or                  326
their contractors and sub-contractors, including the Vessel, or for personal               327
injury or death of the employees of the Owners or of their contractors and                 328
sub-contractors, arising out of or in any way connected with the performance               329
of this Charter Party, even if such loss, damage, injury or death is caused                330
wholly or partially by the act, neglect, or default of the Charterers, their               331
employees, contractors or sub-contractors, and even if such loss, damage,                  332
injury or death is caused wholly or partially by unseaworthiness of any vessel;            333
and the Owners shall indemnify, protect, defend and hold harmless the                      334
Charterers from any and against all claims, costs, expenses, actions,                      335
proceedings, suits, demands and liabilities whatsoever arising out of or in                336
connection with such loss, damage, personal injury or death.                               337
(b) Charterers.— Notwithstanding anything else contained in this Charter                   338
Party excepting Clause 21, the Owners shall not be responsible for loss of,                339
damage to, or any liability arising out of anything towed by the Vessel, any               340
cargo laden upon or carried by the Vessel or her tow, the property of the                  341
Charterers or of their contractors and sub-contractors, including their                    342
offshore units, or for personal injury or death of the employees of the                   343
Charterers or of their contractors and sub-contractors (other than the Owners              344
and their contractors and sub-contractors) or of anyone on board anything                  345
towed by the Vessel, arising out of or in any way connected with the                       346
performance of this Charter Party, even if such loss, damage, liability, injury            347
or death is caused wholly or partially by the act, neglect or default of the               348
Owners, their employees, contractors or sub-contractors, and even if such                  349
loss, damage, liability, injury or death is caused wholly or partially by the              350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect,                351
defend and hold harmless the Owners from any and against all claims, costs,                352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever                 353
arising out of or in connection with such loss, damage, liability, personal                354
injury or death.                                                                           355
(c) Consequential Damages.— Neither party shall be liable to the other for, and            356
each party hereby agrees to protect, defend and indemnify the other against,               357
any consequential damages whatsoever arising out of or in connection with                  358
the performance or non-performance of this Charter Party, including, but not               359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of        360
insurance.                                                                                 361

(d) Limitations.— Nothing contained in this Charter Party shall be construed or                362
held to deprive the Owners or the Charterers, as against any person or party,                  363
including as against each other, of any right to claim limitation of liability                 364
provided by any applicable law, statute or convention, save that nothing in                    365
this Charter Party shall create any right to limit liability. Where the Owners or              366
the Charterers may seek an indemnity under the provisions of this Charter                       367
Party or against each other in respect of a claim brought by a third party, the                368
Owners or the Charterers shall seek to limit their liability against such third                369
party.                                                                                          370
(e) Himalaya Clause.— (i) All exceptions, exemptions, defenses, immunities,                     371
limitations of liability, indemnities, privileges and conditions granted or                    372
provided by this Charter Party or by any applicable statute, rule or regulation                373
for the benefit of the Charterers shall also apply to and be for the benefit of the            374
Charterers' parent, affiliated, related and subsidiary companies; the                          375
Charterers' contractors, sub-contractors, clients, joint ventures and joint                    376
interest owners (always with respect to the job or project on which the Vessel                 377
is employed); their respective employees and their respective underwriters,                    378
(ii) All exceptions, exemptions, defenses, immunities, limitations of liability,               379
indemnities, privileges and conditions granted or provided by this Charter                     380
Party or by any applicable statute, rule or regulation for the benefit of the                  381
Owners shall also apply to and be for the benefit of the Owners' parent,                        382
affiliated, related and subsidiary companies, the Owners' sub-contractors,                      383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its             384
demise Charterer(s), their respective employees and their respective                            385
underwriters.                                                                                   386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or                    387
trustee of and for the benefit of all such persons and parties set forth above,                388
but only for the limited purpose of contracting for the extension of such                       389
benefits to such persons and parties.                                                          390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but              391
regardless of whether this option is exercised the other provisions of Clause 12               392
shall apply and shall be paramount).                                                           393
In order to avoid disputes regarding liability for personal injury or death of                 394
employees or for loss of or damage to property, the Owners and the                             395
Charterers have entered into, or by this Charter Party agree to enter into, an                 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form                               397
substantially similar to that specified in ANNEX "C") between the Owners, the                  398
Charterers and the various contractors and sub-contractors of the Charterers.                  399
(g) Hazardous and Noxious Substances.— Notwithstanding any other                               400
provision of this Charter Party to the contrary, the Charterers shall always be                401
responsible for any losses, damages or liabilities suffered by the Owners,                      402
their employees, contractors or sub-contractors, by the Charterers, or by                       403
third parties, with respect to the Vessel or other property, personal injury or                404
death, pollution or otherwise, which losses, damages or liabilities are caused,                405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and             406
noxious substances in whatever form as ordered by the Charterers, and the                      407
Charterers shall defend, indemnify the Owners and hold the Owners harmless                     408
for any expense, loss or liability whatsoever or howsoever arising with                         409
respect to the carriage of hazardous or noxious substances.                                    410

**13. Pollution**                                                                               411
(a) Except as otherwise provided for in Clause 15(c)(iii), the ~~Owners~~ Charterers shall be   412
liable for, and agree to indemnify, defend and hold harmless the ~~Charterers~~ Owners          413

against, all claims, costs, expenses, actions, proceedings, suits, demands                414
and liabilities whatsoever arising out of actual or potential pollution damage           415
and the cost of cleanup or control thereof arising from acts or omissions of             416
the Owners or their personnel which cause or allow discharge, spills or leaks            417
from the Vessel, except as may emanate from cargo thereon or therein.                    418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold           419
harmless the Owners from all claims, costs, expenses, actions, proceedings,              420
suits, demands, liabilities, loss or damage whatsoever arising out of or                 421
resulting from any other actual or potential pollution damage, even where                422
caused wholly or partially by the act, neglect or default of the Owners, their           423
employees, contractors or sub-contractors or by the unseaworthiness of the               424
Vessel.                                                                                  425

**14. Insurance**                                                                        426
(a)(i) The ~~Owners~~ Charterers shall procure and maintain in effect for the duration of this    427
Charter Party, with reputable insurers, the insurances with total insurance value of USD 5 mill
with the insurance set forth in ANNEX "B"                                                428
Policy limits shall not be less than those indicated. Reasonable deductibles             429
are acceptable and shall be for the account of the ~~Owners~~ Charterers.                430
(ii) The ~~Charterers~~ Owners shall upon request be named as co-insured together with the Charterers
~~The Owners~~                                                                           431
~~shall upon request cause insurers to waive subrogation rights against the~~            432
~~Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or~~                  433
~~waivers of subrogation shall be given only insofar as these relate to liabilities~~    434
~~which are properly the responsibility of the Owners under the terms of this~~          435
~~Charter Party.~~                                                                       436
(b) The ~~Owners~~ Charterers shall upon request furnish the ~~Charterers~~ Owners with certificates of    437
insurance which provide sufficient information to verify that the ~~Owners~~ Charterers have    438
complied with the insurance requirements of this Charter Party.                          439
(c) If the ~~Owners~~ Charterers fail to comply with the aforesaid insurance requirements, the    440
~~Charterers~~ Owners may, without prejudice to any other rights or remedies under this  441
Charter Party, purchase similar coverage and invoice an amount of the insurance costs as additional hire
~~deduct the cost thereof from~~                                                         442
~~any payment due to the Owners~~ under this Charter Party.                              443

**15. Saving of Life and Salvage**                                                       444
(a) The Vessel shall be permitted to deviate for the purpose of saving life at           445
sea without prior approval of or notice to the Charterers and without loss of            446
Hire provided however that notice of such deviation is given as soon as                  447
possible.                                                                                448
(b) Subject to the Charterers' consent, which shall not be unreasonably                  449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it            450
being understood that the Vessel shall be off hire from the time she leaves              451
port or commences to deviate and she shall remain off-hire until she is again            452
in every way ready to resume the Charterers' service at a position which is not          453
less favorable to the Charterers than the position at the time of leaving port           454
or deviating for the salvage services.                                                   455
All salvage monies earned by the Vessel shall be divided equally between the             456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's            457
share, legal expenses, value of fuel and lubricants consumed. Hire of the                458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if            459
any, and any other extraordinary loss or expense sustained as a result of the            460
salvage.                                                                                 461

| | |
|---|---|
| The Charterers shall be bound by all measures taken by the Owners in order | 462 |
| to secure payment of salvage and to fix its amount. | 463 |
| (c) The Owners shall waive their right to claim any award for salvage | 464 |
| performed on property owned by or contracted to the Charterers, always | 465 |
| provided such property was the object of the operation the Vessel was | 466 |
| chartered for, and the Vessel shall remain on hire when rendering salvage | 467 |
| services to such property. This waiver is without prejudice to any right the | 468 |
| Vessel's Master, Officers and Crew may have under any title. | 469 |
| If the Owners render assistance to such property in distress on the basis of | 470 |
| "no claim for salvage", then, notwithstanding any other provisions contained | 471 |
| in this Charter Party and even in the event of neglect or default of the Owners, | 472 |
| Master, Officers or Crew: | 473 |
| (i)   The Charterers shall be responsible for and shall indemnify the Owners | 474 |
| against payments made, under any legal rights, to the Master, Officers | 475 |
| 1 and Crew In relation to such assistance. | 476 |
| (ii) The Charterers shall be responsible for and shall reimburse the Owners | 477 |
| for any loss or damage sustained by the Vessel or her equipment by | 478 |
| reason of giving such assistance and shall also pay the Owners' | 479 |
| additional expenses thereby incurred. | 480 |
| (iii) The Charterers shall be responsible for any actual or potential spill, | 481 |
| seepage and/or emission of any pollutant howsoever caused occurring | 482 |
| with the offshore site and any pollution resulting therefrom, | 483 |
| wheresoever It may occur and Including but not limited to the cost of | 484 |
| such measures as are reasonably necessary to prevent or mitigate | 485 |
| pollution damage, and the Charterers shall indemnify the Owners | 486 |
| against any liability, cost or expense arising by reason of such actual or | 487 |
| potential spill, seepage and/or emission. | 488 |
| (iv)  The Vessel shall not be off-hire as a consequence of giving such | 489 |
| assistance, or effecting repairs under sub-paragraph (ii) of this sub- | 490 |
| clause, and time taken for such repairs shall not count against time | 491 |
| granted under Clause 11 (c). | 492 |
| (v)   The Charterers shall indemnify the Owners against any liability, cost | 493 |
| and/or expense whatsoever in respect of any loss of life, injury, damage | 494 |
| or other loss to person or property howsoever arising from such | 495 |
| assistance. | 496 |

**16. Lien**  497

| | |
|---|---|
| ~~The Owners shall have a lien upon all cargoes for all claims against the~~ | ~~498~~ |
| ~~Charterers under this Charterer Party and the Charterers shall have a lien on the~~ | ~~499~~ |
| ~~Vessel for all monies paid in advance and not earned.~~ The Charterers will not | 500 |
| suffer, nor permit to be continued, any lien or encumbrance incurred by them | 501 |
| or their agents, which might have priority over the title and interest of the | 502 |
| Owners in the Vessel. Except as provided in Clause 12, the Charterers shall | 503 |
| indemnify and hold the Owners harmless against any lien of whatsoever | 504 |
| nature arising upon the Vessel during the Charter Period while she is under | 505 |
| the control of the Charterers, and against any claims against the Owners | 506 |
| arising out of the operation of the Vessel by the Charterers or out of any | 507 |
| neglect of the Charterers in relation to the Vessel or the operation thereof. | 508 |
| Should the Vessel be arrested by reason of claims or liens arising out of her | 509 |
| operation hereunder, unless brought about by the act or neglect of the | 510 |
| Owners, the Charterers shall at their own expense take all reasonable steps to | 511 |
| secure that within a reasonable time the Vessel is released and at their own | 512 |
| expense put up bail to secure release of the Vessel. | 513 |

**17. Assignment** | 514
(a) Charterers.— The Charterers shall have the option of subletting, assigning | 515
or loaning the Vessel to any person or company not competing with the | 516
Owners, subject to the Owners' prior approval which shall not be | 517
unreasonably withheld, upon giving notice in writing to the Owners, but the | 518
original Charterers shall always remain responsible to the Owners for due | 519
performance of the Charter Party and contractors of the person or company | 520
taking such subletting, assigning or loan shall be deemed contractors of the | 521
Charterers for all the purposes of this Charter Party. The Owners make it a | 522
condition of such consent that additional Hire shall be paid as agreed | 523
between the Charterers and the Owners having regard to the nature and | 524
period of any intended service of the Vessel. | 525
(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor | 526
handling and/or towing operations connected with equipment, other than that | 527
used by the Charterers, then a daily increment to the Hire in the amount as | 528
stated in Box 29 or pro rata shall be paid for the period between departure for | 529
such operations and return to her normal duties for the Charterers. | 530
(c) Owners.— The Owners may not assign or transfer any part of this Charter | 531
Party without the written approval of the Charterers, which approval shall not | 532
be unreasonably withheld. | 533
Approval by the Charterers of such assignment shall not relieve | 534
the Owners of their responsibility for due performance of the part of the | 535
services which is assigned. | 536

**18. Substitute Vessel** | 537
The Owners shall be entitled at any time, whether before delivery or at any | 538
other time during the Charter Period, to provide a substitute vessel, subject to | 539
the Charterers' prior approval which shall not be unreasonably withheld. | 540

**19. War** | 541
(a) Unless the consent of the Owners be first obtained, the Vessel shall not be | 542
ordered nor continue to any port or place or on any voyage nor be used on | 543
any service which will bring the Vessel within a zone which is dangerous as a | 544
result of any actual or threatened act of war, war, hostilities, warlike | 545
operations, acts of piracy or of hostility or malicious damage against this or | 546
any other vessel or its cargo by any person, body or state whatsoever, | 547
revolution, civil war, civil commotion or the operation of international law, nor | 548
be exposed in any way to any risk or penalties whatsoever consequent upon | 549
the imposition of sanctions, nor carry any goods that may in any way expose | 550
her to any risks of seizure, capture, penalties or any other interference of any | 551
kind whatsoever by the belligerent or fighting powers or parties or by any | 552
government or rulers. | 553
(b) Should the Vessel approach or be brought or ordered within such zone, or | 554
be exposed in any way to the said risks, (i) the Owners shall be entitled from | 555
time to time to insure their interest in the Vessel for such terms as they deem | 556
fit up to its open market value and also in the Hire against any of the risks | 557
likely to be involved thereby, and the Charterers shall make a refund on | 558
demand of any additional premium thereby incurred, and (ii) notwithstanding | 559
the terms of Clause 11 Hire shall be payable for all time lost including any loss | 560
owing to loss of or injury to the Master, Officers, Crew or passengers or to | 561
refusal by any of them to proceed to such zone or to be exposed to such risks. | 562
(c) In the event of additional insurance premiums being incurred or the wages | 563

of the Master and/or Officers and/or Crew and/or the cost of provisions and/      564
or stores for deck and/or engine room being increased by reason of or during      565
the existence of any of the matters mentioned in sub-clause (a) the amount of      566
any additional premium and/or increase shall be added to the Hire, and paid      567
by the Charterers on production of the Owners' account therefor, such      568
account being rendered monthly.      569
(d) The Vessel shall have liberty to comply with any orders or directions as to      570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in      571
any other way whatsoever given by the government of the nation under whose      572
flag the Vessel sails or any other government or any person (or body) acting      573
or purporting to act with the authority of such government or by any      574
committee or person having under the terms of the war risks insurance on the      575
Vessel the right to give any such orders or directions.      576
(e) In the event of the outbreak of war (whether there be a declaration of war or      577
not) ~~between any of the countries stated in Box 30~~ or in the event of the nation      578
under whose flag the Vessel sails becoming involved in war (whether there be      579
a declaration of war or not) either the Owners or the Charterers may terminate      580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the      581
Owners in accordance with PART I if it has cargo on board after discharge      582
thereof at destination or, if debarred under this Clause from reaching or      583
entering it, at a near open and safe port or place as directed by the Owners, or      584
if the Vessel has no cargo on board, at the port or place at which it then is or if      585
at sea at a near, open and safe port or place as directed by the Owners. In all      586
cases Hire shall continue to be paid and, except as aforesaid, all other      587
provisions of this Charter Party shall apply until redelivery.      588
(f) If in compliance with the provisions of this Clause anything is done or is not      589
1 done, such shall not be deemed a deviation.      590
The Charterers shall procure that all Bills of Lading (if any) issued under this      591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d)      592
and (f) of this Clause.      593

**20. Excluded Ports**      594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners'      595
written permission (a) any place where fever or epidemics are prevalent or to      596
which the Master, Officers and Crew by law are not bound to follow the Vessel;      597
(b) any ice-bound place or any place where lights, lightships, marks and      598
buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival      599
or where there is risk that ordinarily the Vessel will not be able on account of      600
ice to reach the place or to get out after having completed her operations. The      601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on      602
account of ice, the Master considers it dangerous to remain at the loading or      603
discharging place for fear of the Vessel being frozen in and/or damaged, he      604
has liberty to sail to a convenient open place and await the Charterers' fresh      605
instructions.      606
(b) Should the Vessel approach or be brought or ordered within such place,      607
or be exposed in any way to the said risks, the Owners shall be entitled from      608
time to time to insure their interests in the Vessel and/or Hire against any of      609
the risks likely to be involved thereby on such terms as they shall think fit, the      610
Charterers to make a refund to the Owners of the premium on demand.      611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost      612
including any lost owing to loss of or sickness or injury to the Master, Officers,      613
Crew or passengers or to the action of the Crew in refusing to proceed to such      614
place or to be exposed to such risks.      615

**21. *General Average and New Jason Clause***                                                                616
General Average shall be adjusted and settled in in London unless otherwise                                  617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended.                                  618
Hire shall not contribute to General Average ~~Should adjustment be made in~~                                619
~~accordance with the law and practice of the United States of America, the~~                                620
~~following provision shall apply:~~                                                                         621
~~"In the event of accident, danger, damage or disaster before or after the~~                                622
~~commencement of the voyage, resulting from any cause whatsoever, whether~~                                 623
~~due to negligence or not, for which, or for the consequence of which, the~~                                624
~~Owners are not responsible, by statute, contract or otherwise, the cargo,~~                                625
~~shippers, consignees or owners of the cargo shall contribute with the Owners~~                             626
~~in General Average to the payment of any sacrifices, loss or expenses of a~~                               627
~~General Average nature that may be made or incurred and shall pay salvage~~                                628
~~and special charges incurred in respect of the cargo.~~                                                    629
~~If a salving vessel is owned or operated by the Owners, salvage shall be paid~~                            630
~~for as fully as if the said salving vessel or vessels belonged to strangers. Such~~                        631
~~deposit as the Owners, or their agents, may deem sufficient to cover the~~                                 632
~~estimated contribution of the cargo and any salvage and special charges~~                                  633
~~thereon shall, if required, be made by the cargo, shippers, consignees or~~                                634
~~owners of the cargo to the Owners before delivery".~~                                                      635

**22. *Both-to-Blame Collision Clause***                                                                     636
If the Vessel comes into collision with another ship as a result of the                                      637
negligence of the other ship and any act, neglect or default of the Master,                                  638
mariner, pilot or the servants of the Owners in the navigation or the                                        639
management of the Vessel, the Charterers will indemnify the Owners against                                   640
all loss or liability to the other or non-carrying ship or her owners insofar as                             641
such loss or liability represent loss of or damage to, or any claim whatsoever                               642
of the owners of any goods carried under this Charter Party paid or payable by                               643
the other or non-carrying ship or her owners to the owners of the said goods                                 644
and set-off, recouped or recovered by the other or non-carrying ship or her                                  645
owners as part of their claim against the Vessel or the Owners. The foregoing                                646
provisions shall also apply where the Owners, operators or those in charge of                                647
any ship or ships or objects other than or in addition to the colliding ships or                             648
objects are at fault in respect of a collision or contact.                                                   649

**23. Structural Alterations and Additional Equipment**                                                      650
The Charterers shall have the option of, at their expense, making structural                                 651
alterations to the Vessel or Installing additional equipment with the written                                652
consent of the Owners which shall not be unreasonably withheld but unless                                    653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers'                              654
expense, to her original condition. The Vessel is to remain on hire during any                               655
period of these alterations or reinstatement. The Charterers, unless otherwise                               656
agreed, shall be responsible for repair and maintenance of any such                                          657
alteration or additional equipment.                                                                          658

**24. Health and Safety**                                                                                    659
~~The Owners~~ The Charterers shall comply with and adhere to all applicable international,                   660
national and local regulations pertaining to health and safety, and such                                     661
Owners' ~~Charterers'~~ Instructions as may be appended hereto.                                              662

**25. Taxes**                                                                                                663

Each party shall pay taxes due on its own profit, income and personnel. The
Charterers shall pay all other taxes and dues arising out of the operation or
use of the Vessel during the Charter Period.
In the event of change in the Area of Operation or change in local regulation
and/or Interpretation thereof, resulting in an unavoidable and documented
change of the Owners' tax liability after the date of entering into the Charter
Party or the date of commencement of employment, whichever is the earlier,
Hire shall be adjusted accordingly.

**26. Early Termination**
(a) For Charterers' Convenience. — The Charterers may terminate this Charter
Party at any time by giving the Owners written notice as stated in Box 15 and
by paying the settlement stated in Box 14 and the demobilisation charge
stated in Box 16, as well as Hire or other payments due under the Charter
Party
(b) For Cause.— If either party becomes informed of the occurrence of any
event described in this Clause that party shall so notify the other party
promptly, in writing and in any case within 3 days after such information is
received. If the occurrence has not ceased within 3 days after such
notification has been given, this Charter Party may be terminated by either
party, without prejudice to any other rights which either party may have, under
any of the following circumstances:
(i)  Requisition.— If the government of the state of registry and/or the flag of
the Vessel, or any agency thereof, requisitions for hire or title or
otherwise takes possession of the Vessel during the Charter Period.
(ii)  Confiscation.— If any government, individual or group, whether or not
purporting to act as a government or on behalf of any government,
confiscates, requisitions, expropriates, seizes or otherwise takes
possession of the Vessel during the Charter Period.
(iii) Bankruptcy.— In the event of an order being made or resolution passed
for the winding up, dissolution, liquidation or bankrupcy of either party
(otherwise than for the purpose of reconstruction or amalgamation) or if
a receiver is appointed or if it suspends payment or ceases to carry on
business.
(iv) Loss of Vessel.— If the Vessel *is* lost, actually or constructively, or
missing, unless the Owners provide a substitute vessel pursuant to
Clause 18. In the case of termination, Hire shall cease from the date the
Vessel was lost or, In the event of a constructive total loss, from the date
of the, event giving rise to such loss. If the date of loss cannot be
ascertained or the Vessel is missing, payment of Hire shall cease from
the date the Vessel was last reported.
(v)  Breakdown.— If, at any time during the term of this Charter Party, a
*breakdown of the Owners' equipment or Vessel results in the Owners'*
being unable to perform their obligations hereunder for a period
exceeding that stated in Box 32, unless the Owners provide a substitute
vessel pursuant to Clause 18.
(vi) Force Majeure.— If a force majeure condition as defined in Clause 27
prevails for a period exceeding 15 consecutive days.
(vii) Default.— If either party is in repudiatory breach of its obligations
hereunder.
Termination as a result of any of the above mentioned causes shall *not relieve*
the Charterers of any obligation for Hire and any other payments due.

| | |
|---|---|
| | 664 |
| | 665 |
| | 666 |
| | 667 |
| | 668 |
| | 669 |
| | 670 |
| | 671 |
| | |
| | 672 |
| | 673 |
| | 674 |
| | 675 |
| | 676 |
| | 677 |
| | 678 |
| | 679 |
| | 680 |
| | 681 |
| | 682 |
| | 683 |
| | 684 |
| | 685 |
| | 686 |
| | 687 |
| | 688 |
| | 689 |
| | 690 |
| | 691 |
| | 692 |
| | 693 |
| | 694 |
| | 695 |
| | 696 |
| | 697 |
| | 698 |
| | 699 |
| | 700 |
| | 701 |
| | 702 |
| | 703 |
| | 704 |
| | 705 |
| | 706 |
| | 707 |
| | 708 |
| | 709 |
| | 710 |
| | 711 |
| | 712 |
| | 713 |
| | 714 |

**27. Force Majeure** 715
Neither the Owners nor the Charterers shall be liable for any loss, damages or 716
delayer failure In performance hereunder resulting from any force majeure 717
event. Including but not limited to acts of God, fire, action of the elements, 718
epidemics, war (declared or undeclared), warlike actions, insurrection, 719
revolution or civil strife, piracy, civil war or hostile action, strikes or 720
differences with workmen (except for disputes relating solely to the Owners' 721
or the Charterers' employees), acts of the public enemy, federal or state laws, 722
rules and regulations of any governmental authorities having or asserting 723
jurisdiction in the premises or of any other group, organization or informal 724
association (whether or not formally recognized as a government), and any 725
other cause beyond the reasonable control of either party which makes 726
continuance of operations impossible. 727

**28. Notices and Invoices** 728
Notices and invoices required to be given under this Charter Party shall be 729
given In writing to the addresses stated In Boxes 21, 35 and 36 as appropriate. 730

**29. Wreck Removal** 731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and 732
has to be removed upon request by any compulsory law or authority having 733
jurisdiction over the area where the wreck is placed, the Owners shall be 734
liable for any and all expenses in connection with the raising, removal, 735
destruction, lighting or marking of the wreck. 736

**30. Confidentiality** 737
All information or data obtained by the Owners in the performance of this 738
Charter Party is the property of the Charterers, is confidential and shall not be 739
disclosed without the prior written consent of the Charterers. The Owners 740
shall use their best efforts to ensure that the Owners, any of their 741
sub-contractors, and employees and agents thereof shall not disclose any 742
such information or data. 743

**31. Law and Arbitration** 744
\*) (a) This Charter Party shall be governed by Norway law and any dispute 745
arising out of this Charter Party shall be referred to arbitration in Oslo , one 746
arbitrator being appointed by each party, in accordance with the Norwegian Arbitration 747
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for 748
the time being in force. On the receipt by one party of the nomination in 749
writing of the other party's arbitrator, that party shall appoint their arbitrator 750
within 14 days, failling which the arbitrator already appointed shall act as sole 751
arbitrator. If two arbitrators properly appointed shall not agree they shall 752
appoint an umpire whose decision shall be final. 753
\*) (b) Should any dispute arise out of this Charter Party, the matter in dispute 754
shall be referred to three persons at New York Oslo, one to be appointed by each of 755
the parties hereto, and the third by the two so chosen; their decision or that of 756
any two of them shall be final, and for purpose of enforcing any award, this 757
agreement may be made a rule of the Court. The arbitrators shall be members 758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings 759
shall be conducted in accordance with the rules of the Society. 760
\*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration 761
at the place stated in Box 33 subject to the law and procedures applicable 762
there. 763
(d) If Box 33 In PART I is not filled in, sub-clause (a) of this Clause shall apply. 764
\*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33 765

**32. Entire Agreement** 766
This is the entire agreement of the parties, which supersedes all previous 767

| written or oral understandings and which may not be modified except by a | 768 |
| written amendment signed by both parties. | 769 |

| **33. Serverability Clause** | 770 |
| If any portion of this Charter Party is held to be invalid or unenforceable for | 771 |
| any reason by a court or governmental authority of competent jurisdiction, | 772 |
| then such portion will be deemed to be stricken and the remainder of this | 773 |
| Charter Party shall continue in full force and effect. | 774 |

| **34. Demise** | 775 |
| Nothing herein contained shall be construed as creating a demise of the | 776 |
| Vessel to the Charterers. | 777 |

| **35. Definitions** | 778 |
| "Well" is defined for the purposes of this Charter Party as the time required to | 779 |
| *drill, test, complete and/or abandon a single borehole including any* | 780 |
| *sidetrack thereof.* | 781 |
| "Offshore unit" is defined for the purposes of this Charter Party as any vessel, | 782 |
| offshore installation, structure and/or mobile unit used in offshore | 783 |
| exploration, construction, pipe laying or repair, exploration or production. | 784 |
| "Offshore site" is defined for the purposes of this Charter Party as the area | 785 |
| within three nautical miles of an "offshore unit" from or to which the Owners | 786 |
| are requested to take their Vessel by the Charterers. | 787 |
| "Employees" is defined for the purposes of this Charter Party as employees, | 788 |
| directors, officers, servants, agents or invitees. | 789 |

| **36. Headings** | 790 |
| *The headings of this Service Contract are for identification only and shall not be* | 791 |
| deemed to be part of the Charter Party or be taken into consideration in the interpretation | 792 |
| or construction of this Charter Party. | 793 |

The Owners:                                    The Charterers:

_____                        _____

Oleg S. Mnatsukanyan                                 Svein Hoel

Director General                                  Managing Director

FSUE Arktikmorneftegazrazvedka                      North Offshore  AS

### ADDITIONAL CLAUSES TO SUPPLYTIME 89 DATED ........ MAY 2007
### "ALDOMA"

**37.    Russian crew**

The Owners may require that the Charterers employ Russian crew as provided by the Owners, provided the Owners provide crew with suitable experience and with necessary qualification to comply with any sub charter or other contractual commitment for the Vessel. The crew shall be employed on 4 months on 4 months off basis and Charterers *shall pay the crew's replacement costs.*

**38.    Bank Guarantee**

Against cancellation of the security provided for the Charterers' obligations under the previous charter agreement between the parties for the Aldoma, the Charterers will provide the Owners with a bank guarantee in Owners' favour in an amount of USD 500,000 as security for Charterers' obligations towards the Owners hereunder.

Oleg ...............
D............
FSUE Arktik..........................

Svein Hoel

Managing Director

North Offshore AS

# EXHIBIT 6
# HOEL AFFIRMATION

C4E    MC

**SpareBank 1 Nord-Norge**

Dato 25.07.2007
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

003318    4702

North Offshore AS
Postboks 6155

9291 TROMSØ

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07072500083003

## D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 7,9660000 |
| Motverdi | NOK | 1.147.104,00 |
| Våre omkostninger | NOK | 355,00 |
| Andre bankers omkostninger | NOK | 791,68 |
| Total beløp debitert | NOK | 1.148.250,68 |

| | |
|---|---:|
| Vi har debitert deres konto nr. | 4700.05.73678 |
| Valuteringsdato | 2007.07.25 |

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.no 0777

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
29 CHARTER-HIRE

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

4799

```
RESL S    DISPLAY OF SWIFTMESSAGE                          08.02.29 11:53 NG07
                                                          4729     D701534   D-03
-------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE :  103    DATE   :  25.07.2007-09:52
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS  :  ACK ProSwitch
-------------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0707250008301A                  71A OUR
23B CRED
32A 070725EUR144000,
33B EUR144000,
50K /NO7447000573678
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A //RT
    MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.NO 0777

TRAN : ____ _        KEY    : _____
```

C2E    MC

**SpareBank 1 Nord-Norge**

Dato 15.08.2007
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

004394    4702
North Offshore AS
Postboks 6155

9291 TROMSØ

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07081500058003

DEBETOPPGAVE

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,3540401 |
| Motverdi | USD | 201.481,17 |
| Våre omkostninger | USD | 9,35 |
| Andre bankers omkostninger | USD | 122,33 |
| Total beløp debitert | USD | 201.612,85 |

Vi har debitert deres konto nr.                                      4729.01.10455
Valuteringsdato                                                        2007.08.15

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.: 0899

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S     DISPLAY OF SWIFTMESSAGE                    08.02.29 11:54 NG07
                                                      4729     D701534   D-03
-----------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103    DATE   :  15.08.2007-11:30
RECEIVER :   BBRUBEBBXXX   (SWIFT)           STATUS :  ACK ProSwitch
-----------------------------------------------------------------------------
SWIFT MESSAGE                                          PAGE: 001 : 001
20  BF0708150005803A
23B CRED
32A 070817EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 0899
71A OUR

TRAN : _____ _        KEY    : _____
```

SpareBank 1 Nord-Norge

Dato 18.09.2007
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

005050    4702

North Offshore AS
Postboks 6155

9291 TROMSØ

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07091700056003

D E B E T O P P G A V E

| | | |
|---|---|---|
| pprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,3946275 |
| Motverdi | USD | 207.520,57 |
| Våre omkostninger | USD | 9,73 |
| Andre bankers omkostninger | USD | 124,93 |
| Total beløp debitert | USD | 207.655,23 |

| | |
|---|---|
| Vi har debitert deres konto nr. | 4729.01.10455 |
| Valuteringsdato | 2007.09.17 |

Mottaker:
Kto.40502978700001000039
Arktikmornneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv: 1029

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
29 LEIE SKIP

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S     DISPLAY OF SWIFTMESSAGE                        08.02.29 11:54 NG07
                                                          4729     D701534   D-03
------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103    DATE    :   17.09.2007-09:50
RECEIVER :   BBRUBEBBXXX   (SWIFT)          STATUS   :   ACK ProSwitch
------------------------------------------------------------------------------
SWIFT MESSAGE                                                PAGE: 001 : 001
20  BF0709170005603A
23B CRED
32A 070919EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV: 1029
71A OUR

TRAN :  ____  _         KEY    :  _____
```

O1E    MC

**SpareBank 1 Nord-Norge**

Dato 19.10.2007
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

4702

Telefon: 02244

North Offshore AS
Postboks 6155

9291 TROMSØ

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07101900265003

D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 1,4370733 |
| Motverdi | USD | 206.938,56 |
| Våre omkostninger | USD | 10,23 |
| Andre bankers omkostninger | USD | 128,71 |
| Total beløp debitert | USD | 207.077,50 |

Vi har debitert deres konto nr.                                4729.01.10455
Valuteringsdato                                                  2007.10.19

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.: 1137

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

12201

```
RESL S    DISPLAY OF SWIFTMESSAGE                      08.02.29 11:55 NG07
                                                       4729    D701534   D-03
------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103   DATE    :  19.10.2007-12:47
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS   :  ACK ProSwitch
------------------------------------------------------------------------------
SWIFT MESSAGE                                          PAGE: 001 : 001
20  BF0710190026503A
23B CRED
32A 071023EUR144000,
33B EUR144000,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1137
71A OUR

TRAN : _____ _       KEY    : _____
```

C4E   MC

**SpareBank 1 Nord-Norge**

Dato 14.11.2007
Sidenr. 1

00929987020

003943    4702

North Offshore AS
Postboks 6155

9291 TROMSØ

Organisasjonsnr. NO 952706365

Telefon: 02244

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF07111400229003

D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,4771381 |
| Motverdi | USD | 219.798,15 |
| Våre omkostninger | USD | 10,18 |
| Andre bankers omkostninger | USD | 131,86 |
| Total beløp debitert | USD | 219.940,19 |

| | |
|---|---|
| Vi har debitert deres konto nr. | 4729.01.10455 |
| Valuteringsdato | 2007.11.14 |

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.: 1255

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

6262

```
RESL S    DISPLAY OF SWIFTMESSAGE                    08.02.29 11:56 NG07
                                                     4729     D701534   D-03
------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103   DATE    :   14.11.2007-13:37
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS   :   ACK ProSwitch
------------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0711140022903A
23B CRED
32A 071116EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1255
71A OUR

TRAN : ____ _       KEY   : _____
```

O4E   MC

# SpareBank 1 Nord-Norge

Dato 13.12.2007
Sidenr. 1                              00929987020        Organisasjonsnr. NO 952706365

                              4702

North Offshore AS                                        Telefon: 02244
Postboks 6155
                                                         Sparebanken Nord-Norge
9291 TROMSØ                                               Bm - Troms
                                                         Postboks 6800
                                                         9298 TROMSØ

Vår ref. BF07121300254005

## D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 144.000,00 |
| Overført beløp | EUR | 144.000,00 |
| Kurs | | 1,4781571 |
| Motverdi | USD | 212.854,62 |
| Våre omkostninger | USD | 10,17 |
| Andre bankers omkostninger | USD | 58,92 |
| Total beløp debitert | USD | 212.923,71 |

Vi har debitert deres konto nr.                                        4729.01.10455
Valuteringsdato                                                        2007.12.13

Mottaker:                                        Mottakers bankforbindelse:
Kto.40502978700001000039                         MSCJRU21XXX
Arktikmorneftegazrazvedka                        Murmansk Social Commercial Bank Jsc
183032 Murmansk, Kolsky Pr.1                     12, Prospect Lenina
                                                 183032 Murmansk

Betalingen gjelder:                              Overført gjennom:
Inv.: 1370                                       Ing Belgium Sa/nv
                                                 60, Cours St Michel
                                                 1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

```
RESL S    DISPLAY OF SWIFTMESSAGE                    08.02.29 11:57 NG07
                                                     4729    D701534   D-03
-----------------------------------------------------------------------------
SENDER   :  SNOWNO22XXX   M-TYPE  :  103    DATE   :  13.12.2007-12:26
RECEIVER :  DEUTDEFFXXX   (SWIFT)          STATUS  :  ACK ProSwitch
-----------------------------------------------------------------------------
SWIFT MESSAGE                                               PAGE: 001 : 001
20  BF0712130025405A
23B CRED
32A 071217EUR144000,
33B EUR144000,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
53A BBRUBEBBXXX
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032 MURMANSK, KOLSKY PR.1
70  INV.: 1370
71A OUR

TRAN : _____ __      KEY   : _____
```

C6E    MC

# SpareBank 1 Nord-Norge

Dato 15.01.2008
Sidenr. 1                          00929987020          Organisasjonsnr. NO 952706365

     006015     4702                  Telefon: 02244
North Offshore AS
Postboks 6155                                         Sparebanken Nord-Norge
                                                      Bm - Troms
9291 TROMSØ                                           Postboks 6800
                                                      9298 TROMSØ

Vår ref. BF08011500104003

## D E B E T O P P G A V E

| | | |
|---|---|---:|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | | 1,4960149 |
| Motverdi | USD | 222.607,02 |
| Våre omkostninger | USD | 10,45 |
| Andre bankers omkostninger | USD | 133,83 |
| Total beløp debitert | USD | 222.751,30 |

Vi har debitert deres konto nr.                                    4729.01.10455
Valuteringsdato                                                    2008.01.15

Mottaker:                                     Mottakers bankforbindelse:
Kto.40502978700001000039                      MSCJRU21XXX
Arktikmorneftegazrazvedka                     Murmansk Social Commercial Bank Jsc
183032, Murmansk, Kolsky Av. 1                12, Prospect Lenina
Russia
                                              183032 Murmansk

Betalingen gjelder:                           Overført gjennom:
Inv.: 1464                                    Ing Belgium Sa/nv
                                              60, Cours St Michel
                                              1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

     DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

9403

```
RESL S    DISPLAY OF SWIFTMESSAGE                          08.02.29 11:57 NG07
                                                           4729     D701534   D-03
-------------------------------------------------------------------------------
SENDER   :   SNOWNO22XXX   M-TYPE  :  103   DATE    :  15.01.2008-12:03
RECEIVER :   BBRUBEBBXXX   (SWIFT)         STATUS  :  ACK ProSwitch
-------------------------------------------------------------------------------
SWIFT MESSAGE                                              PAGE: 001 : 001
20  BF0801150010403A
23B CRED
32A 080117EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
57A MSCJRU21XXX                                         .
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 1464
71A OUR

TRAN : ____ _        KEY   : _____
```

O4E    MC

**SpareBank 1 Nord-Norge**

Dato 15.02.2008
Sidenr. 1

00929987020

Organisasjonsnr. NO 952706365

4702

Telefon: 02244

North Offshore AS
Postboks 6155

9291 TROMSØ

Sparebanken Nord-Norge
Bm - Troms
Postboks 6800
9298 TROMSØ

Vår ref. BF08021500182003

D E B E T O P P G A V E

| | | |
|---|---|---|
| Opprinnelig/oppdragsbeløp | EUR | 148.800,00 |
| Overført beløp | EUR | 148.800,00 |
| Kurs | . | 1,4744227 |
| Motverdi | USD | 219.394,10 |
| Våre omkostninger | USD | 10,16 |
| Andre bankers omkostninger | USD | 161,07 |
| Total beløp debitert | USD | 219.565,33 |

Vi har debitert deres konto nr.                                                    4729.01.10455
Valuteringsdato                                                                          2008.02.15

Mottaker:
Kto.40502978700001000039
Arktikmorneftegazrazvedka
183032, Murmansk, Kolsky Av. 1
Russia

Mottakers bankforbindelse:
MSCJRU21XXX
Murmansk Social Commercial Bank Jsc
12, Prospect Lenina

183032 Murmansk

Betalingen gjelder:
Inv.: 0072

Overført gjennom:
Ing Belgium Sa/nv
60, Cours St Michel
1040 Brussels

INFORMASJON TIL VALUTAREGISTER I TOLL OG AVGIFTSDIREKTORATET
26 LEIE SKIP I UTENRIKSFART

FRA 1/1-2007 ER DET OBLIGATORISK MED IBAN OG BIC PÅ BETALINGER I EURO TIL
MOTTAKERE I EU/EØS-LAND. BETALINGER UTEN GYLDIG IBAN OG BIC VIL BLI AVVIST.

DENNE BEKREFTELSEN ER GYLDIG UTEN SIGNATUR

Vennlig hilsen

10567

```
RESL S    DISPLAY OF SWIFTMESSAGE              08.02.29 11:58 NG07
                                               4729    D701534   D-03
---------------------------------------------------------------------------
SENDER  :  SNOWNO22XXX  M-TYPE : 103   DATE   :  15.02.2008-12:21
RECEIVER :  BBRUBEBBXXX  (SWIFT)       STATUS :  ACK ProSwitch
---------------------------------------------------------------------------
SWIFT MESSAGE                                          PAGE: 001 : 001
20  BF0802150018203A               71A OUR
23B CRED
32A 080219EUR148800,
33B EUR148800,
50K /NO6247290110455
    NORTH OFFSHORE AS
    POSTBOKS 6155
    9291 TROMSO
56A DNBANOKKXXX
57A MSCJRU21XXX
59  /40502978700001000039
    ARKTIKMORNEFTEGAZRAZVEDKA
    183032, MURMANSK, KOLSKY AV. 1
    RUSSIA
70  INV.: 0072

TRAN : _____ _       KEY    : _____
```

# EXHIBIT 7
# HOEL AFFIRMATION

**FREE TRANSLATION – BOTTOM OF WIRE PAYMENT STATEMENTS**

Information to the foreign currency register in the Norwegian Customs Department confirming that the funds transfer is charter-hire.

From 1/1-2007 it is mandatory with IBAN and BIC on transfers of EURO to receivers within the area of the European Union.  Transfers without IBAN and BIC will be rejected.

This confirmation is valid without a signature.